UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re

SKAT TAX REFUND SCHEME LITIGATION

This paper applies to: 18-cv-5053 (LAK).

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18-md-2865 (LAK)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/23/2020

## MEMORANDUM OPINION

Appearances:

> William R. Maguire
> Marc A. Weinstein
> Sarah L. Cave
> John T. McGoey
> HUGHES HUBBARD & REED LLP
> *Attorneys for Plaintiff*
>
> Martin H. Kaplan
> Kari Parks
> GUSRAE KAPLAN NUSBAUM PLLC
> *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

   Danish companies are required by law to withhold on account of anticipated Danish

tax liability a percentage of dividends distributed to shareholders.  The withholding tax may be

refunded to some U.S. shareholders in certain circumstances under a double taxation treaty.  This

is one of more than a hundred cases in which the Kingdom of Denmark claims that the defendants

defrauded it of by submitting tax refund claims in which they falsely claimed to own stocks in

Danish companies that had paid dividends net of withholding tax.  In fact, the complaints allege, the

defendants did not own those stocks and had no taxes withheld from any dividends.  Nevertheless,

the defendants allegedly obtained many millions of dollars in tax refunds from the Danish treasury

under these allegedly false and fraudulent pretenses.  This case is before the Court on plaintiff SKAT's motion to dismiss counterclaims filed by defendants Goldstein Law Group PC 401(K) Profit Sharing Plan (the "Goldstein Plan") and Sheldon Goldstein (collectively with the Goldstein Plan, "Goldstein") [DI-113[1]].

## *Facts[2]*

The Goldstein Plan is a Florida pension plan exempt from taxation under the Internal Revenue Code.[3]  Its sole trustee is Sheldon Goldstein.[4]  Mr. Goldstein and the Goldstein Plan allege that the Plan maintained a brokerage account with ED&F Man Capital Markets, a broker-dealer headquartered and registered in England.[5]  They allege also – though only in the following, indirect sense – that ED&F Man has stated that it traded Danish securities for the benefit of 36 pension plans, including the Goldstein Plan.[6]

A treaty between the United States and Denmark "provides for the refund of tax withheld on dividend payments to shareholders that," like the Goldstein Plan, "are U.S. pension

---

[1] All docket references are to the master docket, No. 18-md-2865 (LAK) (S.D.N.Y.).

[2] Unless otherwise noted, the following facts are taken from Goldstein's counterclaim and are presumed true.

[3] Counterclaim ¶¶ 1-2 [DI-101].

[4] *Id.* ¶ 3.

[5] *Id.* ¶¶ 6, 28.

[6] *Id.* ¶¶ 34, 46.

plans [that] are exempt from taxation."[7]  Goldstein alleges that it purchased Danish stock with the expectation that it would receive these refunds.[8]  According to Goldstein, ED&F Man filed nine applications for tax refunds on Goldstein's behalf.[9]  SKAT granted the first eight but denied the ninth.[10]  In Goldstein's telling, this was because SKAT discovered a "scheme" whereby one Sanjay Shah helped foreign pension plans file fraudulent tax refund claims.[11]  Goldstein alleges that it had nothing to do with Shah or this scheme and that SKAT's denial of its ninth claim was unlawful.[12]  Although it alleges no supporting facts, it asserts "[u]pon information and belief [that] SKAT commenced litigation against hundreds of U.S. pension plans without bothering to investigate whether" they had any connection to the alleged Shah scheme.[13]  This case allegedly is among them.

   SKAT here alleges that Goldstein fraudulently claimed tax refunds from the Danish government by misrepresenting that it owned Danish stock.[14]  It asserts claims for fraud, aiding and

---

[7]

     *In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 308 (S.D.N.Y. 2019); *see* Counterclaim ¶¶ 41, 65.

[8]

     Counterclaim ¶ 66.

[9]

     *Id.* ¶ 46.

[10]

     *Id.* ¶¶ 53-55.

[11]

     *Id.* ¶¶ 54-55.

[12]

     *Id.* ¶¶ 55, 61-62.

[13]

     *Id.* ¶ 70.  Put differently, Goldstein alleges that "SKAT decided that the existence of one allegedly-fraudulent refund scheme must mean that no U.S. pension plan rightfully owned shares or received dividends from Danish companies." *Id.* ¶ 69.

[14]

     *Id.* ¶¶ 16-17.

abetting fraud, payment by mistake, unjust enrichment, money had and received, and negligent misrepresentation.[15] Not long ago, I denied motions by Goldstein and similarly situated defendants to dismiss SKAT's complaints.[16]

As noted, this is not the only proceeding involving Goldstein and SKAT. Goldstein alleges that "SKAT is pursuing multiple actions and investigations against [Goldstein] arising out of the same transactions in Denmark and, upon information and belief, other jurisdictions."[17] The one such foreign proceeding that Goldstein specifies is a Danish administrative appeal involving SKAT and the Goldstein Plan. Goldstein offers little detail about that proceeding. But this Court already has described it on a general level. In a prior opinion, I noted that many of the defendants in this multidistrict litigation took administrative appeals from SKAT's determination letters finding that they wrongfully claimed ownership of Danish stock and, hence, were not entitled to refunds predicated on their asserted share ownership.[18] I found that "the primary if not only issue [in the Danish appeals] is whether the defendants [such as Goldstein] owned . . . shares [of Danish stock], or owned and lent them to a third party."[19]

Goldstein alleges that this lawsuit and the Goldstein Plan's Danish tax appeal are

---

[15]

      Declaration of Sarah L. Cave, Ex. 3 ¶¶ 50-80 [DI-114]. SKAT's complaint against Goldstein made no mention of Mr. Shah.

[16]

      *In re SKAT*, 356 F. Supp. 3d at 306.

[17]

      Counterclaim ¶ 84.

[18]

      *In re SKAT*, 356 F. Supp. 3d at 318.

[19]

      *Id.* at 319.

parallel proceedings.  In its view, "SKAT is attempting [in both proceedings] to collect [the] eight refunds" it issued to Goldstein.[20]  Goldstein alleges also that both matters involve "the same allegations,"[21] "the exact same conduct,"[22] and even "the same causes of action."[23]

Based on the foregoing allegations, Goldstein filed a counterclaim asserting four claims.  Count 1 asks for a declaration that the decisions of this Court are binding on SKAT in all jurisdictions and venues in the world.[24]  Goldstein alleges that it "will suffer substantial harm" if it is forced to defend itself in cases involving "the exact same conduct"[25] and that will "give[] rise to likely conflicting outcomes."[26]

Count 2 asks for an injunction "prohibiting SKAT from taking any action that would impair or otherwise impact matters that SKAT has submitted for determination to this Court."[27]  The injuries Goldstein seeks to prevent are, as above, the cost of participating in multiple lawsuits and

---

[20]

  Counterclaim ¶ 72.

[21]

  *Id.* ¶ 74.

[22]

  *Id.* ¶ 85.

[23]

  *Id.* ¶ 86.

[24]

  *Id.* ¶ 79.

[25]

  *Id.* ¶ 85.

[26]

  *Id.* ¶ 86.

[27]

  *Id.* ¶ 91.

6

the risk of being subject to conflicting judgments.[28]

Count 3 is captioned "Recovery of Denied Claims."  Goldstein alleges only that it is entitled to recover the ninth tax refund because SKAT "improper[ly]" refused to disburse it.[29]

Count 4 rests on alleged promissory estoppel.  Goldstein claims that "for years, SKAT refunded Danish tax paid to all U.S. pension plans that submit[ted] the documentation requested by SKAT"[30] and that Goldstein purchased shares of Danish companies and submitted reclaim applications "[i]n reliance on SKAT's practice of paying all properly-documented claims."[31] Goldstein likewise refers to the U.S.-Denmark treaty that it believes makes it exempt from paying tax on dividends paid on Danish stock.[32]  After stating these points, Goldstein asserts that SKAT should be "estopped from demanding that the Goldstein Plan pay tax on the dividends."[33]  It asserts also that SKAT must disburse the ninth tax refund.[34]

---

[28]

     *Id.* ¶¶ 88-89.

[29]

     *Id.* ¶¶ 93-94.

[30]

     *Id.* ¶ 96.

[31]

     *Id.* ¶¶ 97-98.

[32]

     *Id.* ¶ 100.

[33]

     *Id.* ¶ 101.

[34]

     *Id.* ¶ 102.

7

*Discussion*

## I.    Common Law Claims

Counts 3 and 4 seek relief under common law.  SKAT is based in Denmark and the counterclaim implies that its relevant conduct took place there.  Goldstein is based in Florida and invested through ED&F Man, which is based in England.  Although none of the facts giving rise to these counterclaims has any apparent connection to New York, both parties assume that New York law applies.[35]  Therefore I apply the law of the forum – New York.[36]

### A.    "Recovery of Denied Claims"

Stating an actionable claim in federal court requires more than demanding relief.  To survive a motion to dismiss under Rule 12(b)(6), a party must "state a claim *upon which relief can be granted.*"[37]  A plaintiff's entitlement to relief depends on the existence of both material facts and a legally enforceable right – *i.e.*, a right of action.

Count 3 is captioned "recovery of denied claims."  The remedy Goldstein demands is clear: it wants SKAT to disburse the ninth tax refund.  But Goldstein has not explained why it has a right to this remedy.  Neither its counterclaim nor its opposition to this motion cites any provision

---

[35]

SKAT does so explicitly and only for the purposes of this motion.  *See* SKAT Mem. 16 n.12 (assuming New York law applies without conceding the point and reserving its right to litigate the issue at a later time).  Goldstein does so implicitly by citing to New York cases in stating a rule for promissory estoppel.  Goldstein Mem. 19-20.

[36]

*See Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 276 (2d Cir. 2013) ("[C]ourts sitting in diversity may properly rely on the forum state's law where neither party asserts that another jurisdiction's law meaningfully differs.").

[37]

FED. R. CIV. P. 12(b)(6) (emphasis added).

of law or judicial decision, in New York or elsewhere, recognizing a cause of action for "recovery of denied claims." I already have informed Goldstein, and all the parties in this MDL, that this Court "is not required, and does not propose, to do the [parties'] homework for them and scour [the] law for a provision that may or may not entitle [them] to a [favorable decision]."[38] Goldstein has stated a claim, but not one upon which relief can be granted given its present form.

Goldstein argues that its claim should survive nonetheless because, under Rule 8 of the Federal Rules of Civil Procedure, "a pleading need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"[39] But Goldstein has *not* given SKAT notice of the grounds upon which its claim rests. "A pleading that states a claim for relief *must* contain . . . a short and plain statement of the claim *showing that the pleader is entitled to relief.*"[40]

Apparently conceding its failure to identify a right of action, Goldstein argues that its claim should survive because it "expect[s]" that discovery will reveal causes of action for "unjust enrichment, money had and received, breach of contract, breach of the covenant of good faith and fair dealing, and negligence."[41] These causes of action are not asserted in the counterclaim, and even

---

[38]  *In re SKAT*, 356 F. Supp. 3d at 316.  Although Goldstein's defense of Count 3 in its opposition memorandum is difficult to understand, it appears to argue that the claim should survive because it include the phrase "as a result of the improper denial of this Reclaim Application" in estimating the damages that Goldstein believes it should recover. Goldstein Mem. 22 (quoting Counterclaim ¶ 94).  All this language does is beg the same, unanswered question of *why* the denial was "improper." It is Goldstein's duty, rather than this Court's, to propose an answer to that question.

[39]  Goldstein Br. 22 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (citing FED. R. CIV. P. 8(a))).

[40]  FED. R. CIV. P. 8(a)(2) (emphasis added).

[41]  Goldstein Mem. 23.

in its memorandum Goldstein has offered no detail about them. I decline to consider these unasserted theories of liability based on an expectation rather than allegations of fact that, if proven, would entitle Goldstein to relief.

### B.    Promissory Estoppel

Unlike "recovery of denied claims," promissory estoppel is a real theory of liability in New York. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."[42]

Goldstein alleges that SKAT for many years had a practice of paying tax refunds to all U.S. pension plans that filed properly documented claims.[43] It alleges also that it "was exempt from all income tax levied . . . [by] Denmark" under a treaty between the United States and Denmark.[44] Goldstein characterizes SKAT's practice and the U.S.-Denmark treaty as "promises" and claims it relied on them in choosing to invest in Danish stock. It asserts that SKAT therefore is estopped from demanding that Goldstein pay the withheld tax on the other eight refund claims.[45]

SKAT's alleged practice of complying with the U.S.-Denmark treaty's refund

---

[42]

Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).

[43]

Counterclaim ¶ 97.

[44]

Id. ¶ 100.

[45]

Id. ¶ 101.

requirement is not a "clear and unambiguous promise."[46]  Goldstein has pointed to no authority, and

I am aware of none, holding that a government agency's pattern of engaging in legally required

behavior on the basis of taxpayer submissions that later turn out to be fraudulent constitutes a

"promise" for the purposes of a promissory estoppel claim.


II.    *Claims for Equitable Relief*

   A.    *Injunctive Relief*

         Goldstein seeks preliminary and permanent injunctions "prohibiting SKAT from

taking any action that would impair or otherwise impact matters that SKAT has submitted for

determination to this Court."[47]  The parties both describe this as an anti-suit injunction, or one that

prevents a party from commencing or pursuing parallel litigation in foreign jurisdictions.[48]

---

46

      Elsewhere, Goldstein refers offhandedly to "SKAT's promise to refund dividend taxes to U.S. pensions" in describing the terms of the U.S.-Denmark treaty. *Id.* ¶ 66.  According to SKAT's memorandum, this language qualifies as an allegation that SKAT made a clear and unambiguous promise to Goldstein. *See* Goldstein Mem. 20.  Unlike "Beetlejuice," saying the word "promise" is not enough to make the desired thing appear.  It is impossible to infer from the counterclaim that SKAT clearly and unambiguously promised Goldstein that it would refund any taxes to which it was entitled.

47

      Counterclaim ¶ 91.

48

      *See id.* ¶¶ 87-91 (explaining that the need for the injunction arises from the SKAT's "pursui[t of] its claims in multiple jurisdictions," the likelihood of "conflicting outcomes," and the risk of "substantial harm if SKAT pursues these foreign actions while prosecuting its claims before this Court").  One perhaps could characterize this injunction as an anti-enforcement injunction to the limited extent that, in addition to enjoining foreign suits, it might enjoin SKAT from enforcing any judgment it receives in another court (in spite of, one would think, the anti-suit component). *Cf. Chevron Corp. v. Naranjo*, 667 F.3d 232, 243 (2d Cir. 2012) (distinguishing between anti-suit and anti-enforcement injunctions).  As both parties characterize this as an anti-suit injunction and neither argues that it would have an anti-enforcement component, I do not consider this possibility here.  In any event, as explained below, an injunction of any character is inappropriate for several reasons.

To begin, the injunction claim is too vague. A party seeking a preliminary injunction must demonstrate "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."[49] Based on Goldstein's pleading, the Court is uncertain exactly what Goldstein wants to enjoin SKAT from doing. This lack of clarity prevents the Court from meaningfully assessing whether Goldstein has a likelihood of success on the merits or whether sufficiently serious merits questions warrant preliminary relief.

To the extent Goldstein is seeking an anti-suit injunction, it additionally must satisfy the factors laid out in the Second Circuit's *China Trade*[50] decision.[51] First, two threshold requirements must be met: "(1) the parties must be the same in both matters, and (2) resolution of the case before the enjoining court must be dispositive of the action to be enjoined."[52] A domestic judgment cannot be "dispositive" of a foreign action unless the foreign court would recognize it.[53]

---

49

> *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004).

50

> *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987).

51

> *See In re Millenium Seacarriers, Inc.*, 458 F.3d 92, 97-98 (2d Cir. 2006); *see also Software AG, Inc. v. Consist Software Solutions, Inc.*, 323 F. App'x 11, 12 ("A preliminary anti-suit injunction may be entered only if the multi-factor test set forth in [*China Trade*] and the ordinary test for a preliminary injunction are both satisfied . . . ." (citations omitted)). Courts apply this doctrine when assessing requests for preliminary and permanent anti-suit injunctions. *In re Millenium Seacarriers*, 458 F.3d at 97.

52

> *China Trade*, 837 F.2d at 36.

53

> The Second Circuit has not stated this rule explicitly, but two of its leading opinions on anti-suit injunctions presume it to be true. *See id.* at 37 (implying that the resolution of the

12

If these threshold requirements are met, courts then look to five additional factors[54]: "(1) frustration

of a policy in the enjoining forum; (2) the foreign action would be vexatious; (3) a threat to the

issuing court's in rem or quasi in rem jurisdiction; (4) the proceedings in the other forum prejudice

other equitable considerations; or (5) adjudication of the same issues in separate actions would result

in delay, inconvenience, expense, inconsistency, or a race to judgment."[55]  Of these factors, the first

and third are the most important.[56]  "[P]arallel proceedings on the same in personam claim ordinarily

---

[54]    domestic dispute cannot be dispositive of the foreign dispute when "there is some question
as to whether the [foreign] courts would recognize [the domestic] judgment"); *Karaha
Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 121
(2d Cir. 2007) ("We agree with KBC that the federal judgments satisfy the *China Trade*
requirement because the Award, and the federal judgments confirming and enforcing it,
actually decided the claims raised in the Cayman Islands action.  We also conclude that the
New York Convention [requiring courts of participating nations to recognize certain foreign
judgments] permits the federal judgments to be treated as 'dispositive' of the Cayman
Islands action.").  The opposite conclusion – that a domestic judgment could be dispositive
of a foreign dispute where the foreign court would not recognize it – would make little
sense.  The *China Trade* factors help ensure that courts think twice before exercising a
remedy that risks disrupting international comity.  *See* 837 F.2d at 36 (emphasizing "due
regard to the interests of comity" in weighing the propriety of an anti-suit injunction); *LAIF
X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 200 (2d Cir. 2004) ("Principles of comity
weigh heavily in the decision to impose a foreign anti-suit injunction." (citation omitted)).
The remedy has no effect, and factors such as protecting jurisdiction or preventing
prejudice become trivial, when the foreign court will refuse to recognize the judgment.

[55]    Whether these factors are discretionary or mandatory is unclear.  *China Trade* referred to
them as "suggested." 837 F.2d at 35 (citation omitted).  And a later decision relying on
*China Trade* repeatedly referred to them as "discretionary." *Karaha Bodas*, 500 F.3d at
120 ("the discretionary *China Trade* factors); *id.* ("the discretionary factors under *China
Trade*"); *id.* at 126 ("the discretionary factors set forth in *China Trade*").  But elsewhere,
that decision stated that "courts are directed to consider" these factors. *Id.* at 119 (quoting
*Ibeto Petrochemical Industries Ltd. v. M/T Beffen*, 475 F.3d 56, 64 (2d Cir. 2007)).  And
a more recent Second Circuit decision stated that a court "must . . . examine [the] five
factors." *Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d 146, 155 (2d
Cir. 2016).  Whether by mandate or discretion, I find it proper to apply the factors here.

[55]    *China Trade*, 837 F.2d at 35.

[56]    *Karaha Bodas*, 500 F.3d at 126.

should be allowed to proceed simultaneously, at least until a judgment is reached in one which can

be pled as res judicata in the other."[57] For that reason, "an anti-foreign-suit injunction should be used

sparingly, and should be granted only with care and great restraint."[58]

The parties involved in this dispute, the Danish appeal, and the possible future

lawsuits are the same: SKAT and Goldstein.[59] And resolving SKAT's fraud claims may require a

determination of at least one apparent issue in Denmark, which is whether Goldstein owned the

shares of Danish stock it claimed in its refund applications to have owned.[60] Goldstein does not,

however, assert that Denmark's courts would recognize a judgment from this Court resolving the

ownership issue. In fact, it asserts that "Denmark[] refus[es] to recognize U.S. judgments."[61] Its

failure to argue that any foreign court would recognize a judgment of this Court forecloses an

inference that such a judgment would be "dispositive" of a foreign action.[62]

Even if the threshold requirements for an anti-suit injunction were met, the five

---

[57]

 *China Trade*, 837 F.2d at 36 (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926-27 (D.C. Cir. 1984)).

[58]

 *Id.* (citations and quotation marks omitted).

[59]

 Mr. Goldstein is not a party to the Danish tax appeal, although the Goldstein Plan is. As SKAT does not argue that this difference is in relevant to threshold requirement that the parties be the same, there is no need to reach that question.

[60]

 *In re SKAT*, 356 F. Supp. 3d at 319 (noting that this appears to be "the primary if not only issue" in Denmark).

[61]

 Goldstein Mem. 25. I express no opinion on whether this assertion is correct.

[62]

 I decline to consider whether forums other than Denmark would recognize a judgment of this Court, as Goldstein has not specified any other forum where an action is pending or may one day be pending between it and SKAT.

additional factors counsel strongly against such relief.  Goldstein has pointed to no U.S. policy that

would be frustrated by allowing an agency of Denmark to defend itself in a tax appeal in Danish

court involving Danish law.  Goldstein certainly will not be heard to argue that the tax appeal is

vexatious, because Goldstein itself is the appellant.[63]  To whatever extent Goldstein does not concede

that the third factor is met here,[64] I hold that it is not.  The Danish appeal poses no threat to this

Court's "in rem or quasi in rem jurisdiction," and there is no indication that the Danish tax court is

likely to enjoin this proceeding.[65]

On the fourth factor, Goldstein has not argued that any equitable considerations would

be prejudiced by the continuation of the tax appeal other than its desire to be free from the cost of

litigation.  That consideration is weighed appropriately under factor five, which also is of no help

to Goldstein.  While it always is true that multiple suits create inconvenience and expense, and it is

possible (though no evidence so suggests at this time) that the two suits will result in a race to

judgment, the ubiquity of these factors means that they are rarely, if ever, determinative under *China*

---

[63]

Goldstein focuses on the fact that the appeal is from SKAT's determination letters finding
that Goldstein was required to return the eight refunds.  These letters are not a parallel
foreign action that Goldstein is seeking to enjoin.  And in any case, "parallel proceedings
are ordinarily tolerable." *China Trade*, 837 F.2d at 36.

[64]

*See* Goldstein Mem. 25 ("[Goldstein's] request for injunctive relief satisfies the five-factor
test, as well.  Every factor but the third is present here . . . .").  Despite this unambiguous
concession, the following page of Goldstein's brief argues that the third factor is not present
here.  *See id.* at 26.  Goldstein's arguments on this point are unpersuasive and do not
grapple with the problems noted above.

[65]

*Cf. China Trade*, 837 F.3d at 36-37 (holding the third factor was not met when there was
no threat that a foreign court would enjoin the federal district court or prevent it from
exercising its jurisdiction).

*Trade*.[66]  Goldstein has failed to demonstrate that they create any special urgency here.


## B.      *Declaratory Judgment*

Count 1 asks for a declaratory judgment stating that "this Court's decisions in this action arising out of the transactions set forth in the Complaint are binding on SKAT in all jurisdictions and venues [in the world]."[67]  This claim fails for at least three reasons.

*First*, Goldstein lacks Article III standing.  Federal courts "must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions, particularly where a ruling is sought that would reach far beyond the particular case."[68]  For this reason, a dispute giving rise to a request for declaratory relief "must not be nebulous or contingent[,] but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and that some useful purpose to be achieved in deciding them."[69]  The injury Goldstein wishes to avoid is contingent upon foreign courts, primarily in actions

---

[66]      *See id.* at 36 (finding that because "vexatiousness" and an expensive "race to judgment" "are likely to be present whenever parallel actions are proceeding concurrently, an anti-suit injunction grounded on these additional factors alone would tend to undermine the policy that allows parallel proceedings to continue and disfavors anti-suit injunctions"); *cf, e.g.*, *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.").

[67]      Counterclaim ¶ 79.  The heading of Count 1 – though none of the allegations that follow – asks also that the declaration "estop" SKAT from pursuing relief in other courts.  This would not be a declaration of rights, but an ant-suit injunction no different than that demanded under Count 2.  I reject it for the reasons explained above.

[68]      *Jenkins v. United States*, 386 F.3d 415, 417-18 (2d Cir. 2004) (brackets and ellipsis omitted) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 243 (1952)).

[69]      *Id.* (quoting *Wycoff*, 344 U.S. at 244).

not yet filed, issuing judgments that conflict with judgments that this Court may or may not issue.[70] This is far to speculative to warrant declaratory relief.  Much for that reason, Goldstein has not demonstrated that a declaration would serve any useful purpose at this time.[71]

   *Second,* Goldstein has not asserted a right of action entitling it to declaratory relief. The Declaratory Judgment Act ("DJA")[72] is "procedural only" and "gives a district court the discretion to 'declare the legal rights and other legal relations of any interested party seeking such a declaration.'"[73]  But this "discretion does not extend to the declaration of rights that do not exist under law."[74]  This is because a declaratory judgment is a *remedy*, not a right, and the DJA "does not create an independent cause of action."[75]  A district court does not have the discretion to issue a

---

[70]

   Counterclaim ¶ 79.

[71]

   SKAT states in a heading in its opposition memorandum that Goldstein lacks standing to pursue its declaratory *and* injunctive relief claims, but the entire analysis that follows focuses on standing to seek declaratory judgments. *See* SKAT Mem. 8-11. The Second Circuit has not explained how to assess standing where a party seeks an anti-suit injunction, although it is at least possible to infer that *China Trade*'s two threshold factors to some degree overlap with the standing inquiry.  Whatever the case, I decline to reach this issue because there are many other reasons for dismissing the anti-suit injunction claim.

[72]

   28 U.S.C. §§ 2201-2202.

[73]

   *Chevron,* 667 F.3d at 244 (quoting 28 U.S.C. § 2201(a)).

[74]

   *Id.*

[75]

   *Id.* (citation omitted); *see also Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) ("Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.")).

declaratory judgment unless it "relies on a valid legal predicate," *i.e.*, a right of action.[76]

Goldstein has not identified – or even attempted to identify – a "valid legal predicate" for its claim.[77] Even if it had, none of the counterclaims could serve as a *valid* predicate, as none of them have survived the motion to dismiss.[78]

*Third*, even if I had the authority to exercise jurisdiction over a claim for declaratory relief, I would exercise my "broad discretion" not to do so.[79] In weighing whether to order declaratory relief, courts must ask "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and

---

[76]

*Chevron*, 667 F.3d at 244.

[77]

Goldstein does not purport to rely on its similar claim for injunctive relief. However, it implies – though it does not argue – that Counts 3 and 4 perhaps create the needed predicate. *See* Goldstein Mem. 15 (arguing Count 1 should move forward "regardless of whether [Counts 3 and 4] survive," but not otherwise asserting that these claims are predicates). It would distort the DJA to declare under the facts of this case that SKAT is bound by this Court's rulings in all jurisdictions worldwide as a remedy for promissory estoppel or "recovery of denied claims." But as Goldstein has not advanced this theory, I decline to consider it.

[78]

The Second Circuit's *Chevron* opinion does not explain whether a "valid legal predicate" must be asserted in the complaint of the party seeking a declaratory judgment. At least one court in this circuit has suggested that it must be. *See Spiteri v. Russo*, No. 12-cv-2780 (MKB) (RLM), 2013 WL 4806960, at *19 n.30 (E.D.N.Y. Sept. 7, 2013) ("A plaintiff cannot maintain a claim for a declaratory judgment where the underlying substantive claim has been dismissed . . . ."), *aff'd sub nom. Spiteri v. Camacho*, 622 F. App'x 9 (2d Cir. 2015). Because Goldstein's claim fails for several other reasons, and Goldstein has not argued that either a hypothetical cause of action not stated in its counterclaim or one of SKAT's fraud claims could support its claim for declaratory relief, I need not reach this issue here.

[79]

*Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).

offer relief from uncertainty."[80]  Some courts ask also "(1) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy."[81]

It is not clear how the judgment would clarify or settle any relevant legal issues. Goldstein confusingly argues that the declaration "would clarify that SKAT . . . intend[s] to abide by this Court's decisions."[82] Nothing in the counterclaim permits an inference that there is any risk whatsoever that SKAT will fail to do that.  What Goldstein really wants is a declaration that SKAT will not be able to rely on a favorable foreign judgment if it does not prevail on its fraud claims in this Court.[83]  As noted above, this problem is conjectural.  For this same reason, the declaration would not finally resolve the controversy between SKAT and Goldstein.

The other three factors all point in the same direction.  The entire purpose of the declaration is "a race to res judicata" because Goldstein would use it to preclude SKAT from trying to enforce a favorable foreign judgment.  The declaration would increase friction between the United States and Denmark by precluding a Danish agency from relying on a Danish judgment based on Danish law.  And there is a far better remedy available to Goldstein: waiting for a concrete dispute

---

[80]

    *Id.*

[81]

    *Id.* at 359-60 (endorsing these factors); *see also Chevron*, 667 F.3d at 245 (repeating and further endorsing these factors).

[82]

    Goldstein Mem. 17.

[83]

    *See id.* (asserting that the risk of SKAT's noncompliance is significant because U.S. judgments do not have preclusive effect in Denmark).

19

involving conflicting judgments and acting at that time.

<em>Conclusion</em>

Plaintiff's motion to dismiss [18-md-2865, DI-113] is granted.

SO ORDERED.

Dated:        January 23, 2020

_____

Lewis A. Kaplan<br>
United States District Judge