# EXHIBIT E

KeyCite Yellow Flag - Negative Treatment
Distinguished by VitalGo, Inc. v. Kreg Therapeutics, Inc., N.D.Ill., March 27, 2019

2009 WL 47499
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

AARP, Plaintiff,
v.
200 KELSEY ASSOCIATES, LLC,
and Michael Reich, Defendants.

No. 06 Civ. 81(SCR).
|
Jan. 8, 2009.

West KeySummary

**1**   **Federal Courts**
       👈  Intellectual property

Trademark holder's infringement and related Lanham Act violation causes of action against alleged infringer satisfied the substantial controversy requirement. Far from relying solely on alleged infringer's mere intent to infringe to demonstrate an actual controversy, trademark holder alleged that alleged infringer had taken significant steps toward realizing that intent, including seeking licenses to publish a magazine and conducting analysis of the publishing industry. While alleged infringer had not settled on a licensing partner, trademark holder was not required to wait for alleged infringer to secure that partner before filing suit. Lanham Act, § 1, 15 U.S.C.A. § 1051.

9 Cases that cite this headnote

**Attorneys and Law Firms**

Chryssa V. Valletta, John J. Dabney (of Counsel), McDermott Will & Emery LLP, New York, NY, for plaintiff.

Edmund J. Ferdinand, III, Susan M. Schlesinger (of Counsel), Grimes & Battersby, LLP, New York, NY, for defendants.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

*1  Plaintiff AARP commenced this action against defendants 200 Kelsey Associates, LLC, and its principal shareholder and managing member, Michael Reich, alleging trademark infringement and related causes of action in violation of the Lanham Act, 15 U.S.C. § 1051 et seq., and New York state law. Plaintiff seeks, inter alia, permanent injunctive relief and a declaration that its federal trademark registration is valid and has been (and will be) infringed by defendants. Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), defendants now move to dismiss the complaint for lack of jurisdiction and for failure to state a claim. The motion will be denied. [1]

**BACKGROUND**

The facts set forth below are based on the allegations of the complaint, which are assumed to be true for purposes of resolving this motion to dismiss.

A. *The Dispute*
Plaintiff AARP is a non-profit organization dedicated to addressing the needs, and promoting the interests, of persons age 50 and older. (Compl.¶ 8.) [2] With a membership exceeding 35 million, it is the largest membership organization in the United States for persons in that age category. (*Id.* ¶¶ 8–9.) In 1958, AARP launched its flagship publication, Modern Maturity magazine. (P. Mem.1.) In 1962, AARP obtained a federal trademark registration for the Modern Maturity mark. (*Id.* 3; *cf.* Compl. ¶ 12.) Modern Maturity was provided to AARP members for some 45 years. (Compl. ¶ 10; P. Mem. 1, 3.) During that time, AARP invested hundreds of millions of dollars in the Modern Maturity mark. (Compl.¶ 13.) While AARP changed the name of its publication to *AARP The Magazine* in 2003, it owns and uses domain names containing the Modern Maturity mark, provides

back issues of Modern Maturity on its website, and employs the Modern Maturity mark in connection with various other products and services. (*Id.* ¶¶ 13–15.)

Defendants 200 Kelsey Associates and Michael Reich seek to launch a new magazine called Modern Maturity, which is also intended for senior citizens. (*Id.* ¶ 20; P. Mem. 3.) In preparation for this launch, they have contacted potential publishers, generated written business plans concerning the design and sale of the magazine, and engaged in extensive market analysis. (Compl. ¶ 23; P. Mem. 3–4.) Defendants have also filed an intent-to-use trademark application with the United States Patent and Trademark Office ("PTO") for "Modern Maturity," a "[m]agazine published periodically in the field of mature lifestyles." (Compl.¶ 20.) This application included a sworn declaration attesting defendants' bona fide intent to use the Modern Maturity mark in commerce. (*Id* . ¶ 23.)

The PTO rejected defendants' application on the ground that the mark they sought to register was confusingly similar to AARP's registered Modern Maturity mark. (*Id.* ¶ 20.) Following this decision, defendants petitioned the Trademark Trial and Appeal Board ("TTAB") to cancel plaintiff's registration of the Modern Maturity mark, arguing that the mark has been abandoned. (*Id.* ¶ 21; D. Mem. 1.) Proceedings on that petition were suspended pending the outcome of this action. (Compl. ¶ 21; P. Mem. 12.)

### B. *Procedural History*

**\*2** On January 5, 2006, AARP brought this action, alleging trademark infringement and various related causes of action in violation of the Lanham Act and New York state law. Defendants consented to entry of a preliminary injunction enjoining defendants' use or attempted use of the Modern Maturity mark, which was duly entered on March 7, 2006. On April 20, 2006, defendants moved pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the complaint for lack of jurisdiction and for failure to state a claim.

Defendants argue that because plaintiff has not alleged that they have actually published or begun selling their Modern Maturity magazine, plaintiff can demonstrate neither the existence of a case or controversy sufficient to confer jurisdiction on this Court (D.Mem.12–13), nor the "use in commerce" of the Modern Maturity mark required to state a claim for trademark infringement and

the related causes of action alleged in the complaint. (*Id.* 2, 3–8.) Defendants further argue that, absent subject matter jurisdiction over plaintiff's trademark infringement and related claims, plaintiff's request for a declaration of the validity of its trademark registration is improper. (D.Mem.9–10.)

In opposition, plaintiff contends that it need not wait to seek relief until defendants' magazine actually hits the newsstand. Rather, it need only "allege sufficient facts, including reasonable inferences that can be drawn from those facts, which show that defendant[s] ha[ve] used the allegedly infringing mark in commerce or that such use is imminent and impending." (P. Mem.2.) Because plaintiff has alleged that defendants "are actively seeking licensees to publish a magazine called 'Modern Maturity' " and "have conducted [an] extensive analysis of the publishing industry" in preparation for the launch of such a publication (Compl.¶ 23), it argues that it has satisfied the relevant standards and that defendants' motion to dismiss should be denied in its entirety. (P. Mem.2–4.)

### DISCUSSION

### I. Motion To Dismiss Standard

A motion to dismiss for lack of subject matter jurisdiction will be granted "when the district court lacks the statutory or constitutional power to adjudicate" an action.

*Luckett v. Bure,* 290 F.3d 493, 496 (2d Cir.2002), quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). A motion to dismiss for failure to state a claim, which "tests the facial legal sufficiency of the complaint," *Rolls–Royce Motor Cars, Inc. v. Schudroff,* 929 F.Supp. 117, 121 (S.D.N.Y.1996), will be granted only where the plaintiff has not alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).

In resolving such motions to dismiss, a court must accept as true all factual allegations in the complaint, and draw all reasonable inferences in the light most favorable to the plaintiff. *See Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992); *Heidsieck & Co. Monopole S.A. v. Piper–Heidsieck,* No. 98 Civ. 7741, 2001 WL 263029, at \*3 (S.D.N.Y. Mar.15, 2001). "However,

argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Atlantic Mut. Ins. Co.,* 968 F.2d at 198.

**\*3** Because dismissal of an action for lack of jurisdiction renders all other accompanying motions moot, *see Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir.1990), and because "a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction," *Magee v. Nassau County Med. Ctr.,* 27 F.Supp.2d, 154, 158 (E.D.N.Y.1998), a court confronted with motions to dismiss both for lack of jurisdiction and for failure to state a claim should decide the jurisdictional question first. *See Rhulen,* 896 F.2d at 678; *Magee,* 27 F.Supp.2d at 158. In doing so, "the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that [jurisdiction] exists." *Luckett,* 290 F.3d at 497.

## II. Motion To Dismiss for Lack of a Case or Controversy

Defendants argue that the Court lacks jurisdiction to issue a declaratory judgment regarding plaintiff's trademark infringement claim because there is no actual controversy between the parties. (D.Mem.10.) By defendants' account, nothing short of their actually publishing, distributing, selling, or offering to sell a magazine called Modern Maturity would create a case or controversy. (*Id.* 2.) Plaintiff, however, argues that, in preparation for the launch of their magazine, defendants have used the Modern Maturity mark in numerous ways, and that this use is sufficient to bring the parties into adversarial conflict. (P. Mem. 13; *cf. id.* 7–8.) Because defendants overstate the threshold for demonstrating the existence of a case or controversy, and plaintiffs have demonstrated the existence of a case or controversy, defendants' jurisdictional motion is denied.[3]

Article III of the United States Constitution limits the subject matter jurisdiction of the federal courts to cases or controversies. *See* U.S. Const. Art. III § 2. This "case or controversy requirement" is the basis for the doctrines of mootness, ripeness, and standing. *See DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 335, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). The Declaratory Judgment Act (the "Act") provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ...

may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Although declaratory judgment actions were once thought to be inherently at odds with the case or controversy requirement, *see Willing v. Chicago Auditorium Ass'n,* 277 U.S. 274, 289, 48 S.Ct. 507, 72 L.Ed. 880 (1928), the constitutionality of the Act has long been established, primarily because a plaintiff seeking relief pursuant to its terms still must establish the existence of a controversy within the meaning of Article III.[4] *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–40, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *see also Matthew Bender & Co., Inc. v. West Publ'g Co.,* No. 94 Civ. 0589, 1996 WL 223917, at \*1 (S.D.N.Y. May 2, 1996) (noting that plaintiff bears the burden of demonstrating that jurisdiction over the declaratory judgment action existed at the time the action was filed and has continued to exist since that time).

**\*4** The Supreme Court has not articulated a bright-line rule for determining when a case satisfies the controversy requirement. In fact, it has stated that "[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Md. Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). Claims that involve "contingent future events that may not occur as anticipated, or indeed may not occur at all," will not suffice. *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (quotation omitted). Rather, "[t]he disagreement ... must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Jenkins v. United States,* 386 F.3d 415, 417–18 (2d Cir.2004) (quotation omitted).

Even after a plaintiff demonstrates that the case or controversy requirement has been met, the permissive language of § 2201(a) gives a district court discretion to determine whether or not it should actually exercise its declaratory judgment authority. A court must, however,

exercise that authority "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Sav. Bank,* 977 F.2d 734, 736 (2d Cir.1992).

Declaratory judgment actions involving intellectual property rights are most often brought by potential infringers seeking a declaration of noninfringement or invalidity. [5] *See, e. g., Lang v. Pac. Marine & Supply Co., Ltd.,* 895 F.2d 761, 763 (Fed.Cir.1990); *Airship Indus. (UK) Ltd. v. Goodyear Tire & Rubber Co. .,* 643 F.Supp. 754, 759 (S.D.N.Y.1986). However, such actions have also been permitted when brought by intellectual property owners seeking declarations of impending infringement. *See Lang,* 895 F.2d at 763 (collecting cases). Consistent with the Federal Circuit's holding in Lang, if the controversy requirement is met, there is no apparent reason why plaintiff should be precluded from seeking a declaration of infringement, particularly when defendants could have maintained such an action under the very same circumstances. *See id.* at 764 ("If the controversy requirement is met by a sufficient allegation of immediacy and reality, we see no reason why a patentee should be unable to seek a declaration of infringement against a future infringer when a future infringer is able to maintain a declaratory judgment action for noninfringement under the same circumstances.... [T]he fact that the patent owner, unlike the accused infringer, will have an express statutory remedy for infringement at a later time is irrelevant. The Declaratory Judgment Act applies 'whether or not further relief is or could be sought.' "), quoting 28 U.S.C. § 2201.

**\*5** Prior to 2007, "[t]he Second Circuit ... articulated a two-pronged test for determining the existence of an actual controversy in declaratory judgment cases involving trademarks. First, the defendant's conduct must have 'created a real and reasonable apprehension of liability on the part of plaintiff.' Second, the plaintiff must have 'engaged in a course of conduct which has brought it into adversarial conflict with the defendant.' Both elements must exist at the time the declaratory judgment action is filed." *The Ritz Hotel, Ltd. v. Shen Mfg. Co.,* 384 F.Supp.2d 678, 682 (S.D.N.Y.2005); *see*

*also Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 595 (2d Cir.1996). Because, as discussed above, declaratory judgment actions are most often brought by potential infringers seeking a declaration of noninfringement or invalidity, this test has been modified where the purported *owner* of an intellectual property right seeks a declaratory judgment to protect that right from future infringement.

*See Lang,* 895 F.2d at 764. Under the modified test, for a controversy to exist, "(1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge under 35 U.S.C. § 271(a) (1982), or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming." *Id.* As noted by the Federal Circuit, this test essentially is the converse of the test applied in declaratory judgment actions brought by potential infringers. *See Lang,* 895 F.2d at 794.

Applying these principles, the Second Circuit has concluded that a case or controversy exists in the trademark context "where a party has engaged in a course of conduct evidencing a 'definite intent and apparent ability to commence use' of the [allegedly infringing] marks on [a] product." [6] *Starter Corp.,* 84 F.3d at 595–96 (quotation omitted). Demonstrating such intent requires more than simply showing that a party has a "vague or general desire" to use the mark(s) at issue.

*See id.* at 596. Rather, the party "must be engaged in 'meaningful preparation,' such that it is 'actively preparing to produce the article in question. This is the last point before the point of no return.' " *Id.,* quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988); *see also G. Heileman Brewing Co., Inc. v. Anheuser–Busch, Inc.,* 873 F.2d 985, 990 (7th Cir.1989). Because "[d]eclaratory judgment actions are particularly useful in resolving trademark disputes ..., the finding of an actual controversy should be determined with some liberality." *Starter,* 84 F.3d at 596. However, even "the most liberal interpretation of justiciability will not admit to an active controversy in the absence of either some imminent infringing conduct *or some assertion of the same.*" *Id.* (emphasis in original),

quoting *Polaroid Corp. v. Berkey Photo, Inc.,* 425 F.Supp. 605, 609 (D.Del.1976).

**\*6** In addressing the "immediate intention and apparent ability" test, a court's "concern is not that the [allegedly infringing product] will never be produced, but rather that because of the relatively early stage of its development, the design [before the court] may not be the design which is ultimately produced and marketed." *Int'l Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1216 (7th Cir.1980). To satisfy these concerns, "the plaintiff must establish that the product presented to the court is the same product which will be produced if a declaration of noninfringement is obtained." *Id.*

Although for much of the recent past the "reasonable apprehension of imminent suit" test—which refers to two-pronged standards like the one announced in *Starter*— has governed the determination of an actual case or controversy in the context of intellectual property-related declaratory judgment actions, the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007), lowered the threshold for proving the existence of such controversies. *See Surefoot LC v. Sure Foot Corp.,* 531 F.3d 1236, 1240–42 (10th Cir.2008) (concluding that the reasonable apprehension of imminent suit test is no longer good law after *MedImmune*); *SanDisk Corp. v. STMicroelecs., Inc.,* 480 F.3d 1372, 1380 (Fed.Cir.2007) ("The Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test."); *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.,* 523 F.Supp.2d 376, 382 (S.D.N.Y.2007) (noting that the Supreme Court "has suggested that a lower threshold is required to find a case or controversy under the Declaratory Judgment Act"); *Linzer Prods. Corp. v. Sekar,* 499 F.Supp.2d 540, 559 (S.D.N.Y.2007) (noting that the "reasonable apprehension of suit" test was rejected by the Supreme Court in *MedImmune);* *Frederick Goldman, Inc. v. West,* No. 06 Civ. 3413, 2007 WL 1989291, at \*3 (S.D.N.Y. July 6, 2007) ("Recent decisions of the Supreme Court have ... in effect lower[ed] the bar for a plaintiff to bring a declaratory judgment action.").

In *MedImmune,* the Supreme Court found an actual controversy, even though plaintiff had complied with the defendants' demands by paying royalties under protest, had not infringed any of defendants' rights, and therefore had no reasonable fear of imminent suit. *See MedImmune,* 549 U.S. at 128, 137. In reaching this conclusion, the Court noted that establishing a controversy for purposes of a declaratory judgment action requires no greater showing than that required under Article III. *See id.* at 126–27. The Court held that neither the Act nor Article III requires a plaintiff to expose himself to liability before bringing a declaratory judgment action. *See id.* at 137. Rather, so long as "[t]he factual and legal dimensions of the dispute are well defined" and "nothing about the dispute would render it unfit for judicial resolution," jurisdiction is not defeated by a party's decision to refrain from taking some action and thus "make[ ] what would otherwise be an imminent threat [of suit] at least remote, if not nonexistent." *Id.* at 128, 137; *see also SanDisk,* 480 F.3d at 1381 ("[W]here a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights."). The true test is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune,* 549 U.S. at 127.

**\*7** While it is clear that the reasonable apprehension of suit test has been rejected, it is unclear whether the "intent and ability" standard has been similarly discredited. On the one hand, that standard is derived from the now-rejected reasonable apprehension of suit test. *See Starter,* 84 F.3d at 595 (treating the "intent and ability" test as related to the second prong of the reasonable apprehension of imminent suit test, i.e., whether plaintiff has engaged in a course of conduct bringing it into adversarial conflict with defendant). On the other hand, the "intent and ability" test stems from the portion of the reasonable apprehension of suit test dealing with the extent to which the parties have been sufficiently brought

into adversarial conflict with one another, and nothing in *MedImmune* purports to have changed the fundamental requirement of adversity. Moreover, the thrust of the "intent and ability" test is the immediacy of the dispute, a requirement the validity of which *MedImmune* specifically upheld. *See MedImmune,* 549 U.S. at 127.

The court in *Geisha, LLC v. Tuccillo,* 525 F.Supp.2d 1002 (N.D.Ill.2007), apparently the only post-*MedImmune* case addressing the "intent and ability" of a potential infringer, considered whether the controversy requirement was met where a trademark owner sought a declaration of infringement based on defendant's planned opening of a restaurant using the name of the mark at issue. *See id.* at 1003, 1007–08. There, defendant had filed an intent-to-use trademark registration application with the PTO nine months after the opening of plaintiff's restaurant Japonais. *See id.* at 1006. The application pertained to defendant's intended use of a stylized version of the word Japonais, also in connection with a restaurant. *See id.* When defendant refused plaintiff's request that it voluntarily abandon the application, plaintiff filed suit in the district court. *See id.* at 1007. Defendant subsequently argued that the court lacked jurisdiction under the Act because there was no "real or immediate controversy." *Id.* at 1009.

Prior to ruling on defendant's claim, the court noted that although defendant had never used the name Japonais in connection with the provision of any restaurant or lounge services, it was undisputed that he had "a firm intent" to do so. *Id.* at 1007. Turning to the merits of the jurisdictional claim, the court noted that the "reasonable apprehension of suit test" was inapposite, not only because "the case reverse[d] the roles of the parties in a typical, 'defensive' declaratory judgment action," but also because the Federal Circuit had discarded the test following *MedImmune. Id.* at 1010. Although the court acknowledged that the test articulated in *Lang* would normally govern an offensive declaratory judgment of the kind before it, it concluded that the *Lang* test was also inapposite "[g]iven the close similarity between [that test] and the traditional reasonable-apprehension-of-suit test." *Id.* at 1012–13. Ultimately, the court concluded that the relevant test was "whether, 'under all the circumstances,' a 'definite and concrete' controversy exists between parties having adverse legal interests; the controversy must be of sufficient 'immediacy and reality to warrant the issuance of a declaratory judgment,' such that a declaration would not simply amount to 'an opinion advising what the law would be upon a hypothetical state of facts.' " *Id.* at 1013, quoting *MedImmune,* 549 U.S. at 127.

**\*8** Applying this test, the court's determination hinged largely on the extent to which defendant's preparations to open the allegedly infringing restaurant rendered the dispute of sufficient "immediacy and reality" to constitute a true controversy. *See id.* at 1013–17. Rejecting plaintiff's claim that an actual controversy was presented, the court held that defendant's "actual preparations for opening a restaurant [did] not appear to have advanced significantly beyond [his] statement of intent." *Id.* at 1015. These preparations were limited to " 'play[ing] around with' a menu and searching for a suitable location." *Id.* While the court acknowledged that the search for a location would normally carry more weight, in this case it found that defendant's search did "not appear either serious or advanced." *Id.* Defendant had no real estate agent, but was merely driving around looking at properties in locations as diverse as Manhattan's Meatpacking District and Nassau County. *See id.* These facts, together with the absence of any record evidence that defendant had ever before opened a restaurant, led the court to conclude that defendant's opening of a restaurant using the Japonais mark "was far from imminent when th[e] action was filed." *Id.* 1015–16. The court was careful to note, however, that "it [was] unclear whether the fact that [defendant] was not using the mark would, in itself, defeat declaratory judgment jurisdiction." *Id.* at 1018.

While there are other cases addressing the factual circumstances under which a party's planned production, distribution, or sale of an allegedly infringing product gives rise to a case or controversy, these cases pre-date *MedImmune* and therefore do not reflect any changes in the applicable legal standard that may have been occasioned by that decision. Nevertheless, because their reasoning often concerns how close the potential infringer is to actually distributing or selling the allegedly infringing goods or services, the cases provide a useful framework for determining when a dispute is of sufficient "immediacy and reality" to constitute a controversy.

A review of the cases demonstrates that where a party has not yet identified a name or location of a business, or has not secured—or attempted to secure—the central components of the formula ordinarily required for production, the case or controversy standard is unlikely to be satisfied. *See Sobini Films v. Tri–Star Pictures, Inc.,* No. 01 Civ. 6615, 2001 WL 1824039, at *5 (C.D.Cal. Nov.21, 2001)* (finding no justiciable case or controversy where plaintiff had not reached any preliminary agreements regarding the proposed film, had not "obtained commitments from 'key talent' such as a director and lead actors," had not contracted with any writers to create the screenplay, and was therefore not "immediately prepared" to produce the film); *Planet Hollywood ( Region IV ), Inc. v. Hollywood Casino Corp.,* 80 F.Supp.2d 815, 874–76 (N.D.Ill.1999)* (finding no controversy where plaintiff had not obtained regulatory approval for the casino it was requesting the court to deem non-infringing, had no plans to open a casino "on the drawing board," had not entered into any licensing agreements with any entity with the capacity to use the trademark in connection with a casino—or even identified such an entity—and could not tell the court how it intended to use its mark in the casino business, much less the name or location of such a casino); *Lang,* 895 F.2d at 764–65* (finding no controversy where the allegedly infringing ship's hull would not be completed until at least nine months after the filing of the complaint and "the accused infringers had not distributed sales literature, prepared to solicit orders, or engaged in any activity indicating that the ship would soon be ready for sea").

*9 Where, however, a party has produced prototypes or samples of the allegedly infringing products, begun soliciting—and advertising to—potential customers, or otherwise invested significant sums of money in preparation for producing the goods, the case or controversy requirement is likely to be satisfied. *See Starter,* 84 F.3d at 596* (finding a case or controversy where plaintiff had "designed styles and prepared prototype shoes; conducted a consumer survey; made strategic decisions regarding who should manufacture the shoes; hired an external licensing agent; ... attempted to find a manufacturing partner"; and was therefore "immediately prepared, at the time the complaint was filed, to begin manufacture and sale of shoes bearing the [marks at issue]") [7]; *Menashe v. v. Secret Catalogue, Inc.,* No. 05 Civ. 239, 2005 WL 1580799, at *6 (S.D.N.Y. July 7, 2005)* (finding a controversy where plaintiffs had registered a domain name related to the mark, retained a web-designer, filed an intent-to-use application with the PTO, "paid for ... and received four hundred samples of their product, as well as eight final articles that would serve as prototypes[,] and ... engaged in activities including interviews and photo shoots to promote their lingerie line"); *Dr. Reddy's Labs., Ltd. v. aaiPharma Inc.,* No. 01 Civ. 10102, 2002 WL 31059289, at *9 (S.D.N.Y. Sept.13, 2002)* (finding an actual controversy where plaintiff had obtained tentative FDA approval of a generic version of a drug and spent millions of dollars on the development of the product, including on construction of a plant to manufacture it).

The foregoing precedent supports the conclusion that the current dispute satisfies the case or controversy requirement, and that the Court therefore has jurisdiction over plaintiff's claims, even under pre-*MedImmune* case law. This is not a case in which defendants "do not appear to have advanced significantly beyond [their] statement of intent." *Geisha,* 525 F.Supp.2d at 1015. Far from relying solely on defendants' mere intent to infringe, which courts have found insufficient to demonstrate an actual controversy, plaintiff has alleged that defendants have taken significant steps toward realizing that intent, [8] including "actively seeking licensees to publish a magazine called 'Modern Maturity' " and "conduct[ing an] extensive analysis of the publishing industry." (Compl.¶ 23.) While defendants may not have settled on a licensing partner, the Court must accept as true plaintiff's allegation that they have been actively searching for one. Plaintiff need not wait for defendants to actually secure that partner before filing suit. Securing a licensing partner to undertake actual publication of the magazine presumably occurs only after one has made a number of concrete decisions concerning the proposed content, design, and layout of the magazine. Thus, once a licensing partner is identified, little will remain for defendants to do other than commence production, distribution, and sale of the magazine.

*10 Since finding a case or controversy in this case is consistent with pre-*MedImmune* case law, it is unnecessary to decide precisely how much that decision loosened the case or controversy tests previously applied. There is no doubt that the circumstances of this case

present a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

_MedImmune,_ 549 U.S. at 127. Accordingly, defendants' motion to dismiss for lack of jurisdiction is denied. [9]

## III. Motion To Dismiss for Failure To State a Claim

Defendants also argue that because plaintiff has not alleged that defendants have actually used the Modern Maturity mark in commerce, the complaint should be dismissed for failure to state a claim. (D.Mem.2–8.) In support of this argument, defendants reiterate their contention that use in commerce cannot exist absent the actual publication, distribution, sale, or offering for sale of a magazine bearing the Modern Maturity mark. (D. Mem. 6; D. Reply Mem. 3.) As before, plaintiff contends that defendants' significant planning efforts, including creating business plans, conducting extensive market analysis, and actively seeking licensees to publish its magazine, satisfy the "use in commerce" standard. (P. Mem.1, 3–4.) Because trademark infringement and related claims brought pursuant to the Lanham Act and state law are not contingent on the actual sale of an allegedly infringing product, and because plaintiff has alleged that defendants have promoted the production of their magazine through use of the Modern Maturity mark, defendants' motion to dismiss must fail.

"Trademark infringement, as codified in the Lanham Act, is not limited to situations where the infringing mark has been used in connection with the actual sale of a product.... [Rather], courts have found that trademark infringement litigation may proceed even in the absence of the product having been sold." _PDK Labs, Inc. v. Proactive Labs, Inc.,_ 325 F.Supp.2d 176, 180 (E.D.N.Y.2004); _see also id._ ("[A]lthough Proactive has not actually sold the product with the allegedly infringing packaging, its promotion of the product on its web site and at trade shows is sufficient to constitute a tort under the language of the Lanham Act and the supporting case law."); _Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.,_ 662 F.Supp. 203, 205 (S.D.N.Y.1987) (rejecting defendants' claim that injunctive relief could not be granted where the product had not been advertised or sold to the general public and finding the "use in commerce" element satisfied where defendants sent one bottle of olive oil to a distributor, offered the product to another, and

printed labels and cartons for the allegedly infringing oil); _Harrison Servs., Inc. v. AI Margino,_ 291 F.Supp. 319, 321 (S.D.N.Y.1968) (denying defendant's 12(b)(1) and 12(b)(6) motions to dismiss because plaintiff alleged more than a "mere intent" to violate the Lanham Act where it alleged that defendant had solicited department stores to participate in the catalog at issue and contacted manufacturers about displaying their products in the catalog). _Cf._ _Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.,_ 808 F.Supp. 952, 957 (E.D.N.Y.1992) ("In a trademark infringement action, a court may grant injunctive relief 'even before defendant actually opens the business,' so long as the threatened act of defendant is 'imminent and impending.'"); _Hertz Corp. v. Knickerbocker,_ 206 F.Supp. 305, 306 (S.D.N.Y.1962) (granting defendant's 12(b)(1) and 12(b) (6) motions to dismiss because the complaint did not allege that defendants had used the mark "in commerce and in conjunction with services," but only that the certificate of incorporation indicated an intent by the corporation to use such mark).

**\*11** "To establish a trademark infringement claim under the Lanham Act, a plaintiff must show that the defendant used in commerce, without the plaintiff's consent, a 'reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion.'" [10] _Cadbury Beverages, Inc. v. Cott Corp.,_ 73 F.3d 474, 477 (2d Cir.1996), quoting 15 U.S.C. § 1114(1)(a); _see also_ _1–800 Contacts, Inc. v. WhenU.com, Inc.,_ 414 F.3d 400, 406–07 (2d Cir.2005) (noting that a plaintiff can prevail under § 1114 where he demonstrates that he has a valid mark entitled to protection, that defendant has used the mark in commerce "in connection with the sale ... or advertising of goods or services" without plaintiff's consent, and that such use is likely to cause confusion). In determining whether a plaintiff has established a likelihood of confusion, a court considers the eight factors outlined in _Polaroid Corp. v. Polarad Elecs. Corp.,_ 287 F.2d 492, 495 (2d Cir.1961). The factors are: (1) strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap (i.e., enter the alleged infringer's market); (5) actual confusion; (6) the defendant's good

faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers. *Id.*

Here, defendants argue only that plaintiff has failed to sufficiently allege their use in commerce of the Modern Maturity mark. As previously discussed, however, plaintiff has alleged that defendants "are actively seeking licensees to publish a magazine called 'Modern Maturity' " and "have conducted [an] extensive analysis of the publishing industry" in preparation for the launch of such magazine. (Compl.¶ 23.) It is reasonable to infer that, in doing so, defendants have not only used the Modern Maturity mark, but have done so through the channels of commerce. Indeed, it would be difficult to fathom defendants pitching their Modern Maturity magazine concept to a potential publisher without providing the publisher with some sort of mock-up or prototype. Any such mock-up or prototype would likely use the Modern Maturity mark, as defendants concede that this is the name of their planned magazine. Even without such a prototype, the pitch itself would necessarily involve the transmission of ideas pertaining to magazine content, design, and layout, including the offending name. Applicable standards of pleading do not require plaintiff to identify the specific manner in which such information was transmitted. *See* Fed.R.Civ.P. 8(a)(2)

(requiring only "a short and plain statement of the claim"); *Twombly,* 127 S.Ct. at 1974 (requiring plaintiff to allege only "enough facts to state a claim to relief that is plausible on its face"). Plaintiff has alleged facts giving rise to a reasonable inference that defendants have used the Modern Maturity mark in commerce, and this is sufficient.

**\*12** For the foregoing reasons, plaintiff has adequately alleged defendants' use in commerce of the Modern Maturity mark. Defendants' motion to dismiss is therefore denied. [11]

### CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 47499

### Footnotes

1   Due to an extreme backlog in the White Plains Division of this Court, this matter was recently assigned by the Chief Judge to the undersigned judge, solely for purposes of deciding the instant long-pending motion, with the gracious consent of the Honorable Stephen C. Robinson, United States District Judge, to whom this case is otherwise assigned. The case remains assigned to Judge Robinson for all other purposes.

2   All references to the complaint are to plaintiff's First Amended Complaint, dated January 11, 2006.

3   Defendants also argue that plaintiff's failure to allege actual use in commerce defeats the existence of any federal question, thus providing an independent basis for dismissal. (D.Mem.11.) This argument overlaps defendants' Rule 12(b)(6) motion, which is addressed below.

4   The Act does not supply an independent ground for subject matter jurisdiction. Thus, "an action for declaratory relief under the Act may ordinarily be brought only if subject matter jurisdiction would exist in a coercive action between the parties." *Progressive Apparel Group, Inc. v. Anheuser–Busch, Inc.,* No. 95 Civ. 2794, 1996 WL 50227, at *2 (S.D.N.Y. Feb. 8, 1996).

5   A number of the cases cited in this opinion discuss questions of justiciability in the context of patent infringement actions. However, these cases constitute valid precedent given this Court's pronouncement that "[t]here is no persuasive reason to distinguish between patent infringement and trademark infringement for purposes of determining whether a justiciable controversy exists." *Id.*

6   Courts in this circuit have, at times, used various formulations of this "intent and ability" test. *See Matthew Bender,* 1996 WL 223917, at *2 (collecting cases). However, this Court has noted that "[a]lthough the wording of the[ ] tests differs somewhat, they share the basic purpose of ensuring that the plaintiff truly intends and is able to undertake a potentially infringing activity, while acknowledging that 'it would be economically wasteful to require a plaintiff to embark on an actual program of manufacture, use or sale which may turn out to be illegal .' Furthermore, '[w]hether a declaratory plaintiff's

ability and definite intention to undertake a potentially infringing activity constitutes sufficient 'preparation' is a question of degree to be resolved on a case-by-case basis.' " *Id.* at *3 (quotations omitted).

**7**   The *Starter* Court seems to have construed the phrase "immediately prepared" rather broadly. The court itself acknowledged that Starter alleged only that it had "attempted to find a manufacturing partner," and not that it had actually found one. Absent its having identified such a partner, it is unclear how Starter could literally have been "immediately prepared" to begin manufacture and sale at the time the complaint was filed.

**8**   While defendants' motions to dismiss may be resolved on the basis of the pleadings, it should be noted that defendants have admitted to possessing documents pertaining to the Modern Maturity mark, including those related to: the design, creation, selection or adoption of the Modern Maturity mark (Doc. Req. No. 6); defendants' intent to use the mark for a magazine (Doc. Req. No. 9); defendants' plans to sell magazines under the Modern Maturity mark (Doc. Req. No. 12); the nature of the planned Modern Maturity magazine (Doc. Req. No. 15); and the business, marketing, and media plans for the magazine (Doc Req. No. 30). (*See also* Dabney Decl. Ex. 1; P. Mem. 4.) Defendants' responses to plaintiff's document requests bolster the conclusion that defendants have taken concrete steps to bring their plans to fruition.

**9**   Contrary to defendants' argument, plaintiff's request for a declaration of the validity of its registration is properly before the Court. (D.Mem.9–10.) This case involves allegations of trademark infringement that present an actual controversy, as well as a request for a declaration of validity. In such situations, "the interest in prompt adjudication far outweighs the value of having the views of the PTO," particularly where a party seeks declaratory relief. *Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 853–54 (2d Cir.1988); *see also Burkina Wear, Inc. v. Campagnolo, S.R.L.,* No. 07 Civ. 3610, 2008 WL 1007634, at *4 (S.D.N.Y. Apr.9, 2008).

**10**   According to the Lanham Act, "a mark shall be deemed to be in use in commerce—(1) on goods when—(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce." 15 U.S.C. § 1127.

**11**   The Court need not address the propriety of any claim for injunctive relief. Defendants consented to the preliminary injunction entered by the Court, and any comment on the merits of a claim for permanent injunctive relief would be premature. *See Patsy's Italian Restaurant, Inc. v. Banas,* 575 F.Supp.2d 427, 464 (E.D.N.Y.2008), quoting *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006) (quotation omitted) ("To obtain a permanent injunction in a trademark action, a party 'must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.' "); *see also A.V. by Versace, Inc. v. Gianni Versace S.p.A.,* No. 96 Civ. 9721, 2005 WL 147364, at *5 (S.D.N.Y. Jan.24, 2005) (same).

---

**End of Document**          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4953566
United States District Court,
S.D. New York.

ACE AMERICAN INSURANCE
COMPANY, Plaintiff,
v.
BANK OF THE OZARKS, Defendant.

No. 11 Civ. 3146(PGG).
|
Signed Sept. 30, 2014.

*MEMORANDUM OPINION & ORDER*

PAUL G. GARDEPHE, District Judge.

**\*1** This is a breach of contract and declaratory judgment action brought by Plaintiff ACE American Insurance Company ("ACE") arising out of Defendant Bank of the Ozarks' failure to honor ACE's draw request on a letter of credit issued by the Bank in favor of ACE. (Cmplt.(Dkt. No. 1) ¶ 1) Plaintiff has moved for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 57) For the reasons set forth below, Plaintiff's motion will be granted in its entirety.

*BACKGROUND*

**I. THE BANK'S LETTER OF CREDIT**
ACE is an insurance company organized under Pennsylvania law.[1] (ACE's Statement of Undisputed Material Facts ("ACE R. 56.1 Stmt.") (Dkt. No. 59) ¶ 1) Between May 1, 2006 and May 1, 2009, ACE issued general liability, automobile liability, and workers' compensation and employee liability policies to Affiliated Foods Southwest, Inc. ("AFS"). (*Id.* ¶¶ 4–5) In connection with these policies, ACE and AFS entered into a contract dated May 1, 2006 (the "Collateral Agreement"), in which AFS agreed to establish a "clean irrevocable evergreen letter of credit," naming ACE as beneficiary. (*Id.* ¶¶ 6, 43)

At the request of AFS, the Bank of the Ozarks (the "Bank")—a state-chartered bank organized under Arkansas law (*id.* ¶ 2)—issued a clean irrevocable evergreen letter of credit ("Letter of Credit") on June

1, 2008, in the amount of $1,376,998, naming ACE as beneficiary. (*Id.* ¶¶ 14, 18; *see* ACE Appendix (Dkt. No. 60–5), Ex. 4) The Letter of Credit is addressed to ACE, as beneficiary, and provides as follows:

> By order of our client, Affiliated Foods Southwest, Inc., we hereby establish this Irrevocable Letter of Credit No. 0706035392 in your favor for an amount up to but not exceeding the aggregate sum of One Million Three Hundred Seventy Six Thousand Nine Hundred Ninety Eight Dollars ($1,376,998), effective immediately, and expiring at the offices of the Bank on June 1, 2009 unless renewed as hereinafter provided.
>
> ....
>
> Funds under this Letter of Credit are available to you against your sight draft(s), drawn on us, bearing the clause "Drawn under Credit No. 0706035392".
>
> ....
>
> This Letter of Credit sets forth in full the terms of our undertaking. Such undertaking shall not in any way be modified, amended or amplified by reference to any document or instrument referred to herein or in which this Letter of Credit is referred to or to which this Letter of Credit relates and any such reference shall not be deemed to incorporate herein by reference any document or instrument.
>
> ....
>
> We hereby agree with the drawers, endorsers and bona fide holders of drafts drawn under and in compliance with the terms of this credit that such drafts will be duly honored upon presentation to the drawee. The obligation of Bank of the Ozarks under this Letter of Credit is the individual obligation of Bank of the Ozarks, and is in no way contingent upon the reimbursement with respect thereto.
>
> **\*2** ....

(ACE Appendix (Dkt. No. 60–5), Ex. 4 at 3–4; *see* ACE R. 56.1 Stmt. ¶ 27)[2] The Letter of Credit further provides that, "[e]xcept as otherwise expressly stated herein, this credit is subject to and governed by the Laws of the State of New York and the 1993 revision of the Uniform Customs and Practice for Documentary Credits of the International Chamber of Commerce (Publication 500)

[ (the "UCP") ] in the event of any conflict, the Laws of the State of New York will control." (ACE Appendix (Dkt. No. 60–5), Ex. 4 at 4; *see* ACER. 56.1 Stmt. ¶ 28)

In connection with the Letter of Credit, AFS entered into an agreement (the "Customer Agreement") with the Bank. (ACE R. 56.1 Stmt. ¶ 32; *see* ACE Appendix (Dkt. No. 60–9), Ex. 8) Among other things, AFS agreed to immediately repay the Bank for any amounts paid by the Bank under the Letter of Credit. (ACE R. 56.1 Stmt. ¶ 35) AFS also agreed that its obligation to reimburse the Bank would not be affected by "any breach of any agreement between [AFS] and the Beneficiary of the Letter of Credit ..., even if [the Bank] has received notice of same." (ACE R. 56.1 Stmt. ¶ 36; ACE Appendix (Dkt. No. 60–9), Ex. 8 at 4)

## II. *AFS'S BANKRUPTCY AND THE PARTIES' EARLIER LITIGATION*

On May 5, 2009, AFS filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Arkansas. (ACE R. 56.1 Stmt. ¶ 23) On July 17, 2009, AFS ceased all operations, and its bankruptcy case was later converted to a Chapter 7 liquidation proceeding. (*Id.* ¶ 24)

On October 22, 2009, ACE filed a complaint against the Bank in this District alleging that it had not honored proper draw requests totaling $143,006.76. (ACE R. 56.1 Stmt. ¶ 57; *see Ace Am. Ins. Co. v. Bank of the Ozarks,* No. 09 Civ. 8938(LAK), 2010 WL 1257327, at *1 (S.D.N.Y. Mar. 18, 2010)) After ACE filed that action, however, the Bank paid the draw requests that were the subject of the parties' dispute. (ACE R. 56.1 Stmt. ¶ 59) The Bank then moved to dismiss or, in the alternative, for a transfer to the Eastern District of Arkansas. (*Id.* ¶ 60)

Judge Kaplan dismissed ACE's breach of contract claim as moot, except to the extent it sought interest. (*Id.* ¶ 61) Judge Kaplan also dismissed ACE's declaratory judgment claim, based on his belief that the Bank would elect to terminate the Letter of Credit, thereby rendering declaratory relief unnecessary. (*Id.* ¶ 63) Judge Kaplan observed, however, that "it is quite clear that there is a real disagreement between Ace and the Bank[,]" and that "[w]hile there are no outstanding draw requests, it seems likely ..., in all the circumstances[,] that the brushfire that has broken out three times likely would erupt in flames again were there sufficient time." (*Id.* ¶ 62) The Bank

elected not to terminate the Letter of Credit, however, and it remains in effect. (*Id.* ¶ 65)

## III. *ACE'S MARCH 16, 2011 DRAW REQUEST*

 **\*3** On March 16, 2011, ACE submitted a draw request to the Bank in the amount of $100,000. (*Id.* ¶ 78) The Bank received the draw request the following day. (*Id.* ¶ 80) In accordance with the terms of the Letter of Credit, the draft bore the clause "Drawn under Credit No. 0706035392," and was signed by an ACE officer. (*Id.* ¶ 81) The Bank has refused to honor the draw request, however. (*Id.* ¶ 86)

On March 31, 2011, the Bank sent a letter to ACE acknowledging receipt of the sight draft but refusing to honor it. (ACE R. 56.1 Stmt. ¶ 86) The Bank, stated that it was refusing to honor the draw request because (1) "ACE [had] not submitted any supporting documentation to the Bank"; (2) "the amount requested was for a settlement of a claim made pursuant to an automobile policy"; and (3) ACE had not submitted documentation "evidencing that relief from the bankruptcy estate was granted to consummate the settlement, evidencing whether the bankruptcy estate agreed to the settlement amount, or evidencing that the Bankruptcy court approved the settlement." (ACE Appendix (Dkt. No. 60–27), Ex. 26 at 3–4; *see* ACE R. 56.1 Stmt. ¶ 86)

Because many of the Bank's arguments in response to ACE's motion require an understanding of the contracts and events underlying ACE's draw request, the Court will now describe the circumstances of that draw request.

### A. *The Underlying Insurance Contracts*

ACE issued an automobile liability policy to AFS (the "Automobile Policy") that became effective on May 1, 2008, and which had a term of one year. (ACE Appendix (Dkt. No. 60–6), Ex. 5 at 3, 6; *see id.* (Dkt. No. 60–7), Ex. 6 at 2 (stating that the Automobile Policy "covers from 05/01/2008 to 05/01/2009 12:01 am")) The Automobile Policy provides that ACE "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.' " (ACE Appendix (Dkt. No. 60–7), Ex. 6 at 13) Under the Automobile Policy, AFS's Bankruptcy or insolvency does not relieve ACE of its obligations under the Automobile Policy. (*Id.* at 19)

As set forth in a notice of election prepared by ACE and a deductible endorsement that was attached to the Automobile Policy at its inception (*Id.* at 6, 37–38), the Automobile Policy was subject to a $100,000 deductible. (ACE R. 56.1 Stmt. ¶ 7; *see* ACE Appendix (Dkt. No. 60–7), Ex. 6 at 37) Thus, ACE's "obligation to pay damages under [the Automobile Policy] applies only to the amount of losses' and 'allocated loss adjustment expenses' in excess of [$100,000]." (ACE Appendix (Dkt. No. 60–7), Ex. 6 at 37)

Under the Automobile Policy, ACE "may investigate and settle any claim or 'suit' as [it] consider[s] appropriate." (ACE R. 56.1 Stmt. ¶ 38) In this regard, the deductible endorsement provides—in Item 4—that ACE "will have the right at [its] sole discretion[ ] ... t]o pay any amounts within the Deductible Per Accident to settle any claim or 'suit.' " (*Id.* ¶ 39; ACE Appendix (Dkt. No. 60–7), Ex. 6 at 37) Moreover, under the deductible endorsement, the parties agreed that ACE "will pay all sums the 'insured' becomes legally obligated to pay within the Deductible Per Accident" (ACE Appendix (Dkt. No. 60–7), Ex. 6 at 37), and that AFS "shall promptly reimburse [ACE] for any sums [ACE] may have paid under Item 4." (*Id.;* ACE R. 56.1 Stmt. ¶ 40)

### B. *The Collateral Agreement*

**\*4** As noted above, ACE and AFS also entered into a Collateral Agreement, which required AFS to establish a "clean irrevocable evergreen letter of credit," naming ACE as beneficiary.[3] (ACE R. 56.1 Stmt. ¶¶ 6, 43) The Collateral Agreement provides that, "[a]s security for payment of the Insured's Obligation, the Insured will provide to the Company, as beneficiary thereof, a clean irrevocable evergreen letter of credit ... issued by a bank or other financial institution acceptable to the Company, and in an amount and form, acceptable to the Company...." (ACE Appendix (Dkt. No. 60–8), Ex. 7 at 6) Under the Collateral Agreement, AFS is required to pay "all ... amounts the Insured is or may in the future be required to pay or reimburse in accordance with the terms and conditions of any Policies, ... including without limitation the Insured's share of Paid Losses within applicable Deductible(s) ... and the Insured's share of Allocated Loss Adjustment Expense as specified in the applicable Policy and/or Notice of Election[,]" as well as "all amounts the Insured is or may be obligated to pay to

other parties but which are paid by the Company...." (*Id.* at 2–3) "Paid Losses" are defined as "all amounts paid for losses (exclusive of Allocated Loss Adjustment Expense) under the Policies; provided, however, that the amount payable by the Insured for each Paid Loss shall be subject to the ... amount of the deductible as provided in the respective Deductible Polcies, or ... [the] amount of the loss limitation as provided in the respective Notice of Election." (*Id.* at 5) "Allocated Loss Adjustment Expense" is defined as "such claim expenses, costs and any interest incurred in connection with the investigation, administration, adjustment, settlement or defense of any claim or lawsuit that the Company ... directly allocates to a particular claim, whether or not a payment indemnifying the claimant(s) is made ." (*Id.* at 3)

The Collateral Agreement provides that "[a]ll payments set out in this Agreement ... must be made by the Insured by the Required Payment Date [,]" which is defined as "a date not later than fifteen (15) calendar days after the date of the Company's invoice for any amount billed by the Company to the Insured under the Insurance Agreements." (*Id.* at 3, 5) The Collateral Agreement further provides that ACE "shall have the right to draw against the [letter of credit] and/or other collateral in each instance where the Insured's Obligation, or any portion thereof, *for any reason* is not fulfilled." (*Id.* at 7 (emphasis added); ACE R. 56.1 Stmt. ¶ 44) The "Insured's Obligation" includes, among other things, claims ACE pays under the Automobile Policy that are within the deductible, and include Allocated Loss Adustment Expense.[4] (ACE Appendix (Dkt. No. 60–8), Ex. 7 at 4–5)

### C. *ACE's Settlement of the Bowman Claim*

On August 4, 2009, Lamar Bowman and his wife commenced an action in Louisiana state court against ACE, AFS, and a truck driver employed by AFS. (ACE R. 56.1 Stmt. ¶ 66) The Bowmans could not proceed against AFS in light of the bankruptcy stay, but they sought recovery directly from ACE under a Louisiana statute that permits direct actions against insurers of bankrupt companies. (*Id.* ¶ 67; *see* [?] La.Rev.Stat. § 22:1269) The Bowman lawsuit stemmed from a multiple vehicle accident that occurred on August 12, 2008, in which AFS's employee—a driver with a history of prior accidents— made a wide turn and struck the rear of another car, which in turn hit a second car that then hit a third car. (ACE

R. 56.1 Stmt. ¶ 68) Given the driver's "failure to keep his vehicle under control" and "failure to watch where he was proceeding on the road," the claims adjuster determined that the likelihood of an adverse verdict was 100%. (*Id.* ¶ 69 (quoting ACE Appendix (Dkt. No. 60–30), Ex. 29 at 3))

**\*5** ACE retained counsel, who then obtained medical records for the Bowmans and arranged for an independent medical examination. (ACE R. 56.1 Stmt. ¶ 71) Although ACE had been advised that the lawsuit was "unwinnable[,]" its counsel managed to settle the case —after mediation—for $100,000. (*Id.*) ACE incurred expenses of more than $31,000 in defending against the *Bowman* lawsuit. (*Id.* ¶ 72)

#### D. *The Draw Request*
In connection with the *Bowman* lawsuit, ACE prepared an invoice, dated March 1, 2011, stating that $100,000 was due for "Claim Payments—Settlement of Bowman Claim." (*See* ACE Appendix (Dkt. No. 60–25), Ex. 24 at 4–5) On March 16, 2011, ACE submitted a draw request to the Bank in the amount of $100,000. (ACE R. 56.1 Stmt. ¶ 78; ACE Appendix (Dkt. No. 60–26), Ex. 25 at 2) As noted above, the request states that it is "Drawn under Credit No. 0706035392," and the request was signed by an ACE officer. (ACE R. 56.1 Stmt. ¶ 81; ACE Appendix (Dkt. No. 60–26), Ex. 25 at 2–3) To date, the Bank has not honored the draw request. (ACE R. 56.1 Stmt. ¶ 86)

#### IV. *ACE'S SUBSEQUENT DRAW REQUESTS*
On October 12, 2012, ACE presented a draw request to the Bank in the amount of $99,649.17, most of which relates to the settlement of a personal injury lawsuit filed by TeiTance Porter. (*Id.* ¶ 96) The Bank has likewise refused to honor this draw request. (*Id.*) The Porter claim arises from another automobile accident, in which an AFS driver was killed when his truck rear-ended Porter's tractor on July 7, 2008. (*Id.* ¶ 102) A claims adjuster fixed the settlement range at between $70,000 and $150,000, and the case was later settled for $100,000. (*Id.* ¶ 103)

On April 26, 2012, ACE presented a draw request to the Bank in the amount of $32,480.72, most of which relates to payment of a claim by Ted Morrow. (*Id.* ¶ 105) The Bank has also refused to honor this draw request. (*Id.* ¶ 107)

#### V. *PROCEDURAL HISTORY*

ACE filed the Complaint on May 10, 2011. (Cmplt.(Dkt. No. 1)) On October 25, 2011, the Bank moved to dismiss or, in the alternative, to transfer the case to the Eastern District of Arkansas. (Dkt. No. 11) This Court denied the Bank's motion on August 3, 2012 (Dkt. No. 25), and the Bank filed its answer on August 20, 2012. (Dkt. No. 27)

On November 25, 2013, ACE filed a motion for summary judgment, pursuant to *Fed.R.Civ.P. 56*. (Dkt. No. 57) ACE contends that the Bank has breached the Letter of Credit by failing to pay the March 16, 2011 draw request. (*See* Pltf. Br. (Dkt. No. 58) at 20–22) ACE seeks $100,000 plus interest on its breach of contract claim. (Dkt. No. 57) ACE further contends that it is entitled to a declaratory judgment that the Bank is obligated to honor and pay ACE the amount of any draw request under the letter of credit within seven banking days from the date of the Bank's receipt of such draw request, provided that ACE presents the Bank with a sight draft, drawn on the Bank bearing the clause Drawn under Credit No. 0706035392." (Dkt. No. 57)

### DISCUSSION

#### I. *LEGAL STANDARD*
**\*6** Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that that party is "entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a)*. "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (citing *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007)). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, this Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment ." *Cifra,* 252 F.3d

at 216 (citations omitted). " '[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.... [M]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist.' " *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (quoting *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995)) (alterations in original). Instead, the non-moving party must " 'offer some hard evidence showing that its version of the events is not wholly fanciful.' " *Golden Pac. Bancorp v. FDIC,* 375 F.3d 196, 200 (2d Cir.2004) (quoting *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998)).

"Although summary judgment is never lightly granted, letter of credit disputes generally present legal issues, rather than questions of fact, and are thus often appropriate for final adjudication upon submission of papers and affidavits." *E & H Partners v. Broadway Nat'l Bank,* 39 F.Supp.2d 275, 280 (S.D.N.Y.1998); *see Banque Worms v. Banque Commerciale Privee,* 679 F.Supp. 1173, 1178 (S.D.N.Y.1988), aff'd, 849 F.2d 787 (2d Cir.1988) (per curiam) ("Actions concerning letters of credit are well suited to determination by motion for summary judgment because they normally present solely legal issues relating to an exchange of documents.").

## II. *ACE'S DRAW REQUEST COMPLIED WITH THE LETTER OF CREDIT*

ACE argues that it is entitled to summary judgment on its breach of contract claim because its draw request was proper under the Letter of Credit, and the Bank's affirmative defenses are without merit. (Pltf.Br.(Dkt. No. 58) at 20–33)

### A. *The Nature of Letters of Credit*

"Letters of credit are commercial instruments that provide a seller or lender (the beneficiary) with a guaranteed means of payment from a creditworthy third party (the issuer) in lieu of relying solely on the financial status of a buyer or borrower (the applicant)." *Nissho Iwai Europe v. Korea First Bank,* 99 N.Y.2d 115, 119 (2002); *see also 3Com Corp. v. Banco do Brasil S.A.,* 171 F.3d 739, 741 (2d Cir.1999). "Three distinct contractual relationships are usually present when a letter of credit is issued":

(1) "the underlying agreement between the applicant ... and the beneficiary ..."; (2) the "contractual obligation ... between the issuer ... and its applicant ... regarding the terms of the letter of credit and the extent of funds to be made available"; and (3) the contractual obligation between the issuer and the beneficiary—that is, the letter of credit itself—which embodies "the issuer's commitment to 'honor drafts or other demands for payment presented by the beneficiary ... upon compliance with the terms and conditions specified in the credit.' " *Nissho Iwai Europe,* 99 N.Y.2d at 120 (citing *First Commercial Bank v. Gotham Originals,* 64 N.Y.2d 287, 294 (1985)). "Fundamental to the letter of credit transaction is the principle that 'the issuing bank's obligation to honor drafts drawn on a letter of credit by the beneficiary is separate and independent from any obligation of its customer to the beneficiary under the sale of goods contract and separate as well from any obligation of the issuer to its customer under their agreement.' " *3Com Corp.,* 171 F.3d at 741 (quoting *First Commercial Bank,* 64 N.Y.2d at 294); *see also Rockwell Int'l Sys., Inc. v. Citibank, N.A.,* 719 F.2d 583, 587 (2d Cir.1983) (letters of credit "represent separate contractual undertakings that are, in legal contemplation, wholly distinct from whatever performance they ultimately secure"); *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.,* 707 F.2d 680, 682 (2d Cir.1983) (bank's obligation to the beneficiary "is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction").

**\*7** "This independence principle is predicated upon the fundamental policy that a letter of credit would lose its commercial vitality if before honoring drafts the issuer could look beyond the terms of the credit to the underlying contractual controversy or performance between its customer and the beneficiary." *Township of Burlington v. Apple Bank for Sav.,* No. 94 Civ. 6116(JFK), 1995 WL 384442, at \*5 (S.D.N.Y.1995) (citing *KMW Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 16 (2d Cir.1979)). "If the documents ... comply with the terms of the credit, the issuer's duty to pay is absolute," regardless of what occurs in the related transaction." *Alaska Textile Co. Inc. v. Chase Manhattan Bank, N.A.,* 982 F.2d 813, 816 (2d Cir.1992).

The Second Circuit has explained the "independence principle" as follows:

> The fundamental principle governing documentary letters of credit and the characteristic which gives them their international commercial utility and efficacy is that the obligation of the issuing bank to [honor] a draft on a credit when it is accompanied by documents which appear on their face to be in accordance with the terms and conditions of the credit is independent of the performance of the underlying contract for which the credit was issued.

> This independence principle infuses the credit transaction with the simplicity and certainty that are its hallmarks. The letter of credit takes on a life of its own as manifested by the fact that in credit operations all parties concerned deal in documents, not in goods, services, and/or other performances to which the documents may relate.

*Id.* at 815–16 (internal citations and quotations omitted).

The "independence principle" is embodied in both the UCP and Article 5 of New York's Uniform Commercial Code (the "UCC"). *See* UCP, Article 3 ("Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit."); *id.,* Article 4 ("In Credit operations, all parties concerned deal with documents, and not with goods, services and/or other performances to which the documents may relate."); N.Y. U.C.C. Law § 5–103(d) ("Rights and obligations of an issuer to a beneficiary ... under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.").

Because of the "independence principle,"

> the issuing or confirming bank must honor a proper demand even though the beneficiary has breached the underlying contract, *Centrifugal*

*Casting Mach. Co. v. Am. Bank & Trust Co.,* 966 F.2d 1348, 1352 (10th Cir.1992)[,][and] even though the insolvency of the [bank's client] renders reimbursement impossible,

*Wood v. R.R. Donnelley & Sons Co.,* 888 F.2d 313, 318 (3d Cir.1989); and notwithstanding supervening illegality, impossibility, war or insurrection, *KMW* [*Intern. v. Chase Manhattan Bank, N.A.,*] 606 F.2d [10,] 16 [ (2d Cir.1979) ]. This independence principle is universally viewed as essential to the proper functioning of letters of credit and to their particular value. *Centrifugal,* 966 F.2d at 1352. The central purpose of the letter-of-credit mechanism would be defeated if courts felt free to examine the merits of underlying contract disputes in order to determine whether letters of credit should be paid. *Id.*

**\*8** *Semetex Corp. v. UBAF Arab Am. Bank,* 853 F.Supp. 759, 770 (S.D.N.Y.1994), *aff'd,* 51 F.3d 13 (2d Cir.1995). [5]

The duty of the issuing bank to pay upon the submission of documents which appear on their face to conform to the terms and conditions of the letter of credit is absolute, *see Bevene v. Irving Trust Co.,* 762 F.2d 4, 6 (2d Cir.1985), absent proof of intentional fraud on the part of the beneficiary. *See Voest–Alpine Int'l Corp.,* 707 F.2d at 686; *see also Semetex Corp .,* 853 F.Supp. at 773 (describing "narrow" fraud defense).

**B.** *The Parties' Obligations Under the Letter of Credit*
The Letter of Credit "is subject to and governed by the Laws of the State of New York and the 1993 revision of the Uniform Customs and Practice for Documentary Credits of the International Chamber of Commerce (Publication 500)," and provides that, "in the event of any conflict, the Laws of the State of New York will control." (ACE Appendix (Dkt. No. 60–5), Ex. 4 at 4)

"An irrevocable Credit constitutes a definite undertaking of the Issuing Bank, provided that the stipulated documents are presented ... to the Issuing Bank and that the terms and conditions of the Credit are complied with[,] ... to pay at sight...." UCP Article 9(a)(i); *see* N.Y. U.C.C. § 5–102(a)(10) (defining a "letter of credit" as "a definite undertaking ... by an issuer to a beneficiary at the request or for the account of an applicant ... to honor a documentary presentation by payment ..."); N.Y. U.C.C. § 5–108(a) ("Except [in instances of fraud], an issuer shall honor a presentation that, as determined by ... standard practice appears on its face strictly to comply with the terms and conditions of the letter of credit."); N.Y. U.C.C. § 5–108 cmt. 8 (noting that "standard practice" includes practice set forth in the UCP). "Upon receipt of the documents the Issuing Bank ... must determine on the basis of the documents alone whether or not they appear on their face to be in compliance with the terms and conditions of the Credit." UCP Article 14(b); *see* N.Y. U.C.C. § 5–108(a).

"Under New York law, in order to recover on its claim that the issuer wrongfully refused to honor its request to draw down on a letter of credit, the beneficiary must prove that it strictly complied with the terms of the letter of credit." *BasicNet S.p.A. v. CFP Servs. Ltd.,* 120 A.D.3d 97, 105 (1st Dep't 2014) (citations omitted); *see* UCP Article 13(a) (requiring that Banks "examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit"); *id.,* Unofficial Comments (describing Article 13(a) as "the UCP's statement of the strict compliance rule"); N.Y. U.C.C. § 5–108, cmt. 1 ("The standard of strict compliance governs the issuer's obligation to the beneficiary and to the applicant. By requiring that a 'presentation' appear strictly to comply, the section requires not only that the documents themselves appear on their face strictly to comply, but also that the other terms of the letter of credit such as those dealing with the time and place of presentation are strictly complied with.").

**\*9** "The strict compliance standard means that the conditions of the letter of credit must be complied with precisely by all parties; documents that are 'nearly the same' will not suffice." *Ocean Rig ASA v. Safra Nat. Bank of N.Y.,* 72 F.Supp.2d 193, 199 (S.D.N .Y.1999)

(quoting *Voest–Alpine Int'l Corp.,* 707 F.2d at 683); *see* *Alaska Textile Co.,* 982 F.2d at 816 ("Because the credit engagement is concerned only with documents, 'the terms and conditions of a letter of credit must be strictly adhered to ....' " (quoting *Corporation de Mercadeo Agricola v. Mellon Bank Int'l,* 608 F.2d 43, 47 (2d Cir.1979))). " 'This rule [of strict compliance] finds justification in the bank's role in the transaction being ministerial, and to require it to determine the substantiality of discrepancies would be inconsistent with its function.' " *Alaska Textile Co.,* 982 F.2d at 816 (alterations in original) (quoting *United Commodities–Greece v. Fid. Int'l Bank,* 64 N.Y.2d 449, 455 (1985)). Indeed, "[s]uch strict compliance standards allow the bank to act quickly, freeing it of the obligation to inquire into the underlying contracts and dealings between parties." *Ocean Rig,* 72 F.Supp.2d at 199 (citation omitted); *see* *Alaska Textile Co.,* 982 F.2d at 816 ("If the documents do comply with the terms of the credit, the issuer's duty to pay is absolute, regardless of whether the buyer-account party complains that the goods are nonconforming.").

Where documents appear on their face not to comply with the terms and conditions of the letter of credit, the issuer "may refuse to take up the documents" under the UCP, while—with limited exceptions—the issuer "shall dishonor [the] presentation" under the UCC. *See* UCP Article 14(b); N.Y. U.C.C. § 5–108(a). If the issuer "decides to refuse the documents, it must give [the beneficiary] notice to that effect ... without delay[,] but no later than the close of the seventh banking day following the receipt of the documents." UCP Article 14(d)(i); *see* N.Y. U.C .C. § 5–108(b). "Such notice must state all discrepancies in respect of which the bank refuses the documents...." UCP Article 14(d)(ii); *see* N.Y. U.C.C. § 5–108(b)(3).

Under both the UCP and the UCC, an issuer who does not comply with the requirement to provide timely notice of discrepancies is precluded from asserting non-compliance with the letter of credit as a basis for dishonor. *See* UCP Article 14(e); N.Y. U.C.C. § 5–108(c); *see also* *Hamilton Bank, N.A. v. Kookmin Bank,* 245 F.3d 82, 89 (2d Cir.2001) ("[T]he issuing bank 'must give notice [of its refusal] by telecommunication or, if that is not possible, by other expeditious means, without delay but no later than the close of the seventh banking day following the day of

receipt of the documents,' and its 'notice must state all discrepancies in respect of which the bank refuses the documents.' Failure to comply with Article 14's notice provisions, 'preclude[s the issuing bank] from claiming that the documents are not in compliance with the terms and conditions of the Credit.' " (quoting UCP Article 14(d)(i)-(ii), (e)) (second and third alterations in original));

📄 *Alaska Textile Co.,* 982 F.2d at 816 ("Issuers ... must swiftly and carefully examine documents submitted for payment; ... they are estopped from complaining about discrepancies they did not assert promptly."). Under the UCC, however, an issuer who does not comply may nevertheless assert fraud or forgery as a basis for dishonor. N .Y. U.C.C. § 5408(d) ("Failure to give [proper] notice ... or to mention fraud, forgery, or expiration in the notice does not preclude the issuer from asserting as a basis for dishonor fraud or forgery as described in subsection (a) of section 5–109....").

### C. *Analysis*

**\*10** ACE argues that (1) the Bank issued the Letter of Credit; (2) ACE submitted a draw request that complied with the terms of the Letter of Credit; and (3) the Bank wrongfully refused to pay, and did not provide timely notice of its dishonor. (Pltf.Br.(Dkt. No. 58) at 20–22)

The Court finds that ACE's draw request complied with the terms of the Letter of Credit. The Letter of Credit provides that "[f]unds under this Letter of Credit are available to [ACE] against [its] sight draft(s), drawn on [the Bank,] bearing the clause 'Drawn under Credit No. 0706035392.' " (ACE Appendix (Dkt. No. 60–5), Ex. 4 at 3; ACE R. 56.1 Stmt. ¶ 27) The Letter of Credit further provides that the Bank "agree[s] with the drawers ... of drafts drawn under and in compliance with the terms of this credit that such drafts will be duly honored upon presentation to the drawee." (ACE Appendix (Dkt. No. 60–5), Ex. 4 at 4; ACE R. 56.1 Stmt. ¶ 27) Here, ACE's March 16, 2011 draw request states "Drawn under Credit No. 0706035392" and is signed by an ACE officer. (ACE Appendix (Dkt. No. 60–26), Ex. 25 at 3–4; ACE R. 56.1 Stmt. ¶¶ 78, 80, 81) By its own terms, the Letter of Credit requires nothing more.

The Bank nevertheless refused to honor ACE's draw request. (ACE R. 56.1 Stmt. ¶ 86) On March 31, 2011—three days after the expiration of the seven-day banking deadline set forth in UCP Article 14(b) and UCC § 5–

108(b)—the Bank stated that it would not honor the draw request because (1) "ACE [had] not submitted any supporting documentation to the Bank"; (2) "the amount requested was for a settlement of a claim made pursuant to an automobile policy"; and (3) ACE had not submitted documentation "evidencing that relief from the bankruptcy estate was granted to consummate the settlement, evidencing whether ... the bankruptcy estate agreed to the settlement amount, or evidencing that the bankruptcy court approved the settlement." (ACE Appendix (Dkt. No. 60–27), Ex. 26 at 3–4; *see* ACE R. 56.1 Stmt. ¶ 86)

The Bank waived these defenses, however, because its response came more than seven days after ACE submitted its draw request. *See* UCP Article 14(e); N.Y. U.C.C. § 5–108(c). In any event, given that the Bank had issued a clean letter of credit (ACE R. 56.1 Stmt. ¶¶ 6, 18), which required no supporting documentation for payment of a draw request, the Bank's refusal cannot be justified by reference to collateral documents or transactions.[6] For all of these reasons, the Court finds that ACE's draw request was proper and that the Bank was required to honor it.

### III. *THE BANK'S FRAUD DEFENSE FAILS*

The Bank argues that it refused to honor ACE's draw request because honoring the request would have facilitated a "material fraud" under the UCC. More specifically, the Bank argues that ACE's actions with respect to the Bowman claim were improper, and that ACE therefore had no right to draw down on the Letter of Credit.

### A. *Applicable Law*

**\*11** "Fraud provides a well-established exception to the rule that banks must pay a beneficiary under a letter of credit when documents conforming on their face to the terms of the letter of credit are presented." *Semetex Corp.,* 853 F.Supp. at 773 (citations omitted). This exception has been codified in the UCC, which provides:

> If a presentation is made that appears on its face strictly to comply with the terms and conditions of the letter of credit, but a required document is forged or

materially fraudulent, or honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant ..., [t]he issuer, acting in good faith, may honor or dishonor the presentation...."

N.Y. U.C.C. Law § 5–109(a)(2). "[C]ourts must examine the underlying transaction when there is an allegation of material fraud, for only by examining that transaction can one determine whether a document is fraudulent or the beneficiary has committed fraud and, if so, whether the fraud was material." N.Y. U.C.C. Law § 5–109, Official Comment 1.

Courts have observed, however, that "because the smooth operation of international commerce requires that requests for payment under letters of credit not be routinely obstructed by prepayment litigation, the fraud exception to the independence principle 'is a narrow one' that is only available on a showing of 'intentional fraud.' " *BasicNet S.p.A.*, 120 A.D.3d at 111 (quoting *All Serv. Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil S.A.*, 921 F.2d 32, 35 (2d Cir.1990)). Indeed, as one court has observed, "[i]nquiry into collateral contracts under the doctrine of fraud in the transaction would eviscerate the commercial utility of the letter of credit by increasing the potential for litigation and judicial interference." *Banque Worms*, 679 F.Supp. at 1182–83.

These policies are reflected both in the case law and in the UCC's Official Commentary. Official Comment 1 explains that—under the UCC—(1) "fraud must be found either in the documents or must have been committed by the beneficiary on the issuer or applicant"; (2) "fraud must be 'material' "; and (3) "[m]aterial fraud by the beneficiary occurs only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor." N.Y. U.C.C. Law § 5–109, Official Comment 1. As to what constitutes "material fraud," the Comment "indorses articulations such as those stated in *Intraworld Indus. no Girard Trust Bank*, 336 A.2d 316 (Pa.1975), *Roman Ceramics Corp. v. People's Nat. Bank*, 714 F.2d 1207 (3d Cir.1983), and similar decisions[,] and embraces certain

decisions under [the former provision] that relied upon the phrase 'fraud in the transaction.' " N.Y. U.C.C. Law § 5–109, Official Comment 1; *see* N.Y. U.C.C. Law § 5–109, NYSBA Committee Report ("After numerous attempts to define 'fraud' or 'material fraud,' the Drafting Committee concluded that it was better to leave to the Official Comment and its reference to several cases an explanation of the types of fraud which would warrant injunctive relief."). The Comment explains that "[s]ome of these decisions have been summarized ... in *Ground Air Transfer, Inc. v. Westate's Airlines, Inc.*, 899 F.2d 1269, 1272–73 (1st Cir.1990)" and then quotes—at length—a passage from that case:

**\*12** "We have said throughout that courts may not *'normally'* issue an injunction because of an important exception to the general "no injunction" rule. The exception, as we also explained in *Itek [Corp. v. First Nat'l Bank]*, 730 F.2d [19,] 24–25 [ (1st Cir.1984) ], concerns 'fraud' so serious as to make it obviously pointless and unjust to permit the beneficiary to obtain the money. Where the circumstances *'plainly'* show that the underlying contract forbids the beneficiary to call a letter of credit, *Itek*, 730 F.2d at 24; where they show that the contract deprives the beneficiary of even a *' colorable'* right to do so, *id.*, at 25; where the contract and circumstances reveal that the beneficiary's demand for payment has 'absolutely no basis in fact,' *id.; see Dynamics Corp. of America [v. Citizens & S, Nat'l Bank]*, 356 F.Supp. [991,] 999 [ (N.D.Ga.1973) ]; where the beneficiary's conduct has 'so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served,' *Itek*, 730 F.2d at 25 (quoting *Roman Ceramics Corp. v. Peoples National Bank*, 714 F.2d 1207, 1212 n. 12, 1215 (3d Cir.1983) (quoting *Intraworld Indus.*, 336 A.2d at 324–25)); *then* a court may enjoin payment."

N.Y. U.C.C. Law § 5–109, Official Comment 1 (emphasis in original) (quoting *Ground Air Transfer*, 899 F.2d at 1272–73).

The cases cited in the Official Comment demonstrate a reluctance to examine the contracts and transactions underlying a letter of credit. For example, in *Intraworld*, the court explained that an "injunction is proper only if [the beneficiary] has no *bona fide* claim to payment

under the lease[,]" and that "neither the trial court nor this Court may attempt to determine [the beneficiary's] actual entitlement to payment under the lease[,]" given that "questions of rights and obligations under the lease are required by the lease to be determined" in collateral litigation. *Intraworld,* 336 A.2d at 325. Thus, the court concluded that "if the documents presented ... are genuine in the sense of having some basis in fact, an injunction must be refused." *Id.* In reaching this conclusion, the court observed that "[i]n light of the basic rule of the independence of the issuer's engagement and the importance of this rule to the effectuation of the purposes of the letter of credit, we think that the circumstances which will justify an injunction against honor must be narrowly limited to situations of fraud in which the wrongdoing of the beneficiary has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served." *Id.* at 324–25.

In *Roman Ceramics,* the court reiterated the principles set forth in *Intraworld,* observing that "[t]he Pennsylvania Supreme Court ... has already carefully weighed the competing strengths of the policies implicated by letters of credit ..., recogniz[ing] the need for unfettered commercial transactions, which a letter of credit serves[, on the one hand, and] ... the importance of the statutory exception to the general rule of independent obligations, when active fraud (as distinct from mere breach of warranty) is practiced by the beneficiary of the letter of credit." *Roman Ceramics,* 714 F.2d at 1213–14 (citing *Intraworld,* 336 A.2d 316). Additionally, the court noted that an issuer asserting fraud or forgery as a defense must demonstrate "that the claim of the party attempting to draw on the letter of credit 'has no basis in fact [,]' and thus that this party 'has no bona fide claim to payment' at all." *Id.* at 1214 (quoting *Intraworld,* 336 A.2d at 325). The court further observed that "[t]his very strong showing is consistent with the concern of the Pennsylvania Supreme Court in *Intraworld,* where that court sought to limit severely those situations where 'the legitimate purposes of the independence of the issuer's obligation would no longer be served.' " *Id.* (quoting *Intraworld,* 336 A.2d at 324–25).

**\*13** Courts interpreting the fraud exception under New York law have expressed similar views. The Second Circuit has explained that the fraud defense "authorizes dishonor only where 'a drawdown would amount to an outright fraudulent practice by the beneficiary.' " *3Com Corp.,* 171 F.3d at 747 (quoting *Recon/Optical Inc. v. Government of Israel,* 816 F.2d 854, 858 (2d Cir.1987)). "[C]ourts have found such 'outright fraudulent practice' only rarely[,]" however. *Semetex Corp.,* 853 F.Supp. at 774. For example, "if a draft is accompanied by documents evidencing shipment of goods under a contract of sale, the doctrine permits dishonor not where a legitimate dispute exists concerning whether the goods conform to the underlying contract, but only where the goods are so obviously defective that the representation of shipment is plainly false." *3Com Corp.,* 171 F.3d at 747 (citing *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 256 (1976); *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 720 (N.Y.Sup.Ct.1941)). Moreover, "if a draft is accompanied by a beneficiary's statement that the issuer's customer has materially breached the underlying contract, dishonor is permissible only where the beneficiary's claim of breach is clearly untenable." *Id.* (citing *Recon/Optical, Inc.,* 816 F.2d at 858; *Ground Air Transfer,* 899 F.2d at 1272–73; *Roman Ceramics,* 714 F.2d at 1214). In other words, "[t]he [fraud] defense is available only where intentional fraud is shown, not where the party alleges improper performance or breach of warranty." *Semetex Corp.,* 853 F.Supp. at 773 (citing *All Serv. Exportacao,* 921 F.2d at 35). Accordingly, the Second Circuit has held that summary judgment is appropriate even where "[a] legitimate dispute exists" concerning the beneficiary's right to draw under the letter of credit. *3Com Corp.,* 171 F.3d at 748.

Moreover, where an issuer has issued a so-called "clean" letter of credit, the Official Comment cautions that courts should be particularly "skeptical" of fraud claims. *See* N.Y. U.C.C. Law § 5–109, Official Comment 3. Specifically, Official Comment 3 provides:

> Whether a beneficiary can commit fraud by presenting a draft under a clean letter of credit (one calling only for a draft and no other documents) has been much debated. Under the current formulation it

would be possible but difficult for there to be fraud in such a presentation. If the applicant were able to show that the beneficiary were committing material fraud on the applicant in the underlying transaction, then payment would facilitate a material fraud by the beneficiary on the applicant and honor could be enjoined. The courts should be skeptical of claims of fraud by one who has signed a "suicide" or clean credit and thus granted a beneficiary the right to draw by mere presentation of a draft.

N.Y. U.C.C. Law § 5–109, Official Comment 3.

"The issuer bears the burden of proving the fraud if it alleges fraud as a defense to an action for wrongful dishonor." *Airline Reporting Corp. v. First Nat'l Bank of Holly Hill,* 832 F.2d 823, 827 (4th Cir.1987); *see 3Com Corp.,* 2 F.Supp.2d 452, 461 (S.D .N.Y.1998) ("Because [the issuer] has failed to demonstrate that a [genuine issue of] material fact exists on the fraud affirmative defense, the plaintiff is entitled to judgment as a matter of law."), *aff'd sub nom.* 3Com Corp., 171 F.3d 739; *Bank of Canton, Ltd. v. Republic Nat'l Bank of New York,* 509 F.Supp. 1310, 1318 (S.D.N.Y.1980) ("As the party defending against the claim for wrongful dishonoring of drafts drawn under a letter of credit, [the issuer] has the burden of establishing fraud in the underlying transaction...."), *aff'd,* 636 F.2d 30 (2d Cir.1980).

### B. *Analysis*

**\*14** The Bank argues that ACE's settlement of the Bowman claim is "void" because (1) ACE never sought relief from the bankruptcy court's automatic stay, nor requested bankruptcy court approval of its settlement of the Bowman claim (Def.Br.(Dkt. No. 64) at 9, 11–16; (2) ACE settled its own obligations, not those of its insured (*id.* at 12, 16–18; and (3) ACE had no right to reimbursement of the deductible, absent its insured's consent to the settlement or the *Bowman* court's approval, and ACE thus settled the Bowman claim in bad faith. (*Id.* at 12, 18–20, 25) According to the Bank, these failures

mean that "ACE had no colorable right to anticipate compliance with the Bowman Draw Request." (*Id.* at 23)

### 1. *The Bank's Burden to Show Material Fraud*
Although the Bank devotes many pages to explaining why ACE's conduct was improper—under bankruptcy law, under Louisiana state law, and under the terms of its agreements with AFS—it devotes little attention to the critical issue in this case: whether ACE's conduct evinced intentional, material fraud. Indeed, as a general matter, the independence principle bars most of the Bank's arguments.

As discussed above, the independence principle "is predicated upon the fundamental policy that a letter of credit would lose its commercial vitality if before honoring drafts the issuer could look beyond the terms of the credit to the underlying contractual controversy or performance between its customer and the beneficiary." *Township of Burlington,* 1995 WL 384442, at *5 (citing *KMW Int'l,* 606 F.2d at 16). While the fraud defense under UCC Section 5–109 provides an exception to the independence principle, in order to defeat summary judgment, the Bank must show that ACE's actions were *fraudulent,* not merely mistaken. *See Semetex Corp.,* 853 F.Supp. at 773 (fraud defense available "only where intentional fraud is shown, not where the party alleges improper performance or breach of warranty"); *Bank of Canton,* 509 F.Supp. at 1318 ("As the party defending against the claim for wrongful dishonoring of drafts drawn under a letter of credit, [the issuer] has the burden of establishing fraud in the underlying transaction."); *cf. Oei v. Citibank, N.A.,* 957 F.Supp. 492, 519–20 (S.D.N.Y.1997) (observing—in a letter-of-credit fraud case—that " 'mere allegations of breach of contract do not give rise to a claim for fraud or fraudulent inducement[,]' " but that "[a] fraud claim may survive, however, where 'the allegations contained [in the fraud claim] are separate and distinct from those giving rise to the breach of contract claim' " (quoting *Sudul v. Computer Outsourcing Servs.,* 868 F.Supp. 59, 61 (S.D.N.Y.1994); *Tuck Indus., Inc. v. Reichhold Chems., Inc.,* 151 A.D.2d 565, 566 (2d Dep't 1989))).

### 2. *ACE Acted Properly*
The Bank has offered no evidence that ACE acted improperly, much less that it committed fraud.

### a. *ACE Did Not Violate the Bankruptcy Code*

**\*15** The Bank argues that ACE's settlement of the Bowman claim is void because ACE never sought relief from the bankruptcy court's automatic stay, nor requested bankruptcy court approval of the settlement. (Def.Br. (Dkt. No. 64) at 9, 11–16)

A bankruptcy petition serves to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [the Bankruptcy Code], or to recover a claim against the debtor that arose before the commencement of the case under [the Bankruptcy Code]." 11 U.S.C § 362(a)(1). The purpose of the automatic stay is to "provide[ ] the debtor with 'a breathing spell from [its] creditors.' " *Teachers Ins. and Annuity Ass'n of America v. Butler,* 803 F.2d 61, 64 (2d Cir.1986). "By its terms, section 362 applies only to debtors, property of the debtor, or property of the estate, [however,] and [it] does not apply to stay proceedings against non-debtors." *In re Calpine Corp.,* 365 B.R. 401, 408 (S.D.N.Y.2007).

The Bank has cited no law demonstrating that ACE's payment of the Bowman claim violated the bankruptcy court's automatic stay. Indeed, in Louisiana, tort plaintiffs such as Bowman "have a substantive right of action against the insurer of [a] debtor [such as AFS], and there is no necessity of naming, or attempting to recover against ... the debtor," *Landry v. Exxon Pipeline Co.,* 260 B.R. 769, 795 (Bankr.M.D.La.2001). In *Landry,* the court found that the automatic stay provision in 11 U.S.C. § 362 does not apply to prevent direct actions against insurers of a debtor in "direct action states such as Louisiana," because in these circumstances the tort plaintiff is seeking to recover against the insurer and not against the debtor or its property. *Landry,* 260 B.R. at 795–96.

The Bank makes little effort to distinguish *Landry,* Indeed, the Bank acknowledges *Landry* 's holding "that proceeds used by an insurance company to pay its own obligations are not property of the estate." (Def.Br.(Dkt. No. 64) at 14) The Bank argues, however, that *Landry* nevertheless "recognized that an insurance policy owned by a debtor is property of the bankruptcy estate." (*Id.*) While the *Landry*

court observed that "[m]ost courts addressing whether 'property of the estate' includes insurance policies have held that an insurance policy owned by the debtor is property of the estate under 11 U.S.C. § 541," the court also noted "whether the funds paid by the Insurers on account of the insurance policies are property of the estate is an entirely different question." *Landry,* 260 B.R. at 784–85 (citations omitted). In the context of a direct action brought against an insurer, "[a] tort plaintiff is not suing to enforce the debtor's policy rights[;] a tort plaintiff wishes to enforce the judgment against the proceeds of that policy, in other words, funds payable by the insurer on account of the insurer's contractual assumption of liability via its insurance policy with the debtor." *Id.* at 795.

**\*16** In any event, to the extent the Bank is arguing that the automatic stay precludes ACE from drawing down on the Letter of Credit, that argument is foreclosed by the following language in this Court's August 3, 2012 opinion:

> "It is well settled that a letter of credit and the proceeds therefrom are not property of the debtor's bankruptcy estate." *In re Papio Keno Club, Inc.,* 247 B.R. 453, 459 (8th Cir.BAP2000) (*citing In the Matter of Compton Corp,* 831 F.2d 586, 589 (5th Cir.1987); *see also* Collier on Bankruptcy 362.03 [8][b]. "When the issuer honors a proper draft under a letter of credit, it does so from its own assets and not from the assets of its customer which caused the letter of credit to be issued." *Id.; see also In re Elegant Merchandising, Inc.,* 41 B.R. 398, 399 (Bankr.S.D.N.Y.1984) ("A letter of credit and its proceeds are not 'property of the estate' within the meaning of 11 U.S.C. 541, and therefore the payment of a letter of credit is not a transfer of assets in violation of the automatic stay provisions of 11 U.S.C. 362. The letter of credit and its proceeds constitute property of the bank."); *Praedium II Broadstone, LLC v. Wall Street Strategies, Inc.,* No. 04 Civ. 3880(WHP), 2004 WL 2624678, at \*2 (S.D.N.Y.2004) ("neither a letter of credit nor its proceeds are property of a bankruptcy estate under Section 541(a) of the [Bankruptcy] Code"); *In re Page,* 18 B.R. 713 (D.D.C.1982) ("cashing the letter of credit will not divest the estate of property since neither the letter of credit nor its proceeds are property of the estate under the Bankruptcy Code"); *Lower Brule Const. Co. v. Sheesley's Plumbing & Heating Co., Inc.,* 84 B.R. 638, 644 (D.S.D.1988) ("Proceeds of a letter of credit held by a creditor of the estate

for the benefit of a third party are not property of the debtor's estate."); *In re Pine Tree Elec. Co.,* 34 B.R. 199 (Bankr.D.Me.1983) ("In calling the letter of credit[, the beneficiary] is not acting to 'collect, assess, or recover a claim against the debtor that arose before the commencement of the case" in violation of 11 U.S.C. § 362(a)(6). Rather, [the beneficiary], in calling the letter of credit, seeks to enforce an independent, primary and direct obligation of the bank to it, the beneficiary of letter of credit.") (citing *In re Page,* 18 B.R. 713)."

*ACE Am. Ins. Co. v. Bank of the Ozarks,* No. 11 Civ. 3146(PGG), 2012 WL 3240239, at *6 (S.D.N.Y. Aug. 3, 2012).

The Bank's argument that the settlement of the Bowman claim was subject to Bankruptcy Rule 9019 is likewise without merit. Indeed, the U.S. Bankruptcy Court for the Eastern District of Arkansas—where AFS's bankruptcy proceeding is pending—has explained that, "by its own terms, Rule 9019(a) applies to trustees (including debtors-in-possession) and therefore does not require parties other than a trustee or debtor-in-possession to obtain court approval of settlements that do not affect the debtor's estate ...." *In re McKay,* 443 B.R. 511, 523 (Bankr.E.D.Ark.2010). Accordingly, ACE's settlement of the Bowman claim was appropriate, notwithstanding AFS's pending bankruptcy proceeding.

#### b. *ACE's Settlement of the Bowman Claim Was Proper*
**\*17** The Bank argues that ACE had no right to reimbursement of the deductible absent its insured's consent to the settlement or the *Bowman* court's approval, and that ACE settled the Bowman claim in bad faith. (Def.Br.(Dkt. No. 64) at 12, 18–20, 25) These arguments offer no proof that ACE committed fraud, however, and in any event are wrong on both the facts and the law.

In support of its argument that ACE had no right to reimbursement of the deductible, the Bank relies on *Employers' Surplus Line Ins. Co. v. City of Baton Rouge,* 362 So.2d 561, 563 (La.1978). There, the court interpreted a contract in which "the insurer's right to reimbursement from the insured ... [was] conditioned upon the Insured's becoming 'legally obligated' to pay by reason of bodily injury or property damage claims resulting from an

occurrence covered by the policy." *Id.* Given this feature of the contract, the court found:

> An insured becomes legally obligated to pay only as a result of a final judgment of court. In such an event, the insurer would be entitled to reimbursement from the insured under this provision of the policy. Absent such a final determination of the insured's legal obligation to pay by a court of law, the insurer would not be entitled to reimbursement. On the other hand, if the insurer settles the claims of third persons against the insured, as in the instant case, the insurer would be entitled to reimbursement from the insured provided the insured consented to the settlement agreement.

*Employers' Surplus,* 362 So. at 564–65. Of course, the court's interpretation of the phrase "legally obligated to pay" in *Employers' Surplus* cannot be divorced from the contract that was the subject of that lawsuit. Indeed, courts have found *Employers' Surplus* "factually distinguishable" where a contract contains a "specific endorsement ... requir[ing] [the insured] to reimburse [the insurer] for all or part of the amount deductible if [the insurer] pays it 'to settle any claim or suit.' " *Reliance Nat'l Indem. Co. v. Evans Cooperage Co.,* Civ. A. No. 95–1917, 1996 WL 288284, at *1 (E.D.La. May 29, 1996). In such contracts, the parties may "provide the insurer with unfettered discretion to investigate, negotiate and enter into settlement agreements which are binding on the insured." (*Id.*)

Here, the agreements between AFS and ACE require AFS to pay its deductible when ACE settles a claim for it under the Automobile Policy. Specifically, the deductible endorsement provides—in Item 4—that ACE "will have the right at [its] sole discretion ... [t]o pay any amounts within the Deductible Per Accident to settle any claim or 'suit[.]' " and that AFS "shall promptly reimburse [ACE] for any sums [ACE] may have paid under Item 4." (ACE R. 56.1 Stmt. ¶¶ 39–40) Moreover, the Collateral Agreement provides that AFS will pay "all ... amounts

the Insured is or may in the future be required to pay or reimburse in accordance with the terms and conditions of any Policies, ... including without limitation the Insured's share of Paid Losses within applicable Deductible(s) ... and the Insured's share of Allocated Loss Adjustment Expense as specified in the applicable Policy and/or Notice of Election[,]" as well as "all amounts the Insured is or may be obligated to pay to other parties but which are paid by [ACE]...." (ACE Appendix (Dkt. No. 60–8), Ex. 7 at 2–3) Accordingly, the agreements here do not fall within the principle stated in *Employers' Surplus.* In short, ACE had a right to repayment of the deductible amount and committed no fraud in submitting the draw request reflecting that amount.

 **\*18** The Bank's arguments about bad faith settlement here also miss the point. In order to defeat ACE's demand for payment on the Letter of Credit, the Bank must offer evidence that ACE committed fraud in submitting the draw request. This is not an action between an insured and an insurer about whether the insurer settled a claim in bad faith. And to treat this action founded on a letter of credit as if it were an insurance dispute would turn the law concerning letters of credit—discussed at length above— on its head.

In any event, the Bank has not shown that ACE settled the Bowman claim in bad faith. The Bank relies on *Commerce & Industry Insurance Co. v. North Shore Towers Management Inc.,* 162 Misc.2d 778 (N.Y.Civ.Ct.1994), in which the court observed that "[c]ases involving settlements within a deductible ... present a potential conflict between the insured's interest in paying as small a part of the deductible as possible, and the insurer's interest in limiting its own exposure to liability by ensuring a settlement within the deductible, or in avoiding litigation expenses to seek dismissal of a claim which may readily be settled within the deductible." *Id.* at 780. Thus, "a bad-faith claim may be raised as to an insurer's settlement within policy limits which causes the insured to become liable for a deductible." *Id.* (citations omitted). The court also observed, however, that "to prevail on a bad-faith claim, the insured must meet a demanding standard on which it has the burden of proof." *Id.* at 781. "[A] showing must be made that the 'insurer's conduct constituted a 'gross disregard' of the insured's interests—that is, a deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering a settlement offer.' " *Id.* (quoting *Pavia*

*v. State Farm Mut. Auto. Ins. Co.,* 82 N.Y.2d 445, 453 (1993)).

In this regard, "[t]he adequacy of the insurer's investigation of the claim and the potential liability of the insured to the claimant ... [are] relevant to the bad-faith inquiry...." *Id.* at 782. Nevertheless, "in evaluating these aspects of the 'bad faith equation[,]' ... the court cannot be called upon in effect to try the underlying claim." *Id.* " 'A determination of [bad] faith cannot be made to turn on an unavoidably speculative prognostication of the outcome of an unfinished [or never commenced] trial' "; instead, "the inquiry must be limited to whether the insurer had an 'arguably prudent' basis for its assessment of the insured's liability and for its position on settlement." *Id.* at 782–83

(quoting *Orion Ins. Co. v. Gen. Elec. Co.,* 129 Misc.2d 466, 475 (N.Y.Sup.Ct.1985) (alterations in original), *aff'd sub nom., U.S. Aviation Underwriters, Inc. v. Gen. Elec. Co.,* 125 A.D.2d 567 (2d Dep't 1986)).

Here, the Bank has offered no evidence that ACE acted against AFS's interests in settling the Bowman claim. As discussed above, the Bowman claim stemmed from a multiple-car accident in which AFS's employee—a driver with a history of prior accidents—made a wide turn and struck the rear of another car, which in turn hit a second car that then hit a third car. (ACE R. 56.1 Stmt. ¶ 68) Given the driver's "failure to keep his vehicle under control" and "failure to watch where he was proceeding on the road," the claims adjuster determined that the likelihood of an adverse verdict was 100%. (*Id.* ¶ 69) ACE retained counsel, who then obtained medical records for the Bowmans and arranged for an independent medical examination. (*Id.* ¶ 71) Although ACE had been advised that the lawsuit was "unwinnable[,]" counsel managed to settle the case—after a mediation—for $100,000. (*Id.*) Nothing in this record suggests bad faith, much less fraud.

 **\*19** Although the Bank argues that ACE's settlement for the deductible amount is "suspicious[ ]" (Def.Br.(Dkt. No. 64) at 17), the Bank does not argue that ACE "engaged in a pattern of settling the claims for the amount of the deductible." *Commerce,* 162 Misc.2d at 783. Indeed, in its opposition brief, the Bank states that it "is not asking this Court to evaluate the merits of the settlements ." (Def.Br. (Dkt. No. 64) at 14 n. 4) The Bank nonetheless argues, however, that, "[b]y virtue of this settlement amount, ACE would avoid paying a penny towards the settlement of the Bowman claim while, at the same time, generating the

maximum liability for Ozarks ." (*Id.* at 17) This argument, of course, ignores the fact that ACE incurred more than $31,000 in expenses in defending the *Bowman* action, which it is not likely to recover from the bankrupt AFS. (ACE R. 56.1 Stmt. ¶ 72)

In sum, the Bank has not offered evidence demonstrating that ACE acted in bad faith in settling the Bowman claim, much less that it committed fraud in seeking payment on its draw request. [7]

## IV. *DECLARATORY JUDGMENT*

Plaintiff seeks a declaration that "defendant is obligated to honor and pay plaintiff the amount of any sight draft within seven banking days from the day of defendant's receipt of such sight draft provided that plaintiff presents defendant with a sight draft, drawn on defendant, bearing the clause 'Drawn under Credit No. 0706035392[ .]" (Dkt. No. 57)

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration...." *28 U.S.C. § 2201(a).* The Act thus "confers on federal courts 'unique and substantial discretion in deciding whether to declare the rights of litigants.' " *Peconic Baykeeper, Inc. v. Suffolk County,* 600 F.3d 180, 187 (2d Cir.2010) (quoting *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286 (1995)). In determining whether declaratory relief is warranted, "[t]he court must consider whether a declaratory judgment will (1) 'serve a useful purpose in clarifying and settling the legal relations in issue;' or (2) 'afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.' " *Camofi Master LDC v. College P'Ship, Inc.,* 452 F.Supp.2d 462, 480 (S.D.N.Y.2006) (quoting *Cont'l Cas. Co. v. Coastal Sav. Bank,* 977 F.2d 734, 737 (2d Cir.1992)). When the court in its discretion determines that either of these conditions is satisfied, it is " 'required to entertain a declaratory judgment action....' " *Cosa Instrument Corp. v. Hobre Instruments BV,* 698 F.Supp.2d 345, 350 (E.D.N.Y.2010) (emphasis in original) (quoting *Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 597 (2d Cir.1996)).

Here, it is clear that there is an "actual controversy" and that a grant of declaratory relief would "serve a useful purpose in clarifying and settling the legal relations in issue." *Camofi Master LDC,* 452 F.Supp.2d at 480. As noted above, this is the second lawsuit arising from the parties' ongoing disagreement about the Bank's obligation to satisfy ACE's draw requests on the Letter of Credit. The instant case presents the same issues as those in the prior action before Judge Kaplan (09 Civ. 8938(LAK)), in which ACE also claimed that the Bank had failed and/or refused to pay certain then-pending draw requests. (09 Civ. 8938(LAK), Dkt. No. 5 (Amended Complaint)) Judge Kaplan found that "it is quite clear that there is a real disagreement between ACE and the Bank," but he dismissed the declaratory judgment claim on March 18, 2010, because he believed that the Letter of Credit would be terminated by the Bank effective June 1, 2010. (09 Civ. 8938(LAK), Dkt. No. 21) The Letter of Credit was not terminated, however, and the identical legal issues have resurfaced. Moreover, since this action was filed, AGE has submitted—and the Bank has refused to honor—two additional draw requests related to the Automobile Policy. (ACE R. 56.1 Stmt. ¶¶ 96, 105, 107) Under these circumstances, a declaratory judgment would "serve a useful purpose in clarifying and settling the legal relations in issue" and "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Camofi Master LDC,* 452 F.Supp.2d at 480.

**\*20** Accordingly, based on the analysis of the Letter of Credit set forth above, the Court declares that the Bank is obligated to honor and pay ACE the amount of any sight draft within seven banking days from the day of the Bank's receipt of such sight draft, provided that ACE presents the Bank with a sight draft, drawn on the Bank, bearing the clause "Drawn under Credit No. 0706035392."

## *CONCLUSION*

For the reasons stated above, Plaintiffs motion for summary judgment is granted. The Cleric of the Court is directed to terminate the motions (Dkt.Nos.51, 57), and to close this case.

SO ORDERED.

84 UCC Rep.Serv.2d 834

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4953566, 84 UCC
Rep.Serv.2d 834

Footnotes

1   To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements, it does so because
    the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. *See*
    *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003) ("If the opposing party ... fails to controvert a fact
    so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where
    the Defendant—the party opposing summary judgment here—disagrees with the moving party's characterization of the
    cited evidence, and has presented an evidentiary basis for doing so, this Court relies on the its characterization of the
    evidence. *See* *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir.2001) (court must draw all rational factual inferences
    in non-movant's favor in deciding summary judgment motion).

2   Citations are to the page numbers as they appear on the ECF system.

3   In the Collateral Agreement, references to "the Insured" are to AFS and references to "the Company" are to ACE. (ACE
    Appendix (Dkt. No. 60–8), Ex. 7 at 2)

4   The "Insured's Obligation" is defined as "all amounts that the Insured is or may in the future be required to pay or reimburse
    to the Company or any of its Affiliates, or any Claims Adjusting Service, pursuant to the Insurance Agreements, including
    the Policies, including Ultimate Losses as calculated by the Company." (ACE Appendix (Dkt. No. 60–8), Ex. 7 at 4)

    The "Insurance Agreements" are defined as "(i) all policies of insurance previously issued, now in force and/or hereafter
    issued (whether or not any such policies have expired or expire hereafter) by the Company or any of its Affiliates to the
    Insured and/or any of its Affiliates (individually or with any other named insured on such policy), including the Policies,
    and any Notices of Election and (ii) this Agreement, and (iii) any and all previously existing, now and/or hereafter
    created ... deductible agreements, ... claims servicing or adjusting agreements, ... or any other agreement among
    the Company and/or any of its Affiliates and the Insured and/or any of its Affiliates ..., together with all amendments,
    modifications, renewals, or extensions thereof, relating to any policies issued to the Insured or any of its Affiliates by
    the Company or any of its Affiliates." (*Id.*)

    The "Policies" are defined as, "collectively, Policies listed in any Notice of Election, and all renewals or extensions
    thereof, including any and all Deductible Policies...." (*Id.* at 5)

    "Ultimate Losses" are defined as "losses incurred under the Insurance Agreements, including the Policies, within the
    respective deductibles or loss limitations plus future loss development and the amount of losses incurred but not
    reported, as estimated by the Company. Ultimate Losses may include Allocated Loss Adjustment Expense to the extent
    specified in the applicable Notice of Election or Policies, as estimated by the Company pursuant to the applicable
    Notice of Election." (*Id.*)

5   *See* *Wood,* 888 F.2d at 318 ("The issuer must pay even if both the customer and the beneficiary are insolvent,
    rendering it impossible to obtain reimbursement for the issuer's honor.") (citing *Eakin v. Cont'l Ill. Nat'l Bank & Trust
    Co.,* 875 F.2d 114, 116 (7th Cir.1989) ("Issuers of letters of credit take the risk of insolvency. Standby letters of credit are
    especially designed to deal with insolvency, and the fact that this risk came to pass ... does not afford [a bank] a good
    reason for balking [at satisfying a draw request].")).

6   To the extent the Bank argues that the Letter of Credit was a "standby" letter of credit, which required ACE to certify that
    AFS had defaulted (*see* Def. Br. (Dkt. No. 64) at 11), that argument is unavailing. First, the Bank waived this argument—
    insofar as it rests on a theory of non-compliance, rather than a theory of fraud—by failing to respond within seven banking
    days. *See* UCP Article 14(d)(i)-(ii), (e); N.Y. U.C.C. § 5–108(b)–(c); *Hamilton Bank, N.A.,* 245 F.3d at 89. Second, "it is
    well settled that ambiguities [in a letter of credit] will be construed strongly against the issuer...." *Ocean Rig,* 72 F.Supp.2d
    at 204 (citing *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 466 (2d Cir.1970); *Bank of China v. Chan,*
    937 F.2d 780, 786 (2d Cir.1991)). Here, the Letter of Credit makes no reference to any collateral documents. In fact, the
    Letter of Credit's merger clause states that "[t]his Letter of Credit sets forth in full the terms of our undertaking[,]" which
    "shall not in any way be modified, amended or amplified by reference to any document or instrument referred to herein

or in which this Letter of Credit is referred to or to which this Letter of Credit relates...." (ACE Appendix (Dkt. No. 60–5), Ex. 4 at 3–4) Thus, the Letter of Credit admits of no ambiguity. Even if the Letter of Credit were ambiguous—which it is not—any such ambiguity would be "construed strongly against [the Bank]." *Ocean Rig,* 72 F.Supp.2d at 204.

**7**    The Bank argues that ACE's motion should be denied under Fed.R.Civ.P. 56(d) because ACE has not produced certain documents related to the Bowman settlement or ACE's estimated liability on current or future claims. (Def.Br.(Dkt. No. 64) at 31–32) In this regard, the Bank submitted a letter to the Court on October 23, 2013, contending that ACE had wrongfully withheld certain material on the grounds of attorney-client privilege and work product privilege. (*See* Dkt. No. 51) The Bank sought the Court's permission to file a motion to compel discovery. (*Id.* at 4) When ACE filed the instant motion, the Bank's letter was *sub judice.*

Fed.R.Civ.P. 56(d) provides that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may ... (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed.R.Civ.P. 56(d).

The Bank's motion to compel discovery of the material withheld on privilege grounds is denied. (Dkt. No. 51) It is obvious from the privilege and redaction logs submitted to the Court that the vast bulk of the material withheld by Plaintiff's counsel reflects communications of ACE's in-house counsel and outside counsel (including counsel in the instant case, bankruptcy counsel, and the Louisiana law firm representing ACE in the *Bowman* case). (*See* Jacobs Nov. 22, 2013 Ltr.; Pikus Nov. 26, 2013 Ltr.) As to the remaining redacted material, Plaintiff's counsel represents that it reflects legal advice or an attorney's thoughts or impressions. (Jacobs Oct. 28, 2013 Ltr. (Dkt. No. 53) at 4 n. 3) There is no reason to distrust that representation under the circumstances of this case.

It is also worth noting that the Bank received, during discovery, access to all non-privileged materials contained in the Bowman claim file. (*Id.* at 4) Given that, as stated above, this action is not about whether ACE settled the Bowman claim in bad faith, there is no reason to believe that any documents withheld on privilege grounds would have been material to this Court's determination that ACE is entitled to payment on its draw request pursuant to the Letter of Credit.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4298572
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ralph L. BALLARD III, individually, and in
his capacity as Seller Representative under
a certain Purchase Agreement, Plaintiff,

v.

PARKSTONE ENERGY, LLC, formerly
known as AMG Acquisition, LLC, Defendant.

No. 06 Civ. 13099(RWS).
|
Sept. 19, 2008.

**Attorneys and Law Firms**

Brown Rudnick Berlack Israels LLP, by: David J.
Molton, Esq., Peter Adelman, Esq., New York, NY, for
Plaintiff.

Frost Brown Todd LLC, by: Denise H. McClelland, Esq.,
Lexington, KY, Peter M. Levine, Esq., New York, NY,
for Defendant.

*OPINION*

SWEET, District Judge.

 **\*1** Defendant Parkstone Energy, LLC ("Parkstone" or
the "Defendant") has moved, pursuant to Local Rule
56.1, for reconsideration of this Court's November 27,
2007, opinion denying the parties' cross-motions for
summary judgment (the "November 27th Opinion").
*Ballard v. Parkstone Energy, LLC,* 522 F.Supp.2d
695 (S.D.N.Y.2007). By separate motion, Parkstone
has requested leave to file an amended answer and
counterclaim in this action, pursuant to Fed.R.Civ.P.
15(a). For the reasons set forth below, Parkstone's motion
for reargument is denied, and its motion to amend is
granted.

*Facta and Prior Proceedings*
The parties' familiarity with the facts and prior
proceedings in this action is assumed. In brief, this
litigation arises out of an October 2005 agreement (the

"Purchase Agreement") between the parties under which
Parkstone, then known as AMG Acquisition, LLC,
bought for $42 million six companies in the business of
operating coal mining washing and loading facilities and
selling and brokering coal products in West Virginia (the
"Companies"). Plaintiff Ralph L. Ballard III ("Ballard"
or the "Plaintiff") was the Seller Representative for
the Companies. The Purchase Agreement contained a
holdback provision of $2 million to provide for an
adjustment for Closing Working Capital Statement, and
it is that adjustment which is at the center of this dispute.

Parkstone's motion for reargument was marked fully
submitted on January 8, 2008. Parkstone's motion to
amend was marked fully submitted on January 30, 2008.

*Parkstone's Motion for Reconsideration is Denied*
To prevail on a motion for reconsideration, "the moving
party must demonstrate controlling law or factual
matters put before the court on the underlying motion
that the movant believes the court overlooked and
that might reasonably be expected to alter the court's
decision." *Parrish v. Sollecito,* 253 F.Supp.2d 713, 715
(S.D.N.Y.2003). Alternatively, "[r]econsideration may be
granted to correct clear error, prevent manifest injustice
or review the court's decision in light of the availability
of new evidence." *Id.* (citing *Virgin Atl. Airways, Ltd. v.
Nat'l Mediation Bd.,* 965 F.2d 1245, 1255 (2d Cir.1992)).
A motion for reconsideration "is not intended as a
vehicle for a party dissatisfied with the Court's ruling to
advance new theories that the movant failed to advance
in connection with the underlying motion, nor to secure
a rehearing on the merits with regard to issues already
decided." *Id.* (citation omitted). Therefore, "Local Rule
6.3 is to be narrowly construed and strictly applied in
order to avoid repetitive arguments on issues that the
court has fully considered." *Abrahamson v. Bd. of Educ.,*
237 F.Supp.2d 507, 510 (S.D.N.Y.2002).

In support of its motion, Parkstone argues that the Court
committed an error of law by engaging in "credibility
assessments and issue-determination" in its November
27th Opinion. *See* Def.'s Rep. Mem. in Supp. at 1. In
that Opinion, in an attempt to "clarify the issues and ...
to encourage the parties to reach a practical commercial
resolution of their dispute rather than to continue the
extensive litigation.," *Ballard,* 522 F.Supp. at 697, the
Court highlighted the central material factual dispute,
namely, whether or not that Closing Working Capital

Statement delivered by Byrd White was authorized. In addition, the Court explained that Parkstone had failed to establish, *inter alia,* that the Purchase Agreement was modified by the parties' conduct, that Ballard had failed to abide by the terms of the Purchase Agreement, and that the arbitration clause had been triggered. However, the Court did not issue an order pursuant to Fed.R.Civ.P. 56(d) establishing facts, nor did it issue any order granting partial summary judgment to either side based on any of those findings. Therefore, Parkstone's instant motion essentially seeks to challenge the Court's interpretation of the evidence, and its conclusion that Parkstone had failed to establish its entitlement to summary judgment.

**\*2** While Parkstone may disagree with the Court's assessment of the evidence, in the absence of any indication that the Court overlooked any controlling law or factual matters, Parkstone's motion is denied. *See In re Houbigant, Inc.,* 914 F.Supp. 997, 1001 (S.D.N.Y.1996) ("A Rule 3(j) [the predecessor to Local Rule 6.3] motion is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved.").

### *Parkstone's Motion to Amend is Granted*

Parkstone seeks to file an amended answer and counterclaim asserting nine additional affirmative defenses, as well as counterclaims based upon Ballard's alleged indemnity obligations under the Purchase Agreement. According to Parkstone, pursuant to Section 9.2 of the Purchase Agreement, Ballard is obligated to indemnify Parkstone for any and all losses exceeding $100,000 and up to an aggregate $20,000,000 arising out of or related to: (i) any inaccuracy of representation or breach of any warranty of any of the sellers in the Purchase Agreement; (ii) any breach of any covenant, undertaking or other agreement of any seller contained in the Purchase Agreement; (iii) any and all pre-closing taxes and all related liabilities, costs and expenses; and (iv) any losses relating to retained liabilities.

In its proposed amended answer and counterclaims, Parkstone seeks enforcement of Ballard's alleged indemnification obligations, arguing that Ballard breached certain representations, warranties, covenants and/or agreements relating to the Companies' financial statements by failing to pay production royalty payables in the ordinary course of business, failing to pay accounts payable in the ordinary course of business, and offering

Parkstone inaccurate reports of accounts and notes payable. Am, Ans. and Countercls. ¶¶ 23-24. Parkstone further alleges that it is entitled to indemnification for losses pertaining to the "Blair lawsuit" and West Virginia tax obligations. Parkstone also asserts a claim for breach of contract, alleging that it has provided proper notice and made proper demand for indemnity, and Ballard has refused to comply, thereby causing damages to Parkstone, "including the failure to receive all the assets purchased and/or incurring obligations for undisclosed or increased Liabilities." Am. Ans. and Countercls. ¶ 55.

Ballard opposes Parkstone's motion to amend, arguing that a number of the affirmative defenses contained in the proposed amended answer and counterclaims were rejected by the Court in its November 27th Opinion, that the indemnity counterclaims are futile, that Parkstone, acting in bad faith, has intentionally delayed filing a motion to amend, and that permitting Parkstone to amend its answer and counterclaims would cause undue prejudice to Ballard. Ballard further asserts that through correspondence to Parkstone by his counsel, he has acknowledged his obligations to indemnify Parkstone for damages resulting from the Blair lawsuit and the West Virginia tax obligations, and Parkstone should not be permitted to amend its answer and counterclaims to include these claims.

### *A. Rule 15 Standard*

**\*3** Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a)(2). Nonetheless, leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Littlejohn v. Artuz,* 271 F.3d 360, 363 (2d Cir.2001) ("Although Rule 15 requires that leave to amend be 'freely given,' district courts nonetheless retain the discretion to deny that leave in order to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive.").

#### *i. Futility*

The party opposing a motion to amend bears the burden of establishing that an amendment would be futile. *See*

*Blaskiewicz v. County of Suffolk,* 29 F.Supp.2d 134, 137-38 (E.D.N.Y.1998) (citing *Harrison v. NBD Inc.,* 990 F.Supp. 179, 185 (E.D.N.Y.1998)). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b) (6)." *Oneida Indian Nation of New York v. City of Sherrill,* 337 F.3d 139, 168 (2d Cir.2003) (citing *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)); *see also A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 298 (S.D.N.Y.2000) (explaining that if the proposed amendment "would be subject to immediate dismissal for failure to state a claim or on some other ground, the Court will not permit the amendment") (quotation marks and citation omitted). Therefore, "[f]or the purposes of evaluating futility, the 12(b)(6) standard is applied: all well pleaded allegations are accepted as true, and all inferences are drawn in favor of the pleader." *E\*Trade Fin. Corp. v. Deutsche Bank AG,* 420 F.Supp.2d 273, 282 (S.D.N.Y.2006) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993)).

Ballard asserts that the indemnity claims would be futile as a result of Parkstone's alleged failure to timely provide proper notice of its claims before the November 21, 2007, as required by Section 9.4(a) of the Purchase Agreement. While Parkstone asserts that a letter sent by its counsel to Ballard on November 16, 2007, constituted the required notice, Ballard argues that the letter was lacked the "reasonable detail" required under Section 9.4(a) and asserts that Parkstone's counsel acknowledged this deficiency by stating in a subsequent letter to Ballard, dated December 7, 2007, that "additional factual information and reasonable detail [would] be provided shortly." *See* Decl. of Peter Adelman Exs. 2, 5. Parkstone replies that its promise to provide "additional" detail was not a concession of the deficiency of its purported notice.

Ballard further asserts that Parkstone's indemnity claims, other than those regarding the Blair lawsuit and the West Virginia tax obligations, would be futile on the basis that Parkstone did not suffer any "losses" as a result of the indemnifiable events, as required under Section 9.2 of the Purchase Agreement.

**\*4** The issues of whether or not the November 16, 2007, letter constituted notice under Section 9.4(a) of the Purchase Agreement and whether Parkstone suffered any losses as a result of the alleged breaches of representations and warranties in the Purchase Agreement both involve questions of fact that cannot be resolved on this motion. As the Court is required to accept the pleaded allegations as true in considering this motion, it cannot say that the indemnity claims, on their face, are futile.

In addition, to the extent that Ballard argues that Parkstone should not be permitted to plead counterclaims related to the Blair lawsuit and West Virginia tax obligations because Ballard does not dispute his obligation to indemnify parkstone for these liabilities, and, in fact, "acknowledged responsibility" for these liabilities in a November 26, 2007, letter to Parkstone, *see* Pl.'s Mem. in Opp. at 19-21, that argument is rejected. If and when Ballard indemnifies Parkstone for these liabilities and the parties enter into a stipulation that the issue has been resolved, the relevant counterclaims may be dismissed.

*ii. Undue Delay and Bad Faith*

Ballard asserts that Parkstone has unduly delayed in filing this motion, as Parkstone has had access to the financial records underlying its claims since at least November 2005, and Parkstone concedes that it was aware its indemnity claims by May 2007. According to Ballard, Parkstone delayed for the purpose of waiting for the Court's summary judgment opinion, in the hopes that the Court would adopt Parkstone's position that this case should be before an arbitrator rather than this Court.

Parkstone states it did not discover the facts underlying these new indemnity claims until after the filing of the original answer and counterclaims and the cross-motions for summary judgment. The complaint in the "New Blair Lawsuit" currently at issue was not filed until November 7, 2007, and, according to Parkstone, it did not discover the alleged "significant accounting errors, omission, misrepresentations and breaches by Ballard" giving rise to its additional indemnity claims until May 2007, when its audit of the 2006 financial statements of the Companies' was completed.

"Mere delay provides an insufficient basis to deny a motion to amend absent a showing of bad faith or undue prejudice." *ResQNet.com, Inc. v. Lansa, Inc.,* 382

F.Supp.2d at 451 (citation omitted). Even if the Court were to assume that Parkstone was aware of the relevant facts at a date prior to the May 2007 close of its audit, amendment would not be properly denied on that basis alone, as "parties 'have been permitted to amend their pleadings to assert new claims long after they acquired the facts necessary to support those claims.' " *ResQNet.com,* 382 F.Supp.2d at 450 (quoting *Richardson Greenshields Secs., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987) (collecting cases)). Moreover, here, the period between the filing of Parkstone's original answer in February 2007 and January 8, 2008, the date of its request to file an amended answer and counterclaim, is shorter than those periods in many cases in which amendments have been allowed. *See, e.g., ResQNet.com,* 382 F.Supp.2d at 450-51 (granting leave to amend two-and-a-half years after initial amended answer and counterclaim filed); *Richardson Greenshields,* 825 F.3d at 652 n. 6 (collecting cases).

**\*5** Ballard further asserts that Parkstone is acting in bad faith by attempting to replead defenses already rejected by the Court in its November 27th Opinion. However, as the Court denied summary judgment to both parties in its November 27th Opinion and did not, therefore, issue final judgment on any of the parties' claims, Parkstone will be permitted to file its proposed amended affirmative defenses.

### iii. Undue Prejudice

To determine whether there would be undue prejudice from a proposed amendment, a court must consider whether the new aspects of the proposed pleading would " '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.' " *Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 284 (2d Cir.2000) (quoting *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993)). "The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial." *Fariello v. Campbell,* 860 F.Supp. 54, 70 (E.D.N.Y.1994) (citation omitted).

In asserting that it will suffer undue prejudice if Parkstone's motion is granted, Ballard again argues that Parkstone unnecessarily delayed in bring in this motion and was well aware of its proposed claims months before it filed its initial pleadings. As noted above, delay alone typically provides an insufficient basis for denying a motion to amend. *See Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 339 (2d Cir.2000); *Rachman Bag Co. v. Liberty Mut. Ins. Co.,* 46 F.3d 230, 234-35 (2d Cir.1995) (citing *State Teachers Ret. Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981)). Moreover, while Ballard states that he "has not been afforded the opportunity to take any discovery whatsoever as to Parkstone's proposed indemnification claims or its new affirmative defenses," Pl.'s Mem. in Opp. at 18, " 'the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading.' " *Bridgeport Music, Inc. v. UMG Recordings, Inc.,* No. 05 Civ. 6430(JCF), 2008 U.S. Dist. LEXIS 1465, 2008 WL 113672 (S.D.N.Y. Jan. 10, 2008), at \*15 (quoting *United States v. Continental Illinois National Bank & Trust Co.,* 889 F.2d 1248, 1255 (2d Cir.1989)).

Discovery in this case is still ongoing and did not commence until after this Court issued its November 27th Opinion. Ballard has offered no arguments or evidence establishing that the addition of Parkstone's proposed defenses and counterclaims will require Ballard to expend significant additional resources conducting discovery or preparing for trial, or will significantly delay resolution of the dispute.

### Conclusion

For the reasons set forth above, Parkstone's motion for reconsideration is denied and its motion to amend is granted.

**\*6** It is so ordered.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4298572

🏳 KeyCite Yellow Flag - Negative Treatment
Distinguished by BNP Paribas Mortg. Corp. v. Bank of America, N.A.,
S.D.N.Y., June 6, 2013

2005 WL 991772
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

William HENNEBERRY, Plaintiff,
v.
SUMITOMO CORPORATION OF
AMERICA, Robert Graustein, Sumitomo
Corporation, and John Does nos. 1-50
(fictitiously named individuals), Defendants.

No. 04 Civ. 2128(PKL).
|
April 27, 2005.

**Attorneys and Law Firms**

John M. Deitch, Mendes & Mount LLP, Newark, New
Jersey, for Plaintiff.

Stuart M. Riback, Siller Wilk LLP, New York, New
York, Stephen D. Hoffman, Pamela L. Kleinberg, for
Defendants Sumitomo Corporation of America and
Robert Graustein.

*OPINION AND ORDER*

LEISURE, J.

**\*1** Plaintiff William Henneberry brings this action
against all named defendants for: (1) detrimental
reliance, including promissory estoppel and negligent
misrepresentation; (2) breach of contract; (3) breach
of fiduciary duty; (4) defamation, including slander
*per se;* (5) injurious falsehood; and, (6) tortious
interference with prospective economic advantage.
Plaintiff's claims arise out of a business investment
relationship between the company of which Henneberry
was Chief Executive Officer ("CEO") and majority
shareholder, Smartix International Corp. ("Smartix"),
and defendants Sumitomo Corporation of America as
investor, its Senior Vice President Robert Graustein,[1]
and Sumitomo Corporation as the parent company of
SCOA.

Defendants SCOA filed the instant motion to dismiss for
failure to state a claim for which relief may be granted,
pursuant to Federal Rule of Civil Procedure 12(b)(6), on
May 24, 2004.[2] Defendants make a series of arguments, in
effect claiming that plaintiff's suit is a "strike suit" wherein
plaintiff is litigating claims that are the sole province of
Smartix as a company allegedly wronged and are not
properly brought by Henneberry in his personal capacity
as CEO and shareholder. Defendants also allege that the
alleged defamatory utterances were mere opinion. SCOA
finally takes issue with plaintiff's claim for damages which
allegedly do not flow directly from the tort alleged. The
parties' arguments for and against the instant motion to
dismiss are addressed in turn below.

*BACKGROUND*

I. *The Parties*
Plaintiff William Henneberry is a Connecticut resident
and a creative marketing entrepreneur specializing in
developing new marketing strategies for credit cards.
(Plaintiff William Henneberry's Complaint ("Compl.") ¶¶
10-11.) His successes involving athletic teams and credit
cards are numerous. (*Id.* ¶ ¶ 15-19.) Further, prior to
the parties' involvement here, Henneberry worked as a
consultant for Major League Baseball and MasterCard
from December 1995 through January 2000, earning
between $10,000 and $25,000 per month. (*Id.* ¶ 139.)
At all times relevant to this action, Henneberry was the
Chairman and a stockholder of Smartix, a non-publicly
traded New York corporation. (*Id.* ¶¶ 12-13, 21.) As
chairman, Henneberry was entitled to $150,000 per year
in salary. (*Id.* ¶ 20.) As of September 9, 2003, Henneberry
owned 1,740,666 shares of Smartix stock. (*Id.* ¶ 22.)

Defendant Sumitomo Corporation of America is a
New York corporation and a wholly owned subsidiary
of defendant Sumitomo Corporation. (*Id.* ¶¶ 3, 34.)
Defendant Robert Graustein is a New York resident
and was Senior Vice President of defendant Sumitomo
Corporation of America at all times relevant to this
lawsuit.

II. *The Program*
Smartix was purposed to create an electronic ticketing
promotion for Major League Baseball with MasterCard

which, *inter alia*, allowed season ticket holders to sell unused tickets on the internet and at designated kiosks (the "Smartfan program"). (*Id.* ¶¶ 23, 24.) The Smartfan program was tested with the Boston Red Sox and the St. Louis Cardinals baseball teams. (*Id.* ¶ 25.) Pursuant to this aim, Smartix sought and obtained investors including SCOA. (*Id.* ¶ 31.)

### III. *SCOA's Investment Activities*

#### A. *Spring of 2002 Investment Agreement*

**\*2** In anticipation of its future investment agreement, SCOA conducted an economic valuation of Smartix which valued Smartix at $10,000,000, or $1.50 per share. (*Id.* ¶¶ 50, 51.) In the Spring of 2002, SCOA agreed to invest at least $3,000,000 and at most $5,000,000 in Smartix, and SCOA agreed to share in the profits and losses of Smartix. (*Id.* ¶¶ 48, 49.) Based on this agreement, Smartix engaged in the following actions: (1) filed a restated certificate of incorporation with the Secretary of State of New York as required by SCOA; (2) convinced its original investors to subordinate their class of shares to those to be issued to SCOA; (3) convinced its original investors to reduce dividend percentages, forego dividends, and invest more cash into Smartix; (4) advised potential investors of SCOA's offer and that future investment would have to wait and suffer a higher valuation; (5) agreed to allow Hank Aaron to serve as a member of Smartix's Board of Directors; and, (6) ordered special stock certificates with legends as specifically requested by SCOA. (*Id.* ¶ 53.) In addition to Smartix's actions resulting from SCOA's anticipated investment, Henneberry also personally acted in reliance, loaning Smartix $100,000. (*Id.* ¶ 54.) However, after documents memorializing this agreement were sent by SCOA to Smartix's shareholders for execution, SCOA advised Henneberry that SCOA would not continue with the investment on the present terms. (*Id.* ¶ 57.) This advisement was made on June 4, 2002. (*Id.*)

#### B. *Subsequent Investment Agreement by SCOA*

SCOA ultimately invested $1,000,000 in Smartix and agreed to share profits and losses with the other classes of Smartix stockholders. (*Id.* ¶ 60.) SCOA also stated that it was now Smartix's lead investor and would actively seek out new investments for Smartix. (*Id.* ¶ 61.) In fact, when faced with Smartix's financial troubles at a meeting in June 2003, Graustein stated that SCOA "would not let

you [Smartix] fail." (*Id.* ¶¶ 63, 64.) At this meeting, SCOA also agreed to provide matching investments and to send a letter confirming this position. (*Id.* 65.) However, no letter was received. Smartix advised SCOA that Smartix would require a further $1,000,000 investment and the implementation of the Smartfan program with ten sports teams. (*Id.* ¶ 68.) Based on SCOA's expressed support for this plan, Henneberry continued to personally loan Smartix money through October 2003, consisting of nine loans (ten in total, counting the initial loan of $100,000 in the Spring of 2002): (1) $47,500; (2) $52,500; (3) $50,000; (4) $150,000; (5) $27,500; (6) $30,000; (7) $190,000; (8) $12,754.83; and (9) $2,170.54. (*Id.* ¶¶ 55, 69.) SCOA was repeatedly warned of Smartix's financial situation which was forcing Smartix to reneg on its financial obligations to the Red Sox and Cardinals. (*Id.* ¶¶ 70, 74.) Also, early on in this struggle, on June 16, 2003, Henneberry advised Graustein that Smartix may need to cease operations; however, Graustein informed him Smartix did not have the legal power to do so without shareholder approval. (*Id.* ¶¶ 71, 72.)

**\*3** Finally, on September 8, 2003, SCOA presented Smartix with a new investment proposal wherein SCOA would provide matching investments up to $500,000 and would require that Henneberry convert his personal loans into company stock. (*Id.* ¶¶ 76, 77.) Smartix and Henneberry rejected this offer because it did not provide sufficient capital and it was based on a lower valuation of the company. (*Id.* ¶¶ 78, 79.)

The next day, Henneberry was called into a meeting with Michael Dee, Executive Vice President of Business Affairs for the Boston Red Sox, regarding the continuation of the Smartfan program for the next year. (*Id.*¶¶ 45, 80.) Henneberry was forced to concede Smartix's financial difficulties and its potential instability in the coming baseball season, causing Dee to express concern about the business relationship going forward. (*Id.* ¶ 82.)

### IV. *SCOA's Meetings with the Red Sox and MasterCard and Final Dealings with Smartix*

On September 22 or 23, 2003, Graustein and other SCOA employees met with Dee and informed him, in sum and substance, that Henneberry "lacked the necessary skill and ability to manage Smartix[,] otherwise disparaged his business acumen," and blamed Smartix's financial troubles and failure to pay monies owed to the Red Sox on Henneberry's mismanagement of the company. (*Id.* ¶

90.) SCOA also stated that it would be taking over Smartix and removing Henneberry. (*Id.* ¶ 96.) Thereafter, Dee lost faith in Henneberry and began using Graustein as the contact for the Smartfan program. (*Id.* ¶¶ 95, 97, 139-40, Ex. B.) Dee also refused to do business with Smartix if Henneberry was involved with the company (*id.* ¶ 108), which directly contradicted Dee's earlier statement on July 2, 2003 that the Red Sox had "taken a leap of faith by aligning ourselves with Smartix, in large part due to my confidence and trust in you personally" (*id.* ¶ 109).

At some point between September 19 and 23, 2003, Graustein met with MasterCard, including, *inter alia,* John Stuart, MasterCard's Senior Vice President of Global Sponsorship and Event Marketing, and informed it, in sum and substance, that Henneberry lacked the necessary skill and ability to manage Smartix, disparaged his business acumen, and blamed Smartix's financial condition and failure to pay the Red Sox and Cardinals monies owed on Henneberry's mismanagement of the company. (*Id.* ¶¶ 99, 100, 106.) MasterCard similarly lost faith in Henneberry. (*Id.* ¶¶ 105, 139-40.)

SCOA did not notify Smartix regarding either of these meetings (*id.* ¶ 89) until after the fact, at a meeting with Henneberry on September 24, 2003 (*id.* ¶ 107). Thereafter, Henneberry sent a letter to SCOA outlining its perceived bad acts and effect on the company. (*Id.* Ex. C.)

On October 9, 2003, Smartix held a shareholder's meeting wherein it was decided that Smartix would continue to pursue the Smartfan program with the Red Sox. (*Id.* ¶ 111.) SCOA represented that it had been in contact with investors who had expressed interest in investing in Smartix. (*Id.* ¶ 112.) SCOA again reiterated that it wanted Smartix to survive and succeed. (*Id.*) Based on SCOA's representations made at this meeting, Henneberry continued to personally loan money to Smartix. (*Id.* ¶ 113.) There is no evidence SCOA invested any further monies in Smartix (*id.* ¶ 117) and Smartix's stock is presently worthless (*id.* ¶ 131).

## DISCUSSION

**\*4** Defendants SCOA claim that plaintiff has failed to state a claim for which relief can be granted, pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, and seek dismissal of the Complaint against them. The legal standard for this motion and plaintiff's six claims against SCOA are discussed, in turn, below.

### I. *Motion to Dismiss Standard*

When determining whether plaintiff's claim should be dismissed on motion for failure to state a claim for which relief may be granted, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (quoting *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000)); *see also Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 740 (1976); *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992), *cert. denied,* 507 U.S. 961, *and,* 507 U.S. 972 (1993). Thus, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 62-63 (2d Cir.1997). Plaintiff's Complaint should not be dismissed in this instance "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 894-95 (2d Cir.1976). However, plaintiff's Complaint "must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory." *Huntington Dental & Med. Co. v. Minnesota Mining & Mfg. Co.,* No. 95 Civ. 10959, 1998 WL 60954, at \*3 (S.D.N.Y. Feb. 13, 1998).

Accordingly, the factual allegations set forth in the Complaint and repeated above do not constitute findings of fact by the Court, but rather are presumed to be true for the purpose of deciding the motion to dismiss. *See Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.,* 165 F.Supp.2d 615, 625 (S.D.N.Y.2001). When deciding a motion to dismiss, the Court may consider:

the factual allegations in [the] complaint ..., documents attached

to the complaint as an exhibit or incorporated in it by reference ..., matters of which judicial notice may be taken ..., or documents ... of which plaintiff [ ] had knowledge and relied on in bringing suit.

*Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *see also* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is part thereof for all purposes."); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir.2002); *Gregory,* 243 F.3d at 691.

The decision of whether to hold an oral hearing regarding a motion to dismiss lies in the sound discretion of the district court. *Greene v. WCI Holdings Corp.,* 136 F.3d 313, 316 (2d Cir.1998). If the district court decides to dismiss any claims, that dismissal is generally considered a judgment on the merits, unless dismissed for "curable defect." *Criales v. Am. Airlines, Inc.,* 105 F.3d 93, 98 (2d Cir.1997). The Second Circuit reviews a district court's determination of whether a motion to dismiss should be granted *de novo. Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998) (citing *Sykes v. James,* 13 F.3d 515, 518-19 (2d Cir.1993)). With this legal parameter in mind, the Court turns to plaintiff's six claims against SCOA.

## II. *Plaintiff's Claims Against SCOA*

**\*5** SCOA avers that plaintiff's Complaint against SCOA should be dismissed for failure to state a claim insofar as it alleges that SCOA, (1) caused plaintiff to detrimentally rely on its statements, stating alternative claims for promissory estoppel and negligent misrepresentation; (2) breached its contract with plaintiff; (3) breached its fiduciary duty to plaintiff; (4) defamed plaintiff to the Red Sox and MasterCard; (5) uttered an injurious falsehood under New York State law in its conversations with the Red Sox and MasterCard; and, (6) tortiously interfered with Henneberry's prospective economic advantage. [3]

### A. *Detrimental Reliance*

Plaintiff claims, pursuant to two different legal theories, that defendants improperly induced plaintiff's reliance on

defendants' statements to plaintiff's detriment. (Plaintiff Henneberry's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint ("Pl.'s Opp'n") at 3-6.) First, plaintiff asserts a claim under a theory of promissory estoppel. (*Id.* at 3-5.) Also, plaintiff claims that his detrimental reliance claim sounds in negligent misrepresentation. (*Id.* at 5-6; *see also* Compl. ¶¶ 114-19.) The Court addresses each theory in turn.

### 1. *Promissory Estoppel*

Both parties agree that in order for plaintiff to assert a claim under a theory of promissory estoppel, plaintiff must plead the following elements: (1) there was a clear and unambiguous promise; (2) plaintiff's reliance on that promise was reasonable and foreseeable to defendants; and, (3) plaintiff sustained injury due to his reliance on defendants' promise. *See Cyberchron Corp. v. Calldata Sys. Dev., Inc.,* 47 F.3d 39, 44 (2d Cir.1995); *R.G. Group v. Horn & Hardart Co.,* 751 F.2d 69, 78 (2d Cir.1984); Restatement (Second) of Contracts § 90 (1981).

### a. *Henneberry's Standing to Assert this Argument*

Defendants first argue that SCOA's alleged promises were to Smartix, and not to Henneberry personally and, therefore, Henneberry cannot assert a claim of promissory estoppel. While defendants are correct that the majority of promissory estoppel caselaw does not deal with promissory estoppel as asserted by a third party, that does not foreclose the possibility at this preliminary stage in the litigation that plaintiff could assert a claim of promissory estoppel as a third party to the promise. The Restatement (Second) of Contracts defines promissory estoppel as:

A promise which the promisor should reasonable expect to induce action or forbearance on the part of the promisee *or a third person* and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90 (1981) (emphasis added). In addressing the availability of a claim of promissory estoppel to a third person other than the promisor or promisee, comment c of the Restatement asserts that courts have allowed this claim where the third party was a beneficiary of the promise at issue. *Id.* cmt. c. However, the Restatement also states that, in rare cases, promissory estoppel might be justifiable for third parties that were not beneficiaries of the promise. *Id.*

**\*6** Caselaw from this Court also supports this position. In *von Kaulbach v. Keoseian,* 783 F.Supp. 170 (S.D.N.Y.1992), defendants, potential trustees, asserted a promissory estoppel claim against the future decedent who was to include funding for the trust in his will. *Id.* at 172, 177. The defendants were lawyers who came out of retirement in order to set up the trust. *Id.* at 177. When it was not funded, they asserted claims for the "thousands of hours" they spent in anticipation of the will. *Id.* There, the Court held that von Kaulbach was required to fund the trust under a theory of third party promissory estoppel. *Id.* Likewise, in a much older case, the New York Court of Appeals granted a third party the power of promissory estoppel to enforce a contract.

*See* Mt. Vernon Trust Co. v. Bergoff, 272 N.Y. 192, 5 N.E.2d 196 (1936). In *Mount Vernon,* the Court estopped defendant from asserting the defense of no consideration where defendant had issued a note to a bank which the bank had stipulated was unenforceable. *Id.* Despite opining that the defendant may have had no intent to deceive the public, the Court held that, in issuing the note, defendant perpetrated a continuing fraud and third parties could enforce the note against her. Id. at 196, 5 N.E.2d at 197 ("Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.")

Defendants will protest that the cases above are readily distinguishable and that the Restatement's edict that third parties who are not intended beneficiaries of the contract can assert a promissory estoppel argument is only to be applied in the rarest of situations. While true, at this stage of the proceeding the Court must only determine whether plaintiff has stated a claim which he should be allowed to support factually. Because precedent does exist for third parties to assert promissory estoppel arguments, and

plaintiff could supply further facts gained from discovery to liken his case to the ones above, the Court will allow plaintiff to proceed on this theory for the time being.

### b. *The Alleged Promises and Reliance*

Defendants next argue that the statements plaintiff hinges his argument on were not clear and unambiguous promises. Plaintiff does not explicitly identify which statements allegedly constituted promises under the first count in the Complaint. However, in its opposition brief, plaintiff identified the following statements as possible "promises": (1) SCOA contracted to invest at least $3,000,000 and at most $5,000,000 ("June 2002 agreement") (Pl.'s Opp'n at 3), and to share in the profits and losses of Smartix (Compl.¶ 49); (2) SCOA stated "we won't let you fail" at a June 2003 meeting with Smartix employees including Henneberry where SCOA also represented it would "pursue a plan to match investments and agreed to provide a letter confirming its position to Smartix" (Pl.'s Opp'n at 3); and, (3) "SCOA repeatedly communicated to Mr. Henneberry that it was actively soliciting outside investment and had investors who were willing to invest" (*id.* at 4).

#### i. *Promise to Invest $3,000,000 to $5,000,000 and Share in Smartix's Profits and Losses*

**\*7** Defendants challenge plaintiff's characterization of this alleged promise, arguing that it only constituted an agreement to agree while they were negotiating with Smartix. (Defendants SCOA and Graustein's Memorandum of Law in Support of Motion to Dismiss the Complaint ("Defs.' Mot.") at 12.) Defendants claim that this argument is supported by plaintiff's Complaint because plaintiff does not point to any written document evidencing the June 2002 agreement wherein SCOA agreed to invest $3,000,000 to $5,000,000 and share in the profits and losses. Further, SCOA eventually did memorialize in writing an agreement to invest $1,000,000 on July 2, 2002 ("July 2nd agreement"). (*Id.*) Defendants further contend that the July 2nd agreement contained a merger clause which superseded any alleged promise made by SCOA to invest $3,000,000 to $5,000,000 and to share in the profits and losses. (Defendants Sumitomo Corporation of America and Graustein's Reply Memorandum of Law in Further Support of Motion to Dismiss ("Defs.' Reply") at 1-2.) Plaintiff claims that the June 2002 agreement was memorialized by SCOA and sent to Smartix shareholders for execution. (Compl.¶ 57).

In deciding the motion to dismiss, the Court can look at any document relied on by plaintiff in making his Complaint. *Brass,* 987 F.2d at 150. Plaintiff specifically mentions the July 2nd agreement in his Complaint; therefore, that agreement is properly considered by the Court at this time. (*See* Compl. ¶ 60.) The identified merger clause of the July 2nd agreement states: "This Agreement and the documents referred to herein constitute the entire agreement and understanding among the parties hereto and supercede all prior negotiations and agreements, whether oral or written." (Reply Declaration of Stuart M. Riback, Esq. ("Riback Reply Decl."), Ex. A § 8.12.) Defendants also point to § 3.15 of the July 2nd agreement, which states that,

> [e]xcept for the agreements explicitly contemplated by this Agreement ... there are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company [Smartix] is bound that may involve (i) obligations (contingent or otherwise) of, *or payments to,* the Company in excess of $50,000.

(*Id.* § 3.15 (emphasis added).)

"Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide,' " *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.,* No. 01 Civ. 1047, 2002 U.S. Dist. LEXIS 18115, at *62-63 (S.D.N.Y. Sept. 25, 2002) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir.1998)). Absent ambiguity in the contract, the Court will not look to extrinsic evidence, but rather will interpret the contract on its face, giving the words their ordinary meaning. *See Kinek v. Paramount Communications, Inc.,* 22 F.3d 503, 509 (2d Cir.1994). The question of ambiguity is a question of law to be decided by the Court. *See Collins v.. Harrison-Bode,* 303 F.3d 429, 433 (2d Cir.2002); *Readco v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir.1996); *Fleet*

*Capital,* 2002 U.S. Dist. LEXIS 18115, at *62-63 ("Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide.'... 'Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." ') (quoting *Alexander & Alexander,* 136 F.3d at 86). The Court should find a contract unambiguous where an examination of the "entire integrated agreement" reveals "a definite meaning" and the Court finds "no reasonable basis exists for a difference of opinion about that meaning." *Fleet Capital,* 2002 U.S. Dist. LEXIS 18115, at *63-64 (internal citations and quotations omitted).

**\*8** The merger clause is inapposite to the present analysis because, as stated in the Complaint, the relevant promise was affirmatively rescinded on June 4, 2002, almost a full month prior to the effective date of the merger clause. (*See* Compl. ¶ 57.) Therefore, the merger language to the effect that there are no other agreements to which Smartix is bound does not conflict with a claim for promissory estoppel based on a prior wrong. Further, taking the factual allegations of the Complaint as true, the June 2002 agreement to invest $3,000,000 to $5,000,000 in Smartix is clear and unambiguous; therefore, defendants' arguments go to the reasonableness of plaintiff's reliance on the promise.

The Court finds that plaintiff has failed to state a claim for reasonable and foreseeable reliance regarding what he terms the June 2002 agreement. (*See* Compl. ¶ 57.) The claimed actions in reliance on this promise are: (1) Smartix filed a re-stated Certificate of Incorporation reflecting changes required by SCOA; (2) Smartix convinced original investors to subordinate their shares to those to be issued to SCOA, reduce their dividend percentages, forego dividends, and invest additional cash in Smartix; (3) Smartix advised additional investors that future investments would be postponed until a later round at a higher valuation; (4) Smartix allowed Hank Aaron to become a Member of the Smartix Board of Directors; and, (5) Smartix ordered special stock certificates with legends that SCOA requested. (Compl.¶ 53.) Henneberry also personally loaned $100,000 to Smartix in reliance on SCOA's promised investment. (Compl.¶ 54.) Even as a third party beneficiary, Henneberry cannot assert injury based on Smartix's actions taken in reasonable reliance. The only action Henneberry personally took in reliance was the loan. However, plaintiff did not plead that it would be foreseeable to SCOA that Henneberry, the CEO,

would make a personal loan to Smartix while waiting for a promised investment from SCOA. Nor does it appear to the Court to be an ordinary course of conduct that SCOA should have anticipated. Therefore, the Court finds that plaintiff has failed to properly plead promissory estoppel. Moreover, the Court notes that any purported reasonable and foreseeable action taken by plaintiff in reliance on this promised investment would only be reasonable up until June 4, 2002 when SCOA affirmatively disavowed their promise to invest $3,000,000 to $5,000,000. All action after that time would be neither reasonable, based on SCOA's expressed intent, nor foreseeable, based on SCOA's expressed understanding of the parties' status.

ii. *"We Won't Let You Fail," Matching Investments and Confirmation Letter*

Plaintiff claims that he continued to loan his own money to Smartix based on SCOA's guarantee, at a meeting in June 2003, that it would not allow Smartix to fail and SCOA's representation that it would pursue a plan to match investments and send a confirmation letter to that effect. (Compl.¶¶ 64, 69.) Defendants claim that the above only evidenced a willingness to cooperate with Smartix, but did not constitute an enforceable oral promise. As above, the Court must determine whether this quote constituted a clear and unambiguous promise on which plaintiff reasonably and foreseeably relied to his detriment. *Cyberchron,* 47 F.3d at 44.

**\*9** The Court finds that these cannot, as a matter of law, be construed as clear and unambiguous promises. "We won't let you fail" is vague and ambiguous on its face for it could mean, as plaintiff contends, that SCOA would invest the amount necessary for Smartix to continue its Smartfan program; or it could mean, as defendants contend, any manner of things including a willingness to work with Smartix in order to come to an agreement regarding investments. It does not clearly mean that SCOA was guaranteeing Smartix's survival, but rather appears more of a policy statement akin to that in *Ward v. New York Univ.,* No. 97 Civ. 8733, 2000 U .S. Dist. LEXIS 14067, at *10 (S.D.N.Y. Sept. 25, 2000) (finding that the University's alleged promises, "i) to provide a great learning environment for adult students; ii) to respect adult students and treat them with respect; iii) to not discriminate against adult students; iv) to provide supervision and teaching by honest and unbiased instructors; and v) to provide and to follow guidelines for student treatment," were not clear and unambiguous but rather policy statements which could not support a claim for promissory estoppel). *See also United States v. Rosario,* 237 F.Supp.2d 242, 248 (S.D.N.Y.2002) (finding no clear and unambiguous promise where the prosecutor represented to defendant that he would " 'go to bat' with the Police Department" to ensure defendant was granted transactional immunity); *Media Sport & Arts s.r.l. v. Kinney Shoe Corp.,* No. 95 Civ. 3901, 1997 U.S. Dist. LEXIS 12394, at *47-48 (S.D.N.Y. Aug. 19, 1997) (finding no clear and unambiguous promise where defendant stated that plaintiff "may proceed to act on the enclosed offer without limitation," and that defendant and plaintiff "are going to make a great team").

Plaintiff also claims that at the June 2003 meeting, SCOA represented that it would pursue a plan to match investments and send a confirmation letter to Smartix to that effect. (Compl. ¶ 69 .) These statements similarly cannot be construed as clear and unambiguous promises. A promise to pursue is nothing more than a preliminary representation that SCOA would look into whether it felt a matching investment strategy was prudent. Further, that SCOA never sent a confirmation letter evidences that it did not intend to be bound to a matching investment program. These statements do not evidence SCOA's intent to be bound and therefore, cannot constitute promises for purposes of Henneberry's promissory estoppel argument.

iii. *SCOA's Representations That They had Located Investors Interested in Investing in Smartix*

Plaintiff asserts that SCOA's representations that they had located investors interested in investing in Smartix constituted clear and unambiguous promises on which Smartix and Henneberry relied by revising and updating documents for presentation to these investors and by Henneberry's continued provision of personal loans to Smartix. However, it is clear to the Court that these statements as pleaded in plaintiff's Complaint were not clear and unambiguous promises to obtain investors. Rather, at most, they constituted representations that SCOA had already contacted interested investors. Therefore, plaintiff cannot argue promissory estoppel as to these statements. Plaintiff's claim of negligent misrepresentation, assuming these statements constituted false representations of then-present fact, is arguably more tenable but ultimately fails, as discussed below.

2. *Negligent Misrepresentation*

**\*10** As an alternative to his promissory estoppel argument, plaintiff contends that his complaint supports a claim for negligent misrepresentation. Specifically, plaintiff argues that the statements discussed above were false and he reasonably relied on them to his detriment. Defendants argue that plaintiff's claim is meritless because the Complaint did not allege any "special relationship" between defendants and plaintiff as necessary for a claim of negligent misrepresentation.

To state a claim for negligent misrepresentation, plaintiff must allege that:

> 1) the defendant had a duty, as a result of a special relationship, to give correct information; 2) the defendant made a false representation that he ... should have known was incorrect; 3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; 4) the plaintiff intended to rely and act upon it; and 5) the plaintiff reasonably relied on it to his or her detriment.

(Pl.'s Opp'n at 5 (citing *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir.2000); *King v. Crossland Sav. Bank,* 111 F.3d 251, 257-58 (2d Cir.1997)).) "The particularity requirements of Rule 9(b) apply to claims for negligent misrepresentation." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* No. 02 Civ. 1312, 2003 U.S. Dist. LEXIS 12351, at \*11-12 (S.D.N.Y. June 4, 2003) (citing, *inter alia, Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4770, 2003 U.S. Dist. LEXIS 5913, at \*4 (S.D.N.Y. Apr. 10, 2003), *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC,* 254 F.Supp.2d 373, 380 (S.D.N.Y.2003), and *Northwestern Mut. Life Ins. Co. v. Banc of America Sec. LLC,* 254 F.Supp.2d 390, 394 (S.D.N.Y.2003)), *aff'd on relevant grounds, rev'd in part,* 375 F.3d 168 (2d Cir.2004).

Plaintiff claims that a special relationship sufficient to support a claim of negligent misrepresentation existed between himself and SCOA because SCOA, in holding themselves out as the "lead investor," also held themselves out as having special expertise, akin to an investment banker. Defendants dispute this contention, instead stating that the relationship was solely contractual and SCOA was nothing more than an investor in Smartix. In *Kimmel v. Schafer,* 89 N.Y.2d 257, 264, 675 N.E.2d 450, 454 (1996), the New York Court of Appeals set forth three factors for determining whether a special relationship existed between the parties absent privity of contract: "[ (1) ] whether the person making the representation held or appeared to hold unique or special expertise; [ (2) ] whether a special relationship of trust or confidence existed between the parties; and [ (3) ] whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.* Because the statements plaintiff claims he relied on were made outside the context of the only written contract of which the Court is aware, the July 2nd agreement, the Court applies the *Kimmel* factors to the instant Complaint and finds that plaintiff has not sufficiently alleged a special relationship with defendants.

**\*11** Plaintiff relies heavily on *EBC I, Inc. v. Goldman Sachs & Co.,* 777 N.Y.S.2d 440, 7 A.D.3d 418 (App.Div.2004), wherein the court found that a relationship between a client and an investment banker is sufficiently "special" under *Kimmel,* to argue that SCOA should similarly be held to possess special skill, knowledge and expertise. (Pl.'s Opp'n at 6.) The Court first notes that plaintiff did not plead that SCOA was akin to an investment banker in his Complaint. In fact, there is absolutely no mention in the pleading of what SCOA's business actually entails. However, even if plaintiff did so plead, it is plain to the Court that SCOA was merely a common investor, despite the use of the term "lead investor." "Lead investor" is not, as plaintiff would have the Court believe, a magical term transforming SCOA and Smartix's common contractual relationship into a special relationship sufficient to sustain a claim for negligent misrepresentation. Nor does that term endow SCOA with unique expertise on the subject of investing. Supporting this conclusion is the parties' July 2nd agreement where SCOA is termed only an investor. (Riback Reply Decl. Ex. A § 1.19).

Plaintiff does sufficiently allege that SCOA knew that plaintiff would use the information regarding SCOA's potential future investment and the investment of third parties in Smartix to float personal loans to Smartix. This is because SCOA was aware of Smartix's financial difficulty and Henneberry's past provision of personal loans. It is unclear whether SCOA supplied the information in order to induce Henneberry to provide loans to Smartix but it is certainly conceivable that SCOA wished Smartix to survive long enough for SCOA to take over its operation, as this was SCOA's goal as alleged in the Complaint. However, this pleading alone does not justify a claim for negligent misrepresentation, even at this early stage. "This Court has held that a 'sparsely pled' special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where 'the complaint emphatically alleges the other two factors enunciated in *Kimmell*.' " *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 188 (2d Cir.2004) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 103 (2d Cir.2001)). "*Suez Investors* thus suggests that where, as here, a 'special relationship' is nowhere pled, and the allegations with respect to the other *Kimmell* factors are soft, a claim for negligent misrepresentation is dismissible under Rule 12(b)(6)." *Id.*

In *Suez Investors,* the Court found plaintiff had impliedly pled a special relationship where defendants initiated contact with plaintiff, induced plaintiff's actions in reliance on the misrepresentations, and repeatedly asserted their false statements were true. 250 F.3d at 103 ("[P]laintiff's complaint implies a relationship between the parties that extended beyond the typical arm's length business transaction."). Conversely, here plaintiff's Complaint specifically states that plaintiff sought out SCOA as an investor (Compl.¶¶ 26, 31) and does not allege that SCOA encouraged Henneberry to make personal loans to Smartix. [4] Moreover, this is not a case wherein the parties' positions are such that SCOA would have an advantage over Henneberry. *See Lasalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.,* No. 02 Civ. 7868, 2003 U.S. Dist. LEXIS 4315, at *17-18 (S.D.N.Y. Mar. 19, 2003) (citing *Fleet Bank v. Pine Knoll Corp.,* 736 N.Y.S.2d 737, 741, 290 A.D.2d 792, 795 (App.Div.2002), and distinguishing similar cases to support the Court's dismissal of plaintiff's negligent misrepresentation claim).

In short, the Court finds that plaintiff has not alleged "a relationship so close as to approach that of privity" and, therefore, must dismiss plaintiff's claim for negligent misrepresentation. [5] See *In re Sterling Foster & Co. Sec. Litig.,* 222 F.Supp.2d 216, 284 (S.D.N.Y.2002) (citing *Parrott v. Coopers & Lybrand, L.L.P.,* 95 N.Y.2d 479, 483, 741 N.E.2d 506, 508 (2000)); *see also Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 158 (2d Cir.1995) ("Generally, banking relationships are not viewed as special relationships giving rise to a heightened duty of care" amongst similarly sophisticated parties.); *In re Time Warner Sec. Litig.,* 9 F.3d 259, 271 (2d Cir.1993) ("New York strictly limits negligent misrepresentation claims to situations involving 'actual privity of contract between the parties or a relationship so close as to approach that of privity.' ") (quoting *Ossining Union Free School District v. Anderson LaRocca Anderson,* 73 N.Y.2d 417, 419, 539 N.E.2d 91, 91 (1989)), *superseded on other grounds as stated in, In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 885 (W.D.N.C.2001).

### 3. *Conclusion*

**\*12** Thus, for the reasons stated above, plaintiff's claim for detrimental reliance is dismissed. Plaintiff has failed to sufficiently state a claim under either a theory of promissory estoppel or negligent misrepresentation. (*See* Com pl. ¶¶ 114-19 ("First Count").)

### B. *Breach of Contract*

Plaintiff also alleges that SCOA is liable for breach of contract stemming from the June 2002 agreement that SCOA would invest $3,000,000 to $5,000,000 in Smartix. Plaintiff claims that breach occurred on June 4, 2003 when SCOA informed plaintiff they would not invest more than $1,000,000. This claim, like that for promissory estoppel, is unaffected by the merger clause in the July 2nd agreement because the purported wrong occurred prior to that agreement. Therefore, the Court only addresses whether plaintiff has sufficiently alleged the elements for a breach of contract claim.

In order to state a claim for breach of contract, plaintiff must allege an intent to be bound demonstrated by an offer, acceptance, and supported with consideration.

*Deutsche Asset Mgmt. v. Callaghan,* No. 01 Civ. 4426, 2004 U.S. Dist. LEXIS 5945, at \*47 (S .D.N.Y. Apr. 7, 2004). The Court finds that, on the present record, plaintiff has sufficiently alleged that a contract for SCOA to invest $3,000,000 to $5,000,000 existed between the parties up until SCOA breached by repudiation on June 4, 2002. Plaintiff's allegations that SCOA agreed to invest and that plaintiff acted in reliance on that agreement to their detriment are sufficient. (Compl.¶¶ 48-54.) Defendants' point that the written memorialization of this promise remained unsigned at the time of breach is not fatal to plaintiff's claim at this time. The Second Circuit has enforced contracts against non-signatories "where the non-signing party 'has accepted [the] written agreement and has acted upon it.' " *Argo Marine Sys., Inc. v. Camar Corp.,* 755 F.2d 1006, 1011 (2d Cir.1985) (citation omitted) (alteration in original). Further, where only an informal writing was created, the Court has left it to the finder of fact to determine whether the parties intended to be bound. *See* *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 575 (2d Cir.1993) ("For the purposes of determining whether the parties intended to be bound absent a written agreement, ... evidence show[ing] partial performance [is] sufficient to contribute to the factual dispute over the ultimate issue of the parties' intent.").

However, defendants rightly point out that, in order to sue for breach of contract, plaintiff must be a party to the contract, which is not alleged, or an intended third party beneficiary to the contract. *See* *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 600 (2d Cir.1991). In order to claim third party beneficiary status, plaintiff must allege: " '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." ' *State of Cal. Publ. Employees' Ret. Sys. v. Sherman & Sterling,* 95 N.Y.2d 427, 434-35, 741 N.E.2d 101, 104 (2000) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 451 N.E.2d 459 (1983)); *Mortise v. United States,* 102 F.3d 693, 697 (2d Cir.1996). The Restatement (Second) of Contracts further guides New York courts, stating that a third party is an intended beneficiary if: "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention

of the parties and ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Restatement (Second) of Contracts* § 302(b) (1981). Finally, the intention to create a third party beneficiary need not be expressed in the contract, *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 573 (2d Cir.1991); however, "the parties' intent to benefit a third party must be shown on the face of the agreement," *In re Gulf Oil Cities Serv. Tender Offer Litig.,* 725 F.Supp. 712, 733 (S.D.N.Y.1989). Absent any facts to this effect, plaintiff may, at best, be deemed an incidental beneficiary with no enforceable rights under the alleged contract. *See, e.g.,* *McPheeters v. McGinn, Smith & Co., Inc.,* 953 F.2d 771, 773 (2d Cir.1992) ("A third-party beneficiary exists, however, 'only if the parties to that contract intended to confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him.") (quoting *Kyung Sup Ahn v. Rooney Pace, Inc.,* 624 F.Supp. 368, 371 (S.D.N.Y.1985)).

**\*13** The alleged contract at issue was one which, on its face, was only intended to benefit the signatories. SCOA, as investor, benefited from the possibility of reaping the rewards of Smartix's possible success. Smartix, as the recipient of the investment, benefited from an injection of liquidity, a sorely needed boon to the beleaguered start-up company. Plaintiff's sole argument supporting his assertion that he was an intended third party beneficiary of this contract is that he suffered a unique injury distinguishable from that suffered by all Smartix's shareholders. (Pl.'s Opp'n at 15-16.) Plaintiff claims that his status as employee, earning a $150,000 salary, and creditor, loaning the company $100,000, sets him apart from other shareholders and supports the contention that SCOA intended to benefit him personally through this investment contract. The Court cannot discern how Smartix's decision to employ plaintiff, and plaintiff's decision to loan money to Smartix, in any way implicates SCOA's intent to benefit plaintiff. Plaintiff points to, and the Court has discovered, no caselaw which enforced a contract on behalf of a third party in this situation. Therefore, plaintiff has not alleged a claim for breach of contract as an intended third party beneficiary and the Court dismisses the claim. (*See* Compl. ¶¶ 158-68 ("Fifth Count").)

C. *Breach of Fiduciary Duty*

In his Complaint, plaintiff asserts that SCOA owed and breached a fiduciary duty of utmost good faith and fair dealing owed to him by virtue of the relationship between Smartix and SCOA as joint venturers. (Compl.¶ 171.) Plaintiff asserts two further theories of fiduciary relationship in his opposition to the instant motion to dismiss: (1) SCOA was an investment banker; and, (2) SCOA was the *de facto* majority shareholder of Smartix owing a duty to all other shareholders, including Henneberry. As to the joint venturers theory, defendants argue that, at best, Henneberry does not assert a fiduciary duty between himself and SCOA, but rather only asserts a duty between Smartix and SCOA. Defendants further argue that there is no factual support for Henneberry's claim that SCOA was an investment banker nor that SCOA was the *de facto* majority shareholder. [6]

To establish a breach of fiduciary duty, plaintiff must plead that, (1) a fiduciary duty was breached; (2) defendant knowingly aided the breach; and, (3) damages resulted from the breach. *See Whitney v. Citibank, N.A.,* 782 F.2d 1106, 1115 (2d Cir.1986). As a predicate consideration, finding a breach of fiduciary duty requires finding that a fiduciary relationship existed between the parties. *See Flickering v. Harold C. Brown & Co., Inc.,* 947 F.2d 595, 599 (2d Cir.1991); *Whitney,* 782 F.2d at 1115. Moreover, plaintiff must allege a relationship of trust or special confidence imposing obligations beyond the express agreements between the parties. *See BridgestonelFirestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir.1996). Fiduciary relationships have been found where: defendant had unique access to material information, *Powers v. British Vita, P.L.C.,* 57 F.3d 176 (2d Cir.1995); defendant was a stockbroker and plaintiff a customer, *Conway v. Icahn & Co., Inc.,* 16 F.3d 504 (2d Cir.1994); defendant's status added special credibility to his representations to plaintiff, *ABKO Music v. Harrisongs Music, Inc.,* 508 F.Supp. 798, 803 (S.D.N.Y.1981) (assigning fiduciary status to the former manager of the Beatles music group); the parties were joint ventures, *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928); and, defendant was a majority shareholder in a closely-held corporation and plaintiff was a minority shareholder, *Barbour v.*

*Knecht,* 743 N.Y.S.2d 483, 490, 296 A.D.2d 218, 227 (App.Div.2002). In short, " '[a] fiduciary relationship involves discretionary authority and dependency' and ... 'at the heart of the fiduciary relationship lies reliance, *and defacto control and dominance." ' United States v. Brennan,* 183 F.3d 139, 150 (2d Cir.1999) (alterations in original) (quoting *United States v. Chestman,* 947 F.2d 551, 569 (2d Cir.1991)). Thus, the Second Circuit finds a fiduciary relationship even where the relationship is informal so long as it can be "readily seen that one party reasonably trusted another." *Brass,* 987 F.2d at 150-151 (noting that relationships such as those between priest and parishioner, bank and depositor, majority shareholder and minority shareholder, and close friends and family members, generally give rise to fiduciary duties). However, there is generally no fiduciary relationship between sophisticated parties involved in an arm's length transaction. *Id.; Mia Shoes, Inc. v. Republic Factors Corp.,* No. 96 Civ. 7974, 1997 U.S. Dist LEXIS 12571, at *5-6 (S.D.N.Y. Aug. 20, 1997).

**\*14** The Court finds as a matter of law that plaintiff has not alleged that SCOA owed him a fiduciary duty. First, plaintiff is correct that joint venturers owe each other a fiduciary duty, as conceded by defendants. (Defs.' Reply at 9, ¶ 2.) However, it is also true that, at best, plaintiff only alleges that SCOA and Smartix entered into a joint venture, specifically failing to allege that Henneberry himself and SCOA entered into any agreement, much less a joint venture. (Compl.¶¶ 60, 170.) Without assessing the merits of whether the relationship between SCOA and Smartix in fact constituted a joint venture, the Court finds that plaintiff has not alleged that SCOA owed him a fiduciary duty personally and, therefore, plaintiff cannot prevail on this theory as a matter of law.

Second, plaintiff's vague reference to New York courts' recognition that investment bankers have "special skill, knowledge and experience in their field" is inapposite, for, as stated above, plaintiff's Complaint does not allege any circumstances wherein SCOA could be considered an investment banker. *See supra* Discussion Part II.A.2.

Finally, plaintiff argues that SCOA was a *de facto* majority shareholder based on its power over Smartix, as stated in Smartix's Re-Stated and Amended Certificates of Incorporation (*see* Compl. ¶ 53; Declaration of John M. Deitch, Esq. ("Deitch Decl.") Exs. 3-5), to:

(1) control whether Smartix could sell, convey, or dispose of its Intellectual Property license; (2) prevent Smartix from reorganizing, consolidating or merging; (3) prevent Smartix from declaring dividends; and, (4) prevent Smartix from amending its Bylaws or Articles of Incorporation.[7] Defendants argue that these powers were also held by Series A preferred shareholders. Further, defendants note that Henneberry was Chairman and CEO of Smartix, exerting considerable control, and owned three times as many shares as SCOA, though concededly those shares were of common, rather than preferred stock. The Court finds defendants' arguments persuasive as courts have almost exclusively found that a shareholder held a *de facto* majority where that shareholder maintained overwhelming control over the operation of the company. *See* Gould v. Ruefenacht, 471 U.S. 701, 705 (1985) ("*de facto* operational *control* may be obtained by the acquisition of less than 50%" of the company's shares) (emphasis added); *Box v. Northrop Corp.*, 459 F.Supp. 540, 547-48 (S.D.N.Y.1978). Nothing in plaintiff's complaint alleges that SCOA maintained overwhelming control over the operation of Smartix to be considered the *de facto* majority shareholder.

Thus, for all these reasons, the Court dismisses plaintiff's claim for breach of fiduciary duty. (*See* Compl. ¶¶ 169-74 ("Sixth Count").)

### D. *Defamation*

Plaintiff claims that defendants defamed him during meetings with both the Boston Red Sox and MasterCard held between September 19, 2003 and September 23, 2003. Plaintiff alleges that, while he was on vacation out-of-town, defendants, represented by Graustein and John Does 1-10, surreptitiously met with both the Red Sox Executive Vice President of Business Affairs, Michael Dee, and, at a separate meeting, with MasterCard Senior Vice President of Global Sponsorship and Event Marketing, John Stuart. At these meetings, defendants made statements that, in sum and substance, alleged that Henneberry "lacked the necessary skill and ability to manage Smartix and otherwise disparaged his business acumen." (Compl.¶¶ 90, 100.) Further SCOA "placed blame for Smartix' present financial condition, and inability to pay monies owed to the Red Sox and St. Louis Cardinals, upon the purported mis-management of Smartix by Mr. Henneberry." (*Id.*) Plaintiff argues this constituted defamation *per se* and also that he suffered

special damages. Defendants counter that the statements were nothing more than opinion, and, in the alternative, were protected by the privilege of common interest.

### 1. *Defamation Law*

**\*15** To plead defamation under New York law, the plaintiff must establish four elements regarding the statements at issue: (1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by defendants; and, (4) resulting in injury to the plaintiff. *See* Dellefave v. Access Temps., Inc., No. 99 Civ. 6098, 2001 WL 25745, at *3 (S.D.N.Y. Jan. 10, 2001) (citing *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61 (2d Cir.1993)). A defamatory statement is one that leaves an individual vulnerable to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... [which] induce[s] an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society." Celle v. Filipino Reporter Enters., 209 F.3d 163, 177 (2d Cir.2000). At the pleadings stage, the Court must determine only whether the complaint "is detailed and informative enough to enable defendant to respond and to raise the defense of res judicata if appropriate." Kelly v. Schmidberger, 806 F.2d 44, 46 (2d Cir.1986); *see* Fed.R.Civ.P. 8. Plaintiff need not directly quote the defamatory statements. Kelly, 806 F.2d at 46.

In addition to the aforementioned elements, the plaintiff in a defamation action must also plead special damages,[8] unless the language at issue qualifies as defamation *per se*. Defamation *per se* is a statement that casts aspersions upon the basic character and integrity of an individual or business. Thus, a statement "which *tends* to disparage a person in the way of his office, profession or trade" is defamatory *per se* and does not require proof of special damages because injury is assumed. Davis v. Ross, 754 F.2d 80, 82 (2d Cir.1985) (quoting *Nichols v. Item Publishers, Inc.*, 309 N.Y. 596, 602, 132 N.E.2d 860, 862 (1956)); *see also* Four Star Stage Lighting, Inc. v. Merrick, 56 A.D.2d 767, 768, 392 N.Y.S.2d 297 (App.Div.1977) (holding that "words are libelous if they affect a person in his profession, trade, or business, by imputing to him any kind of fraud, dishonesty,

misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof").

At this stage of the proceeding, where the plaintiff's allegations must be accepted as true and all reasonable inferences must be drawn in his favor, *see* 🚩 *Conley,* 355 U.S. at 46, the Court's task is clear: Determine whether the statements at issue are "reasonably susceptible of a defamatory connotation." 📄 *Armstrong v. Simon & Schuster, Inc.,* 85 N.Y.2d 373, 380, 649 N.E.2d 825, 829 (1995); *see also* 📄 *Celle,* 209 F.3d at 177 (observing that whether particular words are defamatory is a legal question to be decided by the court as a threshold matter); 📄 *Kelly,* 806 F.2d at 46 ("[O]n a motion to dismiss or for summary judgment, the issue is not whether the court regards the language as libelous, but whether it is reasonably susceptible of such a construction."). If the Court deems the statements to be reasonably susceptible to a defamatory interpretation, then "it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average" listener. *See* 📄 *James v.. Gannett Co., Inc.,* 40 N.Y.2d 415, 419, 353 N.E.2d 834, 837-38 (1976) (citation omitted).

**\*16** Further, because the Court accepts plaintiff's allegations as true, it assumes that defendants' statements are false and that defendants were culpable in making the statements. *See Lucking v. Maier,* No. 03 Civ. 1401, 2003 U.S. Dist. LEXIS 23060, at \*8 n. 4 (S.D.N.Y. Dec. 23, 2003) ("The falsity of the accused passage and defendants' fault are both presumed at this [motion to dismiss] juncture."); *Daniels v. Provident Life & Cas. Ins. Co.,* No. 02 Civ. 0668, 2002 U.S. Dist. LEXIS 24704, at \*15-16 (W.D.N.Y. Dec. 22, 2002) (denying defendant's motion to dismiss due to a dispute as to the truth of alleged facts).

In interpreting allegedly defamatory utterances, the Court must view the statements in context as the literal meaning of the words does not always coincide with their meaning in a grander setting. *See* 📄 *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 226 (2d Cir.1985). The statement in question should not be viewed in isolation, but instead should be interpreted in light of the "whole apparent scope and intent" of the statement. 📄 *November*

*v. Time Inc.,* 13 N.Y.2d 175, 178, 194 N.E.2d 126, 128 (1963). "[T]he words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood *by the public to which they are addressed."* 📄 *Id.* at 178-79, 194 N.E.2d at 128 (alteration in original) (citation omitted). Finally, if the statement in question is reasonably susceptible to more than one interpretation, one of which is not defamatory, "it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." 📄 *Davis,* 754 F.2d at 82.

### 2. *Protected Speech: Opinion and Common Interest Privilege*

The New York State Constitution, unlike the Federal Constitution, provides for absolute protection of pure opinions. *See* 📄 *Flamm v. Am. Assoc. of Univ. Women,* 201 F.3d 144, 147-48 (2d Cir.2000); *compare* 📄 *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 21 (1990) (rejecting the argument that "an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment") *with* 📄 *Immuno AG. v. Moor-Jankowski,* 77 N.Y.2d 235, 567 N.E.2d 1270 (1991) (Kaye, C.J.) (holding that expressions of "pure" opinion are afforded absolute protection under the New York State Constitution). In the realm of defamation, this constitutional shield requires that assertions of fact, not opinion, form the basis of a claim. *See* 📄 *Brian v. Richardson,* 87 N.Y.2d 46, 51, 660 N .E.2d 1126, 1129 (1995) (citations omitted). Thus, the Court must decide as a matter of law whether any of the statements at issue are protected opinion and therefore not actionable. *See* 📄 *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397, 366 N.E.2d 1299, 1306 (1977) ("Whether a particular statement constitutes fact or opinion is a question of law.").

**\*17** The Court's "essential task" in this inquiry is to determine whether the allegedly defamatory statements "may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion," when considering the statements in the immediate context of the communication as a whole and the broader context in which the statements were published. *See* 📄 *Steinhilber v.*

*Alphonse,* 68 N.Y.2d 283, 292, 501 N.E.2d 550, 553 (1986); *see also* Brian, 87 N.Y.2d at 51, 660 N.E.2d at 1129; *Immuno,* 77 N.Y.2d at 254, 567 N.E.2d at 1281. If one of the statements may be viewed as implying undisclosed facts, then it is not protected as opinion under the New York Constitution. *See* Steinhilber, 68 N.Y.2d at 292, 501 N.E.2d at 554. Notably, the Court should examine the material in question from the perspective of an ordinary listener. *See* Mr. Chow, 759 F.2d at 224.

The New York Court of Appeals has considered the following factors when distinguishing between assertions of fact and non-actionable expressions of opinion:

(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to "signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Gross v. N.Y. Times Co.,* 82 N.Y.2d 146, 153, 623 N.E.2d 1163, 1167 (1993) (quoting Steinhilber, 68 N.Y.2d at 292, 501 N.E.2d at 553) (alteration in original).

New York also recognizes a qualified privilege protecting defendants from liability for making what would otherwise be considered defamatory statements. "Statements made by a defendant to a third party on matters relating to their mutual business interests" qualify for this privilege. *Posa, Inc. v. Miller Brewing Co.,* 642 F.Supp. 1198, 1207 (E.D.N.Y.1986); *see also* Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 62 (2d Cir.1993). The New York Court of Appeals explained the privilege as follows:

A communication made *bona fide* upon any subject matter in which the party communicating has an *interest,* or in reference to which he had a *duty,* is privileged if made to a person having a corresponding *interest* or *duty,* although it contained incriminating

matter which, without this privilege, would be slanderous and actionable; and this though the duty be not a legal one, but only a moral or social duty of imperfect obligation.

*Shapiro v. Health Ins. Plan,* 7 N.Y.2d 56, 60-61 163 N.E.2d 333, 335-36 (1959). Courts have found privilege to lie where an insurance carrier warned its client that an autobody shop was disreputable, *East Point Collision Works, Inc. v. Liberty Mut. Ins. Co.,* 706 N.Y.S.2d 700, 271 A.D.2d 471 (App.Div.2000), and where a car purchaser warned the parent company that its dealership was "deceitful, fraudulent, dishonest, disrespectful," *Leary v. DiBlasi,* 674 N.Y.S.2d 749, 251 A.D.2d 550, 551 (App.Div.1998). A party's good faith communication with a party having a common interest creates a rebuttable presumption that a defamation action cannot be maintained. *See* Weldy, 985 F.2d at 62. The presumption is rebutted, however, if the statements were: (1) made for purposes beyond the scope of the privilege "where a defendant does not exercise the privilege in a reasonable manner, abuses the occasion, or makes the statement in furtherance of an improper purpose"; (2) made with common law malice, considering "defendant's personal spite or ill-will" '; or, (3) made with knowledge of falsity or reckless disregard of the truth. *Boyd v. Nationwide Mut. Ins. Co.,* 208 F.3d 406, 410 (2d Cir.2000) (internal quotations omitted).

### 3. *Analysis of the Statements*

**\*18** As alleged, the statements constitute defamation *per se* because they disgraced plaintiff's business aptitude, chipping away at a pillar of the reputation plaintiff had worked hard to build. (*See* Compl. ¶¶ 11, 14-19, 46.) This point is not contested by defendants. Instead, defendants contend the statements, even as vaguely alleged, are statements of opinion rather than fact.

The Court finds that at this stage of the proceedings, it cannot be said as a matter of law that the statements at issue were merely opinion rather than "reasonably understood as implying the assertion of undisclosed facts justifying the opinion," *Steinhilber,* 68 N.Y.2d at 292, 508 N.E.2d at 553. At the time these statements were made, Smartix was in obvious distress. That defendants assigned Henneberry responsibility for that distress does

not, in itself, bring these statements out of the realm of opinion; for, assignation of blame is commonly regarded as opinion. *See, e.g., Chittenden v. Schwartz,* 653 N.Y.S.2d 375, 236 A.D.2d 503 (App.Div.1997). However, the Red Sox and MasterCard could have assumed that SCOA had unique access to undisclosed facts precipitating the demise of Smartix. *See Levin v. McPhee,* 119 F.3d 189, 197 (2d Cir.1997) ("Though some statements may be characterized as hypothesis or conjecture, they may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed.") (citing *Gross v. N.Y. Times Co.,* 82 N.Y.2d 146, 154, 623 N.E.2d 1163, 1168 (1993)). SCOA had entered into an investment contract, prior to which it conducted due diligence, including an economic valuation of Smartix. (Compl.¶ 50.) Also, SCOA held itself out as Smartix's lead investor and actively solicited outside investment on behalf of Smartix. (*Id.* ¶¶ 61, 62.) To satiate potential investors, SCOA "continually requested revised and updated documents from Smartix." (*Id.* ¶ 62.) Further, SCOA was kept abreast of Smartix's financial situation, including a June 2003 meeting where SCOA was advised that Smartix could not sustain operations absent additional funding. (*Id.* ¶ 63; *see also* ¶¶ 70-74.) It is unclear whether the Red Sox or MasterCard knew of SCOA's special relationship with Smartix but it is a reasonable inference given that, in the same meetings in which the defamatory statements were made, SCOA informed the Red Sox that SCOA would be taking over operations of Smartix and removing Henneberry. (*Id.* ¶ 96.) This analysis plainly applies to the statement blaming Henneberry for Smartix's decline. It is equally applicable to the statement regarding Henneberry's business ability because the Red Sox and MasterCard could have inferred from SCOA's many personal dealings with Henneberry that SCOA had factual knowledge regarding his abilities to which the public was not privy. That the statements are vaguely alleged is not fatal to plaintiff's claim. It is reasonable to allow plaintiff to discover the specific wording of the oral, unrecorded statements prior to determining whether SCOA's comments "otherwise disparag[ing plaintiff's] business acumen" (*Id.* ¶ 90) identified "specific defects or derelictions" to justify a claim for defamation (Defs.' Mem. at 16 (citing *Cohen v. Feiden,* 624 N.Y.S.2d 448, 449, 213 A.D.2d 696, 697-98 (App.Div.1995); *McGill v. Parker,* 582 N.Y.S.2d 91, 98, 179 A.D.2d 98, 109-10 (App.Div.1992)).

**\*19** It is also not appropriate to dismiss plaintiff's defamation claim at this stage of the proceeding based on defendants' assertion of the qualified common interest privilege. The Court agrees with defendants that, as investors, they shared an interest in Smartix's success with both the Red Sox and MasterCard. However, plaintiff has sufficiently pleaded that defendants were acting outside the scope of the privilege when they advised the Red Sox and MasterCard that Henneberry was the cause of Smartix's demise. Plaintiff alleges that this advice was given in order to allow SCOA to take over control of Smartix. (Compl.¶¶ 88, 124.) In fact, plaintiff states that SCOA informed the Red Sox that SCOA "would be taking over Smartix and making changes in management so as to remove Mr. Henneberry." (Compl.¶ 96.) The Court does not find these to be conclusory allegations but rather specific statements of intent made by SCOA to third parties. *See Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1004 (2d Cir.1988) ("[I]t would be unworkable and unfair to require great specificity in pleading scienter, since 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'... Nonetheless, circumstances must be pleaded that provide a factual foundation for otherwise conclusory allegations of scienter.") When coupled with the preceding allegations of SCOA's failure to cooperate regarding investments even when faced with Smartix's self-declared inability to survive absent funding, the inference is plain that SCOA's statements to the Red Sox and MasterCard may have been motivated by SCOA's own interest in acquiring the Smartfan program through Smartix and ousting Henneberry, rather than any common interest in Smartix's survival. *Compare Weldy,* 985 F.2d at 63 ("The jury could also have found an abuse of the privilege by determining that Hathaway had an improper purpose, in that he was deliberately exaggerating ... so as to use Tripodi's failure to report the incident as a device to force Tripodi's discharge.") *with Stillman v. Ford,* 22 N.Y.2d 48, 53, 238 N.E.2d 304, 306 (1968) ("As long as the statements were motivated not by ill will or personal spite but by a sincerely held desire to protect the institution, they are not actionable."). [9]

Thus, plaintiff's claim for defamation survives defendants' motion for dismissal on the present record. (*See* Compl. ¶¶ 120-43 ("Second Count").)

E. *Injurious Falsehood*

Plaintiff alleges that the statements underlying his defamation claim also give rise to a claim for injurious falsehood under New York State law. In order to recover for injurious falsehood, plaintiff must plead that (1) defendants had malicious intent, intended the statement to harm plaintiff, or uttered the statement with reckless disregard such that a reasonably prudent person would anticipate damage; (2) defendants knew of the statement's falsity or acted recklessly in disregard of the statement's veracity; (3) special damages directly resulted "in the form of lost dealings." *See Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, P.C.,* 136 A.D.2d 633, 523 N.Y.S.2d 875, 877 (App.Div.1988); *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.,* 7 A.D.2d 441, 444, 184 N.Y.S.2d 58, 61 (App.Div.1959); *Restatement (Second) of Torts* § 623 (1981). Defendants argue that plaintiff has failed to sufficiently plead scienter and special damages. [10]

**\*20** Plaintiff has sufficiently pled scienter. It is clear that a reasonable person would recognize that statements disparaging a CEO's business acumen would harm his reputation. Defendants' reliance on the argument that, "[t]hough there is an allegation of reckless disregard of falsity, that is different from the kind of reckless heedlessness of consequences that the case law requires" is specious. The Court will not engage in defendants' proposed duel of semantics.

Defendants' second argument, however, is more persuasive. Special damages are those that "flow directly from the injury to reputation caused by the defamation; not from the effects of the defamation." *Matherson,* 100 A.D.2d at 235, 473 N.Y.S.2d at 1001; *see also supra* note 8 and accompanying text. For special damages to be found, "actual losses must be identified and causally related to the alleged tortious act." *L.W.C. Agency, Inc. v. St. Paul Fire & Marine Ins., Co.,* 125 A.D.2d 371, 373, N.Y.S.2d 97, 100 (App.Div.1986).

Plaintiff alleges that he suffered damages of (1) $20,000,000 for lost future business opportunities with MasterCard and Major League Baseball ("MLB"); (2) $20,000,000 for injury to his reputation; (3) at least $2,610,999 for diminution of Smartix's stock value; (4) $662,425.37 for failed loans made to Smartix; (5) $18,000 for unreimbursed costs and expenses arising from Smartix's operation; and, (6) $150,000 per year for lost salary. (Compl.¶ 151.) The claim for reputational damage is undoubtedly insufficiently alleged as it cites no basis for its amount, nor specific repercussions of the tort which gave rise to the damage. *See Korry v. Int'l Tel. & Tel. Corp.,* 444 F. Supp 193, 197 (S.D.N.Y.). Nor is the claim for lost future earnings sufficiently alleged, though that conclusion requires further elucidation. Generally, special damages must be itemized, and not pled with round figures. *See Drug Research Corp. v. Curtis Publ'g Co.,* 7 N.Y.2d 435, 441 (1960); *Matherson,* 100 A.D.2d at 235, 473 N.Y.S.2d at 1001. Plaintiff's reliance on *Sadowy v. Sony Corp. of Am.,* 496 F.Supp. 1071 (S.D.N.Y.1980), to justify his pleading the amount in round numbers is unfounded. There, the Court allowed plaintiff to so plead $500,000 as representing the loss of a $50,000 annual salary for ten years. *Id.* at 1075-76 (finding that the damages pled were "a statement of reasonably identifiable losses sustained by the plaintiff") (quoting *Bohm v. Holzberg,* 47 A.D.2d 764, 764, 365 N.Y.S.2d 262, 264 (App.Div.1975)). That case is readily distinguishable from the matter at hand. First, plaintiff alleges that he lost, at most, $25,000 per month, but he pleads no start or end date which would plausibly amount to the $20,000,000 sought. Further the *Sadowy* Court specifically noted that plaintiff alleged that he had sought employment "and, despite a successful professional record, was unable to find any." *Id.* at 1076. Plaintiff makes no such allegation here, only stating that he "is now no longer considered for consultancies with MasterCard or MLB and has lost his prior position of respect and confidence with those institutions." (Compl.¶ 140.) This is a facially insufficient plea for special damages.

**\*21** Plaintiff's remaining four pleas for special damages stem from the demise of Smartix. These damages, while lamentable, do not flow from defendants' statements and, therefore, are not appropriately characterized as special damages. Plaintiff's Complaint details Smartix's hardship beginning in June 2003. Specifically, plaintiff states that, in June 2003, he told SCOA that Smartix could not continue without additional funding and advised them on June 16, 2003 that Smartix may need to cease operations. (Compl.¶¶ 63, 71.) On September 8, 2003, plaintiff advised SCOA that Smartix's lack of funding would prevent continuation of the Smartfan program. (Compl.¶ 78.) The next day, Henneberry advised Dee of the Boston Red Sox that Smartix's financial stability was not guaranteed

for the following year. (Compl.¶ 82.) Dee responded with concern that Smartix would not satisfy its financial obligations to the Red Sox. (Compl.¶ 83.) Defendants' statements were not made until around September 19, 2003, after the occurrence of the above events. Thus, it is apparent that Smartix was plagued by financial difficulties well before those statements were made. Moreover, at least MLB was aware of this difficulty.

It is not necessary that defendants' statements be the only cause of Smartix failure, but they must be a contributing factor. Plaintiff's Complaint makes it clear that the statements did not contribute to the failure; rather they may have actually been Smartix's last ray of hope. After Henneberry made Dee aware of Smartix's woes, SCOA's statements reassured Dee that the cause of the problem, plaintiff, would be removed and Smartix would be run by new management, namely SCOA. (Compl.¶ 96.) Thereafter, Dee called SCOA directly regarding the Smartfan program, the shareholders voted to continue Smartfan, SCOA represented that investors were still interested in Smartix, and plaintiff floated Smartix loans to continue operations. (Compl.¶¶ 97, 111-13.) This evidences that MLB was aware of a problem prior to the statements and chose to continue its relationship with Smartix after the statements. Thus, any damages flowing from the decline of Smartix cannot be attributed to SCOA's statements regarding Henneberry. Regarding MasterCard, plaintiff does not allege what effect, if any, SCOA's statements had on MasterCard's relationship with Smartix. Again, this causes the Court to conclude that any damages flowing from Smartix's failure were not caused by statements made to MasterCard.

Because plaintiff has failed to sufficiently plead special damages flowing from the allegedly tortious statements, his claim of injurious falsehood is dismissed. (*See* Compl. ¶¶ 144-51 ("Third Count").)

### F. *Tortious Interference with Prospective Advantage*
Plaintiff claims that defendants' tortious action in meeting with MLB and MasterCard and making the allegedly defamatory statements give rise to a claim of tortious interference with prospective economic advantage under New York law.

**\*22** To establish a claim for tortious interference with prospective business advantage, plaintiff must prove that: (1) there was a business relationship with a third party; (2)

defendants "knew of that relationship and intentionally interfered with it"; (3) defendants either acted "solely out of malice" or used wrongful means; and (4) defendants' "interference caused injury to the relationship" with the third-party. *See Carvel Corp. v. Noonan,* 350 F.3d 6, 17 (2d Cir.2003); *see also Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir.2002); *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994). This cause of action has a "limited scope." *Piccoli A\S v. Calvin Klein Jeanswear Co.,* 19 F.Supp.2d 157, 168 (S.D.N.Y.1998).

A properly pleaded complaint for this tort must allege relationships with specific third parties with which the respondent interfered. *See Four Finger Art Factory, Inc. v. DiNicola,* No. 99 Civ. 1259, 2000 U.S. Dist. LEXIS 1221, at \*23-24 (S.D.N.Y. Feb. 9, 2000); *Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.,* No. 96 Civ. 3839, 1997 WL 166497, at \*7 (S.D.N.Y. Apr. 9, 1997); *Winner Int'l v. Kryptonite Corp.,* No. 95 Civ. 247, 1996 U .S. Dist. LEXIS 2182, at \*4 (S.D.N.Y. Feb. 27, 1996) ("As Winner does not allege that Kryptonite's conduct interfered with its business relationship with any specific party, it cannot establish the elements necessary for this tort...."). Further, the relationship must be in existence at the time of the interference. *See Minnesota Mining,* 1997 WL 166497, at \*7 ("A claim for interference with advantageous business relationships must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior.") (citations omitted).

The Complaint must also state how defendants interfered in those relationships. *See Four Finger,* 2000 U.S. Dist. LEXIS 1221, at \*24. That interference must be "direct interference with a third party, that is, 'the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." ' *Black Radio Network, Inc. v. NYNEX Corp.,* No. 96 Civ. 4138, 2000 WL 64874, at \*4 (S.D.N .Y. Jan. 25, 2000) (quoting *Fonar Corp. v. Magnetic Resonance Plus, Inc.,* 957 F.Supp. 477, 482 (S.D.N.Y.1997)); *see also Piccoli,* 19 F.Supp.2d at 167-68. Moreover, "as a general rule, the defendant's conduct must amount to a crime or an independent tort" because "[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts

or other non-binding economic relations." *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 190, 818 N.E.2d 1100, 1103 (2004); *see also Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.,* 349 F.Supp.2d 389, 423 (N.D.N.Y.2004) (noting that the general rule following *Carvel* is that defendant's conduct must amount to a crime or an independent tort). The only recognized exception to the rule applies where a defendant engages in conduct "for the sole purpose of inflicting intentional harm on plaintiffs." *Carvel,* 3 N.Y.3d at 190, 818 N.E.2d at 1103 (quotation omitted); *see also Carvel,* 350 F.3d at 17-19 (providing that plaintiff may establish this element of the tort by showing either that defendant used "wrongful means" or acted "solely out of malice").

**\*23** As stated *supra* Discussion Part II.D, plaintiff has adequately pled that defendants engaged in the tort of defamation when meeting with MLB and MasterCard in September 2003. Thus, wrongful means were used. However, plaintiff again fails to sufficiently allege a causal link between the tort and his injury giving rise to damages. Plaintiff's allegation of damages mirrors that listed *supra* Discussion Part II.E. (*See* Compl. ¶ 157.) As stated above in the same section, the damages flowing from the decline of Smartix are not attributable to SCOA's meetings with MLB and MasterCard. Plaintiff's allegation of reputational injury is again plainly inappropriately pled as it does not relate to any plausible prospective economic advantage. Finally, plaintiff's plea for damages resulting from lost future business opportunities as a consultant for MLB and MasterCard fails because he does not allege that any such consulting relationship existed at the time of the interfering meetings. *See Huntington Dental,* 1998 U.S. Dist. LEXIS 1526, at *4. In fact, his prior consulting for those entities was done three years prior to the alleged defamation. (*See* Compl. ¶ 139 (alleging plaintiff consulted for MLB and MasterCard from December 1995 through January 2000).) Plaintiff does not claim that he interacted with MLB and MasterCard at the time of SCOA's meeting with them in any other capacity than as CEO of Smartix.

Therefore, plaintiff's claim for tortious interference with prospective advantage fails and is dismissed. (*See* Compl. ¶¶ 152-57 ("Fourth Count").)

III. *Leave to Amend the Complaint*

Defendant asks the Court to dismiss the Complaint with prejudice, prohibiting plaintiff from repleading his claims. Plaintiff can replead as of right one time without leave of the Court prior to defendants' filing a responsive pleading under Federal Rule of Civil Procedure 15(a). However, this right extinguishes when the Court grants a motion to dismiss. *Sbrocco v. Pacific Fruit, Inc.,* No. 82 Civ. 5650, 1983 U.S. Dist. LEXIS 14825, at *6-7 (S.D.N.Y. Aug. 8, 1983) ("[W]hile the law in this circuit is that a motion to dismiss is not a responsive pleading, and therefore the complaint may be amended without leave of the court, it is equally well established that this right terminates upon the granting of the motion to dismiss.") (citing *Christophides v. Porco,* 298 F.Supp. 403 (S.D.N.Y.1968), and *Swan v. Bd. of Higher Educ. of the City of New York,* 319 F.2d 56 (2d Cir.1963)). Therefore, plaintiff must seek leave to amend his complaint. Leave "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "[T]his mandate is to be heeded," *Foman v. Davis,* 371 U.S. 178, 182 (1962), in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment ." *Sbrocco,* 1983 U.S. Dist. LEXIS 14825, at *7-8. Further, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) (citing *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990), *Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir.1987), and *Pross v. Katz,* 784 F.2d 455, 459-60 (2d Cir.1986)). The Court is guided by the Supreme Court which noted that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep ... may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley,* 355 U.S. at 48.

**\*24** However, if the Court finds that it would be futile to allow plaintiff to replead because he cannot set forth facts supporting a viable claim, leave to amend should be denied. *See Ellis v. Chao,* 336 F.3d 114, 127 (2d Cir.2003); *Oneida Indian Nation of New York v. City of Sherrill, New York,* 337 F.3d 139, 168 (2d Cir.2003); *Hayden v. County of Nassau,* 180 F.3d 42, 53-54 (2d Cir.1999) ("[W]here the plaintiff is unable

to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."). Plaintiff has not submitted any facts or argument in his opposition papers that would rehabilitate the claims dismissed by this Opinion. However, given that plaintiff has yet to have an opportunity to replead and that defendants find protection in Federal Rules 11, 12, and 56 if plaintiff makes allegations in bad faith, without legal support, or without factual support, the Court grants plaintiff twenty days from the date of this Opinion in which to seek leave to replead. *See Highland Capital Mgmt., L.P. v. Schneider,* No. 02 Civ. 8098, 2004 U.S. Dist. LEXIS 18131, at *19 (S.D.N.Y. Sept. 9, 2004) (Leisure, J.); *Sbrocco,* 1983 U.S. Dist. LEXIS 14825, at *7 ("This court delayed entry of judgment for twenty days in order to allow plaintiffs the opportunity to seek such permission [to replead] without the necessity of moving for relief from the judgment under Fed.R.Civ.P. 59(e) or 60(b).") (citing 3 *Moore's Federal Practice* § 15.07 (2d ed.1983)).

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART and DENIES IN PART defendants Sumitomo Corporation of America and Robert Graustein's motion to dismiss plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Only plaintiff's claim for defamation survives. Plaintiff's claims for detrimental reliance, breach of contract, breach of fiduciary duty, injurious falsehood, and tortious interference with prospective advantage are hereby DISMISSED. Plaintiff has TWENTY DAYS from the date of this Order to seek to leave to replead. The parties are ORDERED to appear before this Court at 500 Pearl Street, Courtroom 18b for a status conference on May 19, 2005 at 10:00 a.m. unless a motion is pending.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 991772

## Footnotes

1    Because the claims against Sumitomo Corporation of America and Graustein are indistinguishable, the Court will refer to both defendants collectively as "SCOA" or "defendants" hereinafter.

2    On August 16, 2004, defendant Sumitomo Corporation filed its own motion to dismiss. The Court will address the merits of that motion in a companion Opinion and Order to follow.

3    Plaintiff's claims are governed by state law, but the parties have not raised choice of law issues. Instead, the parties' briefs assumed that New York State law applies. Where the parties so assume, the Court need not address choice of law *sua sponte. See In re Chateaugay Corp.,* 139 B.R. 598, 602 n. 3 (Bankr.S.D.N.Y.1992) (citing *Deep S. Pepsi-Cola Bottling Co. v. Pepsico, Inc.,* No. 88 Civ. 6243, 1989 U.S. Dist. LEXIS 4639, at *24 (S.D.N.Y. May 2, 1989)). Therefore, the Court applies New York State law in accordance with the parties' briefs.

4    The Court notes that SCOA did allegedly repeat its assurances that it would seek out investors and would not allow Smartix to fail. However, those assurances are irrelevant to the present inquiry as they were not misrepresentations of present fact as required for a claim of negligent misrepresentation. *See Eternity,* 2003 U.S. Dist. LEXIS 12351, at *10 (quoting *Hydro Investors,* 227 F.3d at 21, as holding that the "negligent misrepresentation claim failed as a matter of law because the misrepresentations at issue, which related to predictions of energy output, 'were mere promises of future output as opposed to present representations of existing fact' "). The only alleged misrepresentation of then-present fact is SCOA's statement that it was in contact with interested investors. (Compl.¶ 62.) However, simply stating that SCOA was lying when they made this statement is insufficient for Rule 9(b) purposes, *see id. at *12;* and, in fact, plaintiff no where alleges that this statement was untrue.

5    Because the Court finds that plaintiff failed to sufficiently plead the first element of negligent misrepresentation, the Court will not address the other four elements defined, *supra.*

6    Defendants also argue that plaintiff should be barred from arguing these last two theories because they were not represented in the Complaint. However, as stated above, for purposes of a motion to dismiss, the Court may properly consider all factual allegations in the Complaint, attached documents, matters of judicial notice, or documents the plaintiff

relied on in bringing suit. 📙 *Brass,* 987 F .2d at 150. Further, plaintiff realleged each preceding allegation in the Complaint as part of his fiduciary duty claim (Compl.¶ 169) and the Court properly makes all reasonable inferences in favor of plaintiff.

**7**    Plaintiff asserts that SCOA's status as majority shareholder is further evidenced by his own e-mail communication to SCOA employees, dated September 19, 2003, wherein he refers to SCOA as a "major shareholder." (Pl.'s Opp'n at 17; Compl. Ex. A.) However, plaintiff's e-mail reference cannot supplant this Court's determination of matters of law. *See*

📙 *Papasan v. Allain,* 478 U.S. 265, 286 (1986). Further, the Court notes that plaintiff appears to be speaking from both sides of his mouth, as, in one breath he prays the Court disregard portions of this same e-mail that refer to a "term sheet" and in another, argues the Court should pin a finding that SCOA was a *de facto* majority shareholder on an ostensibly analogous representation made in this same e-mail. (Pl.'s Opp'n at 1, 17.)

**8**    Special damages constitute "the loss of something having economic or pecuniary value which must flow directly from the

injury to reputation caused by the defamation...." 📙 *Matherson v. Marchello,* 100 A.D.2d 233, 235, 473 N.Y.S.2d 998 (App.Div.1984) (citations and quotations omitted); Robert D. Sack, 1 *Sack on Defamation: Libel, Slander and Related Problems* § 2.8.7.1, at 2-113 (3d ed. 2004) ("Special damages refers only to pecuniary damages such as out-of-pocket loss.").

**9**    Defendants also argue that plaintiff's alleged damages such as "loss of stock value, failed loans, unreimbursed expenses and loss of salary" did not directly flow from defendants' alleged defamatory statements, but rather resulted from Smartix's general decline and ultimate failure. Defendants' objection fails, however, because a plea of special damages is not a necessary element of a well-pleaded tort for slander *per se.* While the Court recognizes, *infra* Discussion Parts II.E and II.F, that damages resulting from Smartix's failure could not have stemmed from SCOA's allegedly defamatory statements as demonstrated by the timeline of the Complaint, the purpose of removing the requirement to plead special damages is to allow plaintiff to assess his damages after discovery. Therefore, plaintiff's defamation claim cannot fail simply because he went beyond the call of the caselaw and alleged inappropriate specific damages.

**10**    In their reply papers, defendants raised for the first time the argument that plaintiff's claim fails because it failed to allege the exact words giving rise to the tort of injurious falsehood. (Defs.' Reply at 4-5.) The Court will not address this argument because to do so would render the Court's procedural limits moot. *See Dunlop-McCullen v. Pascarella,* No. 97 Civ. 0195, 2002 U.S. Dist. LEXIS 21854, at *80 n. 43 (S.D.N.Y. Nov. 13, 2002) (Leisure, J.). "[E]ntirely new but foreseeable points relevant to a motion [may not] be presented in a reply affidavit.... Such a procedure is foreign to the spirit and objectives of the Federal Rules of Civil Procedure. Were tactics of this type permitted, a sur-reply affidavit would be necessary from

the adversary, followed by a further supplemental response by the moving party, and so on ad infinitum." 📙 *Tetra Techs., Inc. v. Harter,* 823 F.Supp. 1116, 1120 (S.D.N.Y.1993) (citations omitted).

---

End of Document    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-md-02865-LAK    Document 125-5    Filed 06/03/19    Page 53 of 80

MasterCard Intern. Inc. v. Argencard Sociedad Anonima, Not Reported in F.Supp.2d...
2002 WL 432379

2002 WL 432379
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

MASTERCARD INTERNATIONAL
INCORPORATED, Plaintiff,
v.
ARGENCARD SOCIEDAD ANONIMA, Defendant.

No. 01 CIV. 3027(JGK).
|
March 20, 2002.

OPINION AND ORDER

KOELTL, District J.

**\*1** The plaintiff, MasterCard International Inc. ("MasterCard") brings this action against the defendant, Argencard Sociedad Anonima ("Argencard"), seeking a declaration that MasterCard has (i) the right under a license agreement entered into between the parties (the "License Agreement") to terminate the exclusivity provisions in that Agreement and (ii) the right to terminate Argencard's membership in the MasterCard licensing program pursuant to MasterCard's Corporate Rules and By-laws. MasterCard also seeks appropriate injunctive relief allowing it to terminate Argencard's exclusive licensing rights under the License Agreement.

There are currently two motions pending before this Court. First, Argencard moves pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure to dismiss this action on the ground that this Court lacks personal jurisdiction over Argencard, and under the doctrine of forum non conveniens and out of deference to a prior pending action in Argentina. The action pending in Argentina involves one of the principal questions in this case, namely, whether MasterCard has the right under the License Agreement to terminate Argencard's exclusivity rights under that Agreement. Second, MasterCard moves for a preliminary injunction prohibiting Argencard from proceeding with the Argentine litigation.

I.

The relevant facts, as alleged in the Complaint and the affidavits and declarations submitted by the parties in connection with the current motions, are as follows. MasterCard is a joint venture partnership organized under the laws of the State of Delaware, with its principal place of business in New York. See Am. Compl. ¶ 14, attached as Ex. 1 to Declaration of Gary R. Carney dated May 23, 2001 ("Carney Decl."). MasterCard operates a global credit payment system through which consumers and merchants can conduct transactions using credit or debit cards bearing the MasterCard logo. See id. MasterCard does not directly issue these cards to consumers or enter into agreements with merchants to accept the cards, but rather licenses member corporations to perform those tasks in return for use of the MasterCard brand name. See id .

On September 1, 1977, Argencard entered into an agreement with MasterCard, which, among other things, allowed Argencard to use certain MasterCard trademarks in Argentina (the "Original License Agreement"). See Original License Agreement, attached as Ex. A to Am. Compl. Pursuant to this Agreement, Argencard became a member of MasterCard and agreed to be governed by its Standards, By-laws and Rules. See id. at ¶¶ 2, 6, 13. The Original Licensing Agreement was non-exclusive except as otherwise stated in its Attachment A. See id. at ¶ 1. On December 1, 1992, the parties executed a Revised Attachment A, which provided that the grant of the license to Argencard for Argentina would be exclusive for an initial term of five years, after which it would be automatically renewable for periods of three years, unless the parties terminated the Agreement. See Revised Attachment A at ¶¶ 2–4, attached as Ex. B. to Am. Compl. This grant of exclusivity was, however, conditioned upon Argencard's compliance with certain performance objectives. See id. ¶ 3. The Original License Agreement as amended by the Revised Attachment A will be referred to as the "License Agreement."

**\*2** Section 2(a) of the Revised Attachment A states that MasterCard "shall have the right to terminate this exclusivity provision, by a majority vote of the Licensor's Board of Directors ... upon one (1) year prior written notice ... in the event that the Licensee fails to meet any of its Performance Objectives during any Performance Period ...." Id. at ¶ 2(a). Revised Attachment A also has a separate provision, Section 5(b), which allows MasterCard to terminate Argencard's exclusivity rights "if

Case 1:18-md-02865-LAK    Document 125-5    Filed 06/03/19    Page 54 of 80

MasterCard Intern. Inc. v. Argencard Sociedad Anonima, Not Reported in F.Supp.2d...

2002 WL 432379

at any time ... there occurs a change in the competitive or business conditions in Licensee's Area of Use." However, MasterCard cannot terminate under this provision with only one year advance written notice, as described in Section 2(a), because a termination under Section 5(b) is effective only "upon the later of the end of the Initial term or three (3) years after Licensor provides written notice to the Licensee of said termination." *Id.* ¶ 5(b).

MasterCard concedes that when Revised Attachment A was first executed in 1992, Argencard enjoyed an industry leadership position in Argentina and that Argencard maintained that position through at least 1995. *See* Declaration of Jean Rozwadowski dated May 22, 2001, at ¶ 8 ("Rozwadowski Decl."). Thereafter, however, Argencard began to lose this position for reasons that are disputed between the parties. Argencard takes the position that it has complied with all of the relevant performance objectives in the License Agreement, and that any changes in its leadership position are due to changed business conditions in Argentina, such that Section 5(b) of the Revised Attachment A is the sole provision under which MasterCard can terminate Argencard's exclusivity rights due to its present status in the market. MasterCard takes the position that Argencard has lost its leadership role in the industry due to a change in ownership, which has resulted in changed policies and a failure to meet the performance objectives set forth in License Agreement. MasterCard also takes the position that failure to meet the performance objectives in the License Agreement gives MasterCard a right to terminate the exclusivity provisions under the Agreement even if the failure was due to changed business circumstances.

The disputes concerning Argencard's performance and the consequences of this performance under the terms of the License Agreement continued until, on March 23, 2000, MasterCard's Board of Directors adopted a resolution directing MasterCard management to provide Argencard with written notice that MasterCard would terminate the exclusivity rights in the License Agreement if MasterCard determined that Argencard was not meeting its performance objectives by April 30, 2001. *See* Rozwadowski Decl. Ex. 2. On April 24, 2000, MasterCard sent a written notice to Argencard conveying this message. *See* Am. Compl. Ex. C.

Over the course of the next year, the parties continued to dispute whether MasterCard had the right to terminate Argencard's exclusivity rights under the License Agreement in light of Argencard's performance in Argentina. The parties also engaged in continual discussion regarding a potential business solution to the dispute. *See* Rozwadowski Decl. ¶ 12. On July 13, 2000, in the course of these discussions and in response to perceived threats of litigation on the part of Argencard, MasterCard sent Argencard a letter stating, among other things, "[i]f litigation were to be instituted against MasterCard, or is seriously threatened again, MasterCard will then look to its other options with respect to Argencard." *See* Letter from Robert W. Selander, President and C . E.O. of MasterCard International, to Carlos Fuks, Director of Argencard, S.A., dated July 13, 2000, at 2, attached as Ex. A to Second Declaration of Francisco Perez Abella dated June 11, 2001. At oral argument, both parties indicated that they understood this letter to threaten an effective termination of Argencard's exclusivity arrangement with MasterCard by means other than termination of the License Agreement's exclusivity provision, such as by actions taken by the Board of Directors pursuant to MasterCard's rights under the By-laws.

**\*3** In March 2001, shortly before MasterCard's proposed termination was to become effective, Argencard filed an action in Argentina seeking, among other things, a declaration that MasterCard did not have the right to terminate Argencard's exclusivity rights under the License Agreement and an invalidation of the Board Resolution to terminate this exclusivity based on the April 2001 review. *See* Argentine Compl., attached as Ex. B to Declaration of Martin Campbell dated May 23, 2001 ("Campbell Decl."). In the Argentine litigation, Argencard, acting *ex parte,* also sought and obtained on March 22, 2001 an injunction prohibiting MasterCard from terminating Argencard's exclusivity rights under the License Agreement or from using any of MasterCard's contractual or by-law rights to terminate the License Agreement or the exclusivity provision during the Argentine litigation. *See* Argentine Injunction Order, at 1–2, 9, attached as Ex. 3 to Carney Decl. MasterCard alleges that it learned of this action and the injunction only on April 9, 2001. *See* Razwadowski Decl. ¶ 13. On April 10, 2001, MasterCard filed the present action seeking, among other things, a declaration that it has the right under the License Agreement to terminate Argencard's exclusivity rights and the right under its own By-laws and Rules to terminate Argencard's membership in MasterCard. *See* Am. Compl. at 10–13.

Case 1:18-md-02865-LAK    Document 125-5    Filed 06/03/19    Page 55 of 80

MasterCard Intern. Inc. v. Argencard Sociedad Anónima, Not Reported in F.Supp.2d...

2002 WL 432379

On April 11, 2001, MasterCard informed Argencard that it did not believe Argencard had attained the relevant performance objectives and indicated that the grant of exclusivity under the License Agreement would terminate effective April 30, 2001. *See* Rowzwadowski Decl. Ex. 3. The parties are currently litigating their disputes both in this Court and in the Argentine courts.

## II.

Argencard moves to dismiss this action on the ground that the Court allegedly lacks personal jurisdiction over Argencard. A district court has broad discretion in deciding how to proceed with a motion to dismiss for lack of personal jurisdiction, including whether to allow discovery, conduct an evidentiary hearing or even postpone deciding the issue until trial. *See* *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 364 (2d Cir.1986); *APC Commodity Corp. v. Ram Dis Ticaret A.S.,* 965 F.Supp. 461, 464 (S.D.N.Y.1997); *International Customs Assocs., Inc. v. Ford Motor Co.,* 893 F.Supp. 1251, 1258–59 (S.D.N.Y.1995), *aff'd,* 201 F.3d 431 (2d Cir.1999). The plaintiff must establish personal jurisdiction by a preponderance of the evidence. *See* *Marine Midland N.A. v. Miller,* 664 F.2d 899 (2d Cir.1981). Because there has not been an evidentiary hearing in this case, MasterCard need only make a prima facie showing of personal jurisdiction over Argencard to survive a motion to dismiss, and the pleadings and any supporting affidavits are to be interpreted in the light most favorable to MasterCard. *See* *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997); *A.I. Trade Finance, Inc. v. Petra Bank,* 989 F.2d 76, 79–80 (2d Cir.1993). In any event, no party has sought an evidentiary hearing in this case, and it is clear from the affidavits and concessions of the parties that the Court has personal jurisdiction over Argencard.

**\*4** As an initial matter, Argencard is a member of MasterCard, and, as a member, it has indisputably consented to be governed by its By-laws. *See* License Agreement ¶¶ 2, 6, 13. As MasterCard correctly points out, Rule 1.02 of the MasterCard By-laws and Rules contains a forum selection clause, which states that:

[i]n the event of any litigation regarding and/or involving the Corporation Standards (i) the member and/or its agent agrees to only initiate such litigation in the United States District Court for the Southern District of New York or the New York Supreme Court for the County of Westchester, and hereby waives any claims of *forum non conveniens* and (ii) the member hereby submits to the jurisdiction of such courts and waives any claims of lack of personal jurisdiction, improper venue, and *forum non conveniens.*

*See* MasterCard By-laws and Rules, at 1–1, attached as Ex. 2 Carney Decl. The present case clearly involves MasterCard's standards because MasterCard's second cause of action is, in part, for a declaratory judgment holding that it is permitted to terminate Argencard's membership in MasterCard pursuant to these By-laws and Rules. *See* Am. Compl. at 12–13. By becoming a member of MasterCard, Argencard has consented to the personal jurisdiction of this Court in the present action and has waived any arguments related to lack of personal jurisdiction. [1]

In any event, the undisputed facts and affidavits submitted by the parties in this case establish that the Court has personal jurisdiction over Argencard. As a general rule, "the amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779 (2d Cir.1999) (citing *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 223 (2d Cir.1963) (en banc)) (quotation marks omitted). Thus, the first question is whether New York law provides for personal jurisdiction over Argencard. *See* *CutCo,* 806 F.2d at 365.

New York State's long-arm provision allows for an exercise of personal jurisdiction over any foreign defendant who "transacts any business within the state." N.Y.C.P.L.R. § 302(a)(1). For a court to exercise jurisdiction under this provision, the claim must also "arise from" the transaction of business within the State.

See Hoffritz For Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 56–57 (2d Cir.1985). Where, as here, the parties dispute their respective rights under a License Agreement, a court determining whether a defendant meets this standard must consider a variety of factors, including: (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in the contract; (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state. See Agency Rent A Car System, Inc. v. Grand Rent A Car Corp, 98 F.3d 25, 29 (2d Cir.1996) (collecting cases). None of these factors is dispositive, and a court must look at the totality of factors in deciding whether it has personal jurisdiction under Section 302(a)(1). See PaineWebber Inc. v. Westgate Group, Inc., 748 F.Supp. 115, 118 (S .D.N.Y.1990).

**\*5** A consideration of these factors indicates that this Court would have personal jurisdiction over Argencard even if Argencard had not explicitly consented under the By-laws to jurisdiction in this Court. MasterCard has its principal place of business in New York, *see* Am. Compl. ¶ 8, and both parties agree that Argencard has been in an ongoing contractual relationship with MasterCard since at least 1977, when the two parties entered into the Original License Agreement. As part of this arrangement, Argencard became a member of MasterCard and consented to be governed by its By-laws. *See* Original License Agreement ¶¶ 2, 6, 13. Although it is unclear exactly how much of the negotiations of these agreements occurred in New York, Argencard does not dispute that some of those negotiations occurred in New York, and the License Agreement was by its express terms executed and made effective in New York. *See* License Agreement ¶ 23. Moreover, both the License

Agreement and the By-laws are governed by New York law, *see* License Agreement ¶ 21; MasterCard By-laws and Rules Rule 1.02. Argencard concedes that it has sent payments to MasterCard in New York. MasterCard has also presented ample evidence indicating that after execution of the Original License Agreement, Argencard representatives have made numerous visits to New York in connection with the arrangement. *See, e.g.,* Declaration of Ernesto E. Grether dated May 23, 2001, at ¶¶ 1, 3, 6; Declaration of Francisco Perez Abella dated May 23, 2001, at ¶ 21; Declaration of Michael J. Timko dated June 7, 2001, at ¶ 7; Declaration of Malvina Camejo dated June 11, 2001, at ¶ 11. Although Argencard argues that most of its business activities with cardholders, merchants and financial institutions has taken place in Argentina, it is clear that this business arises out of an ongoing relationship with MasterCard, which is headquartered in New York. *See* Agency Rent A Car, 98 F.3d at 30 (finding transaction of business in New York where very few personal representatives entered the State and where the breach occurred outside of New York, but where the defendant's "very businesses arise out of an ongoing contractual relationship with [a company] headquartered in New York."). In these circumstances, the Court has personal jurisdiction over Argencard with respect to the causes of action raised in the First Amended Complaint.

There is also no question that an exercise of personal jurisdiction is consistent with due process in this case.

See International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (outlining minimal contacts that a defendant must have with a forum state in order for an exercise of personal jurisdiction over the defendant to be consistent with federal due process). Argencard explicitly consented to personal jurisdiction by becoming a member of MasterCard and agreeing to be bound by the terms of its By-laws, thus obviating any due process concerns that might otherwise arise because of an exercise of jurisdiction. *See, e.g., National Union Fire Ins. Co. v. Fanelli,* No. 89 Civ. 8348, 1990 WL 134895, at \*3 (S.D.N.Y. Sept. 11, 1990) (citing National Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311 (1964)) ("It is wellsettled that jurisdiction by consent satisfies constitutional principles of due process ...."). Moreover, by obtaining the License Agreement through the conduct discussed above, Argencard purposefully availed itself of the privilege of conducting activities in New York, thus invoking the benefits and protection of its laws.

Case 1:18-md-02865-LAK Document 125-5 Filed 06/03/19 Page 57 of 80

MasterCard Intern. Inc. v. Argencard Sociedad Anonima, Not Reported in F.Supp.2d...

2002 WL 432379

See _Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,_ 209 N.E.2d 68, 71–76 (N.Y.1965); _see also_ _Burger King Corp., v. Rudzewicz,_ 471 U.S. 462, 479–82 (1985) (finding that Florida court could constitutionally assert personal jurisdiction over party with no physical presence in Florida when dispute grew out of the party's contractual relationship with Florida corporation and the contract contained choice-of-law provision specifying that disputes were to be governed by Florida law); _United Res.1988–I Drilling & Completion Program, L. P. v. Avalon Exploration, Inc.,_ 1994 WL 9676, at *4 (S.D.N.Y. Jan. 10, 1994) (finding sufficient minimum contacts with New York to sustain personal jurisdiction over bank that made phone calls and sent letters to plaintiffs in New York and opened an account for a deposit wired from New York).

**\*6** Therefore, Argencard's motion to dismiss this action for lack of personal jurisdiction is denied.

## II.

Argencard moves to dismiss this case under the doctrine of forum non conveniens. However, as MasterCard correctly argues, Argencard has waived this argument with respect to the present case by consenting to be a member of MasterCard and to be governed by Rule 1 .02 of its By-laws, for the same reasons discussed above.

In any event, the Supreme Court has held that federal courts should dismiss actions under the doctrine of forum non conveniens only rarely. _See_ _Quackenbush v. Allstate Ins. Co.,_ 517 U.S. 706, 721 (1996); _see also_ _Gulf Oil Corp. v. Gilbert,_ 330 U.S. 501 (1947). In order to grant a motion to dismiss on forum non conveniens grounds, the Court must determine, first, that there is an adequate alternative forum elsewhere, and, second, that a weighing of the public and private interests identified indicate that adjudication in the alternative forum will "be most convenient and will best serve the ends of justice." _See_ _Alfadda v. Fenn,_ 159 F.3d 41, 45–46 (2d Cir.1998) (quoting _Peregrine Myanmar Ltd. v. Segal,_ 89 F.3d 41, 46 (2d Cir.1996)) (quotation marks omitted); _see also_ _Iragorri v. United Techs. Corp.,_ 274 F.3d 65, 73–74 (2d Cir.2001) (en banc). The defendant bears the burden of establishing these factors, and the defendant must show

that this balance tilts strongly in favor of the foreign forum. _See_ _PT United Can Co. Ltd. v. Crown Cork & Seal Co.,_ 138 F.3d 65, 74 (2d Cir.1998); _R. Maganlal & Co. v. M.G. Chem. Co.,_ 942 F.2d 164, 167 (2d Cir.1991).

Moreover, the Supreme Court has held that in making these determinations, "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum." _Piper Aircraft Co. v. Reynco,_ 454 U.S. 235, 255 (2d Cir.1981). A plaintiff should not be deprived of the presumed advantages of litigating in its home forum:

> except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems.

_Koster v. (American) Lumbermens Mut. Cas. Co.,_ 330 U.S. 518, 524 (1947) (cited with approval in _Wiwa,_ 226 F.3d at 101–02); _see also_ _Piper,_ 454 U.S. at 255 & n. 23. The plaintiff's choice is afforded even greater deference, where, as here, an American plaintiff is filing suit against a foreign defendant. _See_ _Wiwa v. Royal Dutch Petroleum Co.,_ 226 F.3d 88, 101–02 (2d Cir.2000); _Firma Melodiya v. ZYX Music GmbH,_ 882 F.Supp. 1306, 1317 (S.D.N .Y.1995); _Nationsbank v. Banco Exterior,_ 867 F.Supp. 167, 170–71 (S.D.N.Y.1994) (collecting cases); _see also_ _Swift & Co. Packers v. Compania Colombiana,_ 339 U.S. 684, 697 (1950) ("Application of forum non conveniens to a suit by a United States citizen against a foreign respondent brings into force considerations very different form those in suits between foreigners ."). At the same time, this deference is afforded American plaintiffs because the home forum is presumed to be convenient to such plaintiffs, and this deference should therefore be discounted to the degree that the plaintiff has no bona fide

Case 1:18-md-02865-LAK    Document 125-5    Filed 06/03/19    Page 58 of 80

MasterCard Intern. Inc. v. Argencard Sociedad Anonima, Not Reported in F.Supp.2d...

2002 WL 432379

reasons for litigating in a domestic court and the plaintiff's choice masks purely tactical or dilatory strategies. *See* *Iagorri,* 274 F.3d at 71–72.

**\*7**  These factors indicate that dismissal on forum non conveniens grounds would be inappropriate. With regard to the first issue, an alternative forum is ordinarily adequate if the defendant is amenable to process in that forum. *See* *Gilbert,* 330 U.S. at 501 (1947); *Piper,* 454 U.S. at 254 n. 22. The Court of Appeals for the Second Circuit has "repeatedly emphasized that [i]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." *Blanco v. Banco Industrial De Venezuela, S.A.,* 997 F.2d 974, 982 (2d Cir.1993) (internal citations and quotations omitted). Hence, "some inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." *Id.* (internal quotation and citation omitted); *see also* *PT United Can Co., Ltd.,* 138 F.3d at 73. In this case, it is clear that MasterCard can sue Argencard in Argentina, and thus Argentina is an available alternative forum for this litigation. Although MasterCard argues that recent turmoil in Argentina has affected the judicial process in Argentina, there is no evidence that such difficulties would affect the possible litigation in this case or MasterCard's ability to get a fair hearing. Hence, there is nothing in the present record to support the contention that Argentina is an inadequate forum for this case. *See, e.g.,* *Piper,* 454 U.S. at 254 n. 22 ("In the absence of extraordinary circumstances, as where the foreign court does not allow for litigation of the subject matter of the dispute or for recovery, amenability of process is sufficient to render a foreign forum adequate.").

However, turning to the public and private interests that are at stake—the so-called "Gilbert" factors—the most important public interests to consider are: (1) the local interest in having local disputes settled at home; (2) the avoidance of problems in applying foreign law; and (3) the potential burden to jurors if they have to decide a case that has no impact on their community. *See* *Gilbert,* 330 U.S. at 508–09. None of these public interests weighs in favor of dismissal in this case because this case involves a dispute that is governed by New York law and arises between a corporation headquartered

in New York and an Argentine corporation. Hence, the dispute will have obvious impact on the New York community. Moreover, with regard to private interests and convenience, courts have traditionally considered the following *Gilbert* factors: (1) the ease of access to evidence; (2) the cost of obtaining witnesses to attend trial; (3) the availability of compulsory process; and (4) other factors that might shorten trial or make it less expensive. *See id.* Courts also consider issues related to court congestion. *See id.* Although there is some dispute over whether most of the documents and evidence are located in New York or in Argentina, and although an answer to this question will depend in part on whether Section 5(b) provides the sole basis for terminating Argencard's exclusivity rights under the License Agreement or whether Section 2(a) provides another basis, MasterCard correctly argues that most if not all of its own documents and witnesses are in this country. There is certainly a very real convenience to MasterCard in proceeding in this forum, and, in the present circumstances, this bona fide interest is enough to outweigh any inconveniences that the foreign defendant might have in proceeding only in Argentina. *See Koster,* 30 U.S. at 524 ("In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown.").

**\*8**  Having carefully weighed all of the *Gilbert* factors, and acknowledging the great deference ordinarily given to an American plaintiff's choice of forum when suing a foreign defendant, Argencard has not met its burden of establishing that the private and public interests weigh strongly in favor of dismissal. Hence, Argencard's motion to dismiss under the doctrine of forum non conveniens is denied.

### III.

Argencard moves to dismiss this action on the ground that there is a prior action pending in Argentina. A court has inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction. *See* *Landis v. North Am. Co.,* 299 U.S. 248, 254 (1936); *Evergreen Marine Corp. v. Welgrow Int'l, Inc.,* 954 F.Supp. 101, 103 (S.D.N.Y.1997); *Houbigant, Inc. v. ACB Mercantile, Inc.,* 914 F.Supp. 997, 1003 (S.D.N.Y.1996); *Ronar, Inc. v. Wallace,* 649 F.Supp. 310, 318 (S.D.N.Y.1986). A court's discretion

MasterCard Intern. Inc. v. Argencard Sociedad Anonima, Not Reported in F.Supp.2d...

2002 WL 432379

to dismiss an action that is within its jurisdiction is not boundless, however, and is limited by the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given to them." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976); *see also Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs. Inc.,* 949 F.Supp. 1123, 1127 (S.D.N.Y.1997); *Caspian Invs., Ltd. v. Vicom Holdings, Ltd.,* 770 F.Supp. 880, 884 (S.D.N.Y.1991); *Advantage Int'l Mgmt, Inc. v. Martinez,* No. 93 Civ. 6227, 1994 WL 482114, at *2 (S.D.N.Y. Sept. 7, 1994). In determining whether to dismiss a case out of deference to a pending foreign action, courts should consider factors including: (i) the similarity of the parties and issues; (ii) the adequacy of the alternative forum; (iii) the convenience of the parties; (iv) the promotion of judicial efficiency; (v) the possibility of prejudice to either party; and (vi) the temporal sequence of the filings. *See MLC (Bermuda) Ltd. v. Credit Suisse First Boston Corp.,* 46 F.Supp.2d 249, 251 (S.D.N.Y.1999).

In this case, the suits were filed almost simultaneously. Argencard brought the Argentine action and sought and obtained a preliminary injunction from the Argentine court that was issued on March 22, 2001. MasterCard filed the present action shortly thereafter, on April 10, 2001. When MasterCard filed this action, the Argencard action was still in its infancy, and MasterCard had not yet answered the Argentine Complaint. *See, e.g., Herbstein v. Bruetman,* 743 F.Supp. 184, 190 (S.D.N.Y.1990) (refusing to dismiss in favor of foreign litigation on sole ground that foreign action was "still in its preliminary stages"); *compare also Brinco Mining Ltd. v. FDIC,* 552 F.Supp. 1233, 1241–43 (D.D.C.1982) (deferring to foreign proceedings that had "progressed beyond 'incipiency' " through the filing of an answer). Moreover, the submissions by the parties indicate that Argencard engaged in the proceedings in Argentina *ex parte,* while the parties were seeking to negotiate a settlement, and that MasterCard did not learn of those proceedings until after the Argentine injunction had issued, possibly as late as April 9, 2001. *See* Rozwadowski Decl. Ex. 4; Carney Decl. Ex. 3. It appears that the Argentine action was an effort to "jump the gun," while the parties were still negotiating a business resolution. In these circumstances, the temporal priority of the Argentine action does not weigh heavily, it at all, in favor of dismissal, and many of the specific rationales behind the doctrine allowing for abstentions in favor of prior actions pending are absent.

**\*9** Moreover, although the issues related to exclusivity rights under the License Agreement are substantially similar in both cases, MasterCard also seeks in this action a declaration of MasterCard's rights under its By-laws to terminate Argencard's membership in MasterCard. This is an issue that is not raised in Argencard's complaint in the Argentine litigation and that could not be raised there without violating the forum selection clause in the By-laws. There need not be strict identity between the parties and issues in two actions in order to defer to a prior pending foreign action. *See, e.g., Landis,* 299 U.S. at 254; *Caspian Investments,* 770 F.Supp. at 884. However, the fact that MasterCard raises claims that are not properly adjudicable in that forum weighs against dismissal.

Argencard argues that the conveniences to the parties and the courts tilt in favor of deferring to the Argentine action. However, Argencard has not cited any exceptional circumstances warranting such deference, and, for the reasons discussed above, there are substantial reasons of convenience and deference to the plaintiff's choice of forum that counsel against dismissal. *See Quackenbush,* 517 U.S. at 716 (federal courts are obliged to exert their jurisdiction absent exceptional circumstances). Moreover, although there is some overlap between the two litigations, that overlap arises from the business decisions of the parties to include a New York forum selection clause in the By-laws but not in the License Agreement. The two litigations can proceed at the same time. *See, e.g., United States Fid. & Guaranty Co. v. Petroleo Brasileiro S.A.-Petrobras,* No. 98 Civ. 3099, 1999 WL 307642, at *11–12 (S.D.N.Y. May 17), *aff'd,* 199 F.3d 94 (2d Cir.1999) (per curiam). For all of the foregoing reasons, it would be inappropriate to dismiss this action in favor of the action pending in Argentina.

## IV.

MasterCard moves for a preliminary injunction prohibiting Argencard from proceeding in the Argentine litigation. It is well established that federal courts have the power to enjoin foreign suits by persons subject

Case 1:18-md-02865-LAK    Document 125-5    Filed 06/03/19    Page 60 of 80

MasterCard Intern. Inc. v. Argencard Sociedad Anonima, Not Reported in F.Supp.2d...

2002 WL 432379

to their jurisdiction. *See* *United States v. Davis,* 767 F.2d 1025, 1038 (2d Cir.1985); *Laker Airways Ltd. v. Sabena Belgian World Airlines,* 731 F.2d 909, 926 (D.C.Cir.1984). Such injunctions operate directly on the parties themselves, rather than on a foreign court. *See* *Laker Airways,* 731 F.2d at 926. Anti-foreign-suit injunctions can nevertheless effectively restrict the jurisdiction of a foreign court, thus raising issues of international comity. *See* *China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 35–36 (2d Cir.1987). Therefore, anti-foreign-suit injunction should be "used sparingly," *Davis,* 767 F.2d at 1038, and should be granted "only with care and great restraint." *China Trade,* 837 F.2d at 36 (quotation marks omitted). There is, in fact, a fundamental corollary to the existence of concurrent jurisdiction, which makes parallel proceedings possible: "parallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other." *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 926–27 (D.C.Cir.1984) (quoted with approval in *China Trade,* 837 F.2d at 36); *see also* *United States Fid. & Guaranty Co.,* 1999 WL 307642, at *1, *10–13 (allowing parallel proceedings with overlapping claims to proceed in federal and Brazilian courts, when courts had concurrent jurisdiction).

**\*10** In order to obtain an anti-foreign-suit injunction, the moving party must first make two threshold showings: first, that the parties in both suits are the same, and, second, that the resolution of the case before the enjoining court would be dispositive of the enjoined action. *See* *China Trade,* 837 F.2d at 36. It is undisputed that the primary parties in both this action and the Argentine action are MasterCard and Argencard. Although one of Argencard's controlling shareholders, Credit Card Holding Co., has intervened in the Argentine action, this party is not a necessary party to that action, and the present cases are sufficiently similar in terms of parties to meet the first threshold criterion for an anti-foreign-suit injunction extending to Argencard and MasterCard. Moreover, with regard to the second threshold criterion, in this action MasterCard seeks in part a declaration under the License Agreement that it may revoke Argencard's exclusivity, which is precisely the main issue raised

by Argencard in the Argentine action. Both threshold elements for an injunction are thus present in this case.

Anti-foreign-suit injunctions are by their nature equitable, however, and once these threshold elements have been satisfied, courts deciding whether to grant them must consider (1) whether the foreign litigation poses a threat to the enjoining court's jurisdiction; (2) whether the foreign litigation would frustrate important United States policies; (3) whether the foreign action is vexatious; (4) whether adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency, or a race to judgment; and (5) other equitable considerations, including the possibility of prejudice to either party if the foreign action were to proceed. *See* *American Home Assurance Corp. v. Insurance Corp.,* 603 F.Supp. 636, 643 (S.D.N.Y.1984); *see also* *China Trade,* 837 F.2d at 36. The Court of Appeals for the Second Circuit has made it clear that in light of the sparing nature with which foreign-anti-suit injunctions should be issued, the important international comity interests at play, and the basic rule allowing parallel litigations to proceed in multiple forums, the first two criteria are the most important. *See* *China Trade,* 837 F.2d at 36. Hence, absent extraordinary circumstances, the Court should only issue such an injunction if the Argentine litigation presents either a threat to this Court's jurisdiction or a threat to an important domestic policy. *See id.*

There is nothing in this case to suggest that the Argentine action poses a threat to this Court's jurisdiction over the present action. MasterCard does not materially contest this fact and instead argues that the Argentine action poses a threat to the domestic policy of enforcing forum selection clauses. *See* *Farrell Lines Inc. v. Columbus Cello–Policy Corp.,* 32 F.Supp.2d 118, 130–31 (S.D.N.Y.1997) (granting anti-suit injunction to preserve important public policies where it was conceded that action was brought in foreign court to evade both a clearly applicable forum selection clause and the liability limitations in the Carriage of Goods by Sea Act, 46 App. U.S.C. § 130 46 App. U.S.C. § 1300 *et seq.*); *International Fashion Prods., B.V. v. Calvin Klein, Inc.,* No. 95 Civ. 0982, 1995 WL 92321, at *2 (S.D.N.Y. March 7, 1995) (granting anti-suit injunction when foreign action threatened both jurisdiction of the court and public policy favoring the

Case 1:18-md-02865-LAK    Document 125-5    Filed 06/03/19    Page 61 of 80

MasterCard Intern. Inc. v. Argencard Sociedad Anonima, Not Reported in F.Supp.2d...

2002 WL 432379

enforcement of forum selection clauses); *see also* MI S Bremen v. Zapata Off–Shore Co., 407 U.S. 1, 12–15 (1972) (discussing rationales behind enforceability of forum selection clauses). In this case, it is unnecessary to decide whether the preservation of a forum selection clause by itself is a sufficiently important domestic policy to warrant an anti-foreign-suit injunction because the License Agreement does not contain a forum selection clause. Hence, there is nothing offensive to this policy in allowing Argencard to proceed with a suit in Argentina claiming only that MasterCard lacks the right under the License Agreement to terminate its exclusivity provisions. MasterCard executed a License Agreement that allows for such lawsuits to proceed in Argentina, and MasterCard cannot now argue that such a lawsuit would offend any domestic policies favoring the enforcement of forum selection clauses.

 *11  On the other hand, Argencard has also successfully moved in the Argentine litigation for a preliminary injunction prohibiting MasterCard not only from terminating Argencard's exclusivity rights under the License Agreement but also from terminating Argencard's membership in MasterCard or otherwise taking actions pursuant to other contracts or its own By-laws to threaten Argencard's exclusivity rights during the pendency of the Argentine litigation. MasterCard argues that this injunction "involves" its By-laws, within the meaning of Rule 1.02 of the By-laws, and that Argencard has thus violated the forum selection clause in Rule 1.02 by seeking an injunction in Argentina that involves these By-laws. Allowing Argencard to proceed with the Argentine litigation would, in MasterCard's view, therefore undermine the domestic public policy favoring the enforcement of forum selection clauses.

To the extent that Argencard has violated this forum selection clause, allowing Argencard to continue litigating that action does not significantly threaten the policy at issue. As an initial matter, the issue in the Argentine action involves only whether MasterCard has the right under the License Agreement to terminate Argencard's exclusivity rights, not whether MasterCard has the right under its By-laws to terminate Argencard's membership as a non-exclusive licensee. *See* Argentine Compl. Although the injunction that Argencard sought and obtained is broader, it does not purport to decide whether MasterCard has the right under its By-laws to terminate Argencard's membership. *See* Argentine Injunction Order at 2–

8. It merely prevents MasterCard from terminating Argencard's membership during the pendency of that litigation, *see* Argentine Injunction Order at 1, which, as discussed above, directly involves rights under the License Agreement.

Moreover, an anti-foreign-suit injunction would only prevent the parties from pursuing that litigation further; it would not vacate the injunction. The Argentine court that issued the injunction explained that it thought this broader injunction was warranted, when it was issued, because Argencard had presented credible evidence that MasterCard might attempt effectively to circumvent the court's final rulings on the License Agreement issue by terminating Argencard's membership altogether before the court had ruled. *See* Argentine Injunction Order at 8. As both parties agreed at oral argument, this evidence included a letter from MasterCard to Argencard dated July 13, 2000 threatening to explore such options if Argencard were to litigate the exclusivity issue. The injunction's breadth is thus somewhat peripheral to the underlying issues being litigated in the Argentine action.

In any event, courts generally have broad power to issue injunctions to preserve the status quo during a pending litigation and ensure that they maintain jurisdiction over any dispute properly submitted to them. *See, e.g.,* 28 U.S.C. § 1651(a); *Hawaii Hous. Auth. v. Midkiff,* 463 U.S. 1323, 1324 (1983) (Opinion of Rehnquist, J. as Circuit Justice). There is no question that Argencard could have brought a suit to resolve its rights under the License Agreement in an Argentine court without violating any forum selection provisions. By its own terms, the injunction will be extinguished once the Argentine court renders a final ruling on the merits of the underlying licensing disputes. *See* Argentine Injunction Order at 28. The fact that Argencard has sought and obtained interim relief prohibiting MasterCard from taking certain actions pursuant to its By-laws during the pendency of that litigation is insufficient, in these circumstances, to threaten any domestic policies favoring the enforcement of forum selection clauses.

 *12  In sum, the Argentine litigation does not threaten either the jurisdiction of this Court or any important public policies identified by the parties. In these circumstances, the fact that allowing parallel proceedings in multiple jurisdictions might cause some additional costs, delay and vexation is insufficient to outweigh the

Case 1:18-md-02865-LAK   Document 125-5   Filed 06/03/19   Page 62 of 80

MasterCard Intern. Inc. v. Argencard Sociedad Anonima, Not Reported in F.Supp.2d...

2002 WL 432379

important international comity interests that arise when foreign and domestic courts have concurrent jurisdiction over the same in personam claim. *See* *China Trade, 837 F.2d at 36*. Indeed, the existence of the parallel proceedings is simply the result of the agreements the parties executed. MasterCard's motion for an anti-suit injunction is therefore denied.

CONCLUSION

For the foregoing reasons, Argencard's motion to dismiss is denied. MasterCard's motion for an anti-foreign suit injunction is also denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 432379

Footnotes

1    At oral argument, Argencard pointed out that this forum selection clause was only added in 1997. However, in executing the License Agreement in 1977, Argencard consented to be governed by the MasterCard By-laws "as they are now in effect, and any future modifications or interpretations thereof or supplements thereto which are adopted by Licensor and made applicable as standards for the Marks or the Charge Card Business in connection with which any of the Marks are used." License Agreement ¶ 2. Argencard does not contest that it is bound by the forum selection clause in the current By-laws.

End of Document                                         © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 292018
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

UNITED STATES of America,

v.

Martin ARMSTRONG, Defendant.

No. 99 Cr. 997(JFK).
|
Jan. 28, 2011.

**Attorneys and Law Firms**

Preet Bharara, United States Attorney, Southern District
of New York, Andrew D. Goldstein, of Counsel, New
York, NY, for the United States of America.

Martin A. Armstrong, Fort Dix, NJ, pro se.

### *OPINION AND ORDER*

JOHN F. KEENAN, District Judge.

**\*1** Before the Court is *pro se* defendant Martin A.
Armstrong's ("Armstrong") Motion for Emergency Bail
or Transfer to Halfway House or Home Confinement
to Enable Medical Care Being Denied by the Bureau
of Prisons [Dkt. No. 182] ("Emergency Motion"). On
April 10, 2007, Armstrong pleaded guilty to one count of
conspiracy to defraud the United States and is currently
serving a sixty-month sentence at the Federal Correctional
Institution at Fort Dix, New Jersey ("FCI Fort Dix").
Claiming that he is not receiving adequate medical care
while in the custody of the Federal Bureau of Prisons,
Armstrong seeks emergency bail or release prior to
the termination of his sentence so that he can obtain
private medical care. For the reasons set forth below, the
Emergency Motion is denied, and Armstrong is directed
to comply with the terms of this order when making future
submissions to this Court.

### I. Background

### A. The United States' Cases Against Armstrong

On September 13, 1999, the U.S. Securities and Exchange
Commission ("SEC") and the U.S. Commodities Futures
Trading Commission ("CFTC") brought civil actions
against Princeton Global Management Ltd., Princeton
Economics International Ltd., and Armstrong in the
U.S. District Court for the Southern District of New
York. [1] The SEC and CFTC alleged that Armstrong and
the companies he owned violated various provisions of
the federal securities laws "by fraudulently offering and
selling promissory notes in the millions ... to Japanese
institutional investors, and misrepresenting the net asset
value to the investors, thereby concealing large and
mounting trading losses." *SEC v. Princeton Economic
Int'l, Ltd.,* 73 F.Supp.2d 420, 421 (S.D.N.Y.1999). As
part of that litigation, the Court ordered Armstrong to
turn corporate assets over to the receiver of the corporate
defendants. Armstrong defied the Court's order, and
he was held in contempt. *See SEC v. Princeton Econ.
Int'l, Ltd.,* 338 F.Supp.2d 465, 466–67 (S.D.N.Y.2004).
Armstrong unsuccessfully challenged the legality of his
contempt confinement numerous times. *See Armstrong
v. Zickefoose,* No. 10 Civ. 4388, 2010 WL 4810654, at
*6–7 (D.N.J. Nov. 17, 2010) ("Zickefoose II") (citing
*Armstrong v. Guccione,* 470 F.3d 89 (2d Cir.2009)).
The SEC and CFTC actions were eventually resolved
by the Court's approval of a Plan of Final Distribution
negotiated by the parties. *See SEC v. Princeton Econ.
Int'l, Ltd.,* Nos. 99 Civ. 9667, 99 Civ. 9669, 2008 WL
7826694, at *3 (S.D.N.Y. Sept. 30, 2008).

The United States Attorney for the Southern District
of New York also pursued criminal charges against
Armstrong in parallel with the civil actions brought
by the SEC and the CFTC. On September 13, 1999,
Armstrong was indicted on charges of conspiracy to
defraud the United States, securities fraud, and wire
fraud. [2] On August 17, 2006, Armstrong pleaded guilty to
one count of conspiracy to defraud the United States. On
April 10, 2007, Armstrong was sentenced to incarceration
for a period of sixty months. On April 27, 2007, the
civil contempt order was lifted and Armstrong's criminal
sentence began. *Zickefoose II,* 2010 WL 4810654, at *6 n.
9.

### B. Post–Conviction Litigation by Armstrong

**\*2** Since his incarceration at FCI Fort Dix, Armstrong
has made several legal challenges to the execution of

his sentence. The Court is aware of the following three attempts made by Armstrong.

### 1. D.D.C. Action

Armstrong's first legal challenge to the conditions of his confinement was filed in the U.S. District Court for the District of Columbia. *See Armstrong v. Lappin,* 630 F.Supp.2d 73, 74 (D.D.C.2009). Armstrong sued the Director of the Bureau of Prisons for injuries he received when attacked by a fellow prisoner during his confinement for civil contempt at the Metropolitan Correctional Center ("MCC") in New York City. He also requested a "temporary restraining order" requiring the Bureau of Prisons to grant credit for time served on the civil contempt charge against his criminal sentence. The district court denied Armstrong's request for a temporary restraining order and transferred the case to the Southern District of New York under the venue provisions of the Federal Tort Claims Act, 28 U.S.C. § 1402(b). *Lappin,* 630 F.Supp.3d at 77.

Armstrong sought a writ of mandamus challenging the transfer order, but the U.S. Court of Appeals for the District of Columbia Circuit, in a *per curiam* opinion, dismissed the application. *In re Martin A. Armstrong,* No. 09–5395 (D.C.Cir. Mar. 23, 2010). The court of appeals held that it lacked jurisdiction to review the transfer order and that "to the extent [Armstrong] seeks his immediate release, he must pursue such relief through a petition for writ of *habeas corpus* in the district where he is incarcerated." *Id.* The Court of Appeals also denied Armstrong's request for temporary relief and referred Armstrong's request to proceed *in forma pauperis* to the District Court for the District of Columbia. *In re Martin Armstrong,* No. 09–5370 (D .C.Cir. Aug. 6, 2010). After the District Court granted Armstrong leave to proceed *in forma pauperis, Armstrong v. Lappin,* 09 Civ. 972 (D.D.C. Aug. 12, 2010), the Court of Appeals affirmed the District Court opinion denying Armstrong's motion for a restraining order. *In re Martin Armstrong,* No. 09–5370 (D.C.Cir. Jan. 13, 2011).

On December 14, 2009, in light of the then-pending mandamus petition and appeal in the D.C. Circuit, the Southern District of New York placed the transferred action on the suspense docket.

### 2. D.N.J. Petition

On January 28, 2008, in a parallel course of litigation challenging the conditions of Armstrong's confinement, Armstrong filed a *habeas corpus* petition pursuant to 28 U.S.C. § 2241 in the U.S. District Court for the District of New Jersey. [3] Armstrong challenged the conditions of his confinement and asserted other claims, seeking damages for civil rights violations and a permanent injunction against further incarceration. On June 12, 2008, the District Court held that Armstrong "made no effort to exhaust his administrative remedies" and had not shown irreparable harm warranting excusal of the exhaustion requirement, and therefore denied the § 2241 petition. *Armstrong v. Grondolsky,* 2008 WL 7826045, at *6.

**\*3** On December 18, 2009, Armstrong filed another *habeas* petition in the District of New Jersey, claiming that he had pursued the required administrative remedies and therefore was entitled to pursue his *habeas* petition on the merits. This action was dismissed without prejudice by the district court for failure to prosecute. *Armstrong v. Zickefoose,* No. 09 Civ. 6378 (D.N.J. Jan. 14, 2011) ("*Zickefoose I*").

While Armstrong's renewed *habeas* petition was pending, Armstrong filed a "Motion to be Urgently Taken to Saint Francis Hospital for Medical Attention" in the District of New Jersey on August 20, 2010. That motion made various allegations about the quality of medical care that Armstrong was receiving at FCI Fort Dix, and contained legal arguments similar to those in the Emergency Motion. The Court severed the medical care motion from the *habeas* petition and, construing the motion as a claim for injunctive relief, ordered the FCI Fort Dix Warden Donna Zickefoose to respond to Armstrong's allegations. *See Zickefoose* II, 2010 WL 4810654, at *2. Armstrong later filed six additional motions requesting miscellaneous relief. *Id.*

Cognizant of jurisdictional issues raised by the pendency of a previously filed action requesting similar relief in another district court, *see Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929–30 (3d Cir.1941) (holding that "the court which first has possession of the subject matter must decide it"), the District of New Jersey noted that neither the District Court for the District of Columbia nor the Southern District of New York were likely to take further action and exercised jurisdiction in the interests of justice. *See Zickefoose II,* 2010 WL 4810654, at *5–

8. The District Court held that Armstrong had again failed to exhaust potential administrative remedies and noted that "[p]rison officials appear to have responded timely and appropriately to [Armstrong's] various medical complaints." *Id.* at *10–11, *14.

In denying Armstrong's medical care motion, the District Court described Armstrong's past attempts to challenge his confinement for civil contempt, his conviction for defrauding the United States, and the post-conviction conditions of his confinement. *See id.* at *15–22. Out of concern for Armstrong's "history of filing similar or identical lawsuits in multiple jurisdictions, and the consequent effect on the administration of justice," the District Court ordered that "any future submissions" to the District of New Jersey must contain a certification that "the claims asserted therein are not the subject of prior or pending litigation in [that] or any other state or federal court," and a list of "the name, docket number, and jurisdiction, of *all* civil actions previously filed by [Armstrong], in any state or federal court, regardless of the claims asserted in such matters." *Id.* at *22–23. The District Court also advised Armstrong of the *pro se* certification requirements of Rule 11 of the Federal Rules of Civil Procedure and the "three strikes" policy, *see* 28 U.S.C. § 1915(g), governing *in forma pauperis* litigation in the federal courts. *Id.* at *23, *25.

**3. S.D.N.Y. Motion**

**\*4** Armstrong was prosecuted and sentenced for securities fraud before this Court, and his criminal case was closed on April 10, 2007. In yet another attempt to challenge the conditions of his detention, Armstrong filed the Emergency Motion in this Court on December 7, 2010 in the closed criminal docket. Armstrong claims that he was denied adequate treatment from the medical staff at FCI Fort Dix for an infection that spread to his eye, his muscles, and his nerves. (Armstrong Decl. at 1–2.) After "persistent complaints," Dr. Patel, an opthamologist, examined Armstrong. Dr. Patel prescribed medicine and recommended eye surgery for a possible cataract. (*Id.* at 2.) Despite being given the medicine prescribed by Dr. Patel, Armstrong claims to experience continuing medical problems. (*Id.* at 2–3 ("My legs are in constant pain and the muscles feel like they are contracting and burning. It has entered the muscles in my neck and arms and in my back. If this effects the heart, I believe I will surely die.").)

In the Emergency Motion, Armstrong requests "emergency bail pending appeal, transfer to halfway house ..., or a change of custody due to medical conditions." (Emergency Motion at 1.) The factual circumstances underlying the Emergency Motion and the relief requested therein closely reflect those in the petitions originally filed in the District Court for the District of Columbia and the District of New Jersey. The Government responded to Armstrong's motion, contesting the jurisdiction of the Court to hear claims arising within the territorial extent of the District of New Jersey.

## II. Discussion

**A. The Emergency Motion**

In its memorandum of law in opposition to the Emergency Motion, the Government argues that Armstrong's claims should be construed as a petition for a writ of *habeas corpus* under 28 U.S.C. § 2241. In support of this argument, the Government notes that Armstrong challenges "the execution, as opposed to the imposition" of his sentence. (Gov't Mem. at 1.) Under longstanding Second Circuit precedent, a "challenge to the execution of a sentence ... is properly filed pursuant to [ 28 U.S.C. § 2241]." *Chambers v. United States,* 106 F.3d 472, 474 (2d Cir.1997); *see also Thompson v. Choinsky,* 525 F.3d 205, 209 (2d Cir.2008) (the Second Circuit "has long interpreted § 2241 as applying to challenges to the execution of a federal sentence"). In this case, Armstrong's Emergency Motion is focused on the conduct of Bureau of Prison officials and does not challenge the legality of his conviction or the length and duration of his sentence as imposed by the Court. Therefore, the Court construes Armstrong's Emergency Motion as a *habeas corpus* petition brought pursuant to 28 U.S.C. § 2241.

The Government challenges the Emergency Motion on two procedural grounds: (1) the court lacks jurisdiction over Armstrong's claim because FCI Fort Dix is located in New Jersey; and (2) the motion need not be considered because a similar motion has already been rejected by the District Court for the District of New Jersey.

**\*5** Although the Government argues that the Court lacks jurisdiction to entertain Armstrong's *habeas* petition, the

question is more simply addressed on the present record as an issue of the appropriate venue to hear Armstrong's petition.

A petitioner challenging the imposition rather than the execution of a sentence "may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). There is no similar provision specifying venue for a § 2241 claim in the court which imposed sentence. In the absence of such a special venue provision, the normal rules for bringing a civil action against a United States officer apply:

> A civil action in which a defendant is an officer or employee of the United States ... acting in his official capacity or under color of legal authority ... may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e). Here, both Warden Zickefoose—in her official capacity—and the movant reside in the District of New Jersey. Additionally, none of the events giving rise to Armstrong's claim for the unlawful execution of a sentence have taken place in the Southern District of New York; FCI Fort Dix has provided medical care to Armstrong within the District of New Jersey only. Therefore, the Southern District of New York is an improper venue for the determination of the Emergency Motion.

As venue is not proper in the Southern District of New York, the Court is faced with two options: dismissal of Armstrong's request or transfer to the District of New Jersey. See Minette v. Time Warner, 997 F.2d 1023, 1026 (2d Cir.1993). The Court is not persuaded that transfer to the District of New Jersey would serve any useful function because the District of New Jersey has already ruled on the substantive claims presented in the Emergency Motion. In

light of the prior ruling on a substantially similar motion, the Court declines to transfer Armstrong's motion. For all the above reasons, Armstrong's Emergency Motion is denied.

**B. Armstrong's Repeated Litigation**

In denying a similar claim made by Armstrong, the District Court for the District of New Jersey found it necessary to prevent Armstrong's practice of making "virtually simultaneous filings in two federal courts, naming different officials of the same federal agency." *Zickefoose II,* 2010 WL 4810654, at *3. To that end the court ordered, pursuant to the All Writs Act, 28 U.S.C. § 1651, that any further submissions by Armstrong to that court be accompanied by a certification under penalty of perjury that "the claims therein are not the subject of pending or prior litigation" in the District of New Jersey or any other court, and a list of all civil actions previously filed by Armstrong. *See Zickefoose II,* 2010 WL 4810654, at *9. In doing so, the court was forced to balance the principle that "access to the courts is a fundamental tenet of our judicial system" against the " 'interests of repose, finality of judgments, protection of defendants from unwarranted harassment, and concern for maintaining order in the court's docket.' " *Id.* at *8 (quoting *In re Oliver,* 682 F.2d 443, 446 (3d Cir.1982)).

**\*6** The Court agrees with the District Court for the District of New Jersey that the requirements imposed by its order dated November 17, 2010, are in the interests of justice, and hereby adopts a similar order below, applying the restrictions of that order to submissions to the District Court for the Southern District of New York as well. Such an order comports with Second Circuit precedent. *See, e.g., Ward v. Penn. N.Y. Cent. Transp. Co.,* 456 F.2d 1046, 1048 (2d Cir.1972) (order restraining plaintiff "from instituting any further action ... against the defendants or any of them in any court in the United States based on any matter" already litigated in a complaint was justified under 28 U.S.C. § 1651(a)").

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Emergency Bail or Transfer to Halfway House or Home Confinement is DENIED.

Furthermore, in the interests of justice, the Court ORDERS, pursuant to the All Writs Act, 28 U.S.C. § 1651, that when making any future submissions to the united States District Court for the Southern District of New York, including submissions in pending cases as well as complaints or petitions opening new actions, Armstrong shall:

> (1) certify, under penalty of perjury, that the claims asserted therein are not the subject of prior or pending litigation in this or any other state or federal court; and

> (2) provide the name, docket number, and jurisdiction, of *all* civil actions previously filed by or on behalf of

Armstrong, in any state or federal court, regardless of the claims asserted in such matters.

Any failure honestly and completely to abide by the Court's certification requirement may subject Armstrong to appropriate sanctions.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 292018

---

Footnotes

1    These cases are captioned *SEC v. Princeton Global Management Ltd.,* No. 99 Civ. 9667 (S.D.N.Y.) and *CFTC v. Princeton Global Management Ltd.,* No. 99 Civ. 9669 (S.D.N.Y.). Judge Owen, and later Judge Castel, presided over these cases.

2    This case is *United States v. Martin Armstrong,* No. 99 Cr. 997 (S.D.N.Y.).

3    *See Armstrong v. Grondolsky,* No. 08 Civ. 569, 2008 WL 7826045, at *1–2 (D.N.J. June 12, 2008).

---

**End of Document**                         © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3498634
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

VRINGO, INC., et ano., Plaintiffs,

v.

ZTE CORPORATION, et ano., Defendants.

No. 14–cv–4988 (LAK).
|
Signed June 3, 2015.

**Attorneys and Law Firms**

Karl Geercken, Amber Wessels–Yen, Alston & Bird LLP, for Plaintiff.

Paul A. Straus, Robert F. Perry, King & Spalding LLP, for Defendants.

MEMORANDUM OPINION

LEWIS A. KAPLAN, District Judge.

**\*1** This action arises out of a non-disclosure agreement ("NDA") between Vringo, Inc. and another (collectively, "Vringo") and ZTE Corporation and another (collectively, "ZTE") for the purpose of exploring a potential settlement of worldwide patent infringement litigation. The complaint alleges, among other things, that ZTE disclosed confidential information in breach of the NDA. The matter now is before the Court on Vringo's motion for a preliminary injunction.

*Facts*

*The Parties and the Worldwide Patent Infringement Litigation*
Vringo is engaged in the innovation, development, and monetization of intellectual property and mobile technologies. It holds an intellectual property portfolio of more than 600 patents and patent applications covering telecommunications infrastructure, internet search, and mobile technologies. [1]

In August 2012, Vringo purchased a patent portfolio from Nokia Corporation, including at least several patents that have been declared essential to wireless communications standards and are therefore necessary for the operation of telecommunications equipment. [2] The parties agree that Vringo must grant licenses to practice those essential patents on fair, reasonable, and nondiscriminatory ("FRAND") terms and conditions. [3]

ZTE, headquartered in Shenzhen, China, designs, develops, manufactures, and sells telecommunications products and equipment. [4] It claims to be one of the five largest smartphone manufacturers in China and one of the ten largest worldwide. [5]

ZTE allegedly has been selling telecommunications equipment covered by Vringo's patents without a license for several years. [6] Beginning in October 2012, Vringo initiated patent infringement litigation against ZTE in Australia, Brazil, France, Germany, India, Malaysia, the Netherlands, Romania, Spain, and the United Kingdom, perhaps among other places. [7]

*The Non–Disclosure Agreement*
In late 2013, ZTE and Vringo agreed to meet to discuss possible settlement of the international patent litigation. [8] Vringo believed that the "only way to create an environment for productive discussions with good faith settlement offers was ... to exchange information setting forth the parties' respective positions" pursuant to a non-disclosure agreement ("NDA"). [9] Accordingly, on November 26, 2013, Vringo sent a proposed NDA to ZTE. [10] ZTE returned it to Vringo on December 9, 2013, signed and initialed by ZTE's chief intellectual property counsel and dated effective as of December 6, 2013. [11] It was signed and initialed also by Vringo's chief operating officer.

As spelled out in the formal agreement, the NDA served to allow Vringo and ZTE "to explore a potential settlement of some portion of or all of the outstanding litigation as well as any other disputes." [12] It specified that "any and all statements made, positions taken, or documents used or exchanged by either Party during the course of the Discussions" constituted "Confidential Information." It detailed also an agreement that no party

Vringo, Inc. v. ZTE Corp., Not Reported in F.Supp.3d (2015)
Case 1:18-md-02865-LAK    Document 125-5    Filed 06/03/19    Page 69 of 80
2015 WL 3498634

would use Confidential Information "in any existing or future judicial or arbitration proceedings" or "for [their] commercial advantage, dispute advantage, or any other purpose."[13] In relevant part, paragraph 2 of the NDA provided:

> **\*2** "In order to facilitate the Discussions, the Parties hereby agree ... that any and all statements made, positions taken, or documents used in or exchanged by either Party during the course of the Discussions ('Confidential Information') *shall be confidential, inadmissible, and without prejudice and shall not be used or referenced in any way by any Party in any existing or future judicial or arbitration proceedings or made the subject of any public comment or press release.* In addition, each Party agrees not to disclose information covered by this Agreement to any of its personnel or representatives except on a strictly 'need to know' basis, or to any third party, and *not to use such information for its commercial advantage, dispute advantage, or any other purpose* .... Each Party further agrees that it will take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized hereunder to have any such information."[14]

The NDA contemplated the possibility that a governmental entity or another stranger to the agreement might seek access to Confidential Information. In the event that one of the parties received a request for such information from a governmental entity or a third party, whether via a discovery request or a subpoena, the NDA provided that the recipient must (i) "maintain the confidentiality of the Confidential Information;" (ii) "timely seek a protective order ... that would afford the Confidential Information the highest level of confidential treatment possible;" and (iii) "notify the other Party within three business days of receiving the initial request for Confidential Information."[15]

The NDA stated also "that money damages may not be a sufficient remedy for any breach of this Agreement and that, in addition to all other remedies to which it may be entitled, the Parties will be entitled to seek equitable relief, including injunction and specific performance, for any actual or threatened breach of the provisions of this Agreement."[16] Finally, the NDA was to "be governed by

and construed and enforced in accordance with the laws of the State of New York" and "binding upon the parties hereto in the United States and worldwide."[17]

### The Settlement Meeting

The parties met on December 10, 2013—the day after ZTE returned the executed NDA to Vringo —to discuss a possible resolution of the patent litigation.[18] Vringo there made a 40–page presentation to ZTE, which, among other things, included its settlement proposal.[19] Each and every page of the presentation stated: "CONFIDENTIAL—VRINGO/ ZTE SETTLEMENT DISCUSSIONS SUBJECT TO NDA."[20] But no settlement was reached.

### Chinese Litigation

On February 21, 2014, ZTE initiated an antitrust lawsuit in Shenzhen, China, claiming that Vringo had abused its market position by refusing to license its essential patents on FRAND terms and conditions.[21] ZTE's complaint— filed just over two months after ZTE executed the NDA— specifically relied on Vringo's Confidential Information. It stated: "In the second price quotation in December 2013, the Defendant [Vringo] actually intended to charge the Plaintiff USD [Redacted] for its standard-essential patents' portfolio license .... "[22] Moreover, ZTE attached Vringo's December 10, 2013 presentation as an exhibit to the complaint itself .[23]

**\*3** Vringo long remained entirely unaware of the Shenzhen litigation. It was not until June 26, 2014— more than four months after the lawsuit was initiated— that it received a copy of the complaint and supporting documents from the Shenzhen court on its own initiative and learned that ZTE had disclosed Confidential Information in its Shenzhen filing.[24]

### European Commission Litigation

On April 10, 2014, ZTE filed another complaint against Vringo, on that occasion with the European Commission ("EC").[25] Vringo received a copy of the complaint on May 15, 2014 from the EC with the opportunity to respond.[26] As mentioned, Vringo then still was entirely unaware of the Shenzhen litigation. So, on June 4, 2014, Vringo requested "a waiver from

ZTE to allow Vringo to disclose any information that constitutes Confidential Information (as defined in clause 2 of the Vringo/ZTE Non–Disclosure Agreement) to the European Commission in connection with ZTE's complaint." [27] ZTE did not respond before Vringo was required to answer the EC complaint. [28] Consistent with its obligations under the NDA, Vringo redacted any Confidential Information from its EC response. [29]

On June 24, 2014, a week after Vringo's EC submission, ZTE responded to Vringo's letter. [30] ZTE wrote that it "considered [Vringo's] request to waive clause 2 of the Non–Disclosure Agreement concluded between ZTE and Vringo on 6 December 2013 ('the NDA')" and could "only agree to such a waiver under ... two conditions ." [31] *First,* "[t]he waiver should be made reciprocal, meaning that Vringo, Inc ....should also waive the confidentiality obligations under the NDA on ZTE Corporation." [32] *Second,* "the reciprocal confidentiality waiver only concerns the information exchanged under the NDA that is of direct relevance to the complaint ZTE has filed with the European Commission in April 2014." [33] In other words, ZTE took the position that the NDA remained in force and in effect, that disclosure to the EC was permitted only by written agreement, and that Vringo could disclose Confidential Information to the EC only if it permitted ZTE to do so.

*NDRC Investigation*

On January 13, 2015, Vringo received a letter from the Bureau of Price Supervision and Anti–Monopoly of China's National Development and Reform Commission ("NDRC") stating that the NDRC had initiated an investigation after "receiv[ing] a claim that your corporation has violated 'Anti–Monopoly Law of P.R. China.' " [34] The following week, the NDRC informed Vringo that its investigation was "based on complaints which contain prima fac[i]e evidence of ... anticompetitive behavior of your company." [35] While discovery remains ongoing, ZTE now has admitted that it "submitted the December 10, 2013 presentation to the NDRC in or about April 2014." [36]

*This Action*

Vringo commenced this action on July 2, 2014 for breach of the NDA, and moved by order to show cause for a temporary restraining order ("TRO") and a preliminary injunction on July 3, 2014. Vringo sought injunctive relief (1) requiring that ZTE withdraw the Shenzhen complaint and all of its supporting documentation, (2) enjoining ZTE from any further litigation in Shenzhen or any other court in the Guangdong Province of China regarding the same or similar claims, (3) requiring that ZTE withdraw any Confidential Information provided to any other court or tribunal and notify Vringo of any such circumstances, and (4) enjoining ZTE from referencing any Confidential Information in any pending or future litigation.

**\*4** Following argument on July 7, 2014, the Court granted a TRO much more limited than the one Vringo had sought. It restrained ZTE "from using, referencing, or disclosing any Confidential Information, as defined in Paragraph 2 of the [NDA] ... in any manner inconsistent with the terms of that [NDA]." [37] By agreement of the parties, the TRO has remained in effect. [38]

Vringo filed an amended complaint on August 13, 2014, asserting additional claims for fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and unfair competition. The amended complaint alleges that ZTE executed the NDA to elicit the Confidential Information only to use it for its commercial advantage in the Shenzhen lawsuit, perhaps among other places. Vringo, however, does not rely on this allegation in its motion for a preliminary injunction. [39]

On April 6, 2015, the Court granted Vringo's motion for partial judgment on the pleadings to the extent that it determined that the parties entered into the NDA and that ZTE's actions in disclosing the Confidential Information breached its obligations under the NDA. [40] That same day, the Court granted ZTE's motion for judgment on the pleadings to the extent that it dismissed Vringo's unfair competition claim but denied the ZTE motion in all other respects. [41]

*Discussion*

*I. Preliminary Injunction Standard*

In the Second Circuit, a litigant seeking a preliminary injunction must:

"either show that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest, *Winter v. NRDC,* 555 U.S. 7, 20, 129 S.Ct 365, 172 L.Ed.2d 249 (2008); or he may show irreparable harm and either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief,' *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.,* 696 F.3d 206, 215 (2d Cir.2012)." [42]

The Court applies the *Winter* standard here because, as will be seen, Vringo has shown an exceptionally high likelihood of success on the merits and the Court therefore need not examine the 'serious questions' standard.

Additionally, where, as here, a party seeks a preliminary injunction that is "mandatory," *i.e.,* "alter[s] the *status quo* by commanding some positive act," a heightened showing is necessary. [43] In this Circuit, "a mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." [44]

## II. Likelihood of Success on the Merits

### A. ZTE Violated the Unmistakably Clear Terms of the NDA

Not very much need be said with respect to ZTE's violation of the terms of the NDA. This Court already has found that "the pleadings establish the existence and terms of the NDA and defendants breach thereof." [45]

**\*5** Nonetheless, a few points warrant elaboration.

*First,* paragraph 2 of the NDA defined "Confidential Information" as "any and all statements made, positions taken or documents used or exchanged by either Party during the course of the Discussions." [46] Vringo's December 10, 2013 presentation—both the written presentation and the discussion that occurred at the meeting—clearly and unmistakably was Confidential

Information under the NDA. Moreover, bold lettering on each and every page of the written presentation identified it as such: "Confidential–Vringo/ZTE Settlement Discussions Subject to NDA." [47]

*Second,* the NDA clearly and unmistakably prohibited ZTE's disclosure of this Confidential Information. The NDA expressly provided that such Confidential Information "shall not be used or referenced in any way by any Party *in any existing or future judicial or arbitration proceeding."* [48] Yet ZTE voluntarily disclosed Confidential Information when it initiated the judicial proceeding in China a mere two months after agreeing not to use or reference such information., even in judicial proceedings. Indeed, ZTE itself admitted that it "included certain materials relating to the December 2013 meeting between the parties" in the Shenzhen complaint. [49]

ZTE nonetheless argues that non-disclosure agreements typically are concluded to prevent parties from disclosing settlement information in contravention of Federal Rule of Evidence 408, not to prevent all use in judicial proceedings of settlement-related information. [50] Even if that were true in general, it would not matter here because these parties agreed in the NDA that the disclosure of Confidential Information *in judicial proceedings* was prohibited with an exception not relevant here. [51] Had the intention been merely to foreclose disclosure of statements made in settlement discussions to the extent provided by Rule 408, ZTE's chief intellectual property counsel, as an executive of one of the five largest smartphone manufacturers in China and one of the ten largest worldwide, easily could have proposed such language in the NDA. He did not. [52]

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." [53] The NDA was clear and unambiguous, and ZTE unmistakably violated its terms.

*Third,* ZTE's conduct in relation to the EC litigation confirms that ZTE was very well aware that the NDA prohibited disclosure, even in judicial proceedings. [54] As described above, Vringo sought ZTE's written permission to disclose certain Confidential Information to the EC when responding to ZTE's complaint to the EC. Of course, unbeknownst to Vringo, ZTE already had

filed its Shenzhen complaint with Vringo's Confidential Information by that time. Had ZTE believed that it was permissible to disclose Confidential Information for purposes other than those prohibited by Rule 408, it could have so responded. Instead, it chose to wait until after Vringo was required to submit a response to the EC and then to condition Vringo's disclosure on a reciprocal waiver despite the fact that ZTE already had disclosed Confidential Information in another action. [55]

*B. The NDA's Confidentiality Provision Is Enforceable*
**\*6** ZTE voluntarily executed the NDA and agreed not to use any Confidential Information in any existing or future judicial proceeding. It then met with Vringo, ostensibly for the purpose of discussing settlement, and obtained Confidential Information. Within weeks, it then voluntarily sued Vringo in Shenzhen and disclosed the Confidential Information it thus elicited in blatant violation of the NDA. It now contends that its conduct nonetheless was permissible on two principal grounds: that (1) Chinese law supposedly required it to disclose the Confidential Information, and (2) the NDA in any case is a contract to suppress evidence that is unenforceable under New York law. Both arguments are entirely without merit.

*First,* ZTE argues that Chinese law should govern the interpretation of the NDA and conclusorily claims that "under Chinese law an NDA cannot ... prevent a party from submitting relevant evidence to a court *as they are legally required.*" [56] The argument is frivolous.

To begin with, ZTE does not—and could not—claim that Chinese or any other law *required* it to bring its private lawsuit against Vringo. If in fact Chinese law would have required disclosure of Confidential Information in any such complaint, ZTE could have complied with Chinese law by not filing the action. That course certainly was open to it, and ZTE would have been bound to follow it if that were the only means of discharging the obligation of confidentiality it voluntarily assumed by signing the NDA. In any case, however, there is no persuasive reason to assume that ZTE was faced with such a stark choice.

There is no basis for concluding that ZTE was legally required by Chinese law to disclose the Confidential Information in and with the complaint that it voluntary filed against Vringo. ZTE relies on the declaration of

Jianjun Cao, a partner of the Guanghe Law Firm in Guangdong, China, which states that "Chinese law requires proof to be filed with ZTE's complain[t]." [57] But Mr. Cao quite obviously did not claim that Chinese law requires the submission of any and all evidence, no matter the source or its confidentiality. Indeed, Mr. Cao relies on Article 121 of the Chinese Civil Procedure Law, the entirety of which states that a statement of claim must specify the parties' names, genders, ages, etc., "the claim and its supporting facts and grounds," and "evidence and the source thereof." [58] ZTE's suggestion that this basic procedural requirement obligated it to submit to the Shenzhen court Confidential Information which it explicitly had agreed not to use in any future judicial proceeding is nothing more than gamesmanship.

Vringo submitted a declaration from Douglas Clark, a barrister of the High Court of Hong Kong, who has handled, with the assistance of local counsel, hundreds of cases in the People's Republic of China, and written a treatise on patent litigation in China. [59] Mr. Clark explained that "a party has freedom to choose what evidence they file" and "there is no obligation to file all the evidence the Plaintiff relies upon when they file the case." [60] Thus, ZTE's premise that it was obligated under Chinese law to submit the Confidential Information— even assuming that Chinese law applied—is grotesquely overbroad.

**\*7** But even if we assume *arguendo* that Chinese law clearly and unambiguously required the submission of such evidence, that would not be the end of the matter. As "[a] federal court sitting in diversity jurisdiction," the Court must "apply the law of the forum state to determine the choice-of-law." [61] Generally, "[u]nder New York law ... a contract's designation of the law that is to govern disputes arising from the contract ... is determinative if the state selected has sufficient contacts with the transaction." [62] The location of a party's principal place of business is significant and generally suffices on its own to establish sufficient contacts for purposes of New York's choice of law analysis. [63]

There are more than sufficient contacts with New York to enforce the parties' designation that the NDA "shall be governed by and construed and enforced in accordance with the laws of the State of New York." [64] Vringo

maintains its principal place of business in New York and sought protection under its laws when entering into the NDA. [65] ZTE knew this, executed the NDA, and then sent it back to Vringo in New York. [66] The parties, in agreeing to have the law of New York govern their contract, selected the laws of a State that has a reasonable relationship and significant contacts to the contract and that choice must be enforced by this Court.

*Second,* ZTE argues that the NDA is unenforceable under New York law because it constitutes an agreement to suppress evidence. The NDA, however, is merely an agreement between two private parties to foreclose the use of certain information in private litigation. Such an agreement is entirely permissible.

As an initial matter, New York recognizes the strong "public policy of encouraging and facilitating settlement." [67] Courts therefore routinely have maintained the confidentiality of "documents ... created specifically and directly as a result of the informal, off-the-record negotiations designed to settle claimant's claim." [68] There can be no doubt that the NDA was entered into for the explicit purpose of facilitating candid settlement discussions.

Moreover, a private party may release a potential adversary from a private liability so long as it "evince[s] the unmistakable intent of the parties." [69] And New York law expressly permits covenants not to sue private parties. [70] ZTE conceded at argument that it could have signed a general release or a covenant not to sue that would have prevented it from bringing a private lawsuit altogether. [71] The agreement at issue here—to prohibit the parties from using in private litigation certain information obtained during settlement discussions—is considerably less restrictive than either a release or a covenant not to sue. Accordingly, it would be wholly illogical to conclude that ZTE could agree to settle its patent infringement litigation, or that it could agree not to bring any future litigation, but that it could not agree that it would not disclose settlement-related information in private litigation.

**\*8** Of course, as a matter of public policy, such an agreement cannot trump compulsory process in a grand jury investigation or in a criminal case, or perhaps in other areas. But the NDA is not an agreement to suppress evidence. Quite the contrary, the NDA explicitly permits disclosure of Confidential Information upon a request from a governmental entity or third party whether by a discovery request or a subpoena. [72] The party in receipt of the request merely is obligated to seek a protective order to afford the information the highest level of confidential treatment possible and to notify the other party. [73] In other words, the NDA specifically contemplates the possibility of disclosure through compulsory process.

Further, the legal authority on which ZTE relies plainly is distinguishable and inapposite. ZTE cites the First Restatement of Contracts for the proposition that a "[a] bargain that has for its object or consideration the suppression of evidence ... is illegal." [74] But the provision actually reads: "A bargain that has for its object or consideration the suppression of evidence by inducing witnesses to leave the State, by the destruction of documents, or otherwise, is illegal." [75] The NDA, of course, as discussed above, does no such thing.

ZTE relies also on *Cronk v. State of New York,* [76] a 1979 decision by the New York Court of Claims. *Cronk* held that the court could not be preempted from considering a prior property appraisal where the agreement stating otherwise "was not the product of a meeting of the minds," "worked to the prejudice of the claimant[,] and was the product of an unequal bargaining position." [77] Here, however, the agreement unmistakably was entered for the explicit purpose of furthering settlement discussions, did not work to the prejudice of either party, and was not the product of an unequal bargaining position.

Moreover, *Cronk* specifically recognized that the property appraisal was admissible because it "had been used for purposes other than negotiation and settlement." [78] At most, therefore, *Cronk* stands for the proposition that parties cannot prevent a court from considering legally competent evidence that has been exchanged or used for non-settlement purposes. It therefore is distinguishable from the instant case in which the Confidential Information was disclosed for the sole purpose of facilitating a settlement.

Finally, ZTE cites *Trustees of Leake & Watts Orphan House v. Hoyle,* [79] a 1913 Westchester County case vastly

Vringo, Inc. v. ZTE Corp., Not Reported in F.Supp.3d (2015)
2015 WL 3498634

different from this one. As an initial matter, that case was unrelated entirely to settlement or to the facilitation of settlement. Moreover, the court reasoned only that it could not be prevented from examining the terms of the contract itself in an "action between the parties relating to the subject matter of the contract."[80] That reasoning is neither applicable nor persuasive to the instant case.

**\*9** In sum, it was entirely lawful for Vringo and ZTE to agree that they would not use information exchanged in settlement discussions in any judicial proceedings. Vringo is highly likely to prevail on the merits of its breach of contract claim.

### C. ZTE Concedes that its Unclean Hands Defense is Inaccurate

In opposing the preliminary injunction, ZTE argued "[f]irst, and most obviously" that Vringo could not demonstrate a likelihood of success "because, if ZTE breached the NDA with its filing, that would mean plaintiffs themselves breached the same contract by submitting some of the same material to the European Commission."[81] Zhao Wang, the Senior Licensing Director of ZTE, swore under penalty of perjury, that "in the only version of Vringo's response provided to ZTE, the supposedly confidential information is fully redacted," but "[i]nexplicably, rather than withholding this information from the tribunal (as it now demands of ZTE), Vringo instead withheld it from ZTE."[82]

But the accusation that Vringo redacted the confidential information in the version sent to ZTE but not in the version filed with the EC was based on a demonstrably and now admittedly false claim. Vringo redacted the same information in its response to the EC.[83] Accordingly, ZTE withdrew that allegation and any such inferences.[84]

In an attempt to salvage some portion of its unclean hands argument, ZTE nonetheless claims that Vringo's unredacted disclosures to the EC "are substantially similar in kind to the portions of the Shenzhen Complaint concerning 'the substance of the settlement meeting.' "[85] But ZTE has not identified a single disclosure of Confidential Information by Vringo. Thus, the Court finds that ZTE deliberately violated the terms of the NDA and then—having been caught months later with its hands

in the cookie jar—falsely accused Vringo based on no evidentiary support whatsoever.

In these circumstances, Vringo has demonstrated that its likelihood of success on the merits approaches certainty.

### III. Vringo Is Threatened With Immediate and Irreparable Injury

Parties seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction."[86] Such injury must be "neither remote nor speculative, but actual and imminent and ... cannot be remedied by an award of monetary damages."[87] Accordingly, the irreparable injury requirement is satisfied here if Vringo, in the absence of a preliminary injunction, probably would suffer injury in the future that could not be undone even if it prevails in this action.

### A. Vringo Is Highly Likely to Suffer Irreparable Injury Absent a Preliminary Injunction

Vringo is likely to suffer imminent harm absent a preliminary injunction for at least two reasons.

First, ZTE has demonstrated that injunctive relief may be the only way to prevent it from disclosing Confidential Information. ZTE has continued to adhere to the view that "the NDA cannot be read to prohibit submission of competent evidence of an antitrust violation" despite the clear and unequivocal language in the NDA prohibiting such disclosure in private litigation.[88] Nonetheless, ZTE has assured the Court that it "has not shared any confidential materials with any governmental agency, including the NDRC, on or after July 7, 2014, when the TRO went into effect."[89] In other words, the TRO was the reason that ZTE finally began complying with the clear and unequivocal terms of the NDA. Absent injunctive relief, it is likely to continue to disclose Confidential Information in violation of the NDA.

**\*10** Second, ZTE's cavalier behavior reinforces the finding of a likelihood of further dissemination of Vringo's Confidential Information absent a preliminary injunction.[90] ZTE blatantly has disregarded its NDA obligations in at least the following ways:

• A mere two months after signing the NDA, ZTE disregarded completely the obligations it had undertaken and filed a lawsuit against Vringo relying on the Confidential Information it had agreed not to use or mention in any judicial proceeding.

   • ZTE also disseminated the Confidential Information to China's NDRC, perhaps leading to its investigation against Vringo.

   • Despite having no evidence whatsoever, the senior licensing director of ZTE falsely declared under oath that Vringo secretly disclosed Confidential Information to the EC.

The totality of ZTE's conduct evidences a disregard of its obligations so serious as to suggest the likelihood of future breaches of the NDA whenever ZTE, which is enmeshed in worldwide litigation with Vringo, thinks that disclosures in other *fora* or for other purposes would be to its advantage. The Court therefore finds that further disclosure of Vringo's Confidential Information is likely to occur imminently in the absence of a preliminary injunction.

### B. The Threatened Harm to Vringo Would be Irreparable

Public disclosure of Vringo's Confidential Information would cause it irreparable injury. Vringo's business depends substantially on the value of its patent portfolio, which it licenses to third parties.[91] The disclosure of Vringo's Confidential Information, including its proposal to settle years of ZTE's alleged patent infringement, would impact the prices others would pay to obtain licenses as well as the prices its competitors would offer for their licenses.[92] Indeed, once such commercially-sensitive information becomes public knowledge, it can "not be made secret again."[93] In short, the disclosure of that information would have a lasting and immeasurable harm to Vringo's business.

### IV. The Balance of Equities and the Public Interest Favor Appropriate Injunctive Relief

In considering the equities, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Additionally, in exercising their sound direction, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[94] It is helpful to consider the harm that would befall the parties and the public were the ruling on this motion, either way it is decided, ultimately to prove incorrect or inequitable.

If the Court mistakenly were to deny a preliminary injunction, ZTE would continue to disclose and rely on Vringo's Confidential Information in the Shenzhen litigation and likely to other courts and investigatory authorities, such as the NDRC, resulting in the irreparable injury described above. Vringo entered into the NDA precisely to avoid such a destructive outcome.

**\*11** On the other hand, ZTE would face no comparable harm if a prohibitory preliminary injunction were granted erroneously. Enjoining ZTE from further disclosure of Vringo's Confidential Information would prevent ZTE temporarily from referring to the material it agreed explicitly not to use in judicial proceedings.[95] In comparison to the potential harm to Vringo, there simply is no contest.

Finally, the public interest favors appropriate injunctive relief. The Court recognizes the "need for due regard to principles of international comity" and the importance of issuing anti-suit injunctions "only with care and great restraint."[96] There is no need to belabor the point because, as described in Section V.A, enjoining the proceedings in China is not appropriate at this time. But prohibitory injunctive relief would not prevent the Shenzhen court from evaluating the antitrust action and therefore would not offend the comity owed to the foreign court. Moreover, the general public does not have a right to access this material as "the presumption of access to settlement negotiations, draft agreements, and conference statements is negligible to nonexistent."[97]

For these reasons, the balance of equities and the public interest favor appropriate injunctive relief. That is not to say, however, that Vringo is entitled to a preliminary injunction as broad as it seeks.

### V. The Scope of the Preliminary Injunction

#### A. The Court Will Not Grant an Anti–Suit Injunction

Vringo seeks to require ZTE to withdraw its Shenzhen complaint and enjoin it from pursuing the same or similar

claims in that court or any other court in the Guangdong Province.

*China Trade & Development Corp. v. M.V. Choong Yong* [98] and its progeny provide the standard for determining when a court may enjoin parties before it from commencing or pursuing litigation in foreign jurisdictions. There are two threshold requirements to issuing an anti-suit injunction: (1) the parties in the two litigations must be the same, and (2) resolution of the case before the enjoining court must be dispositive of the actions to be enjoined in the foreign *fora.* [99] If these conditions are met, the court then must consider whether the injunction would "(1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; (4) prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment." [100]

While the parties agree that the first threshold requirement is met in this case, they disagree regarding the second. ZTE argues that an anti-suit injunction would be inappropriate because the determination of this action for breach of the NDA would not preclude a decision on ZTE's antitrust claim. [101] This Court agrees.

A decision holding that ZTE breached the NDA would not necessarily foreclose the antitrust action in the Shenzhen court. Vringo has not demonstrated that ZTE's antitrust claim relies so heavily on the Confidential Information that it necessarily would fail without it. The fact that "ZTE uses Vringo's highly confidential opening offer as the basis for its claims that the offer constitutes an abuse of power" [102] does not foreclose the possibility that ZTE provided or will provide the Shenzhen court with other evidence and reasons from which it could conclude that Vringo abused its market position in violation of Chinese antitrust laws. The Court at this stage does not have sufficient evidence to find that resolution of this case would dispose of the antitrust case in Shenzhen, China. Accordingly, because Vringo has failed to satisfy the second threshold requirement, it is not appropriate to enjoin the Shenzhen action.

*B. A Prohibitory Injunction Will Sufficiently Protect Vringo*

**\*12** Vringo requests alternatively that the Court order ZTE to withdraw the Confidential Information from the Shenzhen litigation and to amend its complaint to remove any reference to Confidential Information.

As discussed above, "a mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." [103] This Court carefully has considered the requested relief and concludes that a mandatory injunction is not necessary in this case. Although Vringo has demonstrated a near certain success on the merits, a strong likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction would be in the public interest, it has not met the heightened showing to obtain a mandatory injunction.

Vringo likely will suffer irreparable injury from further disclosure of Confidential Information by ZTE or the Shenzhen Court. It therefore is appropriate to prohibit ZTE from any further use or reference of Confidential Information. As for the material already before the Shenzhen court, the parties have requested that the court maintain the confidentiality of all evidence and materials that were submitted, that the hearings not be conducted in public, and that it not publish any decision publicly. [104] There has been no evidence to suggest that the Shenzhen court denied the request or is likely to do so. Accordingly, while a mandatory permanent injunction may prove appropriate after a trial on the merits, such preliminary relief is not necessary at this time.

*VI. The Bond*

Rule 65(c) provides that preliminary injunctions ordinarily should be issued only upon the giving of a bond or other security. In this case, there is no reason to require security as the preliminary injunction merely requires ZTE to abide by the terms of the NDA it entered in December 2013. Moreover, ZTE neither requests a bond nor provides any basis for fixing an appropriate amount of security.

*Conclusion*

For the foregoing reasons, Vringo's motion for a preliminary injunction is granted in part and denied in

Case 1:18-md-02865-LAK    Document 125-5    Filed 06/03/19    Page 77 of 80
Vringo, Inc. v. ZTE Corp., Not Reported in F.Supp.3d (2015)
2015 WL 3498634

part. Accordingly, pending the final determination of this action, defendants, and all of their subsidiaries, officers, agents, servants and employees and those persons in active concert or participation with any of them who receive actual notice of this order, shall not use, reference, or disclose any Confidential Information, as defined in Paragraph 2 of the Non–Disclosure Agreement entered into between ZTE and Vringo, Inc., dated December 6, 2013, in any manner inconsistent with the terms of that Non–Disclosure Agreement. This includes, but is not limited to, any use, reference, or disclosure of any information provided by Vringo pursuant to the Non–

Disclosure Agreement, including the December 10, 2013 presentation, in any existing or future judicial proceeding.

**\*13**  The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3498634

Footnotes

1    Berger Decl. [DI 5] (hereinafter "Berger Decl. I") ¶ 3.
2    First Am. Cpt. [DI 52] (hereinafter "FAC") ¶ 14; Wang Decl. [DI 16] ¶ 3.
3    FAC ¶¶ 15–16; Wang Decl. ¶ 4.
4    Wang Decl. ¶ 2.
5    *Id.*
6    FAC ¶¶ 18–19; Berger Decl. [DI 24] (hereinafter "Berger Decl. II") ¶ 4; *see also* Wang Decl. ¶ 5.
7    Berger Decl. II ¶ 4; Wang Decl. ¶¶ 5, 7.
8    Berger Decl. II ¶ 5; Wang Decl. ¶ 5.
9    Berger Decl. I ¶ 4; *see also* Wang Decl. ¶ 5.
10   Berger Decl. II ¶ 7.
11   *Id.* ¶ 10; Wang Decl. ¶ 5.
12   FAC Ex. A [DI 52–1] (hereinafter "NDA") ¶ 1.
13   *Id.* ¶ 2
14   *Id.* (emphasis added).
15   *Id.* ¶ 3.
16   *Id.* ¶ 10.
17   *Id.* ¶ 12.
18   Berger Decl. II ¶ 11; Wang Decl. ¶ 6.
19   Berger Decl. I ¶ 6.
20   *Id.*
21   Wang Decl. ¶ 10; Berger Decl. I ¶ 10; FAC ¶ 41.
22   FAC Ex. D (Shenzhen Complaint) [DI 52–4] at 6–7; Berger Decl. I ¶ 7.
      Vringo redacted the Confidential Information from the documents filed before this Court, but it was not redacted in the complaint filed with the Shenzhen court. *See* FAC ¶ 45 n. 2.
23   *See* Berger Decl. I ¶¶ 8–9; *see also* FAC Ex. C (Dec. 10, 2013 Presentation) [DI 52–3]; FAC Ex. E (Shenzhen Evidence List Provided by ZTE) [DI 52–5].
24   Berger Decl. I ¶¶ 7–10.
25   Berger Decl. II ¶ 13.
26   *Id.* ¶¶ 13–14; Chappatte Decl. [DI 28] ¶ 4.
27   Wang Decl. Ex. A (Ltr. from A. Berger, Vringo, to S. Jianfeng, ZTE (June 4, 2014)); Berger Decl. II ¶ 14.
28   Chappatte Decl. ¶ 6; Berger Decl. II ¶ 15.
29   Chappatte Decl. ¶¶ 6, 9, 11–13.
30   Wang Decl. Ex. C (Ltr. from S. Jianfeng, ZTE, to A. Berger, Vringo (June 24, 2014)) [DI 16–3].
31   *Id.*
32   *Id.*

2015 WL 3498634

33    *Id.*

34    Ltr. from L. Jian, NDRC, to A. Berger, Vringo (Jan. 12, 2015) [DI 76–1].

35    E-mail from L. Jian, NDRC, to D. Cohen, Vringo (Jan. 21, 2015) [DI 78–1].

36    *See* Mot. for Sanctions [DI 111], Ex. A at 4 (under seal).

37    TRO (July 9, 2014) [DI 13]; *see also* Tr., July 7, 2014, at 26:17–24.

38    DI 13 at 2.

39    Tr., Apr. 7, 2015, at 21:9–23.

40    *See* Order (Apr. 6, 2015) [DI 91].

41    *See* Order (Apr. 6, 2015) [DI 90].

42    *ACLU v. Clapper,* —— F.3d ——, 2015 WL 2097814, at *32 (2d Cir. May 7, 2015).

43    *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995).

44    *Id.* (internal quotation marks and citation omitted); *accord Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 406 (2d Cir.2011).

45    DI 91 at 1.

46    NDA ¶ 2.

47    Berger Decl. I ¶¶ 6, 9.

48    NDA ¶ 2 (emphasis added).

49    Wang Decl. ¶ 11.

50    Tr., July 7, 2014, at 6:15–22; 35:10–12.

      Rule 408 provides that "conduct or a statement made during compromise negotiations about the claim" "is not admissible ... either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."

51    The qualification refers to the limited exception referred to previously for disclosure pursuant to compulsory process.

52    *See* Berger Decl. II ¶ 10.

53    *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569 (2002).

54    The Court's finding on this issue, like all findings at this stage, is provisional only and may change in light of future evidence.

55    Though it is not necessary to the resolution of this motion, the Court notes that ZTE may have sought by its gambit to obtain immunity for its breach of the NDA in the Shenzhen action. ZTE requested a reciprocal waiver for information exchanged under the NDA "that is of direct relevance to the complaint ZTE has filed with the European Commission." DI 16–3. Both the settlement offer and presentation that ZTE already had disclosed to the Shenzhen court fit that description. In other words, ZTE appears to have taken advantage of Vringo's lack of awareness of the Shenzhen lawsuit and attempted to obtain a waiver that arguably could have provided ZTE immunity for its disclosure of the Confidential Information to the Shenzhen court. In any case, its actions suggest awareness of the wrongfulness of its conduct.

56    ZTE Mem. of Law in Opp'n. to Mot. for Prelim. Inj. [DI 14], at 21 (emphasis added).

57    Cao Decl. [DI 15] ¶ 5.

58    *See* Cao Decl. Ex. A (Civil Procedure Law of the People's Republic of China) [DI 15–1], Art. 121.

59    Clark Decl. [DI 6] ¶¶ 1, 2.

60    Clark Decl. [DI 25] ¶ 9.

61    *Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393 (2d Cir.2001).

62    *Zerman v. Ball,* 735 F.2d 15, 20 (2d Cir.1984) (citations omitted); *see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines,* 230 F.3d 549, 556 (2d Cir.2000) ("New York law is clear [that] in cases involving a contract with an express choice-of-law provision ... a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.").

63    *See Finucane v. Interior Constr. Corp.,* 264 A.D.2d 618, 620, 695 N.Y.S.2d 322, 325 (1st Dept.1999); *cf. Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel,* 346 F.3d 360, 366 (2d Cir.2003) (recognizing that "the choice of New York law would be reasonable, and hence enforceable, if [plaintiff's] 'principal place of business' were in New York, creating significant contacts in the state").

64    NDA ¶ 12.

65    See Berger Decl. II ¶ 2.

66    *Id.* ¶ 10; Wang Decl. ¶ 5.

67    *Crow–Crimmins–Wolff & Munier v. Westchester Cnty.,* 126 A.D .2d 696, 697, 511 N.Y.S.2d 117, 119 (2d Dept.1987) (recognizing that "observations made for the stated purpose of arriving at a settlement agreement, and expressly not for litigation ... should likewise generally be protected by the same public policy of encouraging attempts at settlement").

68    *E.g., Randall Elec., Inc. v. State,* 150 A.D.2d 875, 876–77, 540 N.Y.S.2d 901, 902 (3d Dept.1989).

69    *Golden Pac. Bancorp v. FDIC,* 273 F.3d 509, 515 (2d Cir.2001) (internal quotation marks and citation omitted).

70    *Kamfar v. New World Rest. Grp., Inc.,* 347 F.Supp.2d 38, 50 (S.D.N.Y.2004).

71    Tr., June 7, 2014, at 9:11–24.

72    NDA ¶ 3 (providing that upon such request the party is obligated to "(i) maintain the confidentiality of the Confidential Information," (ii) "timely seek a protective order or other similar means of protection that would afford the information ... the highest level of confidential treatment possible (including but not limited to 'attorneys' eyes only' or a similar designation)," and (iii) "notify the other Party within three business days" of the request).

73    *Id.*

74    DI 14 at 22.

75    RESTATEMENT (FIRST) OF CONTRACTS § 554 (1932).

76    100 Misc.2d 680 (N.Y.Ct.Cl.1979).

77    *Id.* at 683, 687.

78    *Id.* at 683.

79    79 Misc. 301 (N.Y.Sup.Ct.1913).

80    *Id.* at 304.

81    DI 14 at 19–20.

82    Wang Decl. ¶ 14.

83    Chappatte Decl. ¶¶ 9, 11–13.

84    *See* Ltr. from P. Straus, ZTE, to Court (Aug. 5, 2014) [DI 44].

85    *Id.*

86    *Winter,* 555 U.S. at 22 (citations omitted).

In *Winter,* the Supreme Court held that the " 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original) (citations omitted). It did not however elaborate as to what level of certainty is required to establish a likelihood of irreparable harm.

In citing *Winter*'s requirement that irreparable injury be *likely* absent an injunction, ZTE goes on to claim that the Second Circuit in *Citigroup Global Markets, Inc. v. VCG Special Opps. Master Fund Ltd.,* 598 F.3d 30 (2d Cir.2010), "held that ... 'likely' means 'a greater than fifty percent probability.' " ZTE Supp. Mem. of Law [DI 40], at 5 n. 4. Again, ZTE has mischaracterized the case law. The Second Circuit there stated the following: "[W]e take VCG's position to be that the standard articulated by these three Supreme Court cases requires a preliminary injunction movant to demonstrate that it is more likely than not to succeed on its underlying claims, or in other words that a movant must show a greater than fifty percent probability of success on the merits." *Citigroup,* 598 F.3d at 34–35. *First,* the statement expressly describes a litigant's position, not that of the Second Circuit. *Second,* the statement relates to the likelihood of success requirement, not irreparable harm. *Third,* the statement—even had it been the Second Circuit's view of the likelihood of irreparable harm (which it was not)—would have been *dicta,* not a holding.

The Court has not identified any requirement that threatened irreparable harm be more likely than not. Nonetheless, there is no need to decide that question because irreparable harm to Vringo is highly likely.

87    *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 332 (2d Cir.1995).

88    ZTE Opp'n. to Mot. to Compel [DI 82] at 4.

89    *Id.* at 2.

2015 WL 3498634

90    *See EEOC v. KarenKim, Inc.,* 698 F.3d 92, 100–01 (2d Cir.2012) (vacating the district court's denial of injunctive relief because the character of past violations rendered it likely that nothing would prevent the recurrence of misconduct absent a permanent injunction).

91    *See* Berger Decl. I ¶ 11.

92    *Id.*

93    *Ruckelshaus v. Monsanto Co.,* 463 U.S. 1315, 1317 (1983).

94    *Winter,* 555 U.S. at 24 (internal quotation marks and citations omitted).

95    Were the Court erroneously to require ZTE to withdraw its Shenzhen complaint, ZTE would face a delay in its ability to litigate its pending antitrust action against Vringo. ZTE has not asserted that it would be unable to refile its Shenzhen lawsuit against Vringo after a trial on the merits in this case. Nonetheless, the Court need not consider seriously this potential harm to ZTE as it separately has determined that an anti-suit injunction would not be appropriate.

96    *China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 35 (2d Cir.1987) (internal quotation marks and citations omitted).

97    *United States v. Glens Falls Newspapers, Inc.,* 160 F.3d 853, 858 (2d Cir.1998).

98    837 F.2d 33 (2d Cir.1987).

99    *Id.* at 36; *see also Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 500 F.3d 111, 119 (2d Cir.2007).

100   *Karaha Bodas,* 500 F.3d at 119 (alterations, ellipses, internal quotation marks, and citations omitted).

101   DI 40, at 2–3.

102   Berger Decl. ¶ 7.

103   *Tom Doherty,* 60 F.3d at 34 (internal quotation marks and citation omitted).

104   *See* Vringo Pet. for Confidentiality [DI 55–1]; ZTE Req. for Not Being Heard in Public [DI 57–1].

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.