# EXHIBIT F

2018 WL 5118638
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

ALIBABA GROUP HOLDING LIMITED, Plaintiff,
v.
ALIBABACOIN FOUNDATION, et al., Defendants.

18-CV-2897 (JPO)
|
Signed 10/22/2018

**Attorneys and Law Firms**

Lucas Bento, Carey Richard Ramos, Quinn Emanuel
Urquhart & Sullivan LLP, New York, NY, for Plaintiff.

James Wilson Dabney, Deanne Cevasco, Stefanie Lopatkin,
Michael M. Polka, Hughes Hubbard & Reed LLP, Anne
Catharine Lefever, Pillsbury Winthrop Shaw Pittman, LLP,
New York, NY, William P. Atkins, Pillsbury Winthrop Shaw
Pittman LLP, McLean, VA, for Defendants.

OPINION AND ORDER

J. PAUL OETKEN, United States District Judge

**\*1** Alibaba Group Holding Limited ("Alibaba"), the parent
corporation for a multinational web-services conglomerate,
has filed suit against Alibabacoin Foundation a/k/a ABBC
Foundation; ABBC Block Chain IT Solutions LLC;
Alibabacoin General Trading FZE; Alibabacoin Foundation
LLC; Jason Daniel Paul Philip; and Hasan Abbas
(collectively, "Defendants"), alleging that Defendants have
been unlawfully using Alibaba's trademarked names and
symbols to promote a cryptocurrency—called AlibabaCoin
or Alibaba Coin—that Defendants are offering for sale.
In April 2018, Alibaba sought a preliminary injunction
barring Defendants from using Alibaba's protected marks
"anywhere in the United States, including in connection
with the provision of products or services to internet users
located in the United States," during the pendency of this suit.
(Dkt. No. 17 at 18.) This Court denied Alibaba's application,
holding that Alibaba had "not met its burden to establish a
reasonable probability that the Court has personal jurisdiction
over [Defendants]." (Dkt. No. 59 at 16.) Denial, however, was
"without prejudice to renewal upon an adequate showing of
personal jurisdiction." (*Id.*)

Alibaba has now renewed its application for a preliminary
injunction. (Dkt. No. 119.) Alternatively, it asks this Court
to compel Defendants to produce certain documents that,
it argues, would support its entitlement to the requested
relief. (Dkt. No. 121.) As explained below, the present record
supports entry of a preliminary injunction. Accordingly,
Alibaba's renewed application for a preliminary injunction is
granted and its motion to compel is denied as moot.

**I. Background**
Familiarity with the Court's prior opinion in this case is
presumed. *See Alibaba Grp. Holding Ltd. v. Alibabacoin
Foundation,* No. 18 Civ. 2897, 2018 WL 2022626 (S.D.N.Y.
Apr. 30, 2018).

Plaintiff Alibaba is the parent company for "the largest
online and mobile commerce group of businesses in the
world." (Dkt. No. 19 ¶ 2.) Incorporated in the Cayman Islands
and operating principally out of the People's Republic of
China (Dkt. No. 1 ¶ 2), Alibaba enjoys global reach through
its "renowned e-commerce platforms," as well as "numerous
other businesses in the fields of cloud computing, digital
media and entertainment, innovation and technology" (Dkt.
No. 19 ¶ 4), and it courts international investors by offering
securities that trade on the New York Stock Exchange (Dkt.
No. 19 ¶ 3). In an effort to safeguard its international
reputation, Alibaba has secured the exclusive right to certain
uses of its various trade names and symbols by collecting
trademarks in the United States and around the world. (Dkt.
No. 1 ¶¶ 11–28, 52.)

On April 2, 2018, Alibaba brought suit against Defendants,
a group of Dubai- and Belarus-based companies and
individuals involved in the development and marketing
of a novel cryptocurrency known as AlibabaCoin or
Alibaba Coin. (Dkt. No. 1 ¶¶ 3–7, 43.) According to
Alibaba's complaint, Defendants have published a variety
of promotional materials that impermissibly use Alibaba's
trademarks in an effort to align AlibabaCoin with Alibaba
in the minds of potential consumers. (Dkt. No. 1 ¶¶ 42–46.)
Owing to Defendants' marketing efforts, the complaint goes
on, internet users have indeed already begun—erroneously—
to associate AlibabaCoin with Alibaba. (Dkt. No. 1 ¶¶ 47–49.)

**\*2** Soon after Alibaba filed its complaint, this Court issued a
temporary restraining order barring Defendants from making
misleading use of Alibaba's protected marks in the United
States and from making false or misleading statements about

those marks in connection with the sale or promotion of goods and services to any parties located in the United States. (Dkt. No. 10 at 2–3.) At Alibaba's request, the Court further ordered Defendants to show cause why a preliminary injunction of similar scope should not enter. (Dkt. No. 10 at 1–2; Dkt. No. 17.)

On April 30, 2018, after hearing from Defendants, this Court dissolved the temporary restraining order and declined to enter a preliminary injunction, holding that Alibaba had failed to carry its burden of "establish[ing] a reasonable probability that the Court has personal jurisdiction over [Defendants]." (Dkt. No. 59 at 16.) The Court made clear, though, that this holding did not prevent Alibaba from renewing its application for a preliminary injunction "upon an adequate showing of personal jurisdiction." (*Id.*) Consequently, Alibaba requested an order authorizing it to take expedited limited jurisdictional discovery, "so as to obtain information that is uniquely controlled by Defendants regarding their ties to New York and the United States." (Dkt. No. 68 at 1.) That request was granted. (Dkt. No. 71.)

Now with the benefit of evidence obtained through discovery, Alibaba has renewed its application for a preliminary injunction. (Dkt. No. 119.) It has also asked the Court to compel Defendants to produce seven categories of documents that could bear on the question of personal jurisdiction and that, it contends, Defendants have unjustifiably withheld. (Dkt. No. 121.)

The Court concludes, for the reasons that follow, that Alibaba has adequately demonstrated its entitlement to a preliminary injunction on the existing record. As a result, there is no need for further jurisdictional discovery at this stage, and Alibaba's motion to compel is accordingly denied as moot.

## II. Legal Standard

Where, as here, a party moves for a preliminary injunction against a party that has not consented to the Court's exercise of personal jurisdiction, the movant bears the burden of showing "at least a reasonable probability of ultimate success on the question of the court's *in personam* jurisdiction" over the non-moving party. *Weitzman v. Stein*, 897 F.2d 653, 659 (2d Cir. 1990). If the movant successfully makes this showing, a preliminary injunction may enter only if the movant has gone on to demonstrate: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground

for litigation and a balance of hardships tipping decidedly in the movant's favor"; (2) "irreparable harm in the absence of the injunction," *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir. 2004); relatedly, (3) that "the balance of hardships" between the parties "tips in the [movant's] favor"; and (4) "that the 'public interest would not be disserved' by the issuance of a preliminary injunction," *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) ).

## III. Discussion

As this Court has previously noted, Defendants have offered three principal reasons for denying a preliminary injunction. They contend that Alibaba has failed to establish: (1) this Court's subject-matter jurisdiction over the suit; (2) this Court's authority to exercise personal jurisdiction over Defendants; and (3) a likelihood of success on the merits. (Dkt. No. 59 at 4.) This Court has already held that federal subject-matter jurisdiction is proper here (Dkt. No. 59 at 4–5), so the only issues that remain are personal jurisdiction and Alibaba's likelihood of success on the merits.

### A. Personal Jurisdiction

**\*3** Under Federal Rule of Civil Procedure 4(k), "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant ... who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1) (A). Alibaba has served summonses on Defendants (Dkt. Nos. 38–44), so this Court may properly take personal jurisdiction over Defendants if a New York state court could lawfully do the same. [1] And, as the Court has previously explained (Dkt. No. 59 at 5–6), whether a New York state court may exercise personal jurisdiction over any given defendant in any given suit depends on whether such an exercise comports with both (1) the state's long-arm statute, N.Y. C.P.L.R. § 302(a); and (2) the Due Process Clause of the U.S. Constitution. *See LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214 (2000).

### 1. New York's Long-Arm Statute

New York's long-arm statute authorizes the state's courts to "exercise personal jurisdiction over any non-domiciliary" that "transacts any business within the state." N.Y. C.P.L.R. § 302(a)(1). As this Court has previously recognized (Dkt.

No. 59 at 8), "proof of one transaction in New York is sufficient to invoke jurisdiction" under this provision, so long as the transaction was "purposeful and there is a substantial relationship between the transaction and the claim asserted," *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). In denying Alibaba's initial request for a preliminary injunction, the Court observed that Alibaba had "not alleged that even a single sale of Alibabacoin ha[d] occurred in New York, much less presented sufficient proof of commercial activity to justify a preliminary injunction." (Dkt. No. 59 at 8–9.) Now, however, Alibaba has cured that defect. During discovery, Defendants produced a list of the email addresses associated with AlibabaCoin investors (Dkt. No. 120-1), and an investigation has revealed that at least one of these email addresses—connected to three transactions—belongs to an individual who overwhelmingly appears to be a New York resident (Dkt. No. 120 ¶¶ 4–13).

Defendants nowhere dispute that Alibaba has presented evidence that at least one New York resident has purchased AlibabaCoin on at least three occasions. Instead, they argue that these sales "did not occur in the United States" because they "consist of ledger entries made in Minsk, Belarus, following observation of changes in 'blockchain' data outside the United States." (Dkt. No. 130 at 1.) This argument is unpersuasive. When an individual uses her debit card to make an online purchase from an out-of-state vendor, for example, it would strain common usage to say that the transaction occurs at the potentially remote location of the servers that process the buyer's banking activities and not at the location where the buyer clicks the button that commits her to the terms of sale. Certainly, Defendants have pointed to no authority interpreting New York's long-arm statute in such a counterintuitive way.

**\*4** Defendants next argue that Alibaba has failed to show that their role in the transactions at issue was "purposeful." *Kreutter*, 71 N.Y.2d at 467. How could it be their doing, Defendants ask, if "unbeknownst to [them]," New York-based users of their website chose to effectuate cryptocurrency sales by initiating "data exchanges" with Defendants' out-of-state electronic "apparatus"? (Dkt. No. 130 at 2.) Defendants' argument appears to boil down to the questionable claim that an out-of-state vendor selling intangible goods and services online has not acted intentionally with respect to an in-state buyer's subsequent purchase decision. Such a proposition, predictably enough, runs contrary to precedent. *See, e.g., Warner Bros. Entm't Inc. v. Ideal World Direct,*

516 F. Supp. 2d 261, 266 (S.D.N.Y. 2007) (holding that a website operator transacted business in New York under the long-arm statute by "transmit[ting] files to customers in exchange for membership fees"); *Thomas Publ'g Co. v. Indus. Quick Search, Inc.,* 237 F. Supp. 2d 489, 491–92 (S.D.N.Y. 2002) (holding that a website operator transacted business in New York under the long-arm statute when it made an interactive directory of manufacturing and industrial companies available on its website); *Citigroup Inc. v. City Holding Co.,* 97 F. Supp. 2d 549, 565–66 (S.D.N.Y. 2000) (holding that a website operator transacted business in New York under the long-arm statute when its website would permit a user to apply for a loan); *cf. Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.,* 7 N.Y.3d 65, 71 (2006) (holding that "long-arm jurisdiction" arising from the in-state transaction of business can lie "over commercial actors and investors using electronic and telephonic means to project themselves into New York").

Finally, Defendants argue that even if its New York–based transactions could support personal jurisdiction under the long-arm statute for some purposes, the trademark and false-advertising claims that Alibaba presses here lack the requisite "substantial relationship" with those transactions. *Kreutter*, 71 N.Y.2d at 467. According to Defendants, this Court's exercise of personal jurisdiction based on an in-state transaction involving Defendants' infringing conduct can extend no further than the particulars of that specific transaction and can "in no way establish personal jurisdiction with respect to other alleged acts of infringement." (Dkt. No. 130 at 2.) But this argument "too narrowly construes the nexus requirement, which merely requires the cause of action to 'relate to' [Defendants'] minimum contacts with the forum." *Chloé v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 167 (2d Cir. 2010). Given Alibaba's evidence that over one thousand New York users had visited Defendants' website by mid-June 2018 (Dkt. No. 112 at 28:8–15), Alibaba has established a reasonable probability that the transactions at issue here are not isolated instances, "but rather a part of a larger business plan" that involves the purposeful marketing and sale of AlibabaCoin to, among others, New York consumers, *Chloé,* 616 F.3d at 167.

Ultimately, by adducing evidence that a New York resident has purchased AlibabaCoin through Defendants' website, Alibaba has demonstrated a reasonable probability that

Defendants have transacted business in New York within the meaning of New York's long-arm statute. [2]

### 2. Due Process Clause

**\*5** In addition to complying with the state long-arm statute, New York's exercise of personal jurisdiction over Defendants must comport with the U.S. Constitution's Due Process Clause in order for this Court to assume jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k). Alibaba never argues that Defendants are sufficiently connected to New York to be subject to general, all-purpose jurisdiction in the state, so this Court must determine whether New York could constitutionally exercise case-specific jurisdiction over Defendants in connection with this action. Due process requires that a forum state's exercise of specific jurisdiction over a defendant must be limited to controversies arising out of or related to that defendant's forum-state activities, *Chloé*, 616 F.3d at 166, and that those activities reflect the defendant's purposeful availment of "the privilege of conducting activities" within the state, *id.* at 171 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) ). Moreover, the exercise of jurisdiction must be reasonable under the circumstances. *See id.* at 172–73.

In holding that the exercise of personal jurisdiction over Defendants here complies with New York's long-arm statute, the Court has already explained that Alibaba's claims bear a relational nexus to Defendants' forum-state activities and that those activities constitute the purposeful transaction of business in New York. Where those prerequisites to the application of New York's long-arm statute are satisfied, "the constitutional requirements of personal jurisdiction are [likewise] satisfied." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006); *accord Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 469 (S.D.N.Y. 2008); *see also Chloé*, 616 F.3d at 171 (holding that asserting personal jurisdiction in a trademark case over a defendant that had "offer[ed] bags for sale to New York consumers on [a] website and ... s[old] bags—including at least one counterfeit ... bag—to New York consumers" satisfied due process "for the same reasons that it satisfie[d] New York's long-arm statute"); *Alpha Int'l, Inc. v. T-Reproductions, Inc.*, No. 02 Civ. 9586, 2003 WL 21511957,

at \*5 (S.D.N.Y. July 1, 2003) (defendant that "maintain[ed] an interactive website from which at least one New York resident purchased an accused product," advertised in the United States, and otherwise sold items to New York residents had "purposefully avail[ed] [itself] of the privilege of conducting business in New York" for purposes of a trademark claim).

Defendants, however, argue that an exercise of personal jurisdiction here would fall afoul of the Due Process Clause's reasonableness requirement, given among other things that Alibaba "is a Cayman Islands entity which conspicuously lacks any New York or United States presence." (Dkt. No. 130 at 3.) Even if an exercise of personal jurisdiction that satisfies New York's long-arm statute is not *ipso facto* reasonable under the Due Process Clause, the Court nevertheless concludes on the specific facts of this case that Alibaba has adequately demonstrated a probability that an exercise of personal jurisdiction is reasonable here.

In assessing reasonableness,

> [a] court must consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief. It must also weigh in its determination [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies.

*Chloé*, 616 F.3d at 173 (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987) ). Here, Defendants have presented no evidence demonstrating that, "in this modern age and for [litigants] with obvious familiarity with internet communication," subjecting them to "litigation in New York would present so great an inconvenience as to constitute a deprivation of due process." *Savage Universal Corp. v. Grazier Constr., Inc.*, No. 04 Civ. 1089, 2004 WL 1824102, at \*11 (S.D.N.Y. Aug. 13, 2004). Further, New York has a clear interest in protecting in-state consumers from "confusion resulting from the misappropriation of trademarks or trade dress," *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 956 F. Supp. 427, 437 (S.D.N.Y. 1996), and

Alibaba likewise has an interest in safeguarding its corporate reputation among potential New York customers or investors. Finally, nothing suggests that an exercise of personal jurisdiction here would be inefficient or would trench on the prerogatives of other states. To be sure, Defendants point out that Alibaba has initiated similar proceedings in the United Arab Emirates, challenging trademark rights Defendants have been granted in that country. (Dkt. No. 123 ¶¶ 11–14; Dkt. No. 130 at 3.) But notwithstanding these foreign proceedings, there is nothing unreasonable about Alibaba's turning to a court in the United States to protect its *United States* trademarks, to enjoin Defendants from committing infringing acts *in the United States*, and otherwise to seek relief under *United States* (and New York) law.

**\*6** In sum, Alibaba has demonstrated a reasonable probability that a New York state court could lawfully exercise personal jurisdiction over Defendants in connection with this suit and that, as a consequence, Federal Rule of Civil Procedure 4(k) authorizes this Court to do the same.

### B. Likelihood of Success on the Merits

Because success on any of the seven causes of action asserted in the complaint would entitle Alibaba to the injunctive relief it seeks, Alibaba need only demonstrate that it is likely to prevail on at least one of them. *See Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 250 (D.D.C. 2003). The Court therefore limits its analysis to Alibaba's first cause of action, trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*

Under the Lanham Act, Alibaba is entitled to relief if it shows that Defendants have "use[d] in commerce, without consent," any of its " 'registered mark[s] in connection with the sale, offering for sale, distribution, or advertising of any goods,' in a way that is likely to cause confusion." *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir. 1999) (quoting 15 U.S.C. § 1114(1)(a) ). Here, Alibaba has demonstrated, among other things, that it holds a registered trademark protecting its exclusive use of the term "Alibaba" in connection with "computer software for use in exchanging information via global computer networks and online from a computer database and the internet." (Dkt. No. 1-4.) And there is ample evidence that Defendants have used "Alibaba" in connection with their online commercial ventures in a way that is likely to cause confusion. Indeed, the record contains evidence that consumer confusion is actually occurring, with online articles expressing uncertainty as to whether "this new

AlibabaCoin [is] made by" Alibaba (Dkt. No. 1-39 at 1) or even mistakenly attributing AlibabaCoin to "the global retailer and wholesaler Alibaba" (Dkt. No. 1-41 at 1).

Defendants nowhere contest the validity of Alibaba's trademarks, nor do they deny that they have used Alibaba's marks in an area of commerce that would ordinarily fall within Alibaba's legally protected turf. Instead, they argue that Alibaba has abandoned its trademark protection in the commercial area in which they operate because Alibaba has "repeatedly stated that it is not interested in moving into the cryptocurrency space." (Dkt. No. 1 ¶ 54; Dkt. No. 30 at 12–13.) But Defendants point to no authority supporting the proposition that a trademark-holder that has made consistent use of its protected mark in a given commercial context, as Alibaba has done in the internet-services context, has somehow acquiesced in infringing uses of that mark in all other commercial contexts, no matter how nearly those other contexts verge on the trademark-holder's own sphere of operations. Accepting this view of abandonment would render American trademark law largely ineffectual.

Finally, Defendants quibble with the adequacy of Alibaba's evidentiary showing that consumer confusion is occurring. (Dkt. No. 30 at 10–12.) But "courts have not found evidence of actual confusion necessary to show a likelihood of confusion." *Register.com, Inc. v. Domain Registry of Am., Inc.*, No. 02 Civ. 6915, 2002 WL 31894625, at \*11 (S.D.N.Y. Dec. 27, 2002). Defendants have cast little doubt on Alibaba's evidence that AlibabaCoin's promotional material has explicitly equivocated on the cryptocurrency's relationship to Alibaba (Dkt. No. 1-35 at 3), employed imagery related to Alibaba (Dkt. Nos. 1-36, 1-37, 1-38), and disclosed Defendants' plans to expand into e-commerce, Alibaba's "core business." (Dkt. No. 1 ¶ 51; Dkt. No. 1-42 at 2.) Alibaba's further demonstration that Defendants' likely misleading marketing tactics have had the predictable effect of generating actual consumer confusion, then, is merely icing on the cake. And although Defendants point to a March 2018 press release in which they disclaim any relationship between AlibabaCoin and Alibaba, that release itself acknowledges that Defendants have "received many inquiries regarding the relationship between AlibabaCoin" and Alibaba. (Dkt. No. 29-3 at 1.) A single disclaimer buried at the bottom of a single press release is likely insufficient to cure any future confusion that might result from Defendants' continued use of Alibaba's protected marks in connection with the marketing and sale of AlibabaCoin.

**\*7** Alibaba has therefore adequately demonstrated that it is likely to succeed on the merits of its Lanham Act infringement claim. Because Defendants never challenge Alibaba's showing that it is likely to suffer irreparable harm in the absence of an injunction, that the balance of hardships tips in Alibaba's favor, or that an injunction is consistent with the public interest, the Court concludes that Alibaba has shown that it is entitled to preliminary injunctive relief. [3]

**IV. Conclusion**

For the foregoing reasons, Alibaba's renewed application for a preliminary injunction is GRANTED, and its motion to compel discovery is DENIED as moot.

Accordingly, this Court hereby (1) enjoins Defendants from using the ALIBABA Marks, as Alibaba has defined that term in its application for a preliminary injunction, alone or in combination with any words, terms, designations, marks, or designs—as well as any mark, image, or depiction that is confusingly similar to or likely to impair the distinctiveness of the ALIBABA Marks—anywhere in the United States, including in connection with the provision of products or services to internet users located in the United States, and enjoins Defendants' employees, owners, agents, officers, directors, attorneys, representatives, affiliates, subsidiaries, successors, and assigns—and all those in active concert or participation with them or having knowledge of the causes of action—from enabling or assisting Defendants in such uses, and (2) enjoins Defendants from making false or misleading statements concerning the ALIBABA Marks in the sale, advertising, or promotion of Defendants' goods and services to any parties located in the United States, alone or in combination with any words, terms, designations, marks, or designs, as well as any mark, image, or depiction that is confusingly similar or likely to impair the ALIBABA Marks, and enjoins Defendants' employees, owners, agents, officers, directors, attorneys, representatives, affiliates, subsidiaries, successors, and assigns—and all those in active concert or participation with them or having knowledge of the causes of action—from making or assisting Defendants in making such statements.

**\*8** The Clerk of Court is directed to close the motion at Docket Number 121.

SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 5118638

Footnotes

1   Defendants briefly challenge the adequacy of service (Dkt. No. 30 at 25), claiming that the methods by which they were served—email and Federal Express—were not "reasonably calculated to give notice," as the Federal Rules of Civil

    Procedure and the U.S. Constitution's Due Process Clause both require. Fed. R. Civ. P. 4(f)(2); *see also* Mullane *v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 ("The reasonableness and hence the constitutional validity of any chosen method [of service] may be defended on the ground that it is in itself reasonably certain to inform those affected...."). This argument is frivolous. Here, Alibaba effected service in the precise manner this Court directed (Dkt. No. 10 at 3), which is in itself sufficient to comply with the Federal Rules, absent any indication that the court-ordered method of service is prohibited by international agreement, *see* Fed. R. Civ. P. 4(f)(3). And the methods of service employed here clearly satisfy constitutional due-process requirements; that service was reasonably calculated to provide notice of this lawsuit is self-evident, given that Defendants' counsel entered an appearance in the action just days after service was effected. (Dkt. Nos. 26, 38–44.)

2   Defendants object to the treatment of all Defendants "as a collective whole," arguing that Alibaba must "identify the specific way in which each individual Defendant acquired a nexus with New York that is sufficiently robust and intentional to warrant an exercise of jurisdiction." (Dkt. No. 30 at 16–17; *see also* Dkt. No. 30 at 10.) At the preliminary-injunction stage, though, Alibaba need only demonstrate a reasonable probability of personal jurisdiction. Here, although Defendants point out that the corporate entities named as defendants are not interchangeable (Dkt. No. 35 ¶¶ 13–15), Alibaba has raised a reasonable probability that these commonly owned and managed entities, which are lumped together in Defendants' own marketing materials (Dkt. No. 1-2 at 20–22; Dkt. No. 35 ¶ 1), operate jointly to facilitate the cryptocurrency sales that make personal jurisdiction appropriate here. As for the corporate officers who are named as defendants, a corporation's jurisdiction-conferring, in-state activities may be imputed to its officers where the officers "exercise[ ] some control" over those activities. *Chloé*, 616 F.3d at 168 (quoting *Kreutter*, 71 N.Y.2d at 467). Alibaba has named as defendants the

2018 WL 5118638

individual officers whom Defendants' own website described as Alibaba Foundation's Chief Executive and Chief Technical Officers at the time the suit was filed in April 2018. (Dkt. No. 1 ¶¶ 6–7; Dkt. No. 1-1.) There is at least a reasonable probability that those high-level officers exercised some degree of control over Defendants' sales activities at the time of the March 2018 transactions that support personal jurisdiction (Dkt. No. 120 ¶ 5), even if Defendants maintain that one of the officers is no longer involved with AlibabaCoin (Dkt. No. 35 ¶ 11).

3    In connection with their personal-jurisdiction argument, Defendants briefly argue that Alibaba would not suffer ongoing harm in the United States absent an injunction because Defendants have purportedly taken steps to prevent United States citizens or residents from purchasing AlibabaCoin. (Dkt. No. 130 at 3.) To the extent that this argument is intended to challenge the adequacy of Alibaba's showing of irreparable harm, it is unconvincing. Defendants have never seriously disputed Alibaba's persuasive demonstration that Defendants' continued use of Alibaba's trademarks in connection with the promotion of AlibabaCoin would put Alibaba at "risk of losing control of the public's perception of its business." (Dkt. No. 17 at 16.) Indeed, this Court has already expressed its belief "that there is irreparable harm if there is likelihood of success on the merits." (Dkt. No. 66 at 59:24–25.) After all, even if *AlibabaCoin* is not sold to United States consumers —a proposition that in any event contradicts the present record—those consumers' exposure to online advertising likely to create brand confusion could affect their willingness to purchase from or invest in *Alibaba*, the party that claims injury.

*See* *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988) ("In a Lanham Act case a showing of likelihood of [brand] confusion establishes both a likelihood of success on the merits and irreparable harm.").

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Mago Intern. LLC v. LHB AG, Not Reported in F.Supp.3d (2014)

Case 1:18-md-02865-LAK    Document 190-7    Filed 08/30/19    Page 9 of 33

2014 WL 2800751
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

MAGO INTERNATIONAL LLC, Plaintiff,

v.

LHB AG f/k/a Lhb Internationale
Handelsbank AG and Bank for Business,
Sh.A a/k/a Banka Per Biznis, Defendants.

No. 13 Civ. 3370(CM).
|
Signed June 18, 2014.

MEMORANDUM DECISION AND ORDER
DENYING DEFENDANT'S MOTION TO DISMISS

McMAHON, District Judge.

 **\*1** Plaintiff Mago International LLC ("Mago") brought suit against Defendants LHB AG ("LHB") and Bank for Business, seeking damages that Mago alleges it is owed under a confirmed standby letter of credit.[1] LHB moved to dismiss the claim against it for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), or alternatively, on the basis of forum non conveniens. Because Mago has made a prima facie showing of this Court's jurisdiction over LHB, and as forum non conveniens does not suggest an alternate forum is more appropriate, the motion to dismiss is denied.

BACKGROUND

Mago is a two-person "global trading company" incorporated in New York, where it also has its headquarters. Am. Compl. ¶ 8. It maintains its lone bank account with Wells Fargo Bank in a New York branch. Sayilir Decl. ¶ 13.

LHB was licensed as a German bank during the relevant time period. Stanic Decl. ¶ 4. LHB is organized under German law, its principal place of business is in Germany, and it has no offices, employees, subsidiaries, bank accounts, property, or anything else of importance in New York. Am. Compl. ¶ 2; Stanic Decl. ¶¶ 3, 5–8, 10–11. LHB also does not solicit any business in New York, or elsewhere in the United States. Id.

¶ 9. It is a subsidiary member of the NLB Group, and it has about 28 employees. Gershburg Decl., Ex. C.

Mago is in the business of exporting, among other products, frozen poultry. Am. Compl. ¶ 8. On August 16, 2011, it contracted with a Kosovan company, N.T.P. Genita ("Genita"), to sell a sizeable amount of frozen chicken and other food products. Id. ¶ 11. In its contract with Mago, Genita agreed to obtain an irrevocable and confirmed standby letter of credit to guarantee payment. Id. ¶ 13.

When a bank issues a standby letter of credit at the behest of an applicant like Genita, it takes on a secondary obligation for the applicant's commercial transaction. If the applicant fails to pay a contraparty to the transaction, that contraparty-the beneficiary for whom the letter of credit was issued-can seek payment from the issuing bank. Typically, the beneficiary has to provide proof of non-payment by the applicant party; sometimes other documents must also be supplied, within a specified time frame, in order to receive payment. The issuing bank is obligated to pay if the beneficiary presents a demand for payment containing the correct documents before the payment window closes; the reason for non-payment by the primary obligor is irrelevant.

If another bank "confirms" the standby letter of credit, it completely takes over the issuing bank's obligation to the beneficiary; in such a case, the beneficiary has to present its demand for payment to the confirming bank instead of the issuing bank, but all other conditions on the demand remain the same.

The Irrevocable Standby Letter of Credit (Advise Number AS0004093, October 13, 2011) was issued in favor of Mago International LLC (the Beneficiary) by Bank for Business. Am. Compl. ¶ 14. Mago's address is listed at 100 Church Street, 8 th Floor, New York, New York 10007; Bank for Business's address is listed as Pristina, the capital of Kosovo. Sayilir Decl., Ex. A.

 **\*2** The two parties who are responsible for paying on the Letter of Credit are Bank for Business (the Issuing Bank) and LHB (the Confirming Bank). Id. Although Mago dealt only with Bank for Business–Bank for Business obtained confirmation of the Letter of Credit through a separate deal with LHB-there is no indication in the papers before the court that Mago has to presented a demand for payment to Bank for Business and was turned down before it presented a demand to the confirming bank, LHB. Indeed, as this Court

understands the confirmation agreement, Mago can only seek payment from LHB. Regardless, Mago seems to have gone directly to the Confirming Bank in this case.

Per the terms of the Letter of Credit, Mago was required to present a declaration of Genita's non-payment and all other required documents to LHB "through its [Mago's] bank," *id.,* which must confirm that Mago's signatures are legally binding, and that the documents conform to the terms of the Letter of Credit, before payment will be made. *Id.* Mago has its only bank account at a Wells Fargo branch in New York City (a fact pleaded in the complaint and presumed true). Wells Fargo's corporate offices are located in San Francisco and Winston Salem, North Carolina; obviously, its customers, like Mago, are all over the map, including in New York City- where a stroll down the street will reveal that Wells Fargo maintains numerous branches.

The Letter of Credit is governed by the Uniform Customs and Practice for Documentary Credits ("UCP"), I.C.C. Publication No. 600, 2007 Revision. Am. Compl. ¶ 7; Stanic Decl. ¶ 17. LHB's obligation to pay Mago because of the Letter of Credit confirmation agreement is the only link between the parties; LHB was not involved in either the original purchase agreement between Genita and Mago, or in the arrangement between Bank for Business and Mago.

Genita did not fulfill its obligations under the purchase agreement with Mago, Am. Compl. ¶ 22, and Mago demanded payment from LHB through its advising bank, Wells Fargo, as required by the Letter of Credit confirmation agreement. Mago sent four successive requests for payment to LHB: on August 3, 2012; September 25, 2012; October 4, 2012; and October 10, 2012. *Id.* ¶¶ 23, 26, 30, 34. These requests, which were sent from Wells Fargo's offices in San Francisco, include the original commercial invoice, listing Mago, with its New York address, as the beneficiary. Stanic Decl., Ex. B, C. Wells Fargo's "Corporate Offices" were listed as being in San Francisco; a Wells Fargo bank account number, containing no indication of where the branch was located, was also listed. *Id.;* Gershburg Decl., Ex. B. Mago also tried to contact LHB directly, though all official communication went through Wells Fargo, as required by the Letter of Credit confirmation agreement. Sayilir Decl., Ex. C, D, E; Stanic Decl., Ex. B, D, E, F.

LHB refused to honor the first three demands for payment on the ground that the documents submitted by Mago were deficient. Am. Compl. ¶¶ 24, 28, 32. It refused the fourth

demand on the ground that the Letter of Credit had expired on October 8, 2012. *Id.* ¶ 36. Mago has brought this action for damages.

**\*3** Defendant LHB moved to dismiss the claim against it for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), or alternatively, on the basis of forum non conveniens.

## DISCUSSION

### I. Standard of Review.

To defeat a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a plaintiff "need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *DiStefano v. Carozzi N.A., Inc.,* 286 F.3d 81, 84 (2d Cir.2001). This requires that the plaintiff "plead facts which, if true, are sufficient in themselves to establish jurisdiction." *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.,* 975 F.Supp. 562, 564 (S.D.N.Y.1997); *see also Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184 (2d Cir.1998). "Plaintiffs can make this showing through their own affidavits and supporting materials ... that, if credited, would suffice to establish jurisdiction over the defendant." *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000,* 230 F.Supp.2d 376, 381 (S.D.N.Y.2002) (citing *Whitaker v. Am. Telecasting Inc.,* 261 F.3d 196, 208 (2d Cir.2001)). In deciding whether a plaintiff has met this burden, a court must "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in [their] favor." *DiStefano,* 286 F.3d at 84. "However, conclusory allegations are not enough to establish personal jurisdiction." *Gmurzynska v. Hutton,* 257 F.Supp.2d 621, 625 (S.D.N.Y.2003) (internal quotations omitted), *aff'd,* 355 F.3d 206 (2d Cir.2004).

### II. Personal Jurisdiction.

To determine whether personal jurisdiction exists over a non-domiciliary, district courts engage in a two-step analysis. *Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 163 (2d Cir.2010) (citing *Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 243–44 (2d Cir.2007)). The court must first determine whether the exercise of personal jurisdiction is appropriate under the laws of the forum state. *Best Van*

*Lines,* 409 F.3d at 242; *Grand River Enterprises Six Nations, Ltd. v. Pryor,* 425 F.3d 158, 165 (2d Cir.2005). Only if it is appropriate must the court then determine whether the exercise of jurisdiction is consistent with due process requirements. *Id.*

New York law has two bases for establishing personal jurisdiction over a foreign company: (1) "general jurisdiction" pursuant to N.Y. C.P.L.R. § 301; and (2) "specific jurisdiction" pursuant to N.Y. C.P.L.R. § 302. *See Moore v. Publicis Groupe SA,* No. 11 Civ. 1279, 2012 WL 6082454, at *4 (S.D.N.Y. Dec. 3, 2012).

Neither party suggests that this Court may exercise general jurisdiction over LHB. Rather, Mago claims that this Court may exercise specific jurisdiction over LHB pursuant to N.Y. C.P.L.R. § 302.

Mago alleges sufficient facts to support a preliminary conclusion that specific jurisdiction exists.

**A. This Court Has Specific Jurisdiction Over LHB.**

**\*4** Under C.P.L.R. § 302, a New York court may exercise specific jurisdiction over a non-domiciliary who: (1) "transacts any business within the state"; or (2) "contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). When a court exercises specific jurisdiction over a foreign defendant, "the claim must arise out of the acts that form the basis for personal jurisdiction." *Howard v. Klynveld Peat Marwick Goerdeler,* 977 F.Supp. 654, 663 (S.D.N.Y.1997), *aff'd,* 173 F.3d 844 (2d Cir.1999).

**1. LHB Contracted to Provide a Service In New York.**

Deciding whether a defendant "contract[ed] anywhere to supply ... services in the state," N.Y. C.P.L.R. § 302(a) (1), is relatively straightforward. Both parties agree that a contract to pay a guaranty in New York would subject LHB to the jurisdiction of this court. *A.I. Trade Finance, Inc. v. Petra Bank,* 989 F.2d 76, 81 (2d Cir.1993) (holding that a guaranty payable in New York "is a contract to provide a service in New York"); *see also, e.g ., Summit Const. Services Group, Inc. v. Act Abatement, LLC,* 935 N .Y.S.2d 499, 506 (N.Y.Sup.Ct.2011) (holding that a nondomiciliary who contracts outside of New York to supply financial services in New York may be subjected to jurisdiction in New York).

However, the parties disagree over whether LHB contracted to pay a guaranty "in New York." Mago argues that the location of payment is determined by the location of the beneficiary, which is New York. LHB insists that, because the confirmed Letter of Credit provides for payment to a Wells Fargo bank account, and Wells Fargo is headquartered in San Francisco, it agreed to make payment in California.

The Second Circuit dealt with the application of the "contracts anywhere" language to a guaranty in *A.I. Trade.* In *A.I. Trade,* the plaintiff, a New York trade financing firm, had engaged in a forfaiting transaction with the defendant, a Jordanian bank. *A.I. Trade,* 989 F.2d at 77. A forfaiting transaction, the common method to facilitate export sales to troubled or debt-laden countries, operates as follows: "the forfaiter finances the sale by paying the exporter ... and receives in return the importer's promissory notes." *Id.* at 78. One other essential party is involved: a guarantor bank, who issues an unconditional and irrevocable guaranty. *Id.* The guaranty involved in a forfaiting transaction, called an "aval", is similar in form to the guaranty at issue in this case. *Id.* The Second Circuit, after reviewing the legislative history of the "contracts anywhere" clause, and the decisions of lower New York courts and federal district courts in New York, held: "Petra Bank's aval on a promissory note [a guaranty] payable in New York is a contract to provide a service in New York [within the meaning of N.Y. C.P.L.R. § 302]."

LHB argues that the location of the bank account designated for payment from the Letter of Credit, which it alleges is in San Francisco, is where the guaranty is payable. First of all, in deciding a motion to dismiss, this Court must take Mago's pleadings as true, including that its one and only bank account is located in New York. The fact that it chose an advising bank which has its corporate offices in two other states does not alter the well-pleaded fact that Mago's account with the bank is in a New York branch of the bank-and that is where Mago would presumably have received payment. At this stage of proceedings, I must so assume.

**\*5** Furthermore, LHB has a contractual obligation to pay *Mago*—not Wells Fargo-and Mago is a New York corporation with its office in New York. It is the location of the entity to which payment must be made that is relevant, not the location of the corporate office of the beneficiary's bank.

Other courts in this District applying *A.I. Trade* to facts similar to ours ask whether the guaranty provides for payment

Mago Intern. LLC v. LHB AG, Not Reported in F.Supp.3d (2014)

Case 1:18-md-02865-LAK    Document 190-7    Filed 08/30/19    Page 12 of 33

to an *entity* located in New York-thereby guaranteeing payment and performance in New York-not where the bank into which the payment is to be initially deposited is found. *See Sirius,* 461 F.Supp.2d at 162; *see also Michael Kors Co., Inc. v. Compagnia Internazionale Abbigliamento S.p.A.,* No. 93 Civ. 6722, 1996 WL 509725, at *3 (S.D.N.Y. Sept. 9, 1996).* Indeed, "The rule that a guaranty to make payments to a New York *entity* constitutes a contract to provide services in New York pursuant to CPLR 302(a)(1) is so firmly entrenched in case law that it is hardly worth elucidation."

*Key Bank of N.Y., N.A. v. Patel,* 796 F.Supp. 674, 676 (N.D.N.Y.1992) (citing *Chase Manhattan Serv. Corp. v. Nat'l Bus. Sys., Inc.,* 766 F.Supp. 203, 205 (S.D.N.Y.1991) and much other support) (emphasis added). Since LHB entered into a guaranty contract for the benefit of Mago, a New York corporation, LHB should have known that a perceived failure to fulfill its obligations would give rise to suit by that same New York corporation in its home forum.

In any event, *A.I Trade* suggests only that the location of payment *can* be a useful factor in determining whether an entity has contracted to provide a service in New York. *Sirius America Ins. Co. v. SCPIE Indem. Co.,* 461 F.Supp.2d 155, 162 (S.D.N.Y.2006); it does not, however, stand for the proposition that the location of payment is dispositive-or even a factor that must always be considered. *Id.* Rather, *A.I. Trade* looked to the location of payment because it was an important component of the particular financial instrument's legitimacy and value. *Id.* In this case, however, the most significant aspect is the location of the beneficiary, the party that LHB became obligated to pay when it affirmatively elected to confirm the Letter of Credit. That the beneficiary's bank account is allegedly in New York is icing on the cake.

LHB thus contracted to provide a service-the payment of a guaranty-in New York. This fact is enough under C.P.L.R. § 302(a) (1) to confer personal jurisdiction over LHB.

### B. This Court's Exercise of Jurisdiction Over LHB Comports with Due Process.

Where a court finds that it has jurisdiction under C.P.L.R. § 302(a)(1), only in "rare" cases will the exercise of jurisdiction fail to comport with due process. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161, 170 (2d Cir.2013). Many cases suggest such an outcome would be impossible, and a separate due process inquiry therefore unnecessary. *See, e.g.,* *GEM Advisors, Inc. v. Corporacion*

*Sidenor, S.A.,* 667 F.Supp.2d 308, 321 (S.D.N .Y.2009) (citing *D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 105 (2d Cir.2006)) ("where personal jurisdiction is appropriate under section 302(a), the requirements of due process are met"). However, the Second Circuit has held that a separate due process analysis must still be conducted. *Licci,* 732 F.3d at 170.

**\*6** To determine whether due process is satisfied, we conduct a two-part analysis: "(1) the minimum contacts inquiry and (2) the reasonableness inquiry." *Chloe,* 616 F.3d at 171. "The import of the reasonableness inquiry varies inversely with the strength of the minimum contacts showing-a strong (or weak) showing by the plaintiff on minimum contacts reduces (or increases) the weight given to reasonableness." *Bank Brussels,* 305 F.3d at 129 (citing *Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 568 (2d Cir.1996)) (internal citations omitted).

### 1. The Required Minimum Contacts Are Present.

The first component of the analysis is satisfied if the defendant has the required minimum contacts with the forum state. "Minimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum state and could reasonably anticipate being haled into court there." *Pearson Educ., Inc. v. Shi,* 525 F.Supp.2d 551, 557 (S.D.N.Y.2007) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75 (1985) (internal quotations omitted)).

*A.I. Trade* held that "the guaranteeing of the Notes by [defendant], including the promise to make payment to a New York-based company in New York, constitutes some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 989 F.2d at 82 (citing *Burger King,* 471 U.S. at 475) (internal quotations omitted); *see also Chase Manhattan,* 766 F.Supp. At 205 (*Burger King* "purposeful availment" found by "the guarantying of the Lease by [defendant], including the promise to make payments to plaintiff in New York"). It is enough that LHB "was a signatory to a guaranty that states on its face that [Mago] is a New York corporation with [its office] in New York." *Sirius,* 461 F.Supp.2d at 164. By confirming the Letter of Credit, LHB "deliberately contracted to provide

**Mago Intern. LLC v. LHB AG, Not Reported in F.Supp.3d (2014)**

Case 1:18-md-02865-LAK   Document 190-7   Filed 08/30/19   Page 13 of 33

services to a New York entity and thus it was not unreasonable for [it] to anticipate being haled into court in New York in the event that [Genita] defaulted on its payments to [Mago]." *Id.; see also* *World–Wide Volkswagen Corp v. Woodson,* 444 U.S. 286, 297 (1980).

#### 2. The Exercise of Jurisdiction Is Reasonable.

For the second component, "a court considers whether the assertion of jurisdiction comports with traditional notions of fair play and substantial justice-that is, whether it is reasonable under the circumstances of a particular case." *Sirius,* 461 F.Supp.2d at 164 (quoting *Chaiken v. VV Pub. Corp.,* 119 F.3d 1018, 1028 (2d Cir.1997)) (internal quotations omitted). Although exercising jurisdiction is favored once the plaintiff has made a threshold showing of minimum contacts, "it may be defeated where the defendant presents a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life,* 84 F.3d at 568 (quoting *Burger King,* 471 U.S. at 477) (internal quotations omitted).

**\*7** Beyond minimum contacts, courts consider additional factors to determine whether the exercise of personal jurisdiction comports with fair play and substantial justice. These factors include: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Boehner v. Heise,* 410 F.Supp.2d 228, 239 (S.D.N.Y.2006) (citing *Burger King,* 471 U.S. at 476–77; *see also* *Chloe,* 616 F.3d 158, at 173.

These factors suggest that the exercise of jurisdiction would be entirely reasonable.

The first factor either favors Mago, as the party who would have the larger burden if litigating in a foreign forum, or at least, does not favor either party.

The second factor strongly favors Mago, since New York has a "manifest interest in providing effective means of redress for its residents." *Burger King, All* U.S. at 483 (internal quotations omitted).

As regards the third factor, LHB says it has no accounts or property in the United States, so it may be difficult for Mago to effectively enforce any monetary judgment in its favor. However, that is Plaintiff's choice to make; presumably it sued here because it feels this forum will give more effective relief.

Finally, LHB also argues that the fourth factor weighs in its favor because relevant documents and witnesses are beyond the subpoena power of this court. *See* *Tymos hen ko v. Firtash,* No. 11 Civ. 2794, 2013 WL 1234943, at *6 (S.D.N.Y. Mar. 27, 2013) (citing *Metro. Life,* 84 F.3d at 574–75). However, this is a case on a letter of credit; almost no discovery is needed, and the witnesses are few if any. The case will likely be decided on the basis of documents-the Letter of Credit itself and the documents submitted by Mago to LHB with its requests for payment. All of those are already before this Court. If any witnesses or documents located in Kosovo were relevant to the suit-and they likely will not be-then, as LHB admits, German courts have no more power to compel their appearance. The final factor favors Plaintiff, not LHB.

There is not a compelling case that the exercise of jurisdiction over LHB would be unreasonable; indeed, there is no case to be made at all. It is fair to ask LHB to defend themselves here against Mago's allegations.

### III. The Motion in the Alternative to Dismiss on Forum Non Conveniens Grounds Is Denied.

In the alternative, LHB argues that this Court should decline to exercise jurisdiction over LHB under the doctrine of forum non conveniens.

"The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507 (1947). In *Iragorri v. United Technologies Corp.,* 274 F.3d 65 (2d Cir.2001), the Second Circuit, sitting *en banc,* adopted a three-part inquiry to govern analyses of motions to dismiss for forum non conveniens. *See* *Norex Petroleum Ltd. v. Access Indus., Inc.,* 416 F.3d 146, 153 (2d Cir.2005); *see also* *Pollux Holding Ltd. v. Chase Manhattan Bank,* 329 F.3d 64, 70 (2d Cir.2003); *DiRienzo v. Philip Services Corp.,* 294 F.3d 21, 28 (2d Cir.2002). "The defendant bears the burden to establish clearly each factor ... and to demonstrate that the balance tilts *strongly* in favor of the purported

Mago Intern. LLC v. LHB AG, Not Reported in F.Supp.3d (2014)

Case 1:18-md-02865-LAK    Document 190-7    Filed 08/30/19    Page 14 of 33

alternative forum." *PT United Can Co., Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65, 74 (2d Cir.1998) (internal citations omitted) (emphasis added).

**\*8** The first step in a forum non conveniens analysis is determining what level of deference to accord a plaintiff's choice of forum. *DiRienzo,* 294 F.3d at 28 (citing *Iragorri,* 274 F.3d at 73). Then, a court must consider whether there is an adequate alternative forum for the litigation. *Iragorri, 214* F.3d at 73. If one exists, a court must then weigh the relative convenience of the forums by evaluating certain private and public interest factors. *Id.* "The greater the degree of deference to which the plaintiffs choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing forum non conveniens dismissal." *Id.* at 74.

### A. Mago's Choice of Forum Is Entitled to Great Deference.

The Second Circuit has established a "sliding scale" approach to determine the degree of deference to accord a plaintiff s choice of forum. *Id.* at 71. Under that scale,

the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States ..., [the greater the amount of deference that must be accorded the plaintiff's choice of a forum, and] the more difficult it will be for the defendant to gain dismissal for forum non conveniens.

*Id.* at 72.

Factors which argue against dismissal include "the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." *Id.* A district court is not required to consider every single factor specifically in making this determination. *Norex Petrol. Ltd. v. Access Indus., Inc.,* 416 F.3d 146, 155 (2d Cir.2005). Where the plaintiff's choice is determined to stem more from concerns of convenience, it is entitled to greater deference; where the choice indicates forum-shopping, it is entitled to less deference. *Iragorri,* 274 F.3d at 7172; *Strategic*

*Value Master Fund. Ltd. v. Cargill Fin. Services, Corp.,* 421 F.Supp.2d 741, 755 (S.D.N.Y.2006). However, that deference is reduced where "the plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts." *Guidi v. Inter–Continental Hotels Corp.,* 224 F.3d 142, 147 (2d Cir.2000). *See also, e.g., Morrison Law Firm v. Clarion Co., Ltd .,* 158 F.R.D. 285, 287 (S.D.N.Y.1994); *CCS Int'l, Ltd. v. ECI Telesystems, Ltd.,* No. 97 Civ. 4646, 1998 WL 512951, at \*7 (S.D.N.Y. Aug. 18, 1998); *Sussman v. Bank of Israel,* 801 F.Supp. 1068, 1073 (S.D.N.Y.1992) ("Where an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against forum non conveniens dismissal is diminished.").

**\*9** Mago's choice of New York seems clearly motivated by convenience and financial concerns. It is a two-person operation, with one person operating the corporation's office here in New York. Given the choice of bringing suit here, or in a foreign country across the Atlantic, it is hardly surprising that Mago chose this forum. Because it was founded on considerations of convenience and cost, there is substantial deference to that choice. *See, e.g., Pollux,* 329 F.3d at 70.

I do not agree with LHB that this deference should be reduced because of Mago's status as a "global trading company." First, Mago's foreign business was directed at Kosovo; Germany-based LHB became involved by the efforts of Bank for Business. Second, the central purpose of requiring not only the Letter of Credit, but also confirmation by a second bank, was to reduce the chance Mago would need to conduct litigation anywhere, let alone abroad, in order to receive payment for its shipment.

### B. Germany Offers An Adequate Forum.

"An alternative forum is generally adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Bank of Credit and Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan,* 273 F.3d 241, 246 (2d Cir.2001) (internal quotation and citations omitted). The defendant bears the burden of establishing the existence of an adequate alternative forum. *USHA (India), Ltd. v. Honeywell Int'l, Inc.,* 421 F.3d 129, 135 (2d Cir.2005) (citing *Aguinda v. Texaco,*

Case 1:18-md-02865-LAK    Document 190-7    Filed 08/30/19    Page 15 of 33

Mago Intern. LLC v. LHB AG, Not Reported in F.Supp.3d (2014)

*Inc.,* 303 F.3d 470, 476 (2d Cir.2002)); *see also Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 100 (2d Cir.2000).

LHB has established that Germany would be an adequate alternative forum. LHB is subject to the service of process there, no German statute of limitations bars Mago's claim, and the forum would allow Mago's claim to be litigated.

### C. The Balance of Private and Public Interest Factors Weighs Against Dismissal.

To prevail on a forum non conveniens argument, a defendant normally has the burden to show that both the private and public interest factors "strongly" favor dismissal. *Metito (Overseas) Ltd. v. General Elec. Co.,* 2006 WL 3230301, at *5 (S.D.N.Y. Nov. 7, 2006) (quoting *DiRienzo,* 294 F.3d at 3031). Even "a lesser degree of deference to the plaintiff's choice ... does not guarantee dismissal.... The action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the [alternate] forum significantly preferable." *Iragorri,* 274 F.3d at 74–75.

The Second Circuit has endorsed the use of the non-exclusive list of private and public interest factors delineated in *Gilbert* to evaluate *a forum non conveniens* motion. The private interest factors include: (1) the relative ease of access to evidence; (2) the cost to transport witnesses to trial; (3) the availability of compulsory process for unwilling witnesses; and (4) other factors that make the trial more expeditious or less expensive. *Iragorri,* 274 F.3d at 73–74. The public interest factors include: (1) settling local disputes in a local forum; (2) avoiding the difficulties of applying foreign law; and (3) avoiding the burden on jurors by having them decide cases that have no impact on their community. *Id.* at 74; *see also Gilbert,* 330 U.S. at 508.

**\*10** Applying these factors, New York is the better forum for this litigation. The private interest factors favor New York; a change of forum to Germany would needlessly burden Plaintiff and lead to delay and expense without offering any countervailing benefit.

The public interest factors weigh in favor of New York. Despite Mago's self-styled status as a "global trading

company," it is a small New York corporation that, like many New York corporations, did business outside of the United States. An alleged injury to a local corporation, albeit by a foreign one, is a sufficiently local concern that New York has at least some interest in adjudicating the dispute. While German courts may have a similar interest in adjudicating a dispute involving their own corporation, at most this should be given equal weight.

Also, the dispute is governed by the Uniform Customs and Practice for Documentary Credits, a set of rules promulgated by the International Chamber of Commerce, because of a choice-of-law provision in the Letter of Credit. German courts are no more at home with these rules than this jurisdiction, which has enough capability to adjudicate a dispute arising under them, as Mago shows. *See, e .g., 3Com Corp. v. Banco do Brasil, S.A.,* 171 F.3d 739 (2d Cir.1999).

Finally, as discussed above, this is not a case where the location of relevant evidence makes a difference. The Letter of Credit exists. Mago, located in New York, can establish both the fact of Genita's non-payment and the contents of its various demands for payment. The terms of the Letter of Credit dictate whether proper documents were presented; if they were, there is no defense and Plaintiff wins, if not, there is no right to payment and Defendant wins. Nothing located in Germany will be needed to adjudicate this case.

Because the private and public interest factors do not outweigh the substantial deference given to Mago's choice of its home forum, dismissal on grounds of forum non conveniens is unwarranted.

### CONCLUSION

For the foregoing reasons, Defendant LHB's motion to dismiss is denied. The Clerk of the Court is directed to remove Docket No. 18 from the Court's list of pending motions.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 2800751

Footnotes

Case 1:18-md-02865-LAK     Document 190-7     Filed 08/30/19     Page 16 of 33

1       The current motion involves only LHB, however. In fact, it seems that the deadline for Mago to serve Bank for Business has expired. LHB was served in Germany. Stanic Decl. ¶ 12.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

2019 WL 2327810
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rigoberto VASQUEZ and Eva Garcia
on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
HONG KONG AND SHANGHAI BANKING
CORPORATION LTD., a foreign company,
HSBC Bank USA, N.A., a national banking
association, and Does 1 Through 100, Defendants.

18 Civ. 1876 (PAE)
|
Signed 05/29/2019
|
Filed 05/30/2019

**Attorneys and Law Firms**

Julio Joaquin Ramos, Law Offices of Julio J. Ramos, San Francisco, CA, for Plaintiffs.

Craig Andrew Convissar, Katten Muchin Rosenman, LLP, New York, NY, Gregory S. Korman, Stuart M. Richter, Katten Muchin Rosenman LLP, Los Angeles, CA, for Defendants.

OPINION & ORDER

Paul A. Engelmayer, United States District Judge

 *1  Plaintiffs Rigoberto Vasquez and Eva Garcia bring this putative class action against Hong Kong and Shanghai Banking Corporation Ltd. ("HSBC Hong Kong"), HSBC Bank USA, N.A. ("HSBC USA") (together, the "HSBC defendants"), and Does 1 to 100. Plaintiffs allege that the HSBC defendants and unnamed others facilitated the international bank transfers required to perpetrate a Ponzi scheme which violated the federal racketeering statute 18 U.S.C. § 1961 et seq. ("RICO"). Plaintiffs also bring, under state law, three common law claims for aiding and abetting, with the underlying conduct of fraud, breach of fiduciary duty, and conversion.

HSBC Hong Kong now moves to dismiss for lack of personal jurisdiction. In addition, the HSBC defendants move collectively and individually to dismiss all claims on a variety of grounds under Federal Rule of Civil Procedure 12(b)(6) and to strike plaintiffs' class allegations.

For the reasons that follow, as to HSBC Hong Kong, the Court authorizes jurisdictional discovery, to assist in resolution of that defendant's motion to dismiss for lack of personal jurisdiction. The Court dismisses all claims against HSBC USA under Rule 12(b)(6), which obviates the need to resolve the motion to strike class allegations as made by that defendant. After jurisdictional discovery, the Court will, if personal jurisdiction is then established, resolve HSBC Hong Kong's Rule 12(b)(6) motion and its motion to strike plaintiffs' class allegations.

**I. Background**

**A. Facts** [1]

Plaintiffs allege that the HSBC defendants facilitated the perpetration of a Ponzi scheme they call "WCM777." FAC ¶ 1. The perpetrators of WCM777 maintained accounts with HSBC Hong Kong and advised prospective investors to wire money to these accounts. Id. ¶ 2. The bulk of these transfers went through a correspondent bank account held by HSBC Hong Kong at HSBC USA in New York. Id. Plaintiffs allege that HSBC USA became aware that WCM777 was a Ponzi scheme at least by September 30, 2013, and shared this discovery with HSBC Hong Kong. However, the banks continued transferring more than $ 30 million worth of transactions afterwards until a federal court shut down the scheme in March 27, 2014. Id. ¶¶ 1–2.

**1. The Operation of WCM777**

WCM777 is the umbrella name for a number of businesses operating together. Id. ¶ 11. Its name derives from World Capital Markets, Inc., a Delaware corporation headquartered in Pasadena, California, and organized under the laws of the British Virgin Islands. Id. ¶ 12. It was founded around March 2013 by Phil Ming Xu ("Ming Xu"), its chairman. Id. Ming Xu lived in California. Id. ¶ 13. World Capital Markets, Inc. maintained a website with the URL "WCM777.com." Id. ¶ 17(a).

 *2  WCM777 Ltd. is a subsidiary of World Capital Markets, Inc. It is based in the British Virgin Islands and partially owned by Ming Xu and Suo Zhong Xu. Id. ¶ 14. On July

2, 2013, WCM777 Ltd. was incorporated in Hong Kong. *Id.* On February 21, 2014, WCM777 Ltd. registered with the California Secretary of State, stating that it was doing business as WCM777 Enterprises, Inc., and was located in the City of Industry, California. *Id.* ¶ 14. Collectively, the above businesses are known as "WCM777."

WCM777 styled itself as a global merchant investment bank and claimed to be in partnership with more than 700 investment organizations. *Id.* ¶ 17(a). It solicited investors in the United States and abroad through its website, in-person seminars and presentations, webinars, and posts on social media sites such as Facebook and other message boards. *Id.* ¶ 17(b).

WCM777 offered and sold five different levels of packages of cloud-based computing services, titled "World Cloud Media Products." *Id.* ¶¶ 17(d) & (f). In addition to computer services, each package level promised a return within 100 days of approximately 100% of the amount invested with half paid in cash and half paid in points. *Id.* ¶¶ 17(d) & (g). As marketed, these points could ostensibly be redeemed for goods and services to be offered by WCM777 and its affiliates, or converted into equity in an initial public offering of either a company named WCM7.com, or another unidentified high-tech company that WCM777 claimed it planned to bring public. *Id.* ¶ 17(e). WCM777 represented that investors could earn additional cash and points by referring new members or by being passive. *Id.*

WCM777 was a pyramid scheme in that it used some of the investor funds to make Ponzi payments of returns to investors. *Id.* ¶ 17(h). It used the bulk of the investor funds to pay cash for real property purchased in the United States. *Id.* It had no apparent source of revenue other than money received from new investors, and its offering and operation depended almost entirely on the recruitment by existing investors of new investors and purchasers, whose funds were used to pay purported returns to investors. *Id.* ¶¶ 17(h)–(j).

### 2. The Role of the HSBC Defendants

On or about December 11, 2012, HSBC USA and HSBC Holding plc ("HSBC"), of which HSBC Hong Kong is a subsidiary, entered into a Deferred Prosecution Agreement with the United States regarding money laundering and terrorist financing. *Id.* ¶¶ 30, 32. As part of the Agreement, HSBC vouched that it had implemented a new automated

system that monitored every wire transaction that moved through HSBC USA. *Id.* ¶ 32. The system tracks the originator, sender, and beneficiary of a wire transfer. *Id.* HSBC represented that it had also implemented a new customer risk-rating methodology that evaluates: "(1) the country where the customer is located, (2) the products and services utilized by the customer, (3) the customer's legal entity structure, and (4) the customer and business type." *Id.* Transactions that meet a certain threshold for suspicious activity are flagged for additional review by HSBC USA's anti-money laundering department. *Id.*

HSBC USA, at all relevant times, maintained a correspondent account for HSBC Hong Kong. *Id.* ¶ 33. HSBC USA covered payments for credit at HSBC Hong Kong. *Id.* ¶ 43. This meant that money from the United States wired to an HSBC Hong Kong account number would flow through the HSBC Hong Kong correspondent bank account in New York before being credited to an HSBC Hong Kong account. *Id.* ¶ 44.

**\*3** In July 2013, WCM777 opened an account at HSBC Hong Kong in the name of WCM777 Ltd., listing Ming Xu as the main contact. *Id.* ¶ 15. The account was a "Business Vantage foreign currency account that allowed for the deposit of United States Dollars." *Id.* ¶ 26. Wire transfers into WCM777's HSBC Hong Kong account began in July 2013. *Id.* ¶ 29. HSBC Hong Kong employees were in frequent contact with WCM777 employees in California to ensure that the wire transfers were properly processed. *Id.* Between July 22, 2013 and August 14, 2013, WCM777 accounts at HSBC Hong Kong received more than $ 3.5 million, comprised of more than 174 deposits. *Id.* ¶ 35.

In July 2013, HSBC USA flagged a wire transfer headed to one of the WCM777 accounts at HSBC Hong Kong for further, manual review. *Id.* ¶ 36. On or around September 30, 2013, HSBC USA, through internet research, learned of allegations that WCM777 was a "pyramid/Ponzi scheme." *Id.* ¶ 40. On October 2, 2013, it emailed these findings to HSBC Hong Kong. *Id.* ¶ 41.

As part of this review, HSBC USA requested additional information about WCM777 from HSBC Hong Kong. *Id.* ¶ 37. In October 2013, HSBC Hong Kong responded that its customer WCM777 Ltd. had been incorporated on July 2, 2013 and had opened its account on July 10, 2013. *Id.* ¶ 38. HSBC Hong Kong had not conducted a site visit because WCM777 Ltd. was a small business with a main office in the United States. *Id.*

In September 2013, the Securities Division of the Commonwealth of Massachusetts began investigating WCM777. *Id.* ¶ 18. Beginning in September 2013, WCM777 started directing all investors to wire transfer their investments to HSBC Hong Kong, explaining that WCM777 was not in compliance with United States law. *Id.* ¶ 20.

On November 11, 2013, the Securities Division issued a Consent Order reflecting that WCM777 had submitted to an offer of settlement. *Id.* ¶ 21. On or about November 20, 2013, the WCM777.com website stated that WCM777 was putting its U.S. operations on hold in response to the Consent Order. *Id.* ¶ 22.

On January 8, 2014, the State of California—through the Business, Consumer Services and Housing Agency's Department of Business Oversight—issued a Desist and Refrain Order against WCM777 that was publicly available online. *Id.* ¶ 23. On January 21, 2014, the Securities Commissioner for the State of Colorado issued a "Stipulation for [C]onsent Cease and Desist Order" concerning WCM777 that was publicly available online. *Id.* ¶ 24. On March 3, 2014, the State of Alaska—through its Department of Commerce, Community & Economic Development—issued an Investor Fraud Alert concerning WCM777 that was made publicly available online. *Id.* ¶ 25. On March 27, 2014, in an action entitled *Securities and Exchange Commission v. World Capital Market Inc.*, the District Court in the Central District of California "shut down" the WCM777 Ponzi scheme. *Id.* ¶ 1.

Both before and after these regulatory actions—specifically in the period from June 2013 to February 2014—more than $ 45 million was wired, via more than 3,000 wire transfers, through HSBC Hong Kong's correspondent bank account at HSBC USA to WCM777's Hong Kong bank accounts. *Id.* ¶ 44.

### 3. Plaintiffs' Alleged Injuries

Vasquez and Garcia bring this action on behalf of a purported class of "[a]ll individuals or entities who invested and lost money with any of the WCM777 entities by transferring or having their money transferred to one of the WCM777 accounts at HSBC Hong Kong through the HSBC USA correspondent account from the Period June 1, 2013 through

May 31, 2014." *Id.* ¶ 55. Vasquez and Garcia each reside in California. *Id.* ¶¶ 3–4.

**\*4** Vasquez transferred $ 100,000 to the WCM Ltd. account at HSBC Hong Kong on October 21, 2013 and lost all this money. *Id.* ¶ 56. Garcia transferred $ 2,000 to WCM777 in HSBC Hong Kong through HSBC USA on October 11, 2013, and again on October 15, 2013. *Id.* ¶ 57. She lost this $ 4,000. *Id.*

### B. Procedural History

#### 1. Action in the Southern District of New York

On March 1, 2018, plaintiffs filed the original complaint in this action. Dkt. 1. On July 25, 2018, the Court extended the time for the HSBC defendants to respond. Dkt. 26. On August 28, 2018, the HSBC defendants moved to dismiss and to strike the class allegations. Dkts. 31–42. On September 11, 2018, the Court extended the time for plaintiffs to amend their complaint. Dkt. 44. On October 9, 2018, plaintiffs filed the FAC, the operative complaint today. Dkt. 45.

On November 13, 2018, the HSBC defendants collectively filed a motion to strike class allegations from the FAC pursuant to Federal Rules of Civil Procedure 12(f), 23(c)(1)(A), and 23(d)(1)(D), Dkt. 58, and a memorandum of law in support, Dkt. 59. HSBC Hong Kong filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, Dkt. 48, a memorandum of law in support, Dkt. 49 ("Def. 12(b)(2) Mem."), and declarations in support from Yin Yuen Shan Susan, Dkt. 50 ("Shan Decl."), George Rajah, Dkt. 51 ("Rajah Decl."), Nicole Annunziata, Dkt. 52 ("Annunziata Decl."), and Gregory S. Korman, Esq., Dkt. 53 ("Korman Decl."). HSBC USA and HSBC Hong Kong each separately filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), Dkts. 54, 56, and memoranda of law in support, Dkt. 55 ("HSBC USA Mem."), Dkt. 57 ("HSBC Hong Kong Mem.").

Before the plaintiffs responded, they filed an emergency letter motion seeking leave to conduct limited discovery to subpoena documents from the court-appointed Receiver in *SEC v. World Capital Market Inc. et al.*, No. 14 Civ. 2334 (JFW) (MRW), then pending in the Central District of California, because the documents were due to be destroyed on November 30, 2018. *See* Dkt. 60. The Court invited responses from the Receiver and defendants. Dkt.

61. On November 21, 2018, the HSBC defendants filed a response. Dkt. 67. On November 28, 2018, the Receiver and the Securities and Exchange Commission ("SEC") filed a response. Dkts. 68 (Receiver), 69 (SEC). On November 29, 2018, plaintiffs filed a reply. Dkt. 70.

On November 30, 2018, the Court denied plaintiffs' letter motion, finding that the California court had given the "plaintiffs ample opportunity to access [these] documents on the reasonable terms [it] set forth, but plaintiffs declined to meet these terms" and requiring that any further application for relief be made before the Central District of California. Dkt. 71.

On December 7, 2018, plaintiffs responded to the HSBC defendants' motion to strike class allegations, Dkt. 74, and HSBC Hong Kong's motion to dismiss for lack of personal jurisdiction, Dkt. 75 ("Pl. 12(b)(2) Mem."). On December 8, 2018, plaintiffs filed a combined opposition to the motions to dismiss under Rules 12(b)(6), Dkt. 76 ("Pl. 12(b)(6) Mem."), and a request for judicial notice of certain documents under Federal Rule of Evidence 201, Dkt. 77 ("Pl. 201 Mem.").

On December 10, 2018, the Court held an initial pretrial conference in which it stayed discovery until resolution of the pending motions. Dkt. 78. On December 19, 2018, the HSBC defendants replied collectively and individually. Dkts. 79 ("Def. 12(b)(2) Reply"), 80 ("HSBC USA Reply"), 81 ("HSBC Hong Kong Reply"), 82 (12(f) Reply). They also collectively opposed plaintiffs' request for judicial notice. Dkt. 83 ("Def. 201 Mem.").

### 2. Action in the Central District of California

**\*5** On November 16, 2015, approximately two and one half years before this action was initiated, plaintiffs Ramiro Giron, Nicolas J. Herrera, and Orlando Antonio Mendez (the "California plaintiffs") filed a separate putative class action complaint against HSBC Hong Kong, HSBC USA, and Does 1 through 100 in the Central District of California, No. 2:15-cv-08869-ODW-JC ("CDCA action"). Korman Decl. Exs. A (CDCA docket sheet), B ("CDCA Compl."). The California plaintiffs brought substantially the same claims as those now made in this action, as well as claims for violations of California's unfair competition law. *See* CDCA Compl. ¶¶ 88–129. Those plaintiffs were represented by the same counsel, Julio J. Ramos, Esq., as the plaintiffs here. *See id.* at 25.

On October 21, 2016, the district court dismissed the CDCA action as against HSBC Hong Kong for lack of personal jurisdiction. Korman Decl. Ex. J. On November 15, 2017, the district court granted HSBC USA's motion for summary judgment, finding that plaintiffs had failed to show causation, and denied the motion for class certification. *See Giron v. Hong Kong & Shanghai Bank Co., Ltd.*, No. 2:15-cv-08869-ODW(JC), 2017 WL 5495504, at \*16 (C.D. Cal. Nov. 15, 2017).

On December 13, 2017, the plaintiffs appealed the adverse summary judgment decision to the Ninth Circuit. Korman Decl. Ex. L. On July 18, 2018, counsel Ramos filed an unopposed motion for voluntary dismissal, with prejudice, of the appeal. Korman Decl. Ex. O. On July 31, 2018, the Ninth Circuit granted the motion to dismiss the appeal. *Giron v. HSBC Bank USA, N.A.*, No. 17-56866, 2018 WL 6606521, at \*1 (9th Cir. July 31, 2018).

## II. Applicable Legal Standards

### A. Proper Sequence of Motions

"Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether a claim is stated in the complaint." *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 310 (S.D.N.Y. 2008) (collecting cases); *see also Arrowsmith v. United Press Int'l.*, 320 F.2d 219, 221 (2d Cir. 1963) (en banc) ("[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim...."); *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) ("Before addressing Defendants' Rule 12(b)(6) motion to dismiss, the Court must first address the preliminary question[ ] of ... personal jurisdiction.").

### B. Personal Jurisdiction

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies

depending on the procedural posture of the litigation.' "
*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013)* (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

To make out a *prima facie* case of personal jurisdiction, whether based on general or specific personal jurisdiction, plaintiffs must establish both "a statutory basis" for jurisdiction and that exercise of such jurisdiction accords "with constitutional due process principles." *Cortlandt St. Recovery Corp. v. Deutsche Bank AG, London Branch*, No. 14 Civ. 01568 (JPO), 2015 WL 5091170, at *2 (S.D.N.Y. Aug. 28, 2015)* (quoting *Reich v. Lopez*, 38 F. Supp. 3d 436, 454 (S.D.N.Y. 2014)). General personal jurisdiction subjects a defendant to suit on all claims. *Id.*; *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Specific personal jurisdiction subjects a defendant to suit on only claims that arise from the defendant's conduct in the forum. *Cortlandt*, 2015 WL 5091170, at *2; *see also Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014).

**\*6**  "In evaluating jurisdictional motions, district courts enjoy broad discretion in deciding whether to order discovery." *In re Terrorist Attacks*, 349 F. Supp. 2d at 811 (collecting cases). "A district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)* (quotations and citation omitted). "If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction[al] discovery is appropriate even in the absence of a *prima facie* showing as to the existence of jurisdiction." *Daventree Ltd. v. Rep. of Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004)* (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207–08 (2d Cir. 2003)). "However, a court is not obligated to subject a foreign corporation to discovery where the allegations of jurisdictional facts, construed most favorably in the plaintiff's favor, fail to state a basis for the exercise of jurisdiction or where a plaintiff's proposed discovery, if granted, would not uncover facts sufficient to sustain jurisdiction." *Id.* (citing *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185–86 (2d Cir. 1998); *APWU*, 343 F.3d at 627).

**C. Failure to State A Claim**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

In evaluating whether a complaint states a claim, the Court also applies Rule 9(b). It provides that where "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund, Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).

**III. Discussion**

Mindful of the above authority, the Court will address HSBC Hong Kong's motion to dismiss for lack of personal jurisdiction before turning to defendants' motions to dismiss for failure to state a claim. At the threshold, however, the Court considers plaintiffs' motion asking the Court to take judicial notice, on these motions, of certain documents.

**A. Judicial Notice**

Plaintiffs ask the Court to take judicial notice of six documents. *See* Pl. 201 Mem. at 2–3. The HSBC defendants object to only two. Def. 201 Mem. at 1.

The four unobjected-to documents are orders and public filings from the California action. *See id.* Exs. 2–3, 5–6; Def. 201 Mem. at 1 & n.1. The Court accordingly takes judicial notice of them.

As to the remaining two documents, the first is a Consent Order filed in a separate matter, *In re HSBC Bank USA, N.A., McLean, Virginia*, U.S. Dep't of Treasury, Office of the Comptroller of the Currency, No. AA-EC-10-98 (Oct. 6, 2010), Pl. 201 Mem. Ex. 4. The HSBC defendants object to this document solely on the ground that plaintiffs neither cite to nor rely on it in their briefs. Def. 201 Mem. at 1. There is, accordingly, no present occasion for the Court to take judicial notice of this document. The Court accordingly denies the request for judicial notice as unripe.

**\*7** The second document is a Deferred Prosecution Agreement filed in *United States v. HSBC Bank USA, N.A.,* No. 12 Cr. 763, Dkt. 3-2 (E.D.N.Y. Dec. 10, 2012). *See* Pl. 201 Mem. Ex. A (the "DPA"); Def. 201 Mem. at 1–2. The DPA is between, on one side, HSBC North America Holdings, Inc., and HSBC Holdings plc, and, on the other, various components of the United States Department of Justice (specifically, the Asset Forfeiture and Money Laundering Section of the Criminal Division; the United States Attorney's Office for the Eastern District of New York; and the United States Attorney's Office for the Northern District of West Virginia). DPA at 1. It sets out the terms for the Department's deferral of prosecution of the charges in an attached Information, the terms of which include steps taken and to be taken by the various HSBC parties to combat money laundering, the forfeiture of certain funds, and future cooperation. *See generally id.*

The HSBC defendants object on two grounds: (1) that the DPA is irrelevant "to establish HSBC Hong Kong's contacts with New York or the reasonableness of jurisdiction," and (2) that judicial notice is improper because the plaintiffs ask the Court to take notice of the truth of the matters asserted in the DPA. *See* Def. 201 Mem. at 1–2.

The Court grants plaintiffs' request to take judicial notice of the DPA, but solely for the fact of its filing, not the truth of its contents. As the HSBC defendants correctly note, Federal Rule of Evidence 201(b) allows a court to "take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.' " *Liberty*

*Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). As developed *infra*, the Court does not find the DPA relevant to HSBC Hong Kong's personal jurisdiction motion, but does briefly examine it in addressing HSBC USA's Rule 12(b)(6) motion.

**B. Personal Jurisdiction Over HSBC Hong Kong**
HSBC Hong Kong argues that the Court lacks both general and specific personal jurisdiction over it. Def. 12(b)(2) Mem. at 10–25. The Court considers these potential bases for personal jurisdiction in turn.

**1. General Jurisdiction**

General personal jurisdiction in New York courts is exercised pursuant to N.Y. C.P.L.R. § 301. It provides that jurisdiction is proper when "a company has engaged in such a continuous and systematic course of doing business [in New York] that a finding of its presence [in New York] is warranted." *Sonera Holding B. V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (internal quotation marks omitted); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000).

As for the constitutional requirements for general personal jurisdiction, courts may exercise general personal jurisdiction over foreign corporations only "when their affiliations with the state are so 'continuous and systematic' as to render them essentially at home in the forum state." *Goodyear Dunlop*, 564 U.S. at 919. "[E]xcept in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business—the 'paradigm' cases." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016).

Plaintiffs here do not claim to have pled facts establishing, under the above standards, general personal jurisdiction over HSBC Hong Kong. And the facts pled clearly fall well short of establishing this. Nothing in the FAC suggests that HSBC Hong Kong is or was "at home" in New York. On the contrary, as pled, HSBC Hong Kong is not incorporated in New York and does not maintain its principal place of business there.

**\*8** Accordingly, the Court holds that it cannot properly exercise general personal jurisdiction over HSBC Hong Kong.

### 2. Specific Jurisdiction

To meet the requirements for specific jurisdiction, a defendant must satisfy the requirements of both New York's long-arm statute and of constitutional due process. *See* State Farm *Fire & Cas. Co. v. Swizz Style, Inc.*, 246 F. Supp. 3d 880, 887 (S.D.N.Y. 2017).

New York's long-arm statute identifies four categories of conduct that can justify exercise of personal jurisdiction over a defendant. *See* N.Y. C.P.L.R. § 302(a). Three are clearly inapplicable: These concern (1) tortious acts in New York, (2) tortious acts outside New York that are felt in New York, and (3) the ownership of property in New York.[2] Both sides instead focus their arguments on the fourth category, as relevant here, under which a defendant that "transacts any business within the state or contracts anywhere to supply goods or services in the state" is subject to the jurisdiction of New York courts. *Id.* § 302(a)(1).

"To establish personal jurisdiction under § 302(a)(1), two requirements must be met: (1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Barrett v. Tema Development (1988), Inc.*, 251 F. App'x 698, 700 (2d Cir. 2007) (internal citation omitted). Thus, "jurisdiction is proper even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (quotation marks and citations omitted); *see also* Grand *River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("[W]here there is a showing that business was transacted, there must be a 'substantial nexus' between the business and the cause of action." (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 59–60 (2d Cir. 1985))). It is possible for a single transaction to satisfy the requirements for specific personal jurisdiction under § 302(a)(1), so long as it is purposeful. *See Franklin v. X Gear 101, LLC*, No. 17 Civ. 6452 (GBD) (GWG), 2018 WL 3528731, at \*6 (S.D.N.Y. July 23, 2018). "Purposeful activities are those with which a defendant, through volitional acts, avails

itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg*, 9 N.Y.3d at 380.

Plaintiffs' primary basis for asserting specific personal jurisdiction under New York's Long-Arm Statute here involves HSBC Hong Kong's use of a correspondent bank account in New York. The First Circuit has helpfully explained the operation of such accounts:

> Interbank accounts, also known as correspondent accounts, are used by foreign banks to offer services to their customers in jurisdictions where the banks have no physical presence, and otherwise to facilitate transactions involving such jurisdictions. *See generally* Minority Staff of S. Permanent Subcomm. on Investigations, 107th Cong., Report on Correspondent Banking: A Gateway for Money Laundering 11–14 (Comm. Print 2001). Given the international importance of U.S. currency and the U.S. market, many foreign banks have such interbank accounts in the United States. *Id.* at 11–12. There are banks that conduct virtually all transactions external to the bank through their U.S. interbank accounts. *Id.* at 13.

**\*9** *United States V. Union Bank for Savings & Investment (Jordan)*, 487 F.3d 8, 15 (1st Cir. 2007). Plaintiffs allege that, to facilitate the international wire transfers requested by WCM777, HSBC Hong Kong made use of a correspondent account at HSBC USA. FAC ¶¶ 34, 44. They argue that HSBC Hong Kong's " 'intentional and repeated use of New York correspondent bank accounts to launder their customers' illegally obtained funds constitutes purposeful transaction of business substantially related to plaintiffs' claims,' so as to confer personal jurisdiction within the meaning of § 302(a)(1)." Pl. 12(b)(2) Mem. at 5 (quoting, and relying primarily on *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 328 (2016)).

HSBC Hong Kong counters that its use of correspondent account with HSBC USA in New York was merely passive

and does not rise to the level of purposeful conduct required under § 302(a)(1), Def. 12(b)(2) Mem. at 15–16 (citing Hau Yin To v. HSBC Holdings PLC, No. 15 Civ. 3590 (LTS) (SN), 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017)).

Whether the use of a correspondent account satisfies the requirements of § 302(a)(1) is a fact-intensive inquiry. As the New York Court of Appeals has held, the existence of "a correspondent banking relationship standing by itself is insufficient to establish long-arm jurisdiction" over the foreign bank. Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327, 337 (2012) ("Licci II") (quotation marks omitted). However, " 'the first prong of the long-arm jurisdiction test under [CPLR 302(a)(1)] ... may be satisfied by the defendant's use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, if the defendant's use of that account was purposeful.' " Id. (quoting Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59 (2d Cir. 2012) ("Licci I")) (alterations in original).

The Court's assessment is that the facts of this case, as pled, appear to fall between the facts of cases finding maintenance of a correspondent banking relationship sufficient to supply personal jurisdiction under § 302(a)(1) and those finding maintenance of such a relationship insufficient. The Court's further judgment is that jurisdictional discovery will prove helpful in developing the facts, so as to enable the Court to situate this case more reliably among the relevant precedents applying § 302(a)(1) to foreign banks alleged to have utilized in-district correspondent banks in the service of unlawful conduct.

A brief review of three pertinent precedents of the New York Court of Appeals is informative.

In Amigo Foods Corp. v. Marine Midland Bank–New York, 39 N.Y.2d 391 (1979) ("Amigo Foods III"), the Court of Appeals affirmed a ruling that the maintenance by a Maine bank of a correspondent account in New York did not satisfy § 302(a)(1). Plaintiff Amigo Foods Corporation ("Amigo") had contracted to buy potatoes from a Maine potato grower, defendant E.H. Parent, Inc. ("Parent"). Payment was to be made through Aroostook Trust Company ("Aroostook"), a Maine bank. Aroostook maintained a small correspondent account with Irving Trust Company ("Irving"), a New York bank. To make payment, Amigo obtained a letter of credit from defendant Marine Midland Bank ("Marine"). Marine

delivered the letter to Irving and Parent refused to accept payment. Amigo sued for breach of contract, but also sued Aroostook on the theory that it, and the series of banks, had wrongfully failed to deliver payment.

Aroostook moved to dismiss for lack of personal jurisdiction. It argued that "[b]eyond the notification to its depositor of the arrival of the Letter of Credit and the notification to [Irving], who had forwarded the Letter of Credit[,] that [Parent was] rejecting the Letters of Credit, [Aroostook] took no action, and had none to take." Amigo Foods Corp. v. Marine Midland Bank–N.Y., 39 N.Y.2d 391, 394 (1976) ("Amigo Foods I"). The Court of Appeals initially remanded for jurisdictional discovery to determine "whether Aroostook purposely availed itself of the privilege of conducting activities in New York thereby invoking the benefits and protections of its laws and, particularly, the precise nature of its relationship with [Irving] vis-à-vis the handling of letters of credit." Id. at 396. After discovery, it became clear that after Parent had made a demand for payment, Amigo had directed Marine to wire funds to Parent for its account, but it was Marine that unilaterally chose to deposit the funds with Irving in New York, in the interests of speed. Amigo Foods II, 402 N.Y.S.2d at 408. It was therefore for Marine's convenience, not Aroostook's, that the transfer had been made through Aroostook's New York correspondent account rather than to Aroostook directly. Id. On this basis, the lower court found that Aroostook had not purposely availed itself of the privilege of conducting activities in New York, and so did not meet § 302(a)(1)'s requirements, in that the bank had been "passively and unilaterally ... made the recipient of funds which at its customer's direction it ha[d] declined." Amigo Foods Corp. v. Marine Midland Bank–N.Y., 402 N.Y.S.2d 406, 408 (1st Dep't 1978) ("Amigo Foods II"). The Court of Appeals affirmed. Amigo Foods Corp. v. Marine Midland Bank–New York, 46 N.Y.2d 226 (1979).

*10 The Court of Appeals reached a different outcome as to the application of § 302(a)(1) in Licci II. There, a group of plaintiffs whose family members had been killed or injured as the result of rocket attacks allegedly launched by Hizballah in 2006 sued the Lebanese Canadian Bank, SAL ("LCB"), a bank headquartered in Beirut. Id. at 330. LCB maintained a correspondent bank account with American Express Bank ("AmEx") in New York. Id. at 332. The U.S. Department of State had designated Hizballah as an Islamic terrorist organization, and the Department of Treasury had designated LCB as a "primary money laundering concern." Id. at 330

& n.1. The *Licci* plaintiffs claimed that LCB had used the correspondent account with AmEx in New York to transfer several million dollars by means of "dozens" of international wire transfers to the Shahid Foundation ("Shahid"), an organization that they alleged was the "financial arm" of Hizballah. *Id.* at 331–32.

The district court did not find § 302(a)(1) satisfied. It reasoned that the " 'active execution through New York of dozens of wire transfers totaling millions of dollars over a multi-year period' does not convert 'mere maintenance' into 'a "use" of a correspondent account ... sufficient to confer jurisdiction over a foreign bank' since 'no meaningful distinction may be drawn between a foreign bank's maintenance of a correspondent account to effect international wire transfers and its indiscriminate use of that account for that exact purpose.' " *Id.* at 333 (quoting *Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 407 (S.D.N.Y. 2010)). [3]

On appeal, the Second Circuit, in *Licci I*, certified to the New York Court of Appeals the question whether "a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect 'dozens' of wire transfers on behalf of a foreign client, constitute a 'transact [ion]' of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?" 673 F.3d at 74. In *Licci II*, the Court of Appeals held that such activities did so qualify. It noted that "[i]n the banking context, the requisite inquiry under CPLR 302(a) (1)'s first prong may be complicated by the nature of interbank activity, especially given the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Licci II*, 20 N.Y.3d at 338. However, the Court of Appeals held, "complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'— show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 339 (quoting *Indosuez Int'l Fin. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 247 (2002)). The Court of Appeals noted that "[w]hile it may be that LCB could have routed the dollar transactions on behalf of Shahid elsewhere, the fact that LCB used a New York account 'dozens' of times indicates

desirability and a lack of coincidence. Presumably, using the AmEx account was cheaper and easier for LCB than other options, and whatever financial and other benefits LCB enjoyed as a result allowed the bank to retain Shahid as a customer." *Id.* at 340. The Second Circuit thereafter found that subjecting LCB to personal jurisdiction in New York comported with constitutional due process. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 (2d Cir. 2013) ("*Licci III*").

In the third and most recent decision, *Rushaid*, the Court of Appeals again addressed whether use of a correspondent account by a foreign bank was sufficient to satisfy the first prong of § 302(a)(1). Defendants in that case were Pictet & Cie ("Pictet"), a Swiss bank, and its Vice President, Pierre-Alain Chambaz. *Id.* at 319. Plaintiff Rushaid, co-owner of a Saudi company, Al Rushaid Petroleum Investment Corporation, sued Pictet and Chambaz in New York state court for laundering money in conjunction with three of his employees, as part of an illicit scheme. *Id.* at 319–20. Chambaz had been friends with these employees and had set up a "bogus" company to receive bribes on their behalf, called TSJ Engineering Consulting Co. Ltd. ("TSJ"). *Id.* at 320. Chambaz opened and managed Geneva bank accounts for TSJ and the individual employees. *Id.* Vendors would wire bribes in favor of "Pictet and Co. Bankers Geneva"; the money would go first to the correspondent account that Pictet maintained in New York; Pictet would then credit these funds to TSJ's Geneva-based account; and the funds would then be divided up and transferred to the employees' individual accounts. *Id.*

**\*11** Pictet and Chambaz moved to dismiss for lack of personal jurisdiction. *Id.* at 321. In opposition, plaintiffs "submitted copies of documents tracing wire transfers from the vendors to Pictet's five New York correspondent accounts." *Id.* As described by the Court of Appeals:

> The documents provide a record of invoices directing payment to Pictet's Citibank account in New York [and] similar documents evidencing receipts from and transfers to various other Pictet accounts in New York including HSBC Bank USA, N.A., Deutsche Bank Trust Company, America, and JPMorgan Chase Bank N.A. In sum,

the documents represented numerous transfers, including at least 12 of which were to/from Citibank, New York and totaled over $ 4 million.

*Id.* at 321–22.

The lower court and intermediate appellate courts found personal jurisdiction lacking. The Court of Appeals, however, found that Pictet's contact with New York through its correspondent account had been purposeful under the first prong of § 302(a)(1). The Court of Appeals distilled the holdings of *Amigo Foods* and *Licci* as follows:

> [U]nintended and unapproved use of a correspondent bank account, where the non-domiciliary bank is a passive and unilateral recipient of funds later rejected—as in *Amigo Foods*—does not constitute purposeful availment for personal jurisdiction under CPLR 302(a)(1). Repeated, deliberate use that is approved by the foreign bank on behalf of and for the benefit of a customer—as in *Licci*—demonstrates volitional activity constituting transaction of business. In other words, the quantity and quality of a foreign bank's contacts with the correspondent bank must demonstrate more than banking by happenstance.

*Rushaid*, 28 N.Y.3d at 326–27. In *Rushaid*, the Court of Appeals held, "Pictet did not ignore or reject the funds, as the defendant did in *Amigo Foods* [but instead] credited the funds in that correspondent bank account to TSJ, an essential step in the money-laundering scheme." *Id.* at 327.

The Court of Appeals parsed carefully—and put heavy weight on—the volitional aspect of bank Pictet's role in the scheme:

> Citibank and the other banks held funds for Pictet, then Pictet credited them to the TSJ account, and next distributed the funds to the employee accounts. It is of no moment that the employees "directed the vendors" to

deposit the money in the New York accounts because what matters is defendants' banking activity with the correspondent accounts, here, that the money deposited in New York was credited to the Pictet accounts in accordance with Pictet's money-laundering. As described in the complaint, the employees accessed the funds in those accounts after Pictet credited the transfer from its New York correspondent account.

The Appellate [D]ivision erroneously concluded that plaintiffs failed to establish purposeful availment because defendants "merely carried out their clients' instructions."

🔲 9 N.Y.S.3d 16. Our cases do not require that the foreign bank itself direct the deposits, only that the bank affirmatively act on them.... A foreign bank with a correspondent account, therefore, that repeatedly approves deposits and the movement of funds through that account for the benefit of its customer is no less "transacting business in New York" because the customer, or a third party at the customer's direction, actually deposits or transfers the funds to New York.

**\*12** *Rushaid*, 28 N.Y.3d at 327–28.

Plaintiffs here argue that "[t]he role of HSBC Hong Kong is indistinguishable from the defendant bank in *Rushaid*." Pl. 12(b)(2) Mem. at 6. They allege that HSBC Hong Kong knew that WCM777 was centered in the United States. They note that HSBC Hong Kong allowed WCM777 to open an HSBC Hong Kong account without conducting a site visit. They allege that WCM777 directed potential investors to wire money directly to HSBC Hong Kong and that HSBC Hong Kong—for its own convenience as well as that of its customer, WCM777—chose to involve its New York correspondent accounts rather than sending WCM777's funds through other channels.

HSBC Hong Kong, in contrast, depicts its activity as entirely passive. HSBC Hong Kong does not appear to dispute, factually, that plaintiffs' money was wired through its correspondent account in New York. But, it argues, its use of its correspondent account, as in *Amigo Foods*, was insufficiently purposeful to meet the requirements of § 302(a)(1). [4] It argues that *plaintiffs* chose to use United States dollars and to wire these funds to Hong Kong, and that it was those choices that led to the use of HSBC Hong Kong's correspondent bank account. Def. 12(b)(2) Mem. at 15.

The Court concludes that jurisdictional discovery is required to enable the Court reliably to determine whether there is personal jurisdiction under the first prong of § 302(a)(1), insofar as the requirement there that the defendant have transacted business within the state has been held to require purposeful availment by the defendant.[5] "A court may order limited discovery 'targeted at the missing jurisdictional elements[ ]' if plaintiff has shown that such an exercise 'would serve to *fill any holes* in its showing.' " *Smit v. Isiklar Holding A.S.*, 354 F. Supp. 2d 260, 263 (S.D.N.Y. 2005); *see id.* at 268 (authorizing jurisdictional discovery to develop facts relating to one defendant); *In re Sledziejowski*, No. 15–08207 (SHL), 2016 WL 6155929, at *10 (Bankr. S.D.N.Y. Oct. 21, 2016) (authorizing jurisdictional discovery "regarding the contacts relevant to specific [personal] jurisdiction"); *see also In re Terrorist Attacks*, 349 F. Supp. 2d at 820 (authorizing limited jurisdictional discovery to determine whether personal jurisdiction over foreign bank constitutionally sufficient); *Daventree Ltd.*, 349 F. Supp. 2d at 765 (authorizing jurisdictional discovery "regarding the extent of defendant [bank's] general business contacts with the United States [during the relevant period]"). Among other unknowns, plaintiffs do not allege which banks they used to wire money to Hong Kong or where or by whom the decision was taken to wire this money through HSBC Hong Kong's New York correspondent account. If, for example, plaintiffs' local banks made the decision to use that correspondent account for their own convenience, then the facts here would appear more analogous to those of *Amigo Foods*, in which the defendant bank had not made the choice to use the local account. *Licci* and *Rushaid*, however, also point to other factors with the capacity to bear on the § 302(a)(1) question of purposeful availment. These include: (1) whether the use of the correspondent account is cheaper or easier for the foreign bank than other alternatives; (2) how often the correspondent account was used on behalf of the specific customer at issue; (3) the amount of money transferred through the account on behalf of that customer; and (4) the extent to which the customer specifically requested the use of the correspondent account. The declarations submitted by HSBC Hong Kong attest that the use of a correspondent account is not necessary to transfer funds from the United States to HSBC Hong Kong, *see* Yiu Decl. ¶¶ 14–16, and that originator banks have the power to dictate whether or not to use a correspondent account, *see* Rajah Decl. ¶¶ 4–5. They do not, however, engage with the conduct *in this case*. They leave opaque how the wire transfers *in this case* came to occur through the New York correspondent account, and what the volume was of those transfers.

**\*13** The Court accordingly directs that the parties promptly undertake jurisdictional discovery aimed at the issue of purposeful availment. The Court expects that such discovery can be completed within two months of this decision and that counsel will then expeditiously brief anew the issue of personal jurisdiction. In light of the potential impact of this discovery on ensuing questions in the personal jurisdiction inquiry (e.g., whether the second prong of § 302(a)(1) is met and whether constitutional due process is satisfied), the Court invites counsel, on rebriefing, to address those questions as well.

### C. Failure to State a Claim

Because the Court has not yet determined that it has personal jurisdiction over HSBC Hong Kong, the Court considers only HSBC USA's motion to dismiss under Rule 12(b)(6).[6]

HSBC USA moves to dismiss all claims in the FAC against it. It argues the FAC fails to state claims under RICO or state law; that its state law claims are displaced by the Uniform Commercial Code ("UCC"); and that all claims against it are time-barred. For the reasons that follow, the Court holds that the FAC fails to state either a RICO claim or a claim under state law. The Court therefore does not address HSBC USA's arguments based on timeliness or the UCC.

### 1. RICO Claim

Count One of the FAC brings a RICO claim under 18 U.S.C. § 1962(c). *See* FAC ¶¶ 64–75. Section 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or the collection of unlawful debt.

Case 1:18-md-02865-LAK   Document 190-7   Filed 08/30/19   Page 28 of 33

18 U.S.C. § 1962(c). HSBC USA argues that the FAC does not adequately allege a RICO enterprise, that its actions do not rise to the level of "participation" in the conduct of the affairs of the enterprise, and that the FAC does not meet the heightened pleading requirements of Rule 9(b). HSBC USA Mem. at 5–8. The Court holds, as to HSBC USA, that the FAC does not adequately allege the "participation" element necessary for liability under § 1962(c) and therefore addresses only this element.

The Supreme Court has held that " 'to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170, 185 (1993). Here, in defining the alleged enterprise, the FAC broadly labels the HSBC defendants and WCM777 as, collectively, an "enterprise" under RICO, which existed for the purpose of committing the illegal racketeering acts alleged. FAC ¶ 67. Specifically, it alleges that HSBC USA participated in the enterprise by "act[ing] as the intermediary bank for thousands of wired money transfers from investors who were duped." Id. ¶ 71.

For purposes of this decision only, the Court accepts arguendo the FAC's enterprise definition as viable. Courts in this District, however, have repeatedly held that "provid[ing] banking services—even with knowledge of the fraud—is not enough to state a claim under § 1962(c)." Indus. Bank of Latvia v. Baltic Fin. Corp., No. 93 Civ. 9032 (LLS), 1994 WL 286162, at *3 (S.D.N.Y. June 27, 1994); Rosner v. Bank of China, 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007) ("Rosner I") ("[Plaintiff's sole allegation ... that [defendant] provided banking services that aided in the perpetration of the fraudulent scheme ... does not qualify as participation in a RICO enterprise."); Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003) ("[Plaintiff's] allegations of the opening of accounts for [defendant] by [bank employees], transferring funds for [defendants] do not constitute exerting control over the enterprise."); Zhu v. First Atl. Bank, No. 05 Civ. 96 (NRB), 2005 WL 2757536, at *5 (S.D.N.Y. Oct. 25, 2005) ("[Defendant banks] do not remotely satisfy [ § 1962(c)'s] strict test, as each bank merely transferred funds that the plaintiff requested they transfer. The fact that the money eventually benefitted an alleged extortionist has no bearing whatsoever on the banks' limited roles as intermediaries in the transaction.").

**\*14** Plaintiffs attempt to distinguish these cases on the ground that the FAC alleges that HSBC USA had actual knowledge of the fraud. Pl. 12(b)(6) Mem. at 5–6. But even treating that allegation as well-pled, that fact would not demonstrate participation in the enterprise. Rather, as the above cases demonstrate, more is required to show the bank's "operation and management" of the enterprise.

In Industrial Bank of Latvia, for example, the court clearly stated that "knowledge of the fraud" would not elevate the provision of banking services to the level of participation required to state a claim for racketeering under § 1962(c). 1994 WL 286162 at *3. Similarly, as the court in Dubai Islamic Bank summarized governing precedent:

> —"Providing important services to a racketeering enterprise is not the same as directing the affairs of an enterprise.... [E]ven provision of services essential to the operation of the RICO enterprise itself is not the same as participating in the conduct of the affairs of the enterprise."
>
> Dep't of Econ. Dev. V. Arthur Andersen & Co., 924 F. Supp. 449, 466–67 (S.D.N.Y. 1996) (citation omitted).

> —"Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." LaSalle Nat'l Bank [v. Duff & Phelps Credit Rating Co.], 951 F. Supp. [1071,] 1090 [ (S.D.N.Y. 1996) ] (citation omitted).

> —"A defendant does not 'direct' an enterprise's affairs under § 1962(c) merely by engaging in wrongful conduct that assists the enterprise." Redtail Leasing, Inc. v. Belleza, [No.] 95 Civ. 5191 [ (JFK) ], 1997 WL 603496, at *5 (S.D.N.Y. Sept. 30, 1997).

256 F. Supp. 2d at 164.

Here, the FAC is devoid of allegations supporting the claim that HSBC USA conducted or directed the affairs of the enterprise. Tellingly, it does not contain any allegations that HSBC USA ever interfaced with representatives of WCM777. It is said to have interacted only with origin banks and with its affiliate, HSBC Hong Kong. That HSBC USA, as alleged, continued to facilitate wire transfers after

it, allegedly, acquired suspicion about WCM777—even if these were sufficient to concretely allege knowledge of WCM777's wrongdoing—is not tantamount to engagement by HSBC USA in WCM777's "operation and management."

*Cf.* Dubai Islamic Bank, 256 F. Supp. 2d at 164–68 (dismissing § 1962(c) claim against Citibank while finding that Citibank had actual knowledge of a fraudulent scheme because Citibank was not "a central figure" but "[a]t most, ... a handful of relatively low-level employees ... were responsible for the alleged scheme").

The Court therefore holds that the FAC does not plead sufficient facts to allege the RICO element of "participation," and grants HSBC USA's motion to dismiss the FAC's RICO claim.

### 2. Common Law Claims

Plaintiffs' remaining claims against HSBC USA are for various forms of aiding and abetting: of breach of fiduciary duty, fraud, and conversion. FAC ¶¶ 64–100. The parties treat New York law as governing these claims, HSBC USA Mem. at 8 n.2 (citing FAC ¶ 63); Pl. 12(b)(6) Mem. at 9 (citing New York law), and this Court will follow suit. *See* Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (noting implied consent of parties to New York law sufficient to establish choice of law). HSBC USA argues that, as to each such claim, the FAC does not sufficiently plead HSBC's actual knowledge, substantial assistance, or fraudulent intent. *See* HSBC USA Mem. at 8–15. Plaintiffs counter that HSBC USA's alleged investigation of WCM777 and continued facilitation of wire transfers supplied the requisite knowledge, intent, and assistance. *See* Pl. 12(b)(6) Mem. at 8–9.

**\*15** To state a claim for aiding and abetting under New York law, plaintiffs must allege (1) the existence of a primary violation, (2) knowledge of this violation on the part of the aider and abettor, and (3) substantial assistance by the aider and abettor in the achievement of the primary violation. *See* Kaufman v. Cohen, 760 N.Y.S.2d 157, 169 (1st Dep't 2003) (citing S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847–48 (2d Cir. 1987)) (aiding and abetting breach of fiduciary duty); Fidelity Funding of Calif., Inc. v. Reinhold, 79 F. Supp. 2d 110, 122 (E.D.N.Y. 1997) (citing Franco v. English, 620 N.Y.S.2d 156, 159 (3d Dep't 1994)) (aiding and

abetting fraud); Calcutti v. SBU, Inc., 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003) (aiding and abetting conversion).

The "heightened pleading requirement of Rule 9(b) applies equally to claims alleging aiding and abetting fraud, claims alleging aiding and abetting breach of fiduciary duty sounding in fraud, and claims alleging aiding and abetting conversion premised on fraud." Berman v. Morgan Keegan & Co., No. 10 Civ. 5866 (PKC), 2011 WL 1002683, at *7 (S.D.N.Y. Mar. 14, 2011) (citing Wight v. BankAmerica Corp., 219 F.3d 79, 91–92 (2d Cir. 2000), *aff'd*, 455 F. App'x 92 (2d Cir. 2012). Here, because all aiding and abetting claims relate to the underlying fraud alleged against WCM777, each is subject to Rule 9(b)'s heightened pleading requirements.

#### a. Actual Knowledge

Under Rule 9(b), an allegation of aiding and abetting fraud has a distinct scienter requirement from an allegation of fraud itself. Iowa Pub. Emp. Retirement Sys. v. Deloitte & Touche LLP, 919 F. Supp. 2d 321, 344–45 (S.D.N.Y. 2013). Specifically, plaintiffs "must allege that the defendant had *actual knowledge* of the wrongful conduct committed, not simply that the defendant *should have known* of the conduct."

Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 442–43 (S.D.N.Y. 2010) (citing Rosner v. Bank of China, 349 F. App'x 637, 639 (2d Cir. 2009)) ("*Rosner III*") (emphasis added). Important here, "[s]tatements alleging that ... a defendant 'should have known that something was amiss with [ ] transactions,' even if pled with conclusory statements that the defendant 'actually knew something notwithstanding ... [are] insufficient to support an aiding-and-abetting claim under New York law.' " In re Agape, 773 F. Supp. 2d 298, 308 (E.D.N.Y. 2011) (quoting Rosner III, 349 F. App'x at 639). "[P]leading knowledge for purposes of an aiding and abetting claim [therefore] requires allegations of facts that give rise to a 'strong inference' of actual knowledge." Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007).

Courts have generally held that allegations of conscious avoidance, where adequately pled, can satisfy the actual knowledge requirement in the context of an aiding and abetting claim. *See, e.g.*, Agape, 773 F. Supp. 2d at 309 (collecting cases). Conscious avoidance, however, is distinct from constructive knowledge:

Constructive knowledge is knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person. Conscious avoidance, on the other hand, occurs when it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be ably to deny knowledge. Conscious avoidance therefore involves a culpable state of mind whereas constructive knowledge imputes a state of mind on a theory of negligence.

**\*16** *Fraternity Fund Ltd.*, 479 F. Supp. 2d at 368 (quotation marks and footnotes omitted). "Plausibly alleging actual knowledge through conscious avoidance is a very high bar ...." *Agape*, 773 F. Supp. 2d at 319.

Here, the FAC alleges that HSBC USA was on notice of that there was a risk of money laundering associated with its correspondent account, based on its DPA with the Justice Department. FAC ¶¶ 31–32. It further alleges that, in July 2013, the same month that HSBC Hong Kong's correspondent bank account at HSBC USA began to be used to facilitate WCM777 wire transfers, HSBC USA flagged a wire transfer headed to one of the WCM777 HSBC Hong Kong accounts, began a manual review, and requested additional information about WCM777 from HSBC Hong Kong. *Id.* ¶¶ 34, 36–37. As alleged, HSBC Hong Kong reported back that WCM777 Ltd. had been incorporated on July 2, 2013, that it opened its account on July 10, 2013, and that because it was a small business with a main office in the United States, HSBC Hong Kong had not conducted a site visit. *Id.* ¶ 38.

These allegations, viewed in isolation, fall far short of pleading actual knowledge by HSBC USA of a fraud by WCM777. They fall short of pleading conscious avoidance, *i.e.*, awareness of a probability of fraud and a decision to refrain from confirming that fact. "New York courts overwhelmingly recognize that a plaintiff does not satisfy Rule 9(b) by alleging a bank's actual knowledge of a fraud

based on allegations of the bank's suspicions or ignorance of obvious 'red flags' or warning signs indicating the fraud's existence." *Rosner v. Bank of China*, 2008 WL 5416380, at \*6 (S.D.N.Y. Dec. 18, 2008) ("*Rosner II*"), *aff'd* 349 F. App'x 637 (2d Cir. 2008) (*Rosner III*); *see id.* (collecting cases). Rather, as courts have widely recognized, suspicious patterns of bank transfers, withdrawals, and balances indicative of fraud, while sometimes rising to the level of constructive knowledge, do *not* make out conscious disregard. *See Agape*, 773 F. Supp. 2d at 310 (collecting cases).

The FAC, however, contains an additional allegation—not as to circumstantial evidence of a fraud but one tending to put HSBC USA on actual notice of the fraud. It alleges that HSBC USA, as part of its manual review, found an evaluation of WCM777 from June 30, 2013, on a multi-level marketing review website that concluded WCM777 was a Ponzi scheme. FAC ¶ 39 & Ex. A. The FAC also quote HSBC USA on or about September 30, 2013, as concluding that

> "BENE – WCM777 LIMITED though identified by its website and no adverse information on RDC, internet research however shows that the BENE is alleged as a pyramid/Ponzi scheme (sample google results attached) ... Review of the products posted on BENE website reasonably appeared that they are engaged in pyramid/ponzi scheme as they offer no concrete underlying products/services while offering guaranteed 'daily' profit/returns by buying multi-level shares[.]"

*Id.* ¶ 40. The FAC alleges that, despite allegedly receiving this information and drawing this conclusion about the nature of WCM777's operation, HSBC USA, by dint of the correspondent bank account it held for HSBC Hong Kong, thereafter served as "the crucial link in substantially assisting from June 2013 through February 2014 the transfer of over 3,000 transactions and over $ 45,000,000" from the United States to WCM777's HSBC Hong Kong accounts, continuing five months after their alleged report. *Id.* ¶ 44. And, the FAC alleges, between November 2013 to March 2014, the oversight agencies of several states issued public orders against WCM777 on the basis of unlawful securities. *Id.* ¶¶ 21–25.

**\*17** These additional allegations make plaintiffs' claim of actual knowledge on HSBC USA's part stronger than in reported cases where the basis for a bank's alleged knowledge of a third party's fraud was solely circumstantial. To be sure, several courts have held that banks do not have actual

knowledge of a customer's fraud even where they have been specifically informed by a third party of its conclusion that fraudulent conduct was afoot. In *Agape*, for example, the court found that a bank did not have actual knowledge, or conscious avoidance tantamount to actual knowledge, of a fraudulent scheme even though an investor had furnished evidence of the fraud to the bank's vice president, and the bank had separately been made aware of the customer's report as made to the 🔖 Office of the Controller of the Currency. 773 F. Supp. 2d at 320–21. In finding that the conscious avoidance standard had not been met, the *Agape* court noted that the bank representatives did not investigate these allegations because of a broader bank policy not to do so, not "specifically to avoid learning of the ... fraud." 🔖 *Id.* at 321. Similarly, in *Kolbeck v. LIT America, Inc.*, the court held that a bank did not have knowledge of the fraud even though non-clients had claimed a fraud and demanded that the bank liquidate the fraudsters' accounts. 🔖 939 F. Supp. 240, 247–48 (S.D.N.Y. 1996). The court reasoned that a bank "cannot be charged with knowledge of [the fraudster's] misconduct simply because they had knowledge of accusations against him, without more." 🔖 *Id.* at 248. Finally, in *Ryan v. Hunton & Williams*, the court found that a bank's suspicions of fraud that resulted in both an investigation and termination of the accounts amounted only to "suspicions—not actual knowledge—of fraudulent activity." No. 99 Civ. 5938 (JG), 🔖 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000).

This case, however, is different. The allegations here go farther than in the above cases, in that, as alleged, HSBC USA followed up its suspicion of fraud by doing independent internet research. And, importantly, this investigation led HSBC USA, as alleged, to the conclusion that WCM777's business model, as advertised, was a "pyramid/ponzi scheme" devoid of any "underlying products/services." These allegations about the conclusions drawn by the defendant bank itself distinguish this case from *Agape* and *Kolbeck*, where the suspicion was founded on outsiders' claims of illegality, and *Ryan*, where the bank's suspicion derived from abnormalities in the accounts and transactions themselves. Plaintiffs here have concretely alleged not merely that outsiders on the internet have labelled WCM777 a Ponzi scheme, but that, on its review of WCM777's own products, it "reasonably appeared" to HSBC USA that WCM777 was in fact a Ponzi scheme.

The Court is satisfied, on these allegations, that the Amended Complaint adequately alleges the element of actual knowledge on HSBC USA's part. The decision in *Fraternity Fund Ltd., supra,* lends a degree of support to this conclusion. The court there concluded that a bank's willful ignorance of the most likely explanation for conduct was enough for it to have actual knowledge of the underlying fraud. There, the defendant bank had rubber-stamped a list of values sent to it by an asset management company and had honored a suspicious request by the company itself not to conduct its own independent valuation. 🔖 479 F. Supp. 2d at 370. The court reasoned that the asset management company "would not have made such a request [of the bank] if it thought that [the bank's] independent valuation would produce corroborative marks. In other words, the *most likely explanation* for [the company's] request is that it thought its prices were beyond the range of what could be corroborated and therefore not reflective of the [true] market values ...." *Id.* (emphasis added). Here, as alleged, HSBC USA drew the affirmative conclusion, from its research, that it was most likely that WCM777 was a Ponzi scheme. As alleged, HSBC USA had not, apparently unearthed evidence pointing to the contrary conclusion; rather, the bank concluded that WCM777 did not offer any legitimate products. Nonetheless, HSBC USA chose not to investigate further. The FAC plausibly pleads that HSBC USA's decision, after the bank allegedly concluded that WCM777 was an apparent Ponzi scheme, neither to stop transferring WCM777's funds nor to further test this conclusion, reflected conscious avoidance of a high probability plus a conscious decision not to take steps that stood to confirm this conclusion. The Court therefore finds the pled facts sufficient to allege that HSBC USA had, under the conscious avoidance doctrine, actual knowledge of WCM777's fraudulent Ponzi scheme.

### b. Substantial Assistance

**\*18** The FAC, however, fails—by a good margin—to allege that HSBC USA substantially assisted WCM777's fraudulent activity. " '[S]ubstantial assistance' generally exists where: (1) a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act *when required to do so* enables the fraud to proceed'; and (2) 'the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.' " 🔖 *Rosner II,* 2008 WL 5416380, at *12 (quoting 🔶 *Cromer Fin. Ltd. v. Berger,* 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001)) (emphasis added).

"Inaction on the part of the alleged aider and abettor 'ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act.' " *Rosner II*, 2008 WL 5416380, at *5 (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)). A bank that maintains another bank's correspondent account is not, without more, under an independent duty to act affirmatively to terminate accounts of an entity suspected to be engaged in fraud. *See Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (1st Dep't 2003) ("[T]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty *directly* to the plaintiff." (emphasis added)). Plaintiffs have not pointed to a freestanding duty by HSBC USA to close such accounts, and the FAC does not—and cannot—allege that HSBC owed plaintiffs a fiduciary duty (let alone breached such a duty). The "mere fact that participants in a fraudulent scheme use accounts at a bank to perpetrate it, without more, does not in and of itself rise to the level of substantial assistance" by the bank. *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (citations and internal quotations omitted); *see also Ryan*, 2000 WL 1375265, at *9 (bank's opening of account and approval of transfers from the bank account did not constitute substantial assistance); *Renner v. Chase Manhattan Bank*, No. 98 Civ. 926 (CSH), 2000 WL 781081, at *8 (S.D.N.Y. June 16, 2000) (bank manager's drafting of letter confirming bank's receipt of funds which was later used by alleged primary violator to defraud plaintiff and authorization of fund transfers did not constitute substantial assistance); *Williams v. Bank Leumi Trust Co.*, No. 96 Civ. 6695 (LMM), 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) (primary violators' use of accounts did not constitute substantial assistance on the part of the bank). The FAC therefore does not allege, on HSBC's part, affirmative assistance in WCM777's illegal plot, concealment, or a failure to act in the face of a legal duty to do so. The element of substantial assistance is, therefore, not met by HSBC USA's failure to act to terminate the correspondent account relationship.

The FAC alleges that HSBC USA had its own internal protocols for flagging money laundering. *See* FAC ¶ 32. But, even assuming that the FAC adequately pled

conduct inconsistent with those protocols, "violation of an organization's internal policy with respect to financial transactions does not in and of itself constitute substantial assistance." *Mazzaro de Abreu v. Bank of America Corp.*, 525 F. Supp. 2d 381, 391 (S.D.N.Y. 2007) (citing *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 471 ("A failure to enforce margin requirements, or continuing to execute trades despite ... violations" of "its own institutional rules" does "not constitute substantial assistance.")).

**\*19** Similarly, to the extent the FAC alleges that maintaining the correspondent account breached HSBC USA's obligations under its DPA with the Justice Department, plaintiffs have not cited any legal authority to the effect that such an agreement gave rise to a duty to plaintiffs, the breach of which constituted substantial assistance. On the contrary, even the "violation of a federal regulation ... does not of itself constitute substantial assistance." *Id.* at 391.

A separate fatal problem in the FAC's pleading as to substantial assistance is that the maintenance of the correspondent account is not adequately pled to have been the proximate cause of the alleged fraud, breach of fiduciary duty, or conversion. "Allegations of 'but for' causation are insufficient; an alleged aider and abettor will be liable only where the plaintiffs' injury is a direct or reasonably foreseeable result of the defendant's conduct." *Rosner II*, 2008 WL 5416380, at *5 (citation omitted). As alleged, HSBC USA merely received transfers from plaintiffs' bank(s) and relayed them to WCM777's accounts at HSBC Hong Kong. The FAC does not allege that HSBC USA maintained HSBC Hong Kong's only correspondent account, or that the use of a correspondent account was necessary to these transfers. As the *Agape* court aptly recognized in the context of a plaintiffs' similar theory there, although the actions of the correspondent bank may have "made it easier for [WCM777] to effectuate the scheme, these conventional banking transactions were not the proximate cause of the Plaintiffs' damages and therefore do not constitute substantial assistance." *Agape*, 773 F. Supp. 2d at 325 (citing *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 472 ("While the Ponzi scheme may only have been possible because of Bear Stearns' actions, or inaction, Bear Stearns' conduct was not a proximate cause of the Ponzi scheme.")).

Vasquez v. Hong Kong and Shanghai Banking Corporation Ltd., Slip Copy (2019)

Accordingly, the Court dismisses the FAC's claims against HSBC USA for aiding and abetting breach of fiduciary duty, fraud, and conversion.

## CONCLUSION

For the foregoing reasons, as to HSBC USA, the Court grants the motion to dismiss the claims against it. The dismissal is with prejudice. [7]

As to HSBC Hong Kong, however, the Court grants plaintiffs' request for jurisdictional discovery as to the issue of personal jurisdiction, so as to enable the Court to resolve HSBC Hong Kong's motion to dismiss under Rule 12(b)(2). The Court directs HSBC Hong Kong and plaintiffs to file, by June 10, 2019, a joint letter proposing a discovery schedule to be completed within approximately two months of today. The Court denies, without prejudice, HSBC Hong Kong's motions to dismiss and to strike class allegations, without prejudice to the right of HSBC Hong Kong to renew such motions if the motion to dismiss for lack of personal jurisdiction is denied.

The Clerk of Court is respectfully requested to terminate the motions pending at Dkts. 48, 54, 56, and 58, and to terminate HSBC USA as a defendant in this case.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 2327810

Footnotes

1    This account is drawn from the First Amended Complaint. Dkt. 45 ("FAC"). For the purpose of resolving the motion to dismiss, all factual allegations in the FAC are presumed true. See Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012). As described more fully below, for purposes of resolving the motion to dismiss for lack of personal jurisdiction, the Court may consider materials outside the FAC and has done so here.

2    The plaintiffs have not alleged that HSBC Hong Kong committed tortious acts against it or anyone else or that it owns property in the state.

3    In so ruling, the district court denied plaintiffs' request for jurisdictional discovery. That ruling was not appealed. Licci II, 960 N.Y.S.2d at 334 n.8.

4    HSBC Hong Kong relies on Hau Yin To, 2017 WL 816136. That case, however, is readily distinguished, in that it did not involve a correspondent account. The court there held that bank transactions in New York in connection with the obligations of the administrator and custodian of a Bernard Madoff "feeder fund" did not supply a basis for personal jurisdiction over a foreign bank.

5    Some arguments by HSBC Hong Kong appear predominantly relevant to the second prong of § 302(a)(1), which requires that the claim asserted arise from the defendant's in-state business activities. For example, HSBC Hong Kong distinguishes Rushaid on the ground that the collusion and friendship between the defendants in Rushaid and the orchestrators of the scheme in that case has no analog here. Def. 12(b)(2) Reply at 3–5. Having not resolved whether there has been a transaction of business in New York sufficient to satisfy the first, threshold, prong of § 302(a)(1), however, the Court has not here considered the second prong.

6    In the event that personal jurisdiction is found over HSBC Hong Kong, the Court will then take up HSBC Hong Kong's motion to dismiss under Rule 12(b)(6). That motion is not necessarily controlled by the outcome of HSBC USA's motion, insofar as HSBC USA's motion turns on facts particular to the pleadings as to it.

7    Plaintiffs have already amended their complaint once. And, in defending against the motion to dismiss, plaintiffs have not pointed to any additional facts, beyond those in the FAC, that could cure the deficiencies that HSBC USA identified in the claims against it.

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.