# Exhibit 5

*United States Senate*
### *PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*
*Committee on Homeland Security and Governmental Affairs*

*Carl Levin, Chairman*
*Norm Coleman, Ranking Minority Member*

# DIVIDEND TAX ABUSE:
# HOW OFFSHORE ENTITIES DODGE
# TAXES ON U.S. STOCK DIVIDENDS

## STAFF REPORT

## PERMANENT SUBCOMMITTEE
## ON INVESTIGATIONS

## UNITED STATES SENATE



**RELEASED IN CONJUNCTION WITH THE**
**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**
**SEPTEMBER 11, 2008 HEARING**

**SENATOR CARL LEVIN**
Chairman
**SENATOR NORM COLEMAN**
Ranking Minority Member

**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**

**ELISE J. BEAN**
Staff Director and Chief Counsel
**ROBERT L. ROACH**
Counsel and Chief Investigator
**ROSS K. KIRSCHNER**
Counsel

**MARK L. GREENBLATT**
Staff Director and Chief Counsel to the Minority
**TIMOTHY T. TERRY**
Counsel to the Minority

**MARY D. ROBERTSON**
Chief Clerk

9/10/08

*Permanent Subcommittee on Investigations*
199 Russell Senate Office Building    Washington, D.C.  20510
Telephone: 202/224-9505 or 202/224-3721
Web Address: www.hsgac.senate.gov  [Follow Link to "*Subcommittees*," to "*Investigations*"]

**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**
**STAFF REPORT**
**DIVIDEND TAX ABUSE:**
**HOW OFFSHORE ENTITIES DODGE TAXES**
**ON U.S. STOCK DIVIDENDS**

## TABLE   OF   CONTENTS

I.  **EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    A.  Subcommittee Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    B.  Abusive Dividend Tax Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
    C.  Report Findings and Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
        1.  Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
        2.  Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

II.  **BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
    A.  Taxation of Dividends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
        1.  Dividends Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
        2.  Dividends Paid to Non-U.S. Persons . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
    B.  Hedge Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
    C.  Equity Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
    D.  Stock Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

III.  **SIX CASE HISTORIES OF DIVIDEND TAX ABUSE** . . . . . . . . . . . . . . . . . . . . .  22
    A.  Lehman Brothers Case History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
        1.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
        2.  Dividend Tax Abusive Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
    B.  Morgan Stanley Case History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36
        1.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36
        2.  Dividend Tax Abusive Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . .  36
    C.  Deutsche Bank Case History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46
        1.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46
        2.  Dividend Tax Abusive Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . .  46
    D.  UBS Case History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51
        1.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51
        2.  Dividend Tax Abusive Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . .  51
    E.  Merrill Lynch Case History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58
        1.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58
        2.  Dividend Tax Abusive Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . .  58
    F.  Citigroup Case History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69
        1.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69
        2.  Dividend Tax Abusive Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

i

**IV.  U.S. GOVERNMENT RESPONSE TO ABUSIVE  DIVIDEND TAX TRANSACTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75

**V.  ADDITIONAL MINORITY STAFF VIEWS ON THE REPORT** . . . . . . . . . . . . . . . .  77

# # #

**U.S. SENATE**
**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**

**STAFF REPORT ON**

**DIVIDEND TAX ABUSE:**
**HOW OFFSHORE ENTITIES DODGE TAXES ON U.S. STOCK DIVIDENDS**

September 11, 2008

Each year, the United States loses an estimated $100 billion in tax revenues due to offshore tax abuses.[1]  The U.S. Senate Permanent Subcommittee on Investigations has examined various aspects of this problem, including how U.S. taxpayers have used offshore tax havens to escape payment of U.S. taxes.  This Report focuses on a different subset of abusive practices that benefit only non-U.S. persons, have been developed and facilitated by leading U.S. financial institutions, and have been utilized by offshore hedge funds and others to dodge payment of billions of dollars in U.S. taxes owed on U.S. stock dividends.

Using phrases like "dividend enhancement," "yield enhancement," and "dividend uplift" to describe their products, U.S. financial institutions have developed, marketed, and profited

---

[1] This $100 billion estimate is derived from studies conducted by a variety of tax experts.  See, e.g., Joseph Guttentag and Reuven Avi-Yonah, "Closing the International Tax Gap," in Max B. Sawicky, ed., Bridging the Tax Gap: Addressing the Crisis in Federal Tax Administration (2006) (estimating offshore tax evasion by individuals at $40-$70 billion annually in lost U.S. tax revenues); Kimberly A. Clausing, "Multinational Firm Tax Avoidance and U.S. Government Revenue" (Aug. 2007) (estimating corporate offshore transfer pricing abuses resulted in $60 billion in lost U.S. tax revenues in 2004); John Zdanowics, "Who's watching our back door?" Business Accents magazine, Volume 1, No.1, Florida International University (Fall 2004) (estimating offshore corporate transfer pricing abuses resulted in $53 billion in lost U.S. tax revenues in 2001); "The Price of Offshore," Tax Justice Network briefing paper (Mar. 2005) (estimating that, worldwide, individuals have offshore assets totaling $11.5 trillion, resulting in $255 billion in annual lost tax revenues worldwide); "Governments and Multinational Corporations in the Race to the Bottom," Tax Notes (Feb. 27, 2006); "Data Show Dramatic Shift of Profits to Tax Havens," Tax Notes (Sept. 13, 2004).  See also series of 2007 articles authored by Martin Sullivan in Tax Notes (estimating over $1.5 trillion in hidden assets in four tax havens, Guernsey, Jersey, Isle of Man, and Switzerland, beneficially owned by nonresident individuals likely avoiding tax in their home jurisdictions):  "Tax Analysts Offshore Project:  Offshore Explorations: Guernsey," Tax Notes (Oct. 8, 2007) at 93 (estimating Guernsey has $293 billion in assets beneficially owned by nonresident individuals who were likely avoiding tax in their home jurisdictions); "Tax Analysts Offshore Project:  Offshore Explorations: Jersey," Tax Notes (Oct. 22, 2007) at 294 (estimating Jersey has $491 billion in assets beneficially owned by nonresident individuals who were likely avoiding tax in their home jurisdictions); "Tax Analysts Offshore Project:  Offshore Explorations: Isle of Man," Tax Notes (Nov. 5, 2007) at 560 (estimating Isle of Man has $150 billion in assets beneficially owned by nonresident individuals who were likely avoiding tax in their home jurisdictions); "Tax Analysts Offshore Project:  Offshore Explorations: Switzerland," Tax Notes (Dec. 10, 2007) (estimating Switzerland has $607 billion in assets beneficially owned by nonresident individuals who were likely avoiding tax in their home jurisdictions).

from an array of transactions involving multi-million-dollar equity swaps and stock loans whose major purpose is to enable non-U.S. persons to dodge payment of U.S. taxes on U.S. stock dividends.  In addition, many of the offshore hedge funds that have benefited from these abusive transactions appear to function as shell operations controlled by U.S. professionals who are helping them dodge U.S. dividend taxes.  Six case histories illustrate the scope and nature of the offshore dividend tax abuse problem.

## I.  EXECUTIVE SUMMARY

### A.  Subcommittee Investigation

The Permanent Subcommittee on Investigations has a long history of examining offshore tax abuses.  Twenty-five years ago, for example, in 1983, under Chairman William Roth, the Subcommittee held landmark hearings exposing how U.S. taxpayers were using offshore banks and corporations to escape U.S. taxes.[2]  More recently, in March 2001, the Subcommittee took testimony from a U.S. owner of a Cayman Island offshore bank who estimated that 100% of his clients were engaged in tax evasion, and 95% were U.S. citizens.[3]  In July 2001, the Subcommittee examined the historic lack of cooperation by some offshore tax havens with international tax enforcement efforts and their resistance to divulging information needed to detect, stop, and punish U.S. tax evasion.[4]

In 2003, the Subcommittee held hearings showing how some respected accounting firms, banks, investment advisors, and lawyers had become tax shelter promoters pushing the sale of abusive tax transactions, including some with offshore elements.[5]  In 2006, the Subcommittee examined six case studies illustrating how U.S. taxpayers were utilizing U.S. and offshore tax and financial professionals, corporate service providers, and trust administrators to hide assets offshore.[6]  Earlier this year, the Subcommittee held hearings showing how some tax haven banks have employed banking practices that facilitate tax evasion by U.S. clients.[7]

---

[2]  See "Crime and Secrecy: the Use of Offshore Banks and Companies," hearing before the U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 98-151 (March 15, 16 and May 24, 1983).

[3]  See "Role of U.S. Correspondent Banking in International Money Laundering," hearing before the U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 107-84 (March 1, 2 and 6, 2001), testimony of John M. Mathewson, at 12-13.

[4]  See "What is the U.S. Position on Offshore Tax Havens?" before the U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 107-152 (July 18, 2001).

[5]  See "U.S. Tax Shelter Industry:  The Role of Accountants, Layers, and Financial Professionals," hearing before the U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 108-473 (Nov. 18 and 20, 2003).

[6]  See "Tax Haven Abuses:  The Enablers, the Tools and Secrecy," hearing before the U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 109-797 (Aug. 1, 2006).

[7]  See "Tax Haven Banks and U.S. Tax Compliance," hearing before the U.S. Senate Permanent Subcommittee on Investigations (July 17, 2008).

The Subcommittee began its investigation into offshore dividend tax abuse in September 2007. Since then, the Subcommittee has issued more than a dozen subpoenas and conducted numerous interviews of financial institution executives, tax attorneys, hedge fund managers, and others. The Subcommittee has also consulted with experts in the areas of tax, securities, and international law. During the investigation, the Subcommittee reviewed hundreds of thousands of pages of documents, including trading data, financial records, presentations, correspondence, and electronic communications. Using this information, the Subcommittee developed six case histories to illustrate the scope and nature of the problem.

### B.        Abusive Dividend Tax Transactions

Offshore hedge funds and other sophisticated non-U.S. institutions and companies are active players in the U.S. stock market, often hold large volumes of U.S. stock, and are frequent recipients of U.S. stock dividends. Because many are located in tax haven jurisdictions, they are typically subject to a 30% rate of taxation on their U.S. stock dividends. It is not surprising, then, that these non-U.S. persons have sought ways to eliminate or reduce the 30% dividend tax, since to do so would provide them with significant tax savings and greater yield on their investments.

After reviewing practices at nearly a dozen financial institutions and hedge funds,[8] the Subcommittee uncovered substantial evidence that U.S. financial institutions knowingly developed, marketed, and implemented a wide range of transactions aimed at enabling their non-U.S. clients to dodge U.S. dividend taxes.[9] Using a variety of complex financial instruments, primarily involving equity swaps and stock loans, these U.S. financial institutions structured transactions to enable their non-U.S. clients to enjoy all of the economic benefits of owning shares of U.S. stock, including receiving dividends, without paying the tax applicable to those dividends. These structured transactions increased the amount of dividend returns obtained by some of their non-U.S. clients by 30% or more.[10]

The evidence also showed that use of abusive dividend tax transactions is widespread throughout the offshore hedge fund industry. Offshore hedge funds actively sought these abusive transactions, negotiated the terms of the arrangements with the financial institutions, and at times played one financial institution against another to elicit the largest possible tax reduction. In addition, many of the offshore hedge funds benefiting from these tax dodges did

---

[8] The financial institutions examined by the Subcommittee included Citigroup, Deutsche Bank, Goldman Sachs, Lehman Brothers, Merrill Lynch, Morgan Stanley, and UBS. The hedge funds included Angelo Gordon, Highbridge (a JPMorgan Chase affiliate), Maverick, Moore Capital, and funds managed by the financial institutions listed above. The documents produced by those entities and the interviews conducted by the Subcommittee show that the industry practices described in this Report extend beyond the specific institutions reviewed. In particular, the documents produced by the financial institutions include references to a large number of hedge fund clients.

[9] "U.S. financial institution" includes both financial institutions that are organized in the United States and U.S. branches of foreign financial institutions.

[10] If one is entitled, for example, to a $70 dividend and receives $100 instead, the increase is approximately 43%.

not maintain physical offices or investment professionals in their offshore locations, and instead operated primarily under the control of U.S. persons serving as the fund's general partner or investment manager. In these cases, U.S. hedge fund managers and their employees often played key roles in facilitating the offshore dividend tax abuse.

The purpose of this Report is not to condemn the use of complex financial transactions that utilize stock swaps, stock loans, or other forms of structured finance, which can be used for legitimate business purposes such as facilitating capital flows, reducing capital needs, and spreading risk. Instead, this Report attempts to identify abusive financial transactions that have no business purpose other than tax avoidance and to recommend measures to stop the misuse of structured finance to undermine the U.S. tax code.

Abusive dividend tax practices took hold in the 1990s, and have multiplied since, due to a variety of factors. These factors include the lowering of the dividend tax rate in 2003, which resulted in more companies paying dividends; the implementation of other tax code changes, such as more favorable treatment of swaps, which encouraged tax practitioners to think of ways to disguise dividend payments as swap payments to avoid the 30% dividend tax rate; the proliferation of hedge funds willing to engage in complex financial transactions; the proliferation of "dividend enhancement" products offered by financial institutions to attract and retain clients; the failure of regulators to keep track of and regulate these new products to prevent abusive practices; the general loosening of regulation and oversight of the financial industry, including with respect to offshore activities; and the willingness on the part financial institutions, hedge funds, and their legal advisors to adopt more aggressive and abusive tax practices.

**Abusive Stock Swap and Loan Transactions.** The abusive tax products examined by the Subcommittee were primarily associated with stock swaps and stock lending transactions.[11] These transactions varied in form, complexity, and the degree to which they transgressed, distorted, or undermined current tax law.

Abusive stock swap transactions essentially involve an effort to recast a dividend payment as a swap payment in order to take advantage of the favored tax treatment currently given to swap agreements involving non-U.S. persons. Right now, under the U.S. tax code, while U.S. stock dividends paid to non-U.S. persons are generally subject to a 30% tax rate, "dividend equivalents" paid to non-U.S. persons as part of a swap agreement are not subject to any U.S. tax at all.[12]

Abusive stock swap tax transactions seek to take advantage of this disparity in tax treatment. For example, in one of the most blatant forms of this type of transaction, a few days before a stock is scheduled to issue a dividend, an offshore hedge fund sells its stock to a U.S.

---

[11] The Subcommittee also identified other financial transactions, such as equity linked certificates and certain stock option transactions using puts and calls, that were used by a few financial institutions to enable their clients to dodge U.S. dividend taxes. These transactions are discussed in brief in the case histories.

[12] Treas. Reg. § 1.863-7(b)(1).

financial institution and simultaneously enters into a swap agreement with the financial institution, temporarily replacing its stock holdings with a swap agreement tied to the economic performance of the same stock.  After the dividend is issued, the offshore hedge fund receives from the financial institution a "dividend equivalent" payment under the swap agreement equal to the full dividend amount less a fee.  The fee, charged by the financial institution, is usually tied to the tax savings, and generally equals 3% to 8% of the dividend amount.  The end result is that the offshore hedge fund receives 92% to 97% of the dividend amount instead of the 70% that it would have received if the 30% in taxes had been withheld.  A few days after the dividend date, the offshore hedge fund terminates the swap agreement and repurchases the stock, leaving the offshore hedge fund with the same status it had before the transaction was undertaken.

This type of transaction is intended to enable the offshore client to maintain the same economic benefits (including the receipt of dividend payments) and market risks as owning the real stock, while dodging payment of tax on the dividend equivalent payments.  That the offshore client enters into the swap agreement for only a short period of time around the dividend period, and owns shares of the underlying stock both before and after the swap, demonstrates that this type of transaction has no purpose other than to avoid the dividend tax.

More complex variants of this transaction include a multitude of parties, longer time frames, multiple stock sales, and coordinated pricing to give the appearance of market risk and arms length dealing.  These elements have been added, as offshore hedge funds and U.S. financial institutions have tried to disguise the true nature of the transactions and avoid their recharacterization by the Internal Revenue Service (IRS) as ones which are subject to dividend taxes.

Another effort to dodge payment of U.S. dividend taxes utilizes stock lending transactions.  In a typical transaction, a U.S. financial institution uses an offshore corporation it owns and controls to borrow U.S. stock from an offshore hedge fund.  The offshore corporation borrows the stock a few days before a dividend is issued, sells the stock, and simultaneously enters into a swap agreement with its affiliated financial institution.  After receiving a tax-free "dividend equivalent" payment under the swap agreement, the offshore corporation passes the payment (now called a "substitute dividend") back to the offshore hedge fund from which it had borrowed the stock.  Relying upon a misinterpretation of an IRS notice on substitute dividends, the parties then claim that no withholding of the substitute dividend payment is required and the payment can be made tax-free.  A few days after the dividend payment, the offshore corporation returns the borrowed stock to the offshore hedge fund which then regains the same status as before the stock loan took place.

When this type of stock loan first began appearing, a vigorous debate erupted among legal counsel and their clients about its legitimacy.  JPMorgan Chase told Morgan Stanley that the substitute dividend payment was tax-free only if someone earlier in the stock loan lending chain had paid the initial withholding.  A potential client told Merrill Lynch that its legal counsel had said the stock loan works "once, maybe twice" but "repeated use, coincidentally around dividend payment time, would provide a strong case for the IRS to assert tax evasion."  He observed that, "it is the repeated 'overuse', e.g. pigs trying to be hogs, that proves problematic."

**Red Flags.**  The Subcommittee reviewed a wide variety of stock swap and loan transactions used to dodge payment of U.S. dividend taxes.  These transactions typically contained a number of red flags signaling their abusive nature, including one or more of the following features:

- **Short-Term Transaction.**  The transaction took place over a short period of time during which U.S. stockholders received a dividend distribution.

- **Dividend Payments Over 70%.**  The financial institution and client reached agreement on an explicit dividend payment rate above the 70% rate normally available after application of the 30% dividend withholding tax.

- **Fees Tied to Tax Savings.**  The swap or stock loan pricing and fees were tied to the amount of tax savings, measured by the dividend taxes that were not withheld.

- **Stock Replacement.**  Physical shares were sold before and then reacquired after a dividend distribution, suggesting that the stock "sale" was a sham.

- **Sham Market Sales.**  The financial institution and client reached a prior agreement on the sale or repurchase of U.S. stock through third parties to give the appearance of a "market sale."

- **Prevention of Risk.**  The financial institution and client coordinated their stock sales and repurchase transactions to minimize or eliminate the risk of financial loss.

- **Offshore Shell Company.**  In stock loan transactions, the financial institution and client inserted an offshore shell corporation into the middle of the transaction for no apparent purpose other than to create an offshore structure aimed at eliminating dividend withholding.

- **Tax Risk Limits.**  The financial institution treated nonpayment of dividend taxes as a "tax risk" and set a "risk limit" on the aggregate amount of tax withholding avoidance that could be incurred by the institution.

As a result of these abusive dividend tax transactions, non-U.S. persons, including offshore hedge funds and offshore financial institutions, have dodged U.S. taxes and secured benefits that were never intended or contemplated under the U.S. tax code or the regulations and notices issued by the IRS.

**Limiting Tax Risk.**  Casting further doubt on legitimacy of these transactions is the fact that a number of financial institutions and their clients took steps to protect themselves financially against the possibility that the IRS would challenge their transactions and require payment of dividend taxes that were never withheld.

One such protective measure taken by some financial institutions was to establish a limit on the amount of financial exposure that could be incurred by the institution from stock-related

swaps and loan transactions in which dividend amounts were paid but no tax was withheld. To calculate their "withholding tax risk," the financial institution determined the amount of dividend tax that was not withheld as a result of the transactions it arranged, and therefore the amount that the institution might have to pay the IRS if the transactions were invalidated or recharacterized. The institution then established the level of withholding tax risk that it was willing to incur, and did not allow the amount of withholding tax avoidance to exceed that limit. For example, Lehman established an annual withholding tax risk limit of $25 million on its stock loans, later raised to $50 million; it also set a $10 million risk limit on one of its three types of swap transactions. UBS set a limit of $72 million on its stock loans, while Merrill Lynch set a limit on its stock loans equal to the first to be reached of "$50 million annual gross withholding tax elimination" or "$25 million net withholding tax (=gross withholding tax less [its] fees)." These risk limits show that each of these financial institutions was enabling clients to dodge payment of tens of millions of dollars in dividend taxes each year.

An additional protective measure against tax risk was undertaken in connection with some stock loan transactions. The Subcommittee uncovered evidence of several financial institutions that agreed to indemnify their clients against any tax liability arising out of a stock loan transaction that the institution claimed had eliminated the need to withhold dividend taxes. Lehman Brothers and Morgan Stanley, for example, each provided some clients with an indemnity agreement to cover any tax liability, penalty, or interest that the IRS might subsequently assess on substitute dividend payments under stock loan where no dividend taxes were withheld. Some of these agreements also gave the financial institution the right to take over the defense against any IRS claim, and prohibited the indemnified parties from agreeing to any tax settlement without the financial institution's written consent. In another instance, an offshore hedge fund associated with Goldman Sachs apparently insisted that Merrill Lynch provide an indemnity agreement to protect it against tax liability, and when the two parties were unable to agree on its wording, that and other factors led to collapse of a proposed stock loan transaction.

**Fees and Profits.** U.S. financial institutions offered abusive dividend tax transactions to their offshore hedge fund clients, not only to attract and retain their business, but also to profit from the fees. In one instance, for example, a Lehman Brothers employee hailed the 2004 announcement of a special dividend to be paid on Microsoft stock and declared, "the cash register is opening!!!!" A senior Lehman official responded: "Outstanding. … Let's drain every last penny out of this [market] opportunity." The fees charged by the financial institutions for swap, stock loan, and other transactions that enabled clients to dodge U.S. dividend taxes typically included a portion of the dividend tax "savings." Morgan Stanley estimated that its 2004 revenues from its dividend-related transactions totaled $25 million. Lehman calculated that its Cayman stock lending operations produced a 2003 profit of $12 million, and projected doubling those profits the next year to $25 million. UBS estimated its 2005 profits at $5 million and predicted double that amount in 2006. Deutsche Bank stated that, in 2007, its stock loans alone had produced profits of $4 million. The direct fees earned from these transactions are, however, only one reason why financial institutions enter into them. In recent years, providing dividend enhancement has become seen as increasingly necessary to attract and retain clients.

**Lost Tax Revenues.**  The IRS does not currently track abusive dividend tax transactions, so the total volume of dividend payments involved and the total amount of lost tax revenues each year are unclear.  Nevertheless, the information collected by the Subcommittee indicates that the figures are substantial.  For example, Morgan Stanley data indicates that, over a seven-year period from 2000-2007, its dividend tax transactions enabled clients to escape payment of U.S. dividend taxes totaling more than $300 million. An internal Lehman Brothers presentation estimates that, in 2004 alone, its transactions enabled clients to dodge payment of dividend taxes of as much as $115 million. UBS data on its stock loan transactions over a four-year period, from 2004 to 2007, indicate that its clients escaped payment of U.S. dividend taxes totaling about $62 million.  Providing a different perspective, the investment manager of a group of related offshore hedge funds, Maverick Capital Management, calculated that over an eight-year period, from 2000 to 2007, it had entered into "U.S. Dividend Enhancements" with a variety of firms that enabled it to escape paying U.S. dividend taxes totaling nearly $95 million.  In another example, Citigroup told the IRS that it had failed to withhold dividend taxes on a limited set of transactions from 2003 to 2005, and voluntarily paid those taxes which totaled $24 million.  This figure does not take into account tens of millions of dollars in additional dividends associated with its other suspect "dividend uplift" swaps.  Finally, as mentioned earlier, several of the financial institutions established dividend withholding tax risk limits that permitted each of them to conduct transactions that led to unpaid dividend taxes totaling tens of millions of dollars per type of transaction per year.

These data points encompass different periods of time, different types of transactions, and only a few of the financial institutions and offshore clients engaged in dividend enhancement transactions.  So while this limited data is insufficient to extrapolate across the entire industry, it is sufficient to establish that, over the ten-year period that these abusive practices have been taking place, lost U.S. tax revenues likely reach into the billions of dollars.

**Inadequate Response.**  The Department of Treasury and the IRS have failed to take effective action to stop dividend tax abuse.  They have failed to publish for ten years final regulations to address abusive stock loans, failed to clarify existing regulations related to abusive equity swaps, and failed to take enforcement actions against participating financial institutions or their clients.  The silence and inaction of the Treasury Department and the IRS in the face of a growing problem have encouraged the spread of offshore dividend tax abuse.  Much more is needed if U.S. dividend taxes are finally to be collected from offshore stockholders.

### C.     Report Findings and Recommendations

Based upon its investigation, the Subcommittee staff makes the following findings of fact and recommendations.

### 1.     Findings

(1) **Offshore Dividend Tax Abuse.**  For over ten years, some U.S. financial institutions have been structuring abusive transactions aimed at enabling their non-U.S. clients to dodge U.S. taxes on stock dividends.  U.S. financial institutions have developed, marketed, implemented, and profited from these abusive "dividend enhancement" transactions.

(2) **Offshore Hedge Funds.**  Offshore hedge funds are frequent participants in abusive dividend tax transactions, which have become widespread in the hedge fund industry, and in too many instances, their U.S. general partners or investment managers facilitated their participation in such transactions for the express purpose of dodging U.S. dividend taxes.

(3) **Substantial Revenue Loss.**  Over the last ten years, offshore dividend tax abuses have resulted in billions of dollars in lost tax revenues for the U.S. Treasury.

(4) **Inadequate Response.**  The Department of Treasury and IRS have failed to take effective action to stop offshore dividend tax abuses, having failed to publish for ten years final regulations to address abusive stock loans, failed to clarify existing regulations related to abusive equity swaps, and failed to take enforcement actions against participating financial institutions and their clients.  The silence and inaction of Treasury and the IRS continues to encourage the spread of offshore dividend tax abuse.

### 2.     Recommendations

(1) **End Offshore Dividend Tax Abuse.**  Congress should end offshore dividend tax abuse by enacting legislation to make it clear that non-U.S. persons cannot avoid U.S. dividend taxes by using a swap or stock loan to disguise dividend payments.  This legislation should end the abuse by eliminating the different tax rules for U.S. stock dividends, dividend equivalent payments, and substitute dividend payments, and making them all equally taxable as dividends.

(2) **Take Enforcement Action.**  The IRS should complete its review of dividend-related transactions and take civil enforcement action against taxpayers and U.S. financial institutions that knowingly participated in abusive transactions aimed at dodging U.S. taxes on stock dividends.

(3) **Strengthen Regulation on Equity Swaps.**  To stop misuse of equity swap transactions to dodge U.S. dividend taxes, the IRS should issue a new regulation to make

dividend equivalent payments under equity swap transactions taxable to the same extent as U.S. stock dividends.

(4) **Strengthen Stock Loan Regulation.** To stop misuse of stock loan transactions to dodge U.S. dividend taxes, the IRS should immediately meet its 1997 commitment to issue a new regulation on the tax treatment of substitute dividend payments between foreign parties to make clear that inserting an offshore entity into a stock loan transaction does not eliminate U.S. tax withholding obligations.

## II.    BACKGROUND

### A.    Taxation of Dividends

#### 1.    Dividends Generally

A dividend is a distribution by a corporation of a portion of its earnings to its stockholders, with the amount to be distributed based upon the number of shares held by each stockholder.  When a corporation's board of directors declares a dividend, it sets a date in the future on which persons must be listed on its books as a stockholder in order to receive the dividend.  Called the "record date," it determines who is eligible to receive the dividend payment.[13]  In order to be recognized as owning stock on the record date, a stockholder must have purchased the shares earlier, generally two business days before the record date.  This earlier date is the "ex-dividend date."[14]

Dividends are paid by corporations in a variety of ways, most often by sending a check to a stockholder's specified address, crediting the stockholder's account at a financial institution, or reinvesting the dividend amount in the purchase of additional shares of stock.  If the dividend recipient is a U.S. person, at the end of the calendar year, the payor of the dividend must send a 1099 form to the stockholder and to the IRS reporting the total amount of dividends paid to the stockholder during the year.  Stockholders must report all dividends received on their tax return as part of their taxable income.[15]

U.S. stock dividends are included in the gross income of an individual or corporate taxpayer and taxed at the appropriate individual or corporate income tax rate, each of which, in 2003, reached a maximum of 35%.  In 2003, Congress enacted legislation that lowered the individual tax rate on U.S. stock dividends to 15% when paid to most U.S. taxpayers.

#### 2.    Dividends Paid to Non-U.S. Persons

Different rules apply to stock dividends paid by U.S. corporations to nonresident alien individuals or non-U.S. corporations, partnerships, or other entities (hereinafter referred to as "non-U.S. persons").  First, dividends paid to non-U.S. persons that are not connected with a U.S. business are subject to a tax rate of 30%, absent a tax treaty between United States and the stockholder's country of residence setting a lower rate.[16]

---

[13] See U.S. Securities and Exchange Commission, "Ex-Dividend Dates:  When Are You Entitled to Stock and Cash Dividends," at http://www.sec.gov/answers/dividen.htm.

[14] Id.

[15] See I.R.C 861(a)(2)(A).

[16] See I.R.C 871(a)(1)(A) and 881(a)(1); see also "United States Income Tax Treaties - A to Z," Internal Revenue Service (hereinafter "IRS"), at http://www.irs.gov/businesses/international/article/0,,id=96739,00.html.

Second, U.S. tax law requires the 30% tax to be "deducted and withheld at the source" of the dividend payment being made to the non-U.S. person.[17]  The purpose of this requirement is to ensure that the tax owed on the dividend payment is withheld and remitted to the IRS, before the dividend payment leaves the United States, since the United States is generally without authority to compel collection of U.S. taxes outside of its borders.[18]  This tax withholding regime for U.S. stock dividends has been in place for decades.[19]

To ensure taxes on stock dividends are withheld in the United States and remitted to the IRS before the dividend payment leaves the country, U.S. tax law deems any person that has "control, receipt, custody, disposal, or payment of any item of income of a foreign person that is subject to withholding" to be a "withholding agent."[20]  The law also deems the withholding agent "personally liable for any tax required to be withheld," and makes the withholding agent jointly and severally liable for the tax along with the non-U.S. person to whom the payment was made, if the withholding agent fails to withhold and the non-U.S. person fails to satisfy the tax liability.[21]

The law requires the U.S. withholding agent to withhold the appropriate amount of tax from the dividend payment, remit the withheld amount to the IRS, and file a 1099 form with the IRS and the dividend recipient identifying the amount withheld and the amount paid to the non-U.S. person.[22]  If the withholding agent mistakenly withholds too much tax, the dividend recipient may obtain a refund from the IRS.[23]

The withholding agent is generally obligated to withhold 30% of any U.S. stock dividend paid to a non-U.S. person.  This 30% tax rate applies to many countries of residence, including most tax haven jurisdictions, and also applies when a non-U.S. person's country of residence is

---

[17] I.R.C. 1441(a), 1441(b), and 1442(a).

[18] Id.

[19] The first federal withholding statute was enacted in 1913; the first comprehensive set of IRS withholding regulations for nonresident aliens was issued in 1956.  See Tax Compliance:  Qualified Intermediary Program Provides Some Assurance That Taxes on Foreign Investors are Withheld and Reported, but Can Be Improved," Government Accountability Office, Report No. GAO-08-99 (December 2007) (hereinafter "2007 GAO report"), at 6.

[20] See Department of the Treasury, IRS, "Withholding Agent," at http://www.irs.gov/businesses/small/international/article/0,,id=105005,00 html.

[21] See Department of the Treasury, IRS, Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities (Rev. April 2007).

[22] If the withholding agent is a non-U.S. financial institution operating outside of the United States, other rules apply, including in some cases Qualified Intermediary agreements which may specify different disclosure obligations.  This investigation, however, is focused on U.S. financial institutions acting as withholding agents.

[23] See IRS, Publication 515, supra note 21.

unclear.[24]  Certain countries, however, have negotiated a lower tax rate with the United States, including for example, the United Kingdom, which has a 15% tax rate imposed on stock dividends received by its residents.

In 2003, the latest year with available data, about $42 billion in U.S. stock dividends were paid to non-U.S. corporations, from which only about 4.5% or $1.9 billion was withheld.[25] The U.S. Government Accountability Office has raised a number of issues related to the apparent failure to withhold sufficient U.S. taxes related to dividend and other payments sent abroad.[26]

In the transactions reviewed by the Subcommittee, U.S. financial institutions engaged in dividend-related swap and loan transactions with a variety of sophisticated non-U.S. investors, including offshore hedge funds, foreign financial institutions, certain Luxembourg mutual funds, and large institutional investors such as pension funds, insurance companies, and private equity funds.  In addition, the U.S. financial institutions sometimes engaged in abusive transactions on their own behalf involving stock owned by their non-U.S. affiliates, working with other financial institutions to carry them out.

## B.    Hedge Funds

Many of the abusive dividend tax transactions reviewed by the Subcommittee involved a U.S. financial institution and an offshore hedge fund.  In the United States, hedge funds are lightly regulated, private investment funds that pool investor contributions to trade in U.S. securities or make other investments.[27]  Most U.S. hedge funds are structured as limited partnerships, in which the general partner manages the fund for a fixed fee and a percentage of the fund's gross profits, and the limited partners function as passive investors.[28]  Some U.S. hedge funds are structured as U.S. corporations that contract with an investment manager to manage their investments.  Most U.S. hedge funds employ persons living in the United States to manage the fund's investments.

---

[24] Id.

[25] See 2007 GAO report, at 23-24.  GAO reports that, altogether in 2003, about $293 billion in U.S. source income was paid to non-U.S. persons residing abroad.  Id. at 1.  Of that amount, about $200 billion was paid to non-U.S. corporations.  Id. at 23.  Of that $200 billion, about $42 billion consisted of U.S. stock dividends.  Id. at 24.  GAO does not specify what portion of the remaining $93 billion paid to non-U.S. persons other than corporations consisted of dividend payments.

[26] Id. at 4-5, 14-15, 19-24.

[27] For more information about hedge funds, please see "Tax Haven Abuse: The Enablers, The Tools and Secrecy," S. Hrg. 109-797 (Aug. 1, 2006), at 456.

[28] See Goldstein v. SEC, 451 F.3d 873, 875 (D.C. Cir. 2006); Report to Congress by Treasury, Federal Reserve, and the SEC pursuant to Section 356(c) of the Patriot Act (Dec. 31, 2002 ) (hereinafter "Report to Congress"), at 19-24 (discussing hedge funds).  Investors generally sign a "subscription agreement" specifying the investor's ownership interest in the fund, which may be in the form of shares, limited partnership interests, or ownership units.  See, e.g., Report to Congress, at 20 in footnote 67, and 22.

Many U.S. hedge funds are also associated with one or more offshore hedge funds, often sharing the same general partner or investment manager.  These offshore hedge funds are typically organized in a tax haven jurisdiction like the Cayman Islands which now claims to host over 10,000 hedge funds, more than any other jurisdiction in the world. [29]  Offshore hedge funds, when associated with a U.S. hedge fund, often do not maintain a physical office or employ investment professionals in their tax haven jurisdiction, but instead make use of the same U.S. investment professionals used by their U.S. counterparts.

In addition, since U.S. securities are denominated and traded in U.S. dollars, offshore hedge funds often use one or more U.S. financial institutions to act as their "prime brokers" and carry out their U.S. securities transactions.  It is these U.S. financial institutions that typically act as the hedge funds' withholding agents and arrange the abusive stock swap and loan transactions reviewed in this Report.

Most offshore hedge funds use the services of a law firm, financial firm, or corporate services provider located in their tax haven jurisdiction to keep their client lists, subscription agreements, and other records offshore, and perform administrative functions.  But it is not uncommon for a hedge fund organized in a tax haven to have little more than a post office box or a one-person office in that jurisdiction, and operate on a day-to-day basis as a shell entity under the control of U.S. persons acting as its general partner or investment manager.

With respect to U.S. taxes, U.S. hedge funds organized as partnerships file 1065 informational tax returns with the IRS, and provide information about gains and losses to their partners for inclusion in the partners' individual tax returns.  U.S. hedge funds organized as corporations generally file 1099 forms with the IRS reporting any payments made to their clients. [30]  U.S. hedge fund clients are responsible for including any realized hedge fund gains in their taxable income.

Offshore hedge funds, on the other hand, are typically organized as foreign partnerships or corporations, operate outside of U.S. tax law, and do not file U.S. tax returns.  Moreover, since most offshore hedge funds are formed in tax haven jurisdictions, they typically pay little or no tax in their home country.  In 1999, the President's Working Group on Financial Markets

---

[29] The Cayman Island states that approximately 10,000 hedge funds are organized within its borders, making the Cayman Islands the jurisdiction with the largest number of hedge funds in the world.  See Cayman Islands Monetary Authority, "The Navigtor" Vol. 33, July 2008, License Statistics as at 30 June 2008, available at http://www.cimoney.com.ky/section/default.aspx?section=PUB&id=2082#July08_lic_stats (listing 10,037 mutual funds); Cayman Islands Monetary Authority, "Year in Review, 1 July 2006 – 30 June 2007" at 55 (stating that "Although Cayman Islands legislation refers to 'mutual funds,' the vast majority of the funds registered in this jurisdiction fall within the loose definition of a 'hedge fund.'").

[30] See I.R.C. § 6042(a) (on reporting dividends), § 6049(a) (on reporting interest), and § 6045 (on reporting securities transactions).

noted that a significant number of hedge funds operated in tax havens and may be associated with illegal tax avoidance.[31]

One of the few U.S. taxes that offshore hedge funds are subject to are taxes on dividend payments related to their U.S. stock holdings.  These dividend taxes are supposed to be withheld by the U.S. withholding agent before any part of the dividend payment leaves the United States.  But as shown in this Report, many offshore hedge funds, with the assistance of U.S. financial institutions, participate in abusive transactions aimed at enabling them to escape payment of most or all U.S. dividend taxes.

## C.    Equity Swaps

One key type of transaction used by U.S. financial institutions to help offshore clients, including offshore hedge funds, dodge payment of dividend taxes involves swaps, which are a common type of derivative.  A derivative is a "bilateral executory contract with a limited term, the value of which is determined by reference to the price of one or more fungible securities, commodities, rates, or currencies."[32]  Essentially, it is a "wager with respect to the change in the price or yield of an underlier."[33]

Equity swaps are derivatives whose values are tied to the published price of a specified stock or group of stocks.  One of the most common forms of equity swaps, and the type most often used in abusive dividend transactions, is a total return swap.  They are called total return swaps because they are "agreement[s] in which one party (total return payer) transfers the total economic performance of a reference obligation to the other party (total return receiver)."[34]  In other words, in a total return swap that involves an equity swap, one party (called the "long" party) agrees to pay an amount equal to any appreciation in the stock price plus the amount of any stock dividends paid during the term of the swap, while the other party (called the "short" party) agrees to pay any depreciation in the stock price plus certain fees, which usually include an interest component.  The end result is that the swap provides the long party with virtually all of the economic benefits and burdens of holding stock without taking physical possession of the shares.[35]

---

[31] Report of the President's Working Group on Financial Markets, "Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management," (1999), at 41, cited in Report to Congress, at 24.

[32] Staff of the Joint Committee on Taxation, Present Law and Analysis Relating to the Tax Treatment of Derivatives (JCX-21-08) 2 (2008).

[33] Id.

[34] International Swaps and Derivatives Association, Inc., "Product Descriptions and Frequently Asked Questions," at http://www.isda.org/educat/faqs.html (last visited Sept. 1, 2008).

[35] Recently, total return equity swaps have received heightened judicial scrutiny on the issue of how they can be used to hide stock ownership.  The U.S. District Court for the Southern District of New York made the following observation in a 2008 case involving a dispute over whether certain hedge funds should have disclosed their ownership interests in CSX Corporation, a publicly traded U.S. company, "Some people deliberately go close to the line dividing legal from illegal if they see a sufficient opportunity for profit in doing so.  A few cross that line and, if

As explained earlier, a dividend paid on the stock of a U.S. company is treated as a U.S. source payment subject to taxation, since the source of the dividend is the U.S. corporation that paid it. If the dividend is to be paid to a non-U.S. person, the tax code requires the dividend tax to be withheld by the payor – the withholding agent – and remitted to the IRS.

In contrast, a swap is considered a "notional principal contract," and a 1991 regulation provides that the "source" of any payment made under that contract is to be determined according to the country of residence of the person receiving the payment, the potential taxpayer.[36] This approach is the exact opposite of the one for stock dividends, and turns the usual meaning of the word, "source," on its head – since instead of looking to the origin of the payment to determine its "source," the regulation looks to the payment's recipient. For example, if a U.S. financial institution makes a dividend equivalent payment under a swap agreement to a Cayman Island hedge fund, the tax code would normally treat that payment as a Cayman source payment not subject to U.S. withholding taxes. The result is that dividend payments made to an

---

caught, seek to justify their actions on the basis of formalistic arguments even when it is apparent that they have defeated the purpose of the law. This is such a case." CSX Corp. v. The Children's Inv. Fund Management (UK) LLP, No. 08 Civ. 2764 (LAK), 2008 WL 2372693, at *1 (S.D.N.Y. June 11, 2008). In the case, two hedge funds "amassed a large economic position" in CSX "without making the public disclosure required of 5 percent shareholder and groups by the Williams Act." Id. The funds had built their positions in the company using total return swaps and argued that their swap holdings were not equivalent to stock holdings and did not require them to disclose their ownership interests in the company. The Court disagreed. It examined the swap agreements between one of the hedge funds and its counterparties which included eight large financial institutions, Deutsche Bank AG, Citigroup Global Markets Limited, Credit Suisse Securities (Europe) Limited, Goldman Sachs International, JPMorgan Chase Bank, Merrill Lynch International, Morgan Stanley & Co. International plc, and UBS AG. The Court found that "the evidence is overwhelming that these counterparties in fact hedged the short positions created by the [total return swaps] with [the hedge fund] by purchasing shares of CSX common stock . . . on virtually a share-for-share basis and in each case on the day or the day following the commencement of each swap." Id. at *4 FN 15 and *21. The Court stated that "[t]here are persuasive arguments for concluding, on the facts of this case . . . that defendants beneficially owned at least some and quite possibly all of the referenced CSX shares held by their [swap] counterparties." Id. at *1. However, the Court determined it was "unnecessary to reach such a conclusion to decide this case," holding instead that securities law "provides, in substance that one who creates an arrangement that prevents the vesting of beneficial ownership [of stock] as part of a plan or scheme to avoid the disclosure that would have been required if the actor bought the stock outright is deemed to be a beneficial owner of those shares. That is exactly what the defendants did here in amassing their swap positions. In consequence, defendants are deemed to be the beneficial owners of the referenced shares." Id. at *1-2.

[36] Treas. Reg. § 1.863-7(b)(1). Treasury defines a notional principal contract as "a financial instrument that provides for the payment of amounts by one party to another at specified intervals calculated by reference to a specified index upon a notional principal amount in exchange for specified consideration or a promise to pay similar amounts." Treas. Reg. § 1.446-3(c)(1)(i). The "specified index" refers to "(i) A fixed rate, price, or amount; (ii) a fixed rate, price, or amount applicable in one or more specified periods followed by one or more different fixed rates, prices, or amounts applicable in other periods; (iii) an index that is based on objective financial information; and (iv) an interest rate index that is regularly used in normal lending transactions between a party to the contract and unrelated persons." Id. at -3(c)(2). A "notional principal amount" "is any specified amount of money or property that, when multiplied by a specified index, measures a party's rights and obligations under the contract, but is not borrowed or loaned between the parties as part of the contract." Id. at -3(c)(3). Swaps tied to stock prices and dividend payments – called "equity swaps" or "equity index swaps" – are explicitly included in Treasury's definition of notional principal contracts. Id. at -3(c)(1)(i).

offshore recipient are taxed, while dividend equivalent payments made to the same recipient under a swap agreement are not.

Many offshore hedge funds and some U.S. financial institutions have sought to take advantage of the different source rules for dividend versus dividend equivalent payments, in order to eliminate U.S. withholding taxes on U.S. stock dividends. The most blatant type of transaction is as follows. Before the record date on a stock dividend payment, the offshore hedge fund sells its stock to a U.S. financial institution. The offshore hedge fund also enters into a swap agreement with the U.S. financial institution tied to the value of the stock just sold and which is timed to end soon after the dividend is paid. The financial institution agrees to pay the hedge fund an amount equal to any price appreciation in the value of the stock plus any dividend payments during the term of the swap, while the hedge fund agrees to pay the financial institution an amount equal to any price depreciation in the value of the stock plus a fee.

The parties treat the payments to the offshore hedge fund as payments on a notional principle contract. Because the amounts are paid to an offshore entity, the parties claim the payments are from a non-U.S. source and, therefore, tax-free. After the dividend is paid and the financial institution makes a dividend equivalent payment to the offshore hedge fund, the swap is concluded. In some cases, the U.S. financial institution then sells to the hedge fund an equivalent number of shares of the stock that was the subject of the swap. Alternatively, the hedge fund may be required to reacquire the shares of stock from another institution, but arrangements may be made to ensure that it is able to pay the same, or virtually same, price as the swap's termination price. The end result is that, soon after the swap is concluded, the offshore hedge fund regains its physical shares of stock and is in the same position as before the swap, but having pocketed a dividend equivalent without paying any tax on it.

While the financial institution and hedge fund contend that this transaction meets all of the requirements of a tax-free payment on a derivative, the transaction could also be viewed as a sham in which the financial institution simply passed through a stock dividend payment to its client under the guise of a swap payment, for the sole purpose of dodging the dividend tax.

### D.    Stock Loans

The second type of transaction used by U.S. financial institutions to enable offshore clients to dodge payment of U.S. stock dividend taxes involves stock loans. Securities lending or stock loans are standard transactions within the securities industry, in which one party ("the lender") loans securities to another ("the borrower").[37] In a stock lending transaction, the parties typically negotiate a fee to be paid by the borrower to the lender for the loan of the shares. In addition, the borrower typically supplies the lender with collateral for the loan of the shares. The amount of collateral provided by the borrower is typically equal to or greater than the value of the loaned securities, and may be provided in a variety of forms, such as cash, securities, or a

---

[37] The stock loans reviewed by the Subcommittee were often governed by a standard lending agreement used for most trades in the industry, called an Overseas Securities Lending Agreement or Global Master Securities Lending Agreement.

letter of credit.  If the collateral is provided in the form of cash, the lender typically agrees to make a payment to the borrower at the end of the loan reflecting not only the interest earned by the collateral over the term of the loan, but also the loan fee.

While the stock loan is in effect, title to the stock is typically transferred to the borrower. The borrower may use the stock for whatever purpose it wishes, including selling the securities, and the borrower typically controls the voting rights of the stock, and receives any dividends that are paid during the term of the loan.  In the abusive transactions reviewed by the Subcommittee, as part of the loan agreement, the borrower typically agrees to pass any dividends back to the lender.  The dividend payments made to the lender by the borrower are called "substitute dividend payments." [38]  Under current tax law, substitute dividend payments are taxed in the same way as dividends, with the source determined by looking to the origin of the dividend.[39]

If a substitute dividend payment is made to a non-U.S. person as part of a stock loan transaction, however, U.S. tax law currently provides that the substitute dividend payment "shall be sourced in the same manner as the distributions with respect to the transferred security."[40]  In other words, substitute dividend payments are treated like standard dividend payments and are sourced based upon the underlying equity.  That means, if a substitute dividend payment is made with respect to a U.S. stock, that payment is considered U.S. based and is taxable, even if paid to a non-U.S. person.

The regulation creating this rule for substitute dividend payments was issued in October 1997.  It was substantially similar to the rule that had been proposed by the IRS and Treasury Department five years earlier in 1992.[41]  Upon its publication, tax practitioners immediately expressed concern with the wording, warning that the provisions could lead to over withholding in cases where the same shares of stock were lent to multiple non-U.S. parties in concurrent transactions, a common practice in stock loans.  For example, if an offshore hedge fund loaned shares of a U.S. stock to another offshore entity, 30% of any dividend payment made to the offshore entity would have to be withheld by the withholding agent making the dividend payment.  Some tax practitioners claimed that the 1997 regulation then required the offshore entity to withhold an additional 30% on the substitute dividend payment passed back to the initial lender, the offshore hedge fund.  The result, they claimed, was that the aggregate withholding amount would be greater than the statutory tax rate of 30%.  These tax practitioners expressed the concern that there would be a "cascading effect" as substitute dividend payments

---

[38] A substitute dividend "is a payment, made to the transferor of a security in a securities lending transaction . . . of an amount equivalent to a dividend distribution which the owner of the transferred security is entitled to receive during the term of the transaction."  Treas. Reg. § 1.861-3(a)(6).

[39] Id.

[40] Id.  See also "Dividends," Department of Treasury, IRS, at http://www.irs.gov/businesses/small/international/article/0,,id=106181,00.html.

[41] See Certain Payments Made Pursuant to a Securities Lending Transaction, 62 Fed. Reg. 53502 (Oct. 14, 1997).

were made between a number of offshore entities in a lending chain, and each withheld 30% of the substitute dividend amount passed on to the next party. [42]

    To resolve the concern with potential over taxation from a cascading withholding problem as described above, one month after having issued the regulation, the IRS issued Notice 97-66, in November 1997, to "clarif[y] how the amount of the tax imposed [on substitute dividend payments made by one foreign person to another foreign person] will be determined with respect to foreign-to-foreign payments." [43]  In the Notice's "Summary," the IRS stated that it and Treasury "intend to propose new regulations to provide specific guidance" on this topic and this Notice was intended to fill the gap until such new regulations are promulgated. [44]

    The IRS began the section on "Substitute Dividend Payments" by stating that "[t]he final regulations were adopted to eliminate unjustifiable differences between the taxation of similar economic investments." [45]  The Notice then provided a formula for calculating the rate of taxation to be applied when a substitute dividend payment related to U.S. stock is made between foreign parties:

> "[T]the amount of U.S. withholding tax to be imposed . . . with respect to a foreign-to-foreign payment will be the amount of the underlying dividend multiplied by a rate equal to the excess of the rate of U.S. withholding tax that would be applicable to U.S. source dividends paid by a U.S. person directly to the recipient of the substitute payment over the rate of U.S. withholding tax that would be applicable to U.S. source dividends paid by a U.S. person directly to the payor of the substitute payment.  This amount may be reduced or eliminated to the extent that the total U.S. tax actually withheld on the underlying dividend and any previous substitute payments is greater than the amount of U.S. withholding tax that would be imposed on U.S. source dividends paid by a U.S. person directly to the payor of the substitute payment." [46]

    The Notice also stated:  "The recipient of a substitute payment may not, however, disregard the form of its transaction in order to reduce the U.S. withholding tax." [47]  The Notice

---

[42] Specifically, if a lender in the Cayman Islands ($CI^1$) lent its securities to another Cayman Islands entity ($CI^2$), who then lent it to a third Cayman Islands entity ($CI^3$) who lent it to a U.S. financial institution.  Upon receipt of the dividend, the U.S. financial institution would withhold $30 and give $CI^3$ a $70 substitute dividend payment.  $CI^3$ would then be required to withhold 30%, and only pass back $49 to $CI^2$ who likewise would only pass back $34.30 to $CI^1$.

[43] IRS Notice 97-66, 1997-48 I.R.B. 8 (Nov. 12, 1997).

[44] Id.

[45] Id.

[46] Id.

[47] Id.

also stated that, based on this formula, "substitute payments with respect to foreign-to-foreign securities loans . . . that do not reduce the overall U.S. withholding tax generally will not be subject to withholding tax. For example, no withholding tax is required in situations where transactions are entered into between residents of the same country."[48]

This Notice and its complex formula created confusion among financial institutions and gave rise to a variety of interpretations. Moreover, soon after it was issued, some U.S. financial institutions and offshore entities began to take advantage of the wording of the Notice to structure stock loan transactions that they claimed eliminated all withholding tax on substitute payments. These financial institutions took the position that a literal reading of the IRS notice meant that a substitute dividend payment made between two foreign parties located in jurisdictions subject to the same withholding rate (generally either 30% or 15%) was not subject to any withholding tax.

With the support of some law firms that issued opinions supporting this interpretation of the IRS notice, these financial institutions designed stock loan structures aimed at enabling offshore hedge funds to dodge payment of U.S. stock dividend taxes. The first step in the structure was that a U.S. financial institution used an offshore corporation that it owned and controlled to borrow U.S. stock from an offshore client anticipating a dividend. The the offshore corporation borrowed the stock prior to the dividend, sold the stock so that it would not have to pay the dividend itself, and simultaneously entered into a swap agreement with its affiliated financial institution. After the dividend was issued, the financial institution paid a tax-free "dividend equivalent" payment under the swap agreement to the offshore corporation which, in turn, paid the same amount (called a "substitute dividend") back to the offshore client from which it had borrowed the stock. According to the theory the financial institutions adopted, no withholding of the substitute dividend payment was required, because the substitute dividend payment was between two foreign parties located in jurisdictions subject to the same withholding rate. In short, the claim was that the substitute dividend payment, like the dividend equivalent payment under the swap agreement, was tax-free.

As this interpretation of the IRS notice became more widespread, the use of such stock loan structures to dodge U.S. dividend taxes mushroomed. Financial institutions such as Morgan Stanley and UBS established offshore corporations in Jersey and the Cayman Islands specifically for the purpose of transacting stock loans to achieve "dividend enhancement."

The problem, however, is that this interpretation of the 1997 Notice stands the Notice on its head. The IRS issued the notice to eliminate the possibility that withholding on substitute dividend payments by foreign parties would exceed the statutory withholding rate of 30%. Now the same Notice is being used to establish a zero withholding rate. This interpretation was never intended by the IRS.[49]

---

[48] Id.

[49] Subcommittee staff interview with IRS (Aug. 18, 2008).

In addition, this interpretation of the notice was rejected by some major law firms and financial institutions. When Morgan Stanley offered a Cayman Island loan transaction to JPMorgan Chase, for example, JPMorgan Chase replied in an electronic communication that, "JPMorgan Chase's interpretation of the US securities lending regulations and Notice 97-66 (intended to solve the 'cascading withholding tax' issue) is that some form of proof of withholding is required."[50] It stated further that "the ability to rely on the notice requires some showing of actual withholding." Before agreeing to enter into a stock loan agreement, JPMorgan Chase asked Morgan Stanley for a representation that "appropriate U.S. taxes have been withheld" and an agreement to indemnify JPMorgan Chase for any dividend withholding taxes that may be assessed by the IRS.[51] Morgan Stanley "has no reason to believe it did not enter into an indemnification agreement with JPMorgan Chase on the terms of the draft," however they "have not been able to locate the signed agreement."[52]

Despite differing interpretations of Notice 97-66, increased use of abusive stock loan transactions based on the Notice, and the IRS' 1997 commitment to provide clarification on the tax treatment of substitute dividend payments between foreign parties, no clarifying guidance has been issued over the course of the following ten years. In the absence of this guidance, the conflicting interpretations of the Notice have not been resolved, and abusive dividend transactions using stock loans between foreign parties have become widespread.

The fact that the IRS has failed to take decisive action to stop these abusive stock loan transactions over this long period of time has led some financial institutions to claim that the IRS has lost the authority to challenge them. Sometimes referred to as the "Wall Street Rule," some within the financial industry assert that the "IRS cannot attack the tax treatment of any security or transaction if there is a long-standing and generally accepted understanding of its expected tax treatment."[53] Neither the IRS nor the courts have ever accepted this doctrine, however, in part because there are established ways to obtain the IRS' analysis of a transaction, such as by requesting an IRS ruling. To the Subcommittee's knowledge, the first financial institution to make such a request is Lehman Brothers, which sent a letter to the IRS making the request in the summer of 2008.

---

[50] Email from JPMorgan Chase to Morgan Stanley, Re: MSIL Lending (Jan. 9, 2002), MS-PSI* 020806.

[51] Id.

[52] Email from Morgan Stanley's legal counsel (Sept. 10, 2008).

[53] Emily A. Parker, Acting Chief Counsel, IRS, Remarks at the TEI/LMSB Financial Services Industry Conference (Sept. 22, 2003), available at http://www.irs.gov/pub/irs-utl/tei-92203.pdf.

### III.    SIX CASE HISTORIES OF DIVIDEND TAX ABUSE

To illustrate the abusive practices used to dodge U.S. stock dividend taxes, the Subcommittee conducted an in-depth examination of six case histories involving a variety of participants and a variety of transactions over the last ten years.  They focus on transactions devised and carried out by Lehman Brothers, Morgan Stanley, Deutsche Bank, UBS, Merrill Lynch and Citigroup.  The case studies are intended to provide an illustrative, rather than comprehensive, overview of the dividend tax abuse problem, providing evidence of the many methods employed to undermine dividend tax collection, the key role played by U.S. financial institutions in enabling non-U.S. persons to dodge U.S. dividend taxes, the competitive pressures to offer these transactions and their widespread use among non-U.S. clients, the volume of dividend payments and unpaid taxes involved, and the steps that must be taken to put an end to this entrenched offshore tax abuse.

### A.    Lehman Brothers Case History

#### 1.    Background

Lehman Brothers Holding Inc. (Lehman Brothers or Lehman) is an international investment bank that is headquartered in New York City, has 36 foreign offices,[54] and employs over 28,000 people worldwide.[55]  At the end of its 2007 fiscal year, Lehman reported $691 billion in assets and net income of $4.2 billion.[56]  Lehman is organized into three major segments:  Capital Markets, Investment Banking, and Investment Management.[57]  Its subsidiaries include Lehman Brothers Inc., Neuberger Berman LLC, and Neuberger Berman Management Inc.,[58] which are registered as broker dealers with the SEC.[59]  Lehman provides prime brokerage services for many offshore hedge funds through its Capital Markets Prime Services group.[60]  Richard S. Fuld, Jr. serves as Lehman Brothers' Chairman and Chief Executive Officer.[61]

---

[54] http://www.lehman.com/who/offices/Americas.htm.

[55] Lehman Brothers Holding Inc., Annual Report on Form 10-K for the Fiscal Year Ended Nov. 30, 2007 14 (2008).

[56] Id.

[57] Id. at 3.

[58] Id. at 8.

[59] Id. at 10.

[60] Id. at 6.

[61] Id. at 142.

### 2.    Dividend Tax Abusive Transactions

From at least 2000 until the present, Lehman Brothers has developed, marketed, and implemented a variety of transactions, using both swaps and stock loans, aimed at enabling offshore clients to dodge U.S. dividend taxes.  Lehman once estimated that, in 2004 alone, its transactions enabled its clients to dodge payment of dividend taxes of as much as $115 million.

**Product Offerings.**  Lehman Brothers has employed a variety of products to enable its offshore hedge fund clients to dodge U.S. dividend taxes.  These products include three swap transactions called the Single Equity Swap (terminated in 2004 and a revised version, called the "Single Stock Swap," was introduced in 2005); Contract for Differences ("CFD" terminated with respect to U.S. stocks in 2004);[62] and the Lehman Performance Swap ("LPS" or Lehman Portfolio Swap); and two stock lending transactions called the Cayman Islands Trades or "Cayco" trades.[63]

With respect to the swaps, the single stock swap operates as a total return swap.  The LPS is a swap which references a basket of equities and allows for the addition and subtraction of equities into the basket without termination of the swap agreement.  The CFD is a long-term swap that operates under an annex to the standard swap agreement.  It references individual securities, but offers reporting, valuation, and other operational features that aggregate each holding with other holdings across a client's account and provides reports in a fashion similar to the way ownership of a security would be displayed.[64]  Lehman managed some these transactions through its "Yield Enhancement Desk," which is part of its Equity Finance Group.  It appears that Lehman formalized its swap "enhancement" program in May of 2000, when it issued guidelines for equity swaps performed with offshore clients.  At the time of issuance, an official in the Equity Finance Group wrote:  "To the extent that we are to offer pricing to enhance a client' US [dividends], Richard or I should be involved in the process.  This should be viewed as a service that we expect to be paid for, and receive incremental business for."[65]

The Lehman stock lending transactions were designed to exploit the wording of IRS Notice 97-66, which a number of financial institutions interpreted to mean that substitute dividend payments between two foreign parties subject to the same withholding rate were not subject to any withholding taxes at all.  Lehman Brothers used a Cayman Island corporation,

---

[62] While Contract for Differences is a generic name for a derivative product in many markets throughout the world, including the United Kingdom, the CFD discussed here is a specific Lehman Brothers swap product that referenced a U.S. stock.

[63] See Lehman Brothers, The Power of Synthetics (undated), Bates No. LBHIPSI00012296. The Subcommittee's review indicates that these products were used often, but not exclusively, for dividend tax abuse purposes.

[64] Id.

[65] Email from Jeffrey S. Dorman, Lehman Brothers, to Bruce Giedra, Richard G. Story, and David Crowe, copying Howard Blechman, all Lehman Brothers, RE: Equity Swaps, Bates No. LBHIPSI00039837 (fourth email from top).

24

called Lehman Brothers Equity Finance (Cayman) Ltd., as the borrower in the trades. This corporation, however, was a shell that had no physical office in the Caymans, no Cayman employees, and little more than an address at the infamous Ugland House. Instead, the trade operations were conducted through a Lehman Brothers office in Hong Kong, another offshore jurisdiction for which the United States imposed a 30% dividend withholding tax rate.

The first of Lehman's stock lending transactions utilizing its Cayman corporation was initiated in 2000. [66]  It was implemented with clients in offshore jurisdictions where the withholding tax rate on U.S. stock dividends was 30%. The Lehman Brothers Cayman corporation would borrow stocks from clients in offshore jurisdictions where the withholding tax rate on U.S. stock dividends was 30%. The Cayman corporation would sell the stock to Lehman Brothers Special Financing Inc. (LBSF), a Delaware entity. To hedge itself against the sale of the stocks to LBSF, the Cayman entity would also enter into an LPS with Lehman Brothers Finance Ltd., a Swiss entity. LBSF and LBF also entered into an LPS with each other to hedge their positions. At the end of the loan, the entities would unwind the swaps, the Cayman entity would reacquire the stock from LBSF and return the stock to the client. Other than the clients, all of the other participants in the trade were Lehman Brothers entities.

Stock lending trades involving the second type of Cayman Islands trade were initiated in early 2004. [67]  It was similar to the first trade, but incorporated more third parties into the transactions and reduced the number of the Lehman entities involved. The swap, sale, and repurchase transactions involving the borrowed securities were completed with third parties. A 2005 presentation prepared by Lehman's Equities Finance Group includes two detailed diagrams depicting the Cayman Island trades. [68]  In 2003, Lehman's Cayco stock lending operations produced a profit of $12 million, and projected doubling those profits in 2004, to $25 million. [69]

**Tax-Driven Transactions.**  Lehman documents show that it developed and aggressively marketed its dividend enhancement products as a way for offshore hedge funds to dodge payment of the 30% withholding tax on dividends.

A senior Lehman official who headed the firm's Hedge Fund Services group, for example, told an offshore hedge fund client that its CFD product was "a unique and simplified version of a Total Return Equity Swap that gives [the counterparty] all the economic upside/downside (price movement, dividends and corporate actions) of a security without [the counterparty] having a physical position in that security." [70]  He explained: "The CFD is usually

---

[66] Subcommittee staff interview of Ian Maynard, Lehman Brothers (Apr. 3, 2008).

[67] Subcommittee staff interview of Bruce Brier, Lehman Brothers (Apr. 8, 2008).

[68] Lehman Brothers presentation, EFG US Dividend Exposures (Feb. 2005), Bates No. LBHIPSI00002533-40, at 2539-40.

[69] Undated Lehman Brothers presentation, "Equity Finance Yield Enhancement," Bates No. LBHIPSI00174963-69.

[70] Email from Patrick Ryan, Executive Director, Hedge Fund Services, Lehman Brother, to James Thalacker, Highbridge Capital Management, LLC., CFD Presentation (July 20, 2004), Bates No. LBHIPSI00033324.

used for yield enhancement purposes (in this case [Lehman Brothers] hold[s] the physical in a US entity and receive[s] 100% of the dividend which we pass to you through the CFD, whereas you would only receive 70% if you physically owned the stock in the [hedge fund's] offshore fund)."[71]  An employee of another offshore hedge fund that entered into these types of swaps with Lehman, when communicating with his colleagues, put it more succinctly:  "[A] cfd is used to circumvent the tax."[72]

On another occasion in August 2004, a member of Lehman's Prime Broker Sales team sent an email to the entire Prime Broker Sales New York group stating: "There have been quite a few questions on our yield enhancement structure so I put together an explanation of the structures.  There are two ways to yield enhance equities."[73]  The first way is "using [the Lehman] SWAP/CFD product."[74]  However:

> "[t]he best method to enhance yield is our lending program. [Lehman] would borrow the securities from the client, then pay them 70% of the dividend and a stock loan fee of 18% of the dividend which would gross them up to 88%.  This is the best structure, this is not a sale of the security only a loan so no capital gain or loss issues, no reporting issues."[75]

In November 2004, one Lehman employee emailed another a spreadsheet that "contains long positions for [an offshore hedge fund], which [Lehman Brothers] currently buy[s] into a swap to enhance [the hedge fund's] yield for dividends."[76]  The author asked the recipient to "have a look at the top 5 to see if there is any withholding for a Cayman domiciled account."[77]  The request was made, because Lehman was "trying to identify trades where it makes sense to leave long positions in [the hedge fund's Lehman Brothers International Europe prime broker] account.  Without reducing their yield."[78]

---

[71] Id.

[72] Email from George Fink to Donna Howe, both of Angelo Gordon, re CFDs (Aug. 11, 2004), Bates No. ANG-PSI-0001088.

[73] Email from John Carriero, Lehman Brothers, to Prime Broker Sales New York distribution list, Lehman Brothers, (no subject) (Aug. 5, 2004), Bates No. LBHIPSI00034221.

[74] Id.

[75] Id.

[76] Email from Anthony Demonte, Lehman Brothers, to Elizabeth Black, Lehman Brothers, copying Patrick Ryan and Matt Baldassano, Lehman Brothers, Highbridge LPS Basket (Nov. 22, 2004), Bates No. LBHIPSI00036060.

[77] Id.

[78] Id.  This client review apparently related to an effort by Lehman, whenever possible, to move client securities out of swaps, which placed a demand on Lehman's balance sheet assets, and into the prime brokerage account, where the client would bear the cost of carrying the security.

After the email was forwarded to other Lehman employees, a member of the Lehman Hedge Fund Services group wrote the following to a senior member of the Lehman's Yield Enhancement Desk:

> "[T]he 4 US securities below pay cash [dividends] but are not subject to withholding since they are classified as hybrid securities (for tax purposes).  That would mean a Cayman holder would not suffer 30% withholding and would have no incentive to hold the positions in a synthetic structure.  Right now we are holding all of these securities in an LPS [Lehman Portfolio Swap] …. Based on this information I would like to move the positions back to their PB [prime brokerage] account but wanted to run it by you to see if I am missing something. Would hate to do this and find out down the road that [the hedge fund] owe[s] withholding tax on the dividends."[79]

After it was determined that holding the securities in the LPS offered no withholding tax advantage for the client, the manager approved the move, demonstrating that a critical factor for placing and keeping securities in the LPS was dividend enhancement.

On July 20, 2004, Microsoft Corporation announced that it would issue a $3 special dividend on December 2, 2004.  In response to the Microsoft announcement, a senior member of Lehman Brothers' Equity Finance Products group outlined a campaign for Lehman to sell its "dividend enhancement" products to non-U.S. institutions that wanted to avoid tax withholding on the large dividend.

> "The Opportunity: $10mn P&L on this name this year Microsoft has declared a $3 dividend payable 2nd December 2004, subject to shareholder approval. … Lehman has sourced 10mn shares to date from offshore sources with the intention of using this asset to delta hedge third party swaps activity."[80]

The plan was greeted with enthusiasm from other Lehman officials.  One of his superiors responded:  "This summary is excellent. I am sure we will have a terrific result."[81]  Later on, the Equity Finance Products group official reported:  "Good progress so far this morning. ...  I have interest my side for over 30 [million] shares ..... the cash register is opening!!!!"[82]  His boss responded:  "Outstanding. We needed a one off like this and hopefully this will meet our

---

[79] Email from Patrick Ryan, Lehman Brothers, to Ian Maynard, Lehman Brothers, FW: Highbridge LPS Basket (Nov. 29, 2004), Bates No. LHBIPSI00038362.

[80] E-mail from Ian Maynard, Lehman Brothers, to multiple Lehman colleagues, re:  Microsoft Opportunity, (July 22, 2004), Bates No. LBHIPSI00002530-31 (original email).

[81] E-mail from Jeffrey Dorman, Lehman Brothers, to Ian Maynard, Lehman Brothers, re: Microsoft Opportunity, (July 22, 2004), Bates No. LBHIPSI00002530 (second email from bottom).

[82] E-mail from Ian Maynard, Lehman Brothers, to Jeffrey Dorman, Lehman Brothers, re:  Microsoft Opportunity, (July 22, 2004), Bates No. LBHIPSI00002530 (third email from bottom).

expectations. Let's drain every last penny out of this [market] opportunity. Please let me know if I can help in any way."[83]

Shortly thereafter, as work was proceeding on transactions related to the Microsoft special dividend, one Lehman employee sent an email to multiple colleagues entitled "Dividend Strategy" and addressed to "Dear Knights of the Dividend Round Table," leaving little doubt that the motivation of Lehman's Microsoft campaign was to maximize the dividend amounts returned to clients.[84]

Lehman's clients were also very clear that their motive in participating in certain transactions was to avoid withholding taxes.  One Lehman employee sent an email to over 30 colleagues describing a meeting with an offshore hedge fund client.  He wrote:  "re US Business: [the hedge fund's business size is] currently small now though will dramatically increase during the summer of 2004.  [I]nterested in [Lehman] product, specifically around grossing up of dividends to 100%."[85]

On another occasion, a Lehman employee sent an email to a colleague stating, "we will trade today [Oct. 25, 2004], settle on the 28th Record is the 29th …. They are absolutely looking for the div. … fyi, the only reason for [Highbridge, an offshore hedge fund] to swap is for yield enhancement."[86]

Another report noted that the client:

"estimates we won c. 40% of their yield enhancement trades which they do with 3 providers including us.  They would prefer to do as much [yield enhancement] business here as possible as the CFD product is much easier than doing total return swaps elsewhere ….  Stressed that during div. season they don't have time to keep bidding back and forth on each position so if we want to guarantee a position we need to show them our best level immediately."[87]

---

[83] E-mail from Jeffrey Dorman, Lehman Brothers, to Ian Maynard, Lehman Brothers, re: Microsoft Opportunity, (July 22, 2004), Bates No. LBHIPSI00002530 (top email).

[84] E-mail from Bruce Brier, Lehman Brothers, to multiple Lehman colleagues, re: Dividend Strategy, (July 30, 2004), Bates No. LBHIPSI00002502.

[85] Email from Matthew Pinnock, Lehman Brothers, to numerous Lehman Brothers employees, Marshall Wace Asset Management UK – Meeting – EFG Relationship Review and Development Discussion (May 8, 2004), Bates No. LBHIPSI00032569.

[86] Email from Anthony Demonte, Lehman Brothers, to James Metaxas, Lehman Brothers (Oct. 25, 2004), Bates No. LBHIPSI00110753.

[87] Email from Katie Gillham, Lehman Brothers, to Patrick Ryan, Lehman Brothers, re CQS Management UK – Entertainment – General catchup with their Finance team (July 28, 2004), Bates No. LBHIPSI00033591.

In January 2005, a Lehman employee reported to the head of Capital Markets Prime Services that a hedge fund client owned three dividend paying stocks and "would like to do total return equity swaps on the three positions to mitigate/eliminate the tax withholding."[88]  Clearly, eliminating the payment of dividend taxes was a key objective for both Lehman Brothers and its clients.

**Marketing.**  Lehman used dividend enhancement transactions to attract and retain hedge fund clients, often having to match or outperform a competitor.  For example, one Lehman employee wrote to three others that:

> "Special [Dividend] coming up... There is a shareholder vote on Oct 6th, the special div record date is not announced at the moment.  [Hedge fund client] looking for Yield Enhancement on a large position.  … We need to be as competitive as possible.  They are 98 bid away from Lehman, at the very least we need to match."[89]

The "98" refers to the percentage of the dividend payment that another financial institution was apparently willing to provide to the offshore hedge fund, instead of the 70% normally available after the 30% withholding tax.

On another occasion, Lehman wrote to an offshore hedge fund investment manager at Maverick Capital, after a meeting in which dividend enhancement transactions had been discussed.  In a section of the letter regarding, "Dividend Enhancement Solutions," Lehman wrote:  "We have a variety of solutions using swap and securities lending vehicles [to] achieve yield enhancement.  We propose Maverick provide us an Interest List on a Weekly basis for possible enhancement trades …."[90]

A few years later, Lehman was doing business with the same hedge fund, and a Lehman employee sent an email stating:  "I notice that you transfer some of your long position out around their upcoming record dates to [a competitor].  I imagine that is because of the dividend payment.  Is there something we can do for you that they are?  I'd love to discuss if so."[91]  The hedge fund trader responded by asking:  "Do you have a dividend enhancement product for long or short US equities in the offshore accounts?"[92]  The Lehman employee forwarded the question

---

[88] E-mail from Jeffrey Seymour, Lehman Brothers, to John Wickham, Lehman Brothers, re Total Return Equity Swaps for Fortress Off-Shore Fund (Jan. 19, 2005), Bates No. LBHIPSI00001476.

[89] Email from Anthony Demonte, Lehman Brothers, to Matt Baldassano, Ian Maynard, and Bob Boraczek, all Lehman Brothers, MCIP (Sept. 1, 2005), Bates No. LBHIPSI00131584.

[90] Letter from Lehman Brothers to Maverick Capital (April 24, 2001), Bates No. MAV0000794.

[91] Email from Christopher Antonelli, Lehman Brothers, to Jim Chen, Maverick Capital Management, Long Transfers (Jan. 30, 2004), Bates No. LBHIPSI00134533 (original email).

[92] Email from Jim Chen, Maverick Capital Management, to Christopher Antonelli, Lehman Brothers, re Long Transfers (Jan. 31, 2004), Bates No. LBHIPSI00134533 (middle email).

to a colleague and asked him to call the hedge fund manager "to discuss swaps" and "tell them about doing long swap/cfd business around record date items so that they get enhanced div treatment on us stocks and so they don't have to move them out to [a competitor] as they have been doing."[93]

At other times, rather than Lehman's initiating the discussion, its hedge fund clients pressed Lehman to arrange dividend enhancement transactions for them.  For example, in 2005, one hedge fund CEO sent a message to Lehman asking:  "[A]ny word where you are with swaps and CFDs?  We have some deals that we need to get on to avoid withholding on [dividends]."[94] A Lehman employee responded:  "We are getting close, give me the names you would like to do. I will do my best."[95]

In 2002, an offshore hedge fund pressed Lehman to provide it with 100% of the dividend amount, instead of the 92% that had been offered.  In an email to colleagues, a Lehman employee wrote:  "[Angelo Gordon, an offshore hedge fund] called regarding the swaps that [were] discussed on his [preferred shares].  He said he is being quoted by other brokers on the street 100% dividend doing it via a total return swap as opposed to the 92.5% we offered via CFD [a Lehman product].  … He wants a call back tomorrow either way so he knows how and with who to proceed."[96]

**Risk and Regulatory Concerns.**  Throughout its promotion of dividend enhancement transactions, internal documents show that Lehman Brothers was aware of the tax risks posed by those transactions, and tried to limit that risk by capping its financial exposure and by adding features to its transactions to disguise their tax avoidance purpose.

In September 2004, for example, a senior Lehman Brothers Equity Finance official took a closer look at the firm's CFD transactions and identified "a number of areas for concern," including Lehman's "tax exposure":

- "The range of clients for whom we are guaranteeing 100% on long dividends has increased significantly recently[.]"

- There would not appear to be any consistent requirements around minimum holding periods and churning of positions appears to be reasonably frequent. …

---

[93] Email from Christopher Antonelli, Lehman Brothers, to Matt Baldassano, Lehman Brothers, re Long Transfers (Feb. 4, 2004), Bates No. LBHIPSI00134533 (top email).

[94] Bloomberg message between Pat Hess, University Capital Strategies Group, and Anthony Demonte, Lehman Brothers (March 28, 2005), Bates No. LBHIPSI00109857.

[95] Id.

[96] Email from Steve Trommer, Lehman Brothers, to Alan Pace and Patrick Ryan, Lehman Brothers, Re: Swaps for Angelo Gordon (May 6, 2002), Bates No. LBHIPSI00020696.

- The annualised tax capacity numbers are in excess of circa $15mn whereas a previous limit of $10mn was recommended for this business. Feel that we need to reduce exposures selectively and certainly cap the tax exposure."[97]

A few days later, the Equity Finance official made a number of recommendations to address the identified tax risks. His recommendations included the following:

- "Set a maximum capacity limit within which we as a business will operate. This capacity limit will reflect a maximum WHT [withholding tax] at risk number (the 30% number as the counterparties are largely offshore entities) and will cover both CFD, LPS and single stock swap product. My initial suggestion for Risk Capacity threshold is $20mn. Given the fact that we are nearing this limit it will not leave us with significant room for expansion.

- … [M]inimum holding periods of stock to avoid excessive churning of stocks over dividend."[98]

Shortly afterwards, Lehman revised its guidelines for dividend enhancement transactions to stress features that would make it hard to depict them as designed to dodge dividend taxes. A senior vice president in the Equity Finance Group ("EFG") with tax expertise summarized the new guidelines for a colleague in an email:

"To summarize our discussion earlier today.

First, there is no "silver bullet" with respect to these issues but rather relative risks that should be priced accordingly. For lack of clarity, similar issues are present whether the transaction is effected as a swap, future, securities loan, or CFD. The guidelines below apply to CFDs, Swaps, and Securities Loans unless otherwise noted:

1. The longer the better-3 to 6 months are the shortest duration we should consider. One year or greater swaps are preferred. CFDs are perps so this is not an issue. Longer term swaps or perps which are habitually terminated prematurely

---

[97] Email from Ian Maynard, Lehman Brothers, to multiple Lehman colleagues, re: LBSF Capacity Using CDFs (Sept. 21, 2004), Bates No. LBHIPSI00018414.

[98] Email from Ian Maynard, Lehman Brothers, to Jeffrey S. Dorman, Lehman Brothers, and Richard Story, Lehman Brothers, re: LBSF Capacity Using CFDs (September 23, 2004), Bates No. LBHIPSI000017487-89. When asked about his concerns and recommendations as expressed in his September emails, Mr. Maynard told the Subcommittee that after conducting a more detailed review of the CFD and other transactions at issue, he believes the comments he made in 2004 were incorrect. Subcommittee interview of Ian Maynard, Lehman Brothers (Apr. 3, 2008 and Aug. 20, 2008).

are suspect.  Shorter term security loans are acceptable since this is market practice.

2.  Swaps-single equity swaps should be avoided.  Baskets should generally exceed 20 referenced assets.  Swaps that are liked to distribution transactions can have 10 referenced assets.  Risk will be further reduced by including referenced assets that: i. do not pay dividends, ii. are issued by non-US corps, or iii. pay low dividend yields.  For this reason, all other things remaining constant, Swaps are lower risk than CFDs.

3.  General background-offered transaction should be viewed in light of existing customer background including i. current notional balances, ii. trading patterns, iii. composition of referenced assets, iv. ex-dates, etc.

4.  All transactions have residual risk which should be priced accordingly. By definition, 100%  dividend equivalent payments under price the inherent risk.

5.  The lowest risk transaction is the distribution business.  Specifically.  In this transaction LBIE borrows or buys vs. swap from an 85% country and loans or sells vs. swap to an 85% country."[99]

This same EFG vice president also had concerns about the stock lending transactions Lehman was implementing from Hong Kong via the Cayman Islands.  In 2003, he explained to the head of Equity Finance for Europe why certain features of the Cayman Trades were necessary to reduce tax risk.  For example, in response to a question about whether it was necessary to use a person from the Hong Kong office, as opposed to an office in another jurisdiction with the same tax rate (such as Luxembourg), he answered:

"The reason for the bodies is to thwart any argument that these entities are non-substantive shells.  If a tax authority successfully argued this withholding and other taxes could be due….  Cayco is a division of Hong Kong for US tax (check the box) which is why the body can work in Hong Kong or Cayman." [100]

When asked whether the Lehman employee had to be physically present in Hong Kong, he explained:  "Maximum reduction in US tax risk if resident in Hong Kong. Moreover, if person stayed in Japan HK entity could be considered to have a Japanese branch."[101]  He also explained Lehman's tax risk was reduced by a plan to trade baskets of securities rather than a single type of security, and to include an additional swap in the transaction:

---

[99]Email from Bruce Brier, Lehman Brothers, to Alan Pace, and others, Lehman Brothers (November 19, 2004), Bates No. LBHIPSI00017490.

[100] Email from Bruce Brier, Lehman Brothers, to Richard Story, Lehman Brothers, re: US Cayman 70% Trade (May 25, 2005), Bates No. LBHIPSI00149673-76.

[101] Id.

"The safeguard issue is as follows: IRS is could argue US withholding tax is due either on the in lieu made by Cayco or the swap payment made by LBSF. This safeguard applies to the swap payment. While the general rule is no withholding on swaps the IRS could argue that LBSF is a agent for Cayco and the dividends collected by LBSF are really for Cayco's. (i.e., the swap payment was in fact a dividend payment). One existing safeguard is the use of baskets instead of swaps. In addition to the basket safeguard I proposed having LBSF sell and swap back so that LBSF receives swap payments instead of actual dividends. If the IRS used the agent argument there would be no withholding since Cayco could receive swap payments directly. Unfortunately we have some regulatory issues here I am analyzing."[102]

In early 2005, the same EFG vice president explained why the second version of the Cayman trade, with more third parties involved in the transaction, reduced Lehman's tax risk:

"It is not the Cayman borrow which makes this the best trade for Lehman risk adjusted it is what Cayman or LBIE does with the shares. That is to say the transfer to an unrelated offshore broker dealer substantially reduces the US withholding tax risk. This process, for lack of a better name, is called "distribution."[103]

This EFG vice president also expressed concerns about Lehman's single equity swaps, which were finally halted in 2004. He later explained some of the tax risks:

"While single equity swaps do occur in the market most US tax lawyers would say such swaps warrant elevated attention for a few reasons. First, the relevant regulations do not comport particularly well with the single equity model. Second, many finance and legal professionals in the industry believe a single equity swap can be equated to a securities loan. If this were the case, US withholding would likely be imposed on swap payments made from LBIE to hedge funds."[104]

In addition to advising on the structures of the dividend enhancement transactions to minimize their tax risk, the EFG vice president cautioned colleagues against leaving a paper trail related to the nature and purpose of the transactions being designed and implemented. For

---

[102] Id.

[103] Email from Bruce Brier, Lehman Brothers, to Kevin Harrison, Lehman Brothers (January 21, 2005), Bates No. LBHIPSI00012258.

[104] Email from Bruce Brier, Lehman Brothers, to Richard Story, Lehman Brothers, and Peter Sugarman, Lehman Brothers (January 21, 2005), Bates No. LBHIPSI00001474.

example, when discussing the diagram of a Cayco trade sent to him by a colleague, the attorney wrote back: "Personally, I would not prepare anything and leave a trail."[105]

**Risk Limits.**  In January 2005, Lehman Brothers reorganized its operations and created a Capital Markets Prime Services group, which included the Equity Finance Group.  Upon assuming control of the group, the Capital Markets group head initiated a review of the group's services and activities.  As part of this review, Lehman's Equities Finance Group prepared a presentation entitled, "EFG US Dividend Exposures."[106]  One chart in the presentation describing Lehman's "Yield Enhancement US Business" lists "Risk of Re-categorization" as one factor to consider, apparently referring to the risk that a tax authority could recategorize Lehman's swaps as transactions in which the dividend tax should have been withheld and remitted to the IRS.[107]

As a result of the review, Lehman decided to limit the use of its CFD swaps to non-US clients and non-U.S. securities; limit the new single equity swap to portfolios of no more than 20 securities; and limit the LPS to baskets of 20 or more stocks,[108] changes apparently intended to reduce the likelihood that the transactions would be noticed and challenged by the authorities.

Because of its recognition of the tax risks associated with its dividend enhancement transactions, Lehman also developed and applied overall monetary risk limits on those trades.  These limits imposed a cap on the financial exposure that could be incurred by Lehman from transactions in which dividend amounts were paid and passed onto a client, but no tax was withheld or remitted to the IRS.  The purpose was to limit the amount of unpaid dividend taxes that Lehman might be held liable for, as a withholding agent, if the IRS were to invalidate or recategorize its transactions.  For example, Lehman set a $10 million limit on its CFD transaction for 2004, only to discover later that its transactions had exceeded this limit by $5 million, for a total tax exposure of $15 million.[109]  Lehman set separate limits on its stock loan transactions, and as the transactions became more popular with Lehman's clients, adjusted those limits upward.  For example, Lehman established a $25 million limit on its Cayco trades in 2003, but doubled that limit the next year to $50 million.[110]

---

[105] Email from Bruce Brier, Lehman Brothers, to John Carriero, Lehman Brothers (April 7, 2004), Bates No. LBHIPSI00040003.

[106] Lehman Brothers presentation, EFG US Dividend Exposures (Feb. 2005), Bates No. LBHIPSI00002533-40.

[107] Id. at 2538, chart entitled, "Yield Enhancement US Business."

[108]Email from Melanie Nunn, Lehman Brothers, to Patrick Ryan, Lehman Brothers, and others, Lehman Brothers (May 17, 2005), Bates No. LBHIPSI 00012121.

[109]Email from Ian Maynard, Lehman Brothers, to Jeffrey S. Dorman, Lehman Brothers, and others, Lehman Brothers (September 21, 2004), Bates No. LBHIPSI 00018414-16.

[110] Lehman Brothers, "Equity Finance Yield Enhancement," (undated), Bates No. LBHIPSI00174963-69.

Lehman clients also sought to limit their financial exposure by obtaining tax indemnification agreements from Lehman to protect themselves against the imposition of any tax liability associated with Lehman's Cayman stock lending transactions.  Lehman agreed to sign a number of indemnity agreements with such clients as Citigroup, Goldman Sachs Europe, JPMorgan Chase, and the Royal Trust Corporation of Canada.[111]

These and other documents make it clear that Lehman, as well as its clients, viewed its dividend-related transactions as exposing the firm to possible tax liability.  Lehman nevertheless continued to engage in these transactions.

**Lost Tax Revenues.**  The dividend enhancement swap and stock loan transactions implemented by Lehman proved to be very lucrative for its clients, and quite costly for the U.S. government.  While complete data is not available, documents produced to the Subcommittee help illustrate the size of the problem.

In February 2005, as part of an internal review of Lehman "dividend enhancement" products, Lehman's Equities Finance Group prepared a presentation entitled, "EFG US Dividend Exposures."[112]  One chart, entitled "2004 Exposures," listed Lehman's five types of dividend-related transactions (single stock swap, LPS, CFD, Cayco I and Cayco II) and, for each, estimated the total amount of dividend payments that had been passed through to clients and the total amount of withholding tax that had not been paid, using a 30% tax rate.[113]  The Lehman chart estimates that the single stock swaps generated $1 million in unpaid dividend taxes; the CFD swaps generated $24 million; the LPS swaps generated $15 million; and the Cayco I stock loan transactions generated $30 million.  The Lehman chart indicates that no withholding risk was associated with the Cayco II transactions so that there were no unpaid taxes to report.  However, the chart also estimates that Lehman forwarded $150 million in dividends to clients that year through the Cayco II transactions, which at a 30% rate means that they generated estimated unpaid dividend taxes totaling $45 million.  Altogether then, for the single year of 2004, with respect to the five types of Lehman transactions analyzed in the chart, the amount of dividend taxes that were not withheld and paid to the U.S. government totaled $115 million.

Another, more narrow analysis conducted by Lehman Brothers for the years 2004-2005, performed at the request of the IRS, identified a smaller subset of transactions using Lehman's

---

[111] Subcommittee interview of Lehman Brothers representative (Sept. 8, 2008); see also, e.g., US Equity Lending Annex between Goldman Sachs Europe and Lehman Brothers Equity Finance (Cayman) Ltd. (Oct. 15, 2003), Bates No. GS-PS-00427-28.

[112] Lehman Brothers presentation, EFG US Dividend Exposures (Feb. 2005), Bates No. LBHIPSI00002533-40.

[113] Id. at 2535, chart entitled, "2004 Exposures." When asked about this chart, Lehman indicated that the figures were not based on specific data but consisted of general estimates that could include some transactions that did not involve dividends and could have omitted some transactions that should have been included.

SES, LPS, or CFD swaps, or its Cayman stock loans.[114]  The transactions included in this analysis were restricted to those that met the following criteria:

1.      A Lehman entity acquired a U.S. dividend paying stock directly or indirectly from a foreign counterparty, with settlement occurring between seven days prior to the dividend declaration date and the record date.

2.      Lehman held the stock over the dividend record date and, after the record date, directly or indirectly sold the U.S. equity back to the foreign party.

Lehman calculated that, with respect to these specific dividend enhancement transactions, it had paid a total of about $35 million in dividend-based payments to clients and failed to withhold and remit to the IRS at least $10 million in dividend withholding taxes.

Whether Lehman's tax exposure in 2004 was $10 million, as calculated in response to an IRS request, or $115 million, as estimated in its own internal analysis, it is clear that Lehman knew its dividend enhancement swap and stock loan products were built around enabling its clients to dodge U.S. dividend taxes.

---

[114] Leman Brothers, Information Document Request Response to IDR IE-52 (Oct. 17, 2007), Bates No. LBHIPSI00021476.

### B.    Morgan Stanley Case History

#### 1.    Background

Morgan Stanley is an international financial services firm, with 600 offices across 33 countries, headquarters in New York City, and international centers in London, Tokyo, and Hong Kong. [115]  The company took its current form in 1997 following a merger with Dean Witter and employs about 50,000 employees worldwide. [116]  It is organized into three business segments, Asset Management, Institutional Securities, and Global Wealth Management. [117]  It conducts its securities transactions primarily through wholly-owned subsidiaries that include Morgan Stanley & Co. Incorporated (MS&Co), a registered U.S. broker-dealer. [118] Through its Institutional Securities segment, Morgan Stanley provides prime brokerage services for offshore hedge funds and other offshore financial institutions. [119]  For fiscal year 2007, it reported assets of nearly $270 billion, and net income of $3.2 billion. [120]  The current Chief Executive Officer and Chairman of the Board of Directors is John J. Mack. [121]

#### 2.    Dividend Tax Abusive Transactions

From at least 1999 until the present, Morgan Stanley has developed, marketed, and implemented a variety of transactions, using swaps, stock loans, and equity linked certificates, aimed at enabling its non-U.S. clients to dodge U.S. dividend taxes.  In September 2005, a Morgan Stanley internal presentation on its "U.S. Equity Swaps Flow Business," estimated that 34%, or a third, of its revenue came from dividend enhancement transactions. [122]  That presentation also indicated that "Dividend Enhancement" swaps alone had brought in over $25 million in revenue for Morgan Stanley in 2004, and would bring in an estimated $40 million in 2005. [123]

---

[115] See http://www.morganstanley.com/about/company/index.html.

[116] Morgan Stanley, Annual Report on Form 10-K for the Fiscal Year Ended Nov. 30, 2007 1 (2008).

[117] Id. at 2.

[118] Id. at 2 and 9.

[119] See id. at 4.

[120] Id. at S-1 and S-2.

[121] Id. at 12.

[122] Morgan Stanley Presentation to Global Financing Products Group[:] U.S. Equity Swaps Flow Business (Sept. 6, 2005), Bates No. MS-PSI 021298, at 3.

[123] Id. at 5.  When asked about the basis for these figures, Morgan Stanley told the Subcommittee that the presentation had been compiled by the head of its U.S. swap trading desk using a "back of the envelope" analysis provided by its equity swaps head about why clients had entered into certain swap transactions.  Subcommittee staff interview of Alan Thomas, Morgan Stanley (July 2, 2008).

**Tax-Driven Transactions.**  In 1999, an investment advisor to offshore hedge funds prepared an internal memorandum noting: "Morgan Stanley has approached us about entering into stock loan agreements that would minimize the adverse effects of U.S. withholding."[124]  In 2001, a Morgan Stanley employee sent a group of colleagues an email entitled, "Trading Idea: Dividend Yield Enhancement Swap for US Stock."[125]  It stated:  "Non-US investors (resident in Hong Kong, Taiwan, Singapore, Cayman Islands, Jersey etc.) typically suffer withholding tax on US dividends, ranging from 15-30%," and that "[i]nstead of buying/holding the stock directly, clients can enter into a Total Return Equity Swap with Morgan Stanley and achieve yield enhancement."[126]  These and other document suggest that, from their inception, Morgan Stanley's swap and stock loan "dividend yield enhancement" products were aimed at enabling non-U.S. clients to dodge U.S. dividend taxes.

These transactions continued over the following years.  Documents supplied to the Subcommittee by Citigroup, for example, in connection with its decision, described below, to reimburse the IRS for unpaid dividend taxes on certain stock swap transactions, identified swap transactions between Citigroup and Morgan Stanley over a three-year period, from 2003 to 2005, involving nearly $16 million in dividend payments and $2.3 million in unpaid dividend taxes.[127]  These figures related to Morgan Stanley's dividend-related swaps with just one counterpart.

In December 2005, an offshore hedge fund emailed Morgan Stanley's Institutional Equities Division stating that its "Global Financials team are thinking of purchas[ing] a US name which pays a special dividend of $6 and were wondering if they could potentially swap it out to get a div [dividend] enhancement."[128]  The subject line of the email was "Possible Div Enhance Trade."[129]  Morgan Stanley's Institutional Equities Division responded that it was willing to do the swap and re-sell the stock to the hedge fund after the dividend was paid.  Its email stated that the hedge fund could "[o]pen pos[ition] by trading straight into swap[.]  After the div [dividend] … [Morgan Stanley] can cross the stock to the client['s [prime brokerage] acc[ount] if they do not want to close out [their position.]"[130]

---

[124] Maverick memorandum re Dividend Enhancement Transactions, marked "Draft – As of 4/26/99," prepared by Keith Hennington (Apr. 22, 1999), Bates No. MAV0001082-83, at 1082.

[125] Email from Tommie Fang, Morgan Stanley, to numerous Morgan Stanley distribution lists and employees, Trading Idea: Dividend Yield Enhancement Swap for US Stock (June 14, 2001), Bates No. MS-PSI* 020758 (original email).

[126] Id.

[127] Citigroup untitled chart prepared for the IRS listing swap transactions from 2003 to 2005 (undated), Bates No. CITI_PSIWHTAX001460.  See also discussion of Citigroup case history.

[128] Email from Justine Ayling, Landsdowne Partners Limited, to Declan Ryan, Morgan Stanley, Possible Div Enhance Trade (Dec. 14, 2005), Bates No. MS-PSI* 020745 (original email).

[129] Id.

[130] Email from Chirag Patel, Morgan Stanley, to the swap distribution list, copying the "fpgswap" distribution list, Morgan Stanley, RE: Possible Div Enhance Trade (Dec. 14, 2005), Bates No. MS-PSI* 020745 (second email from

**2004 Microsoft Dividend.**  Morgan Stanley's knowing participation in the development, marketing, and implementation of transactions to facilitate nonpayment of U.S. dividend taxes by offshore clients is also illustrated by its response to the Microsoft special dividend.  On July 20, 2004, Microsoft Corporation announced a $3 special dividend to be paid on December 2, using a record date of November 17.[131]  The day after the announcement, the head of Morgan Stanley's trading desk for equity swaps emailed his colleagues urging them to develop dividend enhancement swaps for the Microsoft dividend.  In a "WHY" section, he explained:  "Morgan Stanley can enhance the dividend payout [to offshore hedge funds] from 70% to 100% through a total return equity swap."  He wrote:  "This is a great opportunity to highlight an application that is relevant to all dividend-paying securities (not just MSFT)."[132]  He noted that, due to U.S. dividend taxes, the "bottom line" was that "[t]he incremental cost of having a swap versus owning MSFT is either zero or minimal depending on the client's situation."[133]

The head of Morgan Stanley's equity swaps group urged early action on the swaps, because while the record date for the Microsoft dividend was November 17, transactions involving Microsoft stock had to be completed by November 12, to ensure that each transaction cleared the standard three business day settlement period for the purchase or sale of securities.[134] The following day, a senior member of Morgan Stanley's equity trading division sent an email entitled, "MSFT div timing," urging even quicker action due to tax considerations:

> "Please note:
>
> This trade is more urgent than people are assuming.  It should be traded NOW. Here's why:
>
> Although the special is slated for November, we do NOT want to put on trades close to record date. Tax risk increases dramatically.
>
> The trade should be put on well in advance of the record date.
>
> There is also a regular dividend in August, which presents a perfect opportunity to get positioned in advance of the special.

---

top).  While this email clearly shows Morgan Stanley's knowledge of its client's motivation for utilizing a swap transaction, Morgan Stanley and the client did not cross shares on either end of the transaction they entered into.

[131] Microsoft Corp., "Microsoft Outlines Quarterly Dividend, Four-Year Stock Buyback Plan, And Special Dividend to Shareholders," (July 20, 2004), available at http://www.microsoft.com/presspass/press/2004/jul04/07-20boardPR.mspx.

[132] Email from Alan Thomas, Morgan Stanley, to multiple Morgan Stanley distribution lists and individuals, MSFT Total Return Swaps – FOR INTERNAL DISTRIBUTION (July 21, 2004), Bates No. MS-PSI 000798.

[133] Id.

[134] See id.

Furthermore, we don't want to trade on top of that record date, either.

Bottom line, this is CURRENT BUSINESS, over the next 2-3 weeks.  Please do not let clients become complacent.

. . . .  We have first mover advantage and need to close."[135]

This email shows that Morgan Stanley was aware of the "tax risk" associated with its dividend-related transactions, and sought to avoid that tax risk by arranging swap trades that were not closely associated in time with the November record date for Microsoft's special dividend or its regular dividend payment date in August.  By changing the timing, so that the swaps were not near in time to the dividend distributions, the Morgan Stanley employee apparently thought the firm could disguise the tax-driven nature of the swaps.

On July 26, 2004, six days after the Microsoft announcement, Morgan Stanley circulated a document internally identifying "2 different trades that will allow a client to enhance the yield of their [Microsoft dividend] to 2 different levels depending on their sophistication/risk appetite."[136]  Both trades were flexibly designed to incorporate a variety of financial instruments such as swaps, certificates, single stock futures, and options.[137]

The first transaction, deemed the "US Trade," allegedly provided Morgan Stanley clients with 100% of the Microsoft dividend, but cost between 20 and 50 basis points for financing and a $0.05 commission, which was characterized as "negotiable."[138]  The document estimated that the two costs "will normally amount to about 5% of dividend," so the client would end up with 95% of the dividend amount.[139]  The U.S. Trade transaction was described as follows:  "Client Sells shares to Morgan Stanley.  Morgan Stanley sells a derivative to the client. Enhancement is passed back through the derivative.  In order to receive 100% of dividend, on unwind, Morgan Stanley must sell stock back to market (not the client) and close out the derivative."[140]

The second Morgan Stanley transaction, called the "European Trade," allegedly provided clients in a 70% jurisdiction, such as the Cayman Islands or Jersey, with 89% of the dividend amount, while clients in an 85% jurisdiction, such as the United Kingdom, were told they could obtain 92% of the dividend amount.  The European Trade transaction was described as follows: "Client sells shares (through a broker) to Morgan Stanley.  Morgan Stanley sells a derivative to

---

[135] Email from Jeffrey Penney, Morgan Stanley, to multiple Morgan Stanley distribution lists and individuals, MSFT div timing (July 22, 2004), Bates No. MS-PSI 020727.

[136] Morgan Stanley, "Microsoft Yield Enhancement" 2 (July 26, 2004), Bates No. MS-PSI 020293.

[137] See id. at 3 and 4.

[138] See id. at 3.

[139] Id.

[140] Id. (emphasis omitted).

the client. Enhancement is passed back through the derivative.  On unwind the reverse occurs. Alternatively, the shares are simply lent to Morgan Stanley."[141]

The transactions designed by Morgan Stanley had no purpose other than to enable clients to dodge the U.S. taxes that would otherwise be withheld from the Microsoft dividend.  Morgan Stanley actively pushed the transactions, reminding one offshore hedge fund, for example, about the need to execute a swap related to Microsoft stock:  "Still plenty of time, but I believe you had wanted me to contact you regarding MSFT div enhancement this week.  We are ready when you are."[142]  The hedge fund responded:  "Yes … assuming we are in the swap for 30+ days prior to record date, I assume we could unwind the swap at any time subsequent to record date, correct?"[143]  As indicated earlier, these swaps contributed to the $25 million in revenues that Morgan Stanley reported receiving from dividend enhancement swaps in 2004.

**Equity Linked Certificates.**  In addition to equity swaps, Morgan Stanley marketed and employed another financial instrument – an equity linked certificate – to assist clients in avoiding the withholding tax on the 2004 Microsoft dividend.

An equity linked certificate is a security which references one or more stocks as the source for determining the certificate's value.  The buyer typically purchases the certificate, whose price is determined in relation to one or more specified stocks on a specified date.  In the Morgan Stanley certificates, buyers also received payments equal to any dividends paid on the referenced stock during the term of the certificate.  Morgan Stanley also allowed the buyers to redeem the value of the certificate at or before its maturity date.

In early November 2004, Morgan Stanley's Jersey and Netherland subsidiaries issued 30 million certificates linked to Microsoft stock.  The Jersey subsidiary issued 1 million certificates, while the Netherlands subsidiary issued 29 million.  Morgan Stanley told the Subcommittee that its Microsoft Certificate represented one of the two times when it has issued a certificate based upon a single U.S. stock.  The certificate's maturity date was October 15, 2005, but purchasers were allowed to redeem the certificates before then.  The payment at the maturity date consisted of three parts:  the closing price of one share of Microsoft; the "Net Yield" which equaled 85% of the dividends paid on one share of Microsoft over the term of the certificate; and the "Outperformance" which equaled 6.99% of the dividends.  Apparently, the "Outperformance" reflected the amount of "dividend enhancement" recovered through the transaction, and resulted in the purchasers receiving about 92% of the dividend amount.

Morgan Stanley's UK broker-dealer helped buy and sell the certificates, many of which were cashed in before the maturity date.  About 12.4 million shares were sold out of the

---

[141] Id. at 4.  Morgan Stanley ultimately did not offer the "European Trade."

[142] Email from Alan Thomas, Morgan Stanley, to Steve Maresco, Eminence Capital, MSFT (Oct. 8, 2004), Bates No. MS-PSI 001402.

[143] Email from Steve Maresco, Eminence Capital, to Alan Thomas, Morgan Stanley, RE: MSFT (Oct. 8, 2004), Bates No. MS-PSI 001402.

Netherlands and about 513,000 were sold out of Jersey.  According to Morgan Stanley representatives, many of the purchasers of the certificates sold physical shares of Microsoft stock and used the funds to purchase the certificates.  It calculated that, in all but one instance, the amount of Microsoft shares bought or sold by Morgan Stanley on behalf of the certificate purchasers was equal to the number of certificates purchased.  To hedge its own exposure to the certificates, Morgan Stanley decided not to acquire any Microsoft stock, but to use derivative transactions, apparently to ensure that the transactions would not be characterized and taxed as a stock repurchase or stock loan transaction.

The fact that most of the purchasers of the certificates switched from physical shares to Microsoft certificates, however, and held on to the certificates for only a short time surrounding the dividend payment period, strongly suggests that they were purchasing the certificates to escape payment of the withholding tax that would have applied to their physical shares.

**Abusive Stock Loans.**  In addition to swaps and the Microsoft equity linked certificate, Morgan Stanley has used stock loan transactions since at least 1999, to enable its clients to dodge U.S. dividend taxes.  These abusive stock loan transactions were conducted using a Cayman Islands "branch," MSDW Equity Finance Services I (Cayman) Limited, commonly referred to as "MS Cayman" or "Cayco."[144]  Cayco, which is still in existence today, has no full time employees or any employees in the Cayman Islands at all.[145]  As explained in its "Outline operating procedures," "Cayco is a thinly capitalised company and cannot absorb losses."[146]  Further, "Cayco should never hold long stock positions" overnight.  Yet, this entity borrowed enough securities to pay out over $1.1 billion in net dividends to clients between 2000 and 2007.[147]  Among the top five clients were JPMorgan Chase Bank, which placed orders on behalf of multiple persons and received over $121 million in dividend payments; Goldman Sachs Europe, which placed orders behalf of Goldman Sachs US Core Equity Portfolio and received over $73 million in dividend payments; and Blackrock Investment Management (UK) Ltd. which placed orders on behalf of Merrill Lynch International Investment Funds and received $55 million in dividend funds.[148]

Morgan Stanley clearly pitched its Cayman stock loan transactions as a way for its clients to dodge U.S. dividend taxes.  For example, a 1999 internal memorandum prepared by the Director of Tax of Maverick Capital, an investment advisor for several offshore hedge funds, reports the following:

---

[144] See Morgan Stanley, "Yield Enhancement Transactions, Stock Loan of Fully Paid for U.S Securities By MS Cayman" diagram (undated), Bates No. 020945.

[145] Subcommittee staff interview of Matthew Berke, Morgan Stanley (Aug. 21, 2008).

[146] MSDW Equity Finance Services I (Cayman) Limited ("Cayco") Outline operating procedures (undated), Bates No. MS-PSI 020270.

[147] Morgan Stanley, "MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)," Bates. No. MS-PSI 019326 [Sealed Exhibit].

[148] Letter from Morgan Stanley's legal counsel (March 14, 2008), at 3.

"Maverick is the advisor for several offshore funds that are having taxes withheld on dividends received from United States companies. Morgan Stanley has approached us about entering into stock loan agreements that would minimize the adverse effects of U.S. withholding. … Our Cayman Islands funds would enter into a stock loan on each U.S. security that is scheduled to pay a dividend. We would loan the security to a Cayman Morgan Stanley entity. They would pay us an amount equal to 70% of the dividend paid on that security (dividend entitlement). They would also pay us a stock loan fee equal to 13% of the dividend. … The end result would be that we would receive 83% of the dividend instead of the normal 70%. … Morgan is relying on Notice 97-66 to avoid withholding on the dividend entitlement."[149]

Maverick's Tax Director then compared the proposed stock loan transaction against the use of swaps to dodge payment of U.S. dividend taxes:

"I will get several quotes on the cost of entering into swaps. I have talked to Paine Webber and Deutsche Bank. They are estimating that we would receive approximately 93% of dividends after expenses of the swap. … It sounded like the swaps would be much more difficult to manage and we would lose some of the flexibility we would have with the stock loan transaction. I plan to focus on the stock loan transaction unless we feel there is too much tax exposure."[150]

Seven years later, in December 2006, a Maverick document discussing "Dividend Enhancement Transactions" and focusing in particular on stock loans noted that "Maverick began using the dividend enhancement transaction in 1999. During that time, Maverick has done this transaction with Morgan Stanley, UBS, Lehman, Merrill Lynch, and ING."[151]

In 2004, Morgan Stanley pitched its Cayman stock loan transactions to another client by providing "an outline of the key points regarding a stock lending transaction as a way to increase the yield" on an equity.[152] Morgan Stanley explained that the transaction "would lend your shares to Morgan Stanley for a period to be decided (typically a month)" and:

"[a]t maturity of the stock lending period, Morgan Stanley would pay you: 1) a manufactured dividend equal to the dividends paid out[] during the period net of the withholding tax that you normally incur ie 85% of gross dividends [and] 2) a stock lending fee equal to 6% of the gross dividends paid during the period[.]"[153]

---

[149] Maverick memorandum re Dividend Enhancement Transactions, marked "Draft – As of 4/26/99," prepared by Keith Hennington (Apr. 22, 1999), Bates No. MAV0001082-83, at 1082.

[150] Id. at 1083.

[151] Maverick memorandum re Description of Dividend Enhancement Transactions (Dec. 12, 2006), Bates No. MAV0001071-72.

[152] Email from Morgan Stanley to Eiger Capital, Stock Lending (Dec. 13, 2004), Bates No. MS-PSI 020249.

[153] Id.

On still another occasion, a member of Morgan Stanley's Equity Financing Services emailed a colleague in the Institutional Equities Division following a discussion of securities lending agreements, because a "[c]lient just called looking to trade some US names that are nearer record date."[154]  Later in the day, the same Morgan Stanley employee emailed six of his colleagues stating that he "would like to provide [the client] with some color [because] he's looking for US enhancements on his longs on MO (ex 3/11) and WWVY (ex 3/16)."[155]

Clearly, both Morgan Stanley employees and their clients saw its Cayman stock loan transactions as providing a way to dodge U.S. dividend taxes.

**Restrictions.** Aware of the tax risks associated with its dividend-related transactions, Morgan Stanley has taken a number of steps to limit its exposure.

Since at least 1994, for example, Morgan Stanley has not allowed its clients to both initiate a swap transaction by selling shares to Morgan Stanley (cross-in) and then repurchase those shares from the firm at the conclusion of the swap (cross-out), in an effort to ensure that its swaps are not recharacterized as a stock loan or stock repurchase subject to dividend taxes.[156]  In 2005, Morgan Stanley went further and prohibited its swap clients from engaging in either the initial stock sale or the subsequent stock purchase with the firm.[157]  After this policy was adopted, new clients were not allowed to sell their stock to the firm at the beginning of a swap, but existing clients were "grandfathered" and some were permitted to engage in this practice though 2007.[158]  In October 2006, Morgan Stanley's Equity Risk Management group took another significant step by deciding to stop offering its Cayman stock loan transactions directly to hedge fund clients.[159]  Morgan Stanley told the Subcommittee that this step was taken due to a concern over its ability to maintain adequate controls over the business.[160]

These steps suggest that Morgan Stanley has cut back, but not exited the dividend enhancement business.  It remains among the largest financial institutions in the world, for example, in the stock lending business.  One of its key activities is to borrow U.S. securities from custodian banks and other entities with large supplies of securities in 30% withholding tax

---

[154] Email from Sean Rivera, Morgan Stanley, to Dennis De Coninck and Eric Groom, copying Ross McDougall, all Morgan Stanley, RE: Levin Cayman osla (Mar. 1, 2005), Bates No. MS-PSI 001478 (fifth email).

[155] Email from Sean Rivera, Morgan Stanley, to multiple Morgan Stanley recipients, RE: Levin Cayman osla (Mar. 1, 2005) Bates No. MS-PSI 001478 (eighth email).

[156] Subcommittee staff interview, Matthew Berke, Morgan Stanley (Aug. 21, 2008).  Morgan Stanley made an exception to this policy if it was covering a short position.

[157] Subcommittee staff interview of Alan Thomas, Morgan Stanley (July 2, 2008).

[158] Id.

[159] See email from Manish Vekaria, Morgan Stanley, to multiple Morgan Stanley distribution lists and employees, PB and IPB US Borrows (Oct. 25, 2006), Bates No. MS-PSI * 020680

[160] Subcommittee staff interview, Matthew Berke, Morgan Stanley (Aug. 21, 2008).

jurisdictions and then lend those securities to other non-U.S. financial institutions such as ABN Amro Asian Financial Services Limited, Bank of Nova Scotia Asia Limited, Fortis Global Arbitrage (Asia) Limited, Hong Kong Shanghai Banking Corporation Limited, ING Middenbank Curacao NV, Macquarie Asia Limited, and Nomura International (Hong Kong) Limited.[161]  By playing this intermediary role, Morgan Stanley may not be directly arranging dividend enhancement transactions, but it may be a key facilitator of dividend tax dodging arranged by its counterparties.

**Lost Tax Revenue.**  Like Lehman Brothers, Morgan Stanley provided the Subcommittee with information indicating that its dividend enhancement products led to the loss of significant tax revenues for the U.S. Treasury.  For example, Morgan Stanley spreadsheets related to its Cayman stock loan transactions indicate that, over a seven-year period, from 2000 to 2007, its Cayman shell corporation paid out substitute dividends to clients in excess of  $1.1 billion.[162]  Using a 30% dividend tax rate indicates that those transactions cost the U.S. treasury about $300 million in unpaid dividend taxes.

Morgan Stanley also identified the top five recipients of the $1.1 billion in substitute dividends paid by its Cayman corporation.  The data shows that those top five recipients obtained over one-third of the total, about $370 million, and escaped paying about $110 million in dividend taxes.[163]

In addition to its stock loan transactions, Morgan Stanley enabled its clients to dodge U.S. dividend taxes applicable to the 2004 Microsoft dividend.  As indicated earlier, Morgan Stanley sold about 13 million Morgan Stanley Certificates to clients, provided about $39 million in dividend-related payments to the certificate holders, and, assuming application of the 30% dividend tax rate, denied the U.S. treasury about $12 million in 2004.

Morgan Stanley also helped its clients dodge U.S. taxes on the Microsoft dividend through the use of swaps, as it did with respect to many other dividend-paying U.S. securities.  Morgan Stanley provided spreadsheets on these swap transactions as well.  An analysis of the transactions identified numerous red flags, but the Subcommittee was unable to determine how many had been undertaken for dividend enhancement purposes.  Even without this swaps data, the evidence provided to the Subcommittee indicates that, over the seven-year period, from 2000

---

[161] Morgan Stanley, "MSDW Equity Finance Services I (Cayman) Ltd. - Stock On-Lending Transactions (2000-2007)," Bates No. 019335 [Sealed Exhibit].

[162] Morgan Stanley, "MSDW Equity Finance Services I (Cayman) Ltd. - Stock Borrowing Transactions (2000-2007)," Bates. No. MS-PSI 019326 [Sealed Exhibit].

[163] Letter from Morgan Stanley's legal counsel (March 14, 2008), at 3.  In the same letter, Morgan Stanley disclosed that its UK subsidiary, Morgan Stanley & Co. International, which also engaged in stock lending transactions, had also paid dividends to clients, and the top five recipients over the same seven-year period, 2000-2007, had received in excess of $390 million. Applying a 15% tax dividend rate indicates that Morgan Stanley enabled those clients to dodge payment of nearly $60 million in dividend taxes.  Id.

to 2007, Morgan Stanley's dividend tax transactions enabled its clients to escape U.S. dividend taxes in excess of $300 million.

## C.    Deutsche Bank Case History

### 1.    Background

Deutsche Bank AG is a large global investment bank with 1,889 branches in 76 countries,[164] that generated over $9.5 billion in income in 2007with total assets of nearly $3 trillion.[165]  Founded in 1870, the bank employs more than 80,000 people worldwide and operates three major divisions:  The Corporate and Investment Bank, Private Clients and Asset Management, and Corporate Investments.[166]  Deutsche Bank conducts securities transactions through its Global Prime Broker service within its Global Markets Division; U.S. securities transactions are conducted primarily by Deutsche Bank Securities Inc, a U.S. securities broker-dealer registered with the SEC.[167]  The Chairman of Deutsche Bank's Management Board and Group Executive Committee is Dr. Josef Ackermann.[168]

### 2.    Dividend Tax Abusive Transactions

Beginning in the 1990s and continuing to the present, Deutsche Bank has developed, marketed, and implemented a variety of abusive dividend tax transactions, utilizing swaps and stock loans, to enable its non-U.S. clients to dodge payment of U.S. taxes on U.S. stock dividends.  Since 2004, it has conducted most of its abusive stock loan transactions through a tax haven affiliate, Deutsche Bank Investment Limited, located in the Isle of Jersey.  In 2007 alone, Deutsche Bank Investment Limited engaged in stock lending transactions involving U.S. dividend paying securities with a notional value of over $30 billion.[169]

**Tax-Driven Transactions.**  An internal memorandum from Deutsche Bank's tax department estimated that, by 2002, the bank was conducting millions of dollars in swap transactions that permitted its clients to dodge payment of U.S. dividend taxes.  The memorandum states:

> "An estimate of average annual notional on U.S. equity swaps for all clients for 2001 was $2.8billion, with approximately $2billion in notional with foreign persons (non-U.S.) ….
> Based on an estimated annual dividend yield of 2.6%, U.S. withholding tax at the

---

[164] Deutsche Bank AG, Annual Report on Form 20-F/A for the Fiscal Year Ended Dec. 31, 2007 17 (2008).

[165] See Id. at 17.

[166] Id. at 17

[167] Id. at 52.

[168] Id. at 95.

[169] Letter from counsel to Deutsche Bank to Subcommittee (Mar. 6, 2008) (on file with Subcommittee).

maximum rate of 30% on all manufactured dividends paid through swaps to foreign persons for this period, would be approximately $12.6 million."[170]

The purpose of the memorandum appears to have been to allow the Deutsche Bank tax department to suggest additional ways for the bank to "reduce its US withholding tax risk" by changing its "swap tax policy."[171]   The memorandum states:

"The stated policy of the structured finance business in New York is that DB [Deutsche Bank] will not execute swaps around dividend dates.  The policy has been to require clients to hold swap positions for a minimum of 30 days.  We cannot force clients to maintain the positions for this period, but strongly discourage early terminations. …

"The DB Americas Tax Department would like the structured finance business to continue to reduce its US withholding tax risk by increasing, as quickly and to the extent possible, the percentage of market executions around swap trading in US equities with foreign clients.  In this regard, it is preferable to execute trades in the market both in and out of the swap. …

"The policy of trading for a minimum term should be modified to require a 45-day minimum term, increased from 30 days.  The 45 day term, while not mandated by any statute or regulation relating to swaps, conforms to the period of time the IRS believes is necessary to hold foreign stock for foreign tax credit capture, and may provide an analogy for this business as well."[172]

The memorandum shows Deutsche Bank tax lawyers suggesting two strategies to reduce the bank's "US withholding tax risk:"  imposing longer minimum time frames for U.S. equity swaps, and instituting a general practice of trading related U.S. stock in the market place rather than allowing a client to sell the stock to or buy it back from the bank itself.

Deutsche Bank eventually adopted these recommendations only in part.  By 2008, for example, its policy was still to "require" a 30-day minimum term, but "encourage" a 45-day holding period.[173]   At the same time, it authorized the head of its synthetic trading desk to permit swap terminations prior to the 30-day "minimum," if related to a "market event."[174] Deutsche Bank also expressly prohibited swap transactions within seven days of an ex-dividend date.[175]

---

[170] Deutsche Bank memorandum from Jules Goodman and Adrienne S. Browning of DB Americas Tax Department, to Jim Rowen and Julian Sale, re Swap Tax Policy (Nov. 12, 2002), Bates No. DB-PSI 00000043.

[171] Id.

[172] Id.

[173] Subcommittee staff interview of Andrea Leung, Deutsche Bank (Feb. 7, 2008).

[174] Id.

[175] Id.

With respect to market executions, by 2008, Deutsche Bank permitted swap clients to trade their physical shares directly with the bank at only one end of a transaction – either at the beginning or the conclusion of the swap.[176]  Deutsche Bank also, however, permitted clients to sell their shares to the Bank, enter into a swap transaction using the purchasing price, and then exit the swap within a few weeks at an "objective" price, such as the "Market on Close" price, which is the price of the stock at the end of the trading day.  Using Market on Close pricing means that a client is able to exit the swap with Deutsche Bank and reacquire shares in the same security at the same price from another broker with virtually no market risk.  These practices suggest that Deutsche Bank remained interested in helping its clients regain their stock holdings with little market risk after conducting a swap transaction with the bank to avoid paying dividend taxes.

Other documents, including Deutsche Bank emails, show that Deutsche Bank personnel were well aware that their swap and stock loan transactions were used by clients to dodge U.S. dividend taxes.  In 1999, for example, an offshore hedge fund employee wrote a memorandum on discussions he had held with several financial institutions on "Dividend Enhancement Transactions," and indicated that Deutsche Bank would be sending him a price quote on the cost of entering into swaps, and was "estimating that we would receive approximately 93% of the dividends after expenses of the swap."[177]  In 2004, in an email discussing Microsoft's upcoming special dividend, a Deutsche Bank employee wrote:  "We are in the process of determining hedge fund demand for 'All In' enhancement to clients ….  We'll be hopefully sitting down as a group in the next week to outline our plan of action on 70% dividend liability underlying."[178]  On another occasion, a 2006 email sent by the director of Deutsche's Global Prime Services group in New York to the investment professionals with Goldman Sachs offshore hedge funds stated:  "Are you all available next Tuesday 2/28 at 1 PM for a meeting to discuss securities lending in detail?  Specifically: - Yield Enhancement …."[179]

A February 2007 email between two Deutsche Bank traders shows how familiar each was with dividend-related transactions.  One of the traders asked:  "[M]ate – can you use NVS US for div [dividend]?"; the other responded:  "[Y]ep we can use it – do you need dates?"[180]  A March

---

[176] Id.

[177] Maverick memorandum re Dividend Enhancement Transactions, marked "Draft – As of 4/26/99," prepared by Keith Hennington (Apr. 22, 1999), Bates No. MAV0001082-83.

[178] Email from Paul Busby of DBNA to multiple Deutsche colleagues, re Extraordinary Dividend Rules and Microsoft One-Time Dividend (Sept. 16, 2004), Bates No. DB-PSI 00000084.

[179] Email from Scott Carter, Director of Global Prime Services at Deutsche Bank Securities, Inc. in New York, to Gary Chropuvka, Arlen Khodadadi, and Karl Wianecki, all of Goldman Sachs Asset Management, re Meeting with Deutsche Bank (Feb. 23, 2006), Bates No. GS-PSI-05735.

[180] Email from Ben Davies to Chiraag Shah, both of Deutsche Bank London, no subject line (Feb. 12, 2007), Bates No. DB-PSI 00001470.

2007 email between two Deutsche Bank traders was even more explicit.[181]  The first trader asked:

> "Hi Martin – I understand you spoke to Shane last week about some US stocks – MO and RAI – related to dividends. … [D]o you want to trade 1,908,100 shares of MO US and 150,000 shares of RAI?  We can give you 97.5% of the dividends on those names[.]"

His counterpart then agreed to the trades.  Still another email observed:  "us mkt for div is traded out of London," referring to Deutsche Bank's London branch.[182]

**Jersey Stock Loans.**  Beginning in 2004, Deutsche Bank International Limited (DBIL), located on Jersey in the Channel Islands, began arranging offshore stock loan transactions involving U.S. dividend-paying stocks.  According to an internal Deutsche Bank application seeking approval to develop, market, and implement those stock loan transactions,[183] DBIL entered the business because Deutsche Bank needed to interpose a "non-U.S. treaty entity" in its stock loan transactions to avoid dividend withholding and lower its stock loan pricing to match its competitors:

> "Broadly speaking, there are substantial US equities held offshore which are consistently included in basket pricing (baskets that would be borrowed on an exclusive basis for use within the overall equities business).  We are currently not competitive in that pricing as any borrow of those US equities requires a deduction and payment of withholding tax on substitute payments equal to 15% of any dividend.[184]  Our competitors do not have to account for this tax (given some of their offshore structures) and can therefore offer a more aggressive price to lenders.  A non-US treaty is attractive as the amount of withholding tax required to be deducted is reduced to 0% (providing certain criteria are met), therefore allowing us to be more competitive with our pricing."[185]

This document shows that, from its inception, the Jersey stock loans were tax-driven transactions.

The 2004 application, as well as a revised 2005 application, include charts and explanations of the stock loan transactions DBIL planned to offer.[186]  Essentially, DBIL

---

[181] Emails between Chiraag Shah and Martin Cornell, both of Deutsche Bank London, no subject line (March 12, 2007), Bates No. DB-PSI 00002358.

[182] Email from Simon Pearson to Adrian Todd, both of Deutsche Bank, re Travel Dates (March 12, 2007), Bates No. DB-PSI 00007343.

[183] Deutsche New Product Application (March 15, 2004), Bates No. DB-PSI 00000047-55 and 70-71.

[184] Deutsche Bank's London branch is subject to a 15% dividend tax rate, because the United Kingdom has negotiated a 15% dividend tax rate with the United States.

[185] Deutsche New Product Application (Mar. 15, 2004), Bates No. DB-PSI 00000047-55, at 52.

[186] Id.; Deutsche New Product Application (Jan. 27, 2005), Bates No. DB-PSI 00007472-78.

proposed and later carried out transactions in which it borrowed a basket of U.S. securities from a non-U.S. client, sold that basket to the market, and entered into a derivative with Deutsche Bank London's branch to hedge itself against any market risk.[187]    The insertion of the Jersey entity into the proposed transactions was arranged solely for the purpose of invoking IRS Notice 97-66 and enabling Deutsche clients to dodge their U.S. dividend tax obligations.

In 2008, Deutsche Bank indicated that "approximately 98% of the loans transacted through the Deutsche Bank Jersey entity, Deutsche Bank Investment [sic] Limited ('DBIL'), involve U.S. dividend-paying securities."[188]    It reported that, in 2007 alone, DBIL engaged in stock lending transactions involving U.S. dividend paying securities with a notional value of over $30 billion.[189]  DBIL's major clients included Pioneer Fund, BGI, Merrill Lynch International Investment Fund, and AIG Global Funds, each of whom may have been trading on behalf of other non-U.S. stockholders.[190]

**Lost Tax Revenues.**  The documents produced to the Subcommittee did not contain data indicating the total volume of dividend-related swap transactions engaged in by Deutsche Bank over the years or the total amount of dividend taxes that were not paid to the U.S. government as a result of its transactions.  The evidence does suggest, however, that Deutsche Bank has participated in transactions involving tens of millions of dollars in unpaid dividend taxes.  In a document cited earlier, for example, the Deutsche Bank tax department estimated that seven years ago, in 2001, Deutsche Bank handled U.S. equity swaps with non-U.S. persons that may have generated unpaid dividend taxes totaling about $12 million.[191]  In documents supplied to the Subcommittee by Citigroup in connection with its decision, described below, to reimburse the IRS for unpaid dividend taxes on a limited number of swap transactions, data shows that Citigroup entered into swap transactions with Deutsche Bank, from 2003 to 2005, involving over $20 million in dividend related payments and $3.1 million in unpaid dividend taxes.[192]  Those figures cover Deutsche Bank's swaps with just one counterparty.  At the least, these documents show that Deutsche Bank structured transactions that enabled its clients to dodge payment of tens of millions of dollars in U.S. dividend taxes.

---

[187] See id.

[188] Letter from Deutsche Bank legal counsel to the Subcommittee (Mar. 6, 2008), at 2(on file with Subcommittee).

[189] Letter from counsel to Deutsche Bank to Subcommittee (Mar. 6, 2008) (on file with Subcommittee).

[190] See Deutsche Bank, DBIL Stock Lending Transaction Information, Bates DB-PSI 00000499 [sealed exhibit]; Letter from Deutsche Bank legal counsel to Subcommittee (June 12, 2008) (on file with Subcommittee).

[191] Emails between Chiraag Shah and Martin Cornell, both of Deutsche Bank London, no subject line (March 12, 2007), Bates No. DB-PSI 00002358.

[192] Citigroup untitled chart prepared for the IRS listing swap transactions from 2003 to 2005 (undated), Bates No. CITI_PSIWHTAX001460.  See also discussion of Citigroup case history.

D.    **UBS Case History**

1.    **Background**

UBS AG is one of the largest financial institutions in the world, with over 2.2 trillion Swiss francs, approximately $2 trillion U.S. dollars, in total assets.[193]  UBS is headquartered in Switzerland, operates in 50 countries[194] with more than 80,000 employees,[195] and maintains a large banking and securities presence in the United States.  UBS AG is the parent company of the UBS Group which is organized into four major divisions, the Investment Bank, Global Asset Management, Global Wealth Management and Business Banking, and the Corporate Center.[196] In 2007, UBS reported a net loss of 5.247 billion Swiss francs, or approximately $4.7 billion U.S. dollars.[197]  The current UBS Chairman of the Board is Marcel Ospel, and its Chief Executive Officer is Marcel Rohner.[198]

2.    **Dividend Tax Abusive Transactions**

From at least 2000 until 2007, UBS engaged in abusive dividend tax transactions, marketing in particular stock loan transactions that utilized a Cayman affiliate.  UBS data on its stock loan transactions during a four-year period from 2004 to 2007, indicate that UBS enabled its clients to dodge payment of U.S. dividend taxes totaling about $62 million; an eight-year analysis covering 2000 to 2007, conducted by a single hedge fund, estimated that UBS had helped it escape payment of U.S. dividend taxes totaling about $70 million.  In 2007, however, UBS made a business decision to stop conducting Cayman stock loan transactions and no longer offers these transactions to its clients.

**Tax-Driven Transactions.**  Like Lehman Brothers, Morgan Stanley, and Deutsche Bank, UBS documents make it plain that its dividend enhancement transactions were designed to enable its offshore hedge fund clients to dodge U.S. taxes on U.S. stock dividends.

This point was made explicitly, for example, in 2005 marketing materials developed for its "Dividend Enhancement" products.  Using a question and answer format, the UBS document asks: "In general what does Dividend enhancement [on long positions] offer me?"[199]  UBS then responds:

---

[193] UBS AG, Annual Report on Form 20-F/A for the Fiscal Year Ended Dec. 31, 2007 (2008) at 41.

[194] Id. at 23.

[195] See Id. at 58.

[196] Id. at 10.

[197] Id. at 3.

[198] Id. at 5.

[199] UBS Investment Bank, "Dividend Enhancement on Long Positions" (2005), Bates No. UBS 000529.  Note that UBS, like other financial institutions, had an active "dividend enhancement" business focusing on short equity

"A Cayman Islands (or other offshore) domiciled Hedge Fund enjoys legal and administrative benefits associated with offshore incorporation. However, one downside to being domiciled in a jurisdiction that does not have an income tax treaty with the United States is that dividends on your US equity holdings are subject to a 30% withholding tax, which reduces the net yield of such holdings. Dividend enhancement provides incremental revenue to significantly mitigate this yield loss."[200]

Another UBS internal document, entitled "Why offer Dividend Enhancement?," presents several reasons for conducting these transactions, including using the products to attract and retain hedge fund clients, outmaneuver competitors, and generate profits.[201]  The first paragraph in the document states, for example, that offering dividend enhancement products "differentiates us from our competitors and provides an opportunity for us to speak with Hedge Funds."[202]  The next paragraph states: "It's profitable.  Estimated 2005 P&L is $5 million.  This amount should easily double next year after audited financials allow us to gather supply from external lenders."[203]  The next point is:  "Often, Hedge Fund[s] will move positions in and leave them with us to gain the enhancement.  This increases balances.  Conversely, they will move positions to competitors if we can't offer enhancement."  The document concludes: "It wins us new / added business that can generate P&L in other firm 'silos,'" providing four examples of hedge funds which, after UBS began "enhancing" their dividends, increased their balances with the bank.[204]

UBS plainly pitched its dividend enhancement products to clients by citing its potential tax savings, as shown in this marketing effort aimed at Maverick Capital, an investment manager for several offshore hedge funds:

"For US securities paying dividends, the IRS requires a 30% withholding tax be levied against offshore entities.  This means that a Cayman entity such as Maverick Fund LDC would only receive 70% value on their US dividends.  UBS offers a product known as "Dividend Enhancement", whereby Maverick LDC is able to realize a greater portion of their dividends, and pay an amount less than 100% of a dividend, if they are short a security.  It works on the basis that UBS can get more favorable treatment than an

---

positions, in which the financial institution would structure a transaction to require an offshore hedge fund to pay less than the 100% of the substitute dividend it should pay as the short equity party.  The Subcommittee has not focused on short enhancements and this Report primarily discusses long equity dividend tax abuse transactions.

[200] Id.

[201] See UBS, "Why offer Dividend Enhancement?" (undated, but likely 2005), Bates No. UBS 000512.

[202] Id.

[203] Id.

[204] Id.

offshore entity and thus can put the following arrangement in place, whereby UBS passes an enhanced amount back to the client."[205]

On another occasion, UBS sent an email to an offshore hedge fund client entitled, "Dividend Enhancement," which provided, in part, the following:

"As per our conversation Friday we would like to sign your offshore account to a [Global Master Securities Lending Agreement] with our UBS Cayman entity so you can benefit from our enhanced dividend program.

Here is a brief description of how it works.

Long Positions

Currently you are entitled to 70% of any US dividend in the offshore account. With these agreements we would borrow your stock and loan it to a third party. By doing this we will be able to enhance your divide[n]d (85% on average)."[206]

**UBS Cayman Stock Loan Transactions.** UBS primarily used stock loan transactions, frequently along with an intercompany total return swap, to enable its clients to escape U.S. dividend taxes. To conduct these transactions, UBS made use of an offshore shell corporation in the Cayman Islands, called UBS Cayman Ltd., that "was formed in 1999 to facilitate long dividend enhancement for the firm's hedge fund clients."[207]

UBS Cayman Ltd. apparently had no employees of its own, no physical office, and no business operations other than to function as a placeholder in various UBS dividend-related transactions. When asked by the IRS about this corporation, UBS described it as follows:

"UBSCL is not licensed, registered or regulated (e.g., by reason of capital adequacy requirements) as a broker/dealer or similar entity in any jurisdiction, cannot access the capital markets except through a broker/dealer, and does not hold itself out as a broker/dealer. UBSCL is not, and does not hold itself out as being, capable of servicing customers (e.g., it does not possess adequate systems or personnel), UBSCL's counterparties do not view themselves as UBSCL's customers, and UBSCL does not have any fiduciary duties to its counterparties. UBSCL does not make markets, possess

---

[205] "Dividend Enhancement" document attached to email sent from Veronica Wilthew, UBS, to Michael Madaio and Mark Niesen, both UBS, FW: Dividend Enhancement Flow (Nov. 1, 2004), Bates No. UBS 000509.

[206] Email from Anthony Silvio of UBS to Catherin Carr of PCM-US, re Dividend Enhancement (Aug. 30, 2004), Bates No. UBS 000653.

[207] UBS Cayman Ltd. Capital Request – Request for Circular GEB Approval, (Jan. 23, 2004), Bates No. UBS 000521.

inventory, or have an established place of business.  UBSCL does not hold itself out as a merchant or as willing to enter into either side of securities or derivative trades."[208]

Despite being a shell operation, UBS Cayman Ltd. was routinely used by UBS in its dividend-related stock loan transactions, most of which were "structured for a week or less."[209]

An internal UBS document explains how its "Dividend Enhancement" transactions typically worked.[210]  The transaction was described as follows:

"1)  UBS Cayman borrows the US stock from [a Cayman hedge fund].

2)  UBS Cayman executes a total return swap with UBS AG, whereby Cayman are 'long' the returns.

3)  UBS Cayman sell[s] the stock to UBS AG London in order for UBS AG London to hedge the swap.

4)  UBS AG London creates a long basket trade (in swap form), including the security that it received from UBS Cayman.

5)  UBS AG London sell[s] the physical stock to the swap counterpart, as the other side of the swap transaction UBS AG London then receive returns on the swap, including 100% of the dividends value (as a part of the swap transaction), on the stock received from UBS Cayman.

6)  UBS AG London returns 90% of the value of the dividend to UBS Cayman, this is done by way of a commission, to reflect 90% value of such dividend.

7)  UBS Cayman passes the 90% dividend payment onto [the Cayman hedge fund]."[211]

The document also states:  "At the expiration of the transaction UBS AG London purchases the stock, in the market, in the name of UBS Cayman.  The stock is then returned to [the Cayman hedge fund], and the transaction is closed."[212]  The position of UBS legal counsel is that this

---

[208] Technical analysis prepared by UBS' legal counsel for the IRS (undated), Bates No. UBS 000474, at 4 n.4.

[209] Id.

[210] "Dividend Enhancement" document attached to email sent from Veronica Wilthew, UBS, to Michael Madaio and Mark Niesen, both UBS, FW: Dividend Enhancement Flow (Nov. 1, 2004), Bates No. UBS 000509.

[211] Id.

[212] Id.

admittedly "convoluted structure" complies with IRS Notice 97-66, and enables UBS to omit any tax withholding for the offshore hedge fund involved in the transaction.[213]

A 2007 legal opinion prepared for UBS indicates that the bank continued to engage in these abusive stock loans until recently. The opinion describes a typical UBS Cayman stock loan transaction as follows: "UBS Cayman borrows voting shares of publicly-traded U.S. corporations from unrelated persons ... or from UBS Zurich, a Swiss branch of UBS AG ("UBS Zurich"), and lends those shares to unrelated non-U.S. persons ineligible for the benefits of a tax treaty that reduces withholding tax on dividends."[214] The opinion notes that to carry out these transactions, "UBS Cayman conduct[ed] its activities by means of employees located in the United States that [we]re also employees of UBS Securities LLC."[215]

In June 2006, the UBS Head of Tax for the Americas made a presentation on the Cayman stock loan transactions to the UBS management board in Switzerland.[216] The board was asked to approve an increase in the stock lending business, but the board decided to hold the business at existing level and imposed a $72 million risk limit on the Cayman stock loan transactions, meaning that those particular transactions could generate no more than $72 million in substitute dividend payments.[217] UBS representatives informed the Subcommittee that in November 2007, the management board in Switzerland made the decision to terminate the Cayman Islands stock lending program.[218] UBS told the Subcommittee that the program was terminated, because it was not making money and for policy reasons. UBS informed the Subcommittee that today it does not conduct any stock lending transactions based upon IRS Notice 97-66.[219]

**Lost Tax Revenues.** UBS provided the Subcommittee with spreadsheets and other documents containing detailed data related to its Cayman stock loan transactions over a four-year period, from 2004 to 2007. These spreadsheets show that, in 2004, UBS conducted stock loan transactions in which it passed through substitute dividend payments to its clients totaling about $42 million which, after application of the 30% dividend tax, meant that UBS had helped its clients dodge payment of about $12 million in dividend taxes.[220] In 2005, the total amount of

---

[213] Id.

[214] Memorandum from Sullivan & Cromwell LLP to UBS, re "Withholding Tax On Substitute Dividend Payments (Aug. 17, 2007), Bates No. UBS 000664, at 2.

[215] Id.

[216] Subcommittee staff interview with Todd Tuckner, UBS Head of Tax for the America (Nov. 1, 2007).

[217] Id.

[218] Subcommittee staff interview with Todd Tuckner, UBS Head of Tax for the America (Aug. 25, 2008).

[219] Id.

[220] The totals provided in this paragraph and the next were derived by the Subcommittee from UBS Cayman Substitute Payments spreadsheets, 2004, 2005, 2006, and 2007 (Feb. 28 and Mar. 17, 2008) (on file with Subcommittee).

substitute dividends was about $67 million, and the total amount of unpaid dividend taxes was about $20 million. In 2006, the total amount of substitute dividend payments was about $71 million, and the unpaid dividend taxes about $21 million. In 2007, the year in which the program was terminated in November, the total amount of substitute dividends was about $26 million, and the unpaid dividend taxes about $8 million. Altogether then, over the four year period, UBS passed onto its clients substitute dividend payments totaling $206 million and helped them skip paying dividend taxes totaling about $62 million.

The spreadsheets also indicate that UBS' top clients during this four-year period were primarily offshore hedge funds. In 2006 alone, for example, Maverick participated in Cayman stock loan transactions that generated a total of about $24 million in dividends, and enabled it to dodge dividend taxes totaling about $7 million. Highsfield Capital participated in Cayman stock loan transactions that generated a total of about $17 million in dividends and unpaid dividend taxes of about $5 million. Jana Master Fund participated in transactions that generated about $9 million in dividends and unpaid dividend taxes of about $3 million. Other clients included S.A.C. Capital Associates, The Canyon Value Realization Fund (Cayman) Ltd., Oz Overseas Fund, and Black Diamond Offshore Ltd.

Another analysis, prepared by Maverick Capital, has additional information related to UBS and provides another perspective on the tax revenues lost as a result of its abusive dividend tax transactions. In this analysis, which was prepared for Maverick's internal use, Maverick estimated the "Tax Benefit" from "U.S. Dividend Enhancements" conducted over an eight-year period, from 2000 to 2007 for several offshore funds that it managed. Using specific data from past dividend enhancement transactions involving U.S. securities, Maverick estimated that, overall, of the U.S. dividend related payments made to its offshore hedge funds, the potential unpaid U.S. dividend taxes totaled about $95 million. Of that $95 million, the data showed that the bulk of the transactions had been brokered by UBS which had enabled Maverick to escape payment of about $70 million.[221]

A third analysis, prepared in 2007 by Citigroup in connection with its decision to voluntarily pay the IRS $24 million in unpaid dividend taxes associated with certain swap transactions, explained further below, identifies swaps that Citigroup conducted with UBS over a three-year period, from 2003 to 2005. Citigroup determined that these UBS brokered transactions had provided it with dividend-based payments totaling about $22 million, and allowed it to escape paying dividend taxes totaling about $3.4 million.[222]

Using different years and different counterparties, with some overlap, each of these totals, $62 million, $70 million, and $3.4 million, helps quantify the dividend taxes that were never withheld or remitted to the U.S. treasury due to transactions arranged by UBS. At the

---

[221] Maverick Funds charts entitled, "U.S. Dividend Enhancements" and "Summary of Domestic Enhancements (by broker)" (Dec. 31, 2007), Bates No. MAV0000856-57.

[222] Citigroup untitled chart prepared for the IRS listing swap transactions from 2003 to 2005 (undated), Bates No. CITI_PSIWHTAX001460. See also discussion of Citigroup case history.

least, they show that UBS structured transactions that enabled its clients to dodge payment of tens of millions of dollars in U.S. dividend taxes.

### E.    Merrill Lynch Case History

#### 1.    Background

Merrill Lynch is a global investment bank with headquarters in New York City,[223] offices in more than 40 countries, and over 64,000 employees worldwide.[224]  Through its subsidiaries, Merrill Lynch holds nearly $2 trillion in client assets,[225] as well as a 45% share in BlackRock, a financial firm with approximately $1.4 trillion in assets under management.[226]  It conducts much of its trading operations through Merrill Lynch, Pierce, Fenner & Smith Incorporated, a registered U.S. broker-dealer.  Other subsidiaries include ML IBK Positions, Inc, through which Merrill Lynch invests in private equity, and Merrill Lynch International Bank Limited, which is its primary non-U.S. banking entity.  In 2007, Merrill reported a loss of $8.6 billion.[227]  John Thain, former head of the New York Stock Exchange, became the firm's Chairman and Chief Executive Officer in December 2007.[228]

#### 2.    Dividend Tax Abusive Transactions

Merrill Lynch developed, marketed, and implemented a variety of abusive dividend tax transactions to enable its non-U.S. clients to dodge payment of U.S. taxes on U.S. stock dividends.  These abusive transactions made use of not only swaps and stock loans, but also stock options, including coordinated puts and calls.  In 2005, under a program called Project Gemini, Merrill began conducting abusive stock loan transactions using an offshore corporation established for that purpose called Merrill Lynch Equity Solutions Jersey (MLESJ).  Some of its clients, worried about the tax risk involved in these loans, asked Merrill to indemnify them against the associated tax liability.  In early 2008, apparently due to the Subcommittee investigation, Merrill suspended its Project Gemini stock loans.

**Tax-Driven Transactions.**  Merrill documents clearly demonstrate that it has developed and marketed its dividend enhancement products as a way for its non-U.S. clients to dodge payment of U.S. dividend taxes.

This approach is clearly set out, for example, in 2004 documents related to the Microsoft $3 special dividend.  On July 21, 2004, the day after Microsoft announced the special dividend, the head of Merrill's corporate equity derivatives group in London sent an email to several

---

[223] http://www ml.com/media/92209.pdf.

[224] Merrill Lynch & Co Inc., Annual Report on Form 10-K for the Fiscal Year Ended Dec. 28, 2007 19 (2008).

[225] Id. at 20.

[226] Id.

[227] Id. at 22.

[228] Id. at 167.

colleagues stating: "Okay, so we always use Microsoft as the 'no dividend' example in tax scenarios, and now that will have to stop! $32 billion dollars in dividends is a lot of dividends, and we should discuss whether there is value to be had. … We will obviously need to discuss generally the Firm's position on [IRS Notice] 97-66 and look at derivative solutions."[229]

An employee in Merrill's Global Tax group in New York responded with several ideas for financial transactions to enable clients to dodge payment of U.S. dividend taxes on the Microsoft dividend, including transactions involving stock loans, total return swaps, and options. He observed:

> "We had in place a 97-66 structure out of our SNCFE-Hong Kong entity, as it related to our Luxembourg SICAV funds. This structure was put on hold because the systems infrastructure supporting the trade did not work as anticipated. We also know that Morgan Stanley had a 97-66 facility for a couple of years, and our 97-66 thing was an internal response to that. … I also heard that the IRS is looking into this issue as part of the single stock futures project and there is some concern that whatever rules they devise as part of that could adversely impact the 97-66 trades. Other thoughts - …[t]ypical total return swaps or collars to avoid [withholding] tax."[230]

In a second email on the same day, the Global Tax employee wrote:

> "I also just heard that there is *extreme* interest in foreign holders replacing their long physical position with a put/call combo. … The options exchange is pricing 100% of the dividend into the option, so the foreign holders have the incentive to do a 'conversion transaction' whereby they sell their stock to the specialist and simultaneously replace it with a put/call synthetic …. [B]y holding options where the strikes automatically drop by 100% of the dividend, foreign holders can receive 100% of the dividend through the options."[231]

He also noted the tax risk associated with these transactions:

> "Normally, we are concerned where a customer (i) sells stock to ML [Merrill Lynch]; (ii) at the same time faces ML on an OTC TRS [over-the-counter total return swap] or forward or put/call combo; and (iii) gets the stock back at the end, either via physical settlement or a cross out or what have you. I am not that concerned where the options are

---

[229] Email from Jacqueline Duval-Major at Merrill Lynch International in London to Thomas Visone, Merrill Global Tax in New York, and other Merrill colleagues in London and New York, re Microsoft dividend (July 21, 2004), Bates No. ML-PSI-00147052. IRS Notice 97-66 is the notice that some financial institutions claim allows certain offshore stock loan transactions to eliminate the payment of U.S. dividend taxes, as explained earlier.

[230] Email from Thomas Visone, Merrill Global Tax in New York, to Jacqueline Duval-Major and other Merrill colleagues in New York and Montreal, re Microsoft dividend (July 22, 2004), Bates No. ML-PSI-00147050-51.

[231] Email from Thomas Visone, Merrill Global Tax in New York, to Merrill colleagues in New York, London, and Montreal, including Jacqueline Duval-Major, re Microsoft dividend (July 22, 2004), Bates No. ML-PSI-00147049-50 (emphasis in original).

exchange traded because ML is technically not the counterparty and we could close out our position through offset on the exchange while our customer still has his options with OCC.  However, OTC options don't have that argument available, thus may be a repo [stock repurchase], thus there may be withholding tax."[232]

The head of Merrill's corporate equity derivatives group responded:

"Tom:  This is exactly what I had in mind – a synthetic long structure for non-US holders to get as close to 100% of that dividend value:  Put/call combo (or as you mentioned in an earlier email, total rate of return swap). …  Maybe we could ameliorate your concerns re recharacterization as a repo with an OTC by making sure that either the sale or any potential purchase at the close of our derivative potion to unwind the hedge (or both) are not done directly with a client, but rather from a broker.  Also, I firmly believe that when ML has synthetic in and sy[n]thetic out (your example below on the short collar), it is hard to show a repo."[233]

These emails show that, in 2004, Merrill employees were actively designing financial transactions to enable their "non-US holders" of Microsoft stock to avoid dividend withholding, were aware of the tax risk that the transactions might be recharacterized as a stock sale and repurchase subject to dividend taxes, and were interested in including features that would make it "hard to show a repo."

One month later, in August 2004, Merrill employees exchanged emails regarding the transactions being developed:

"Can you speak to … the US swaps desk about Microsoft – after our follow up phone call with tax dept today related to various ways our clients are going to expect to see yield enhancement trades on MSFT .…  Paul is writing up (again) a list of the trades proposed and the advantages/disadvantages of each, with the view to get Tax dept guidelines asap."[234]

One colleague responded:  "Our competitors are out there with products and we need to get ours out there asap!"[235]

By early October, Merrill circulated an email describing a proposed "Microsoft Trade," involving coordinated puts and calls.[236]  The author of the email stated:  "The beauty of the trade

---

[232] Id. at 50.

[233] Id. at 49.

[234] Email from Jacqueline Duval-Major at Merrill Lynch International in London to Tobias Gehrke in London and Paul Cipriano who works at the US swaps desk in New York, re microsoft (Aug. 27, 2004), Bates No. ML-PSI-00054123-24.

[235] Email from Tobias Gehrke of Merrill in London to Jacqueline Duval-Major in London and others, re microsoft (Aug. 31, 2004), Bates No. ML-PSI-00054123.

is that the option strike is lowered by $3 on the XD [ex dividend] date, thereby giving 100% of the special dividend." The email provided an example of how the trade would be executed for a non-U.S. client subject to "a US dividend withholding rate of 15%." It indicated that the trade would return 100% of the withheld dividend, less Merrill's fee: "The fees of 6 cents per share (or $3 per option) equate to 2% of the special dividend. Therefore the client receives 100% gross of the dividend through the trade, or 98% net after costs." The same Merrill employee noted later that the transaction was "our only internally recommended listed trade, but clearly you have to be comfortable yourselves from a tax angle before you proceed."[237]

In October, Merrill's Corporate Equity Derivatives group head circulated an email to a wide group of Merrill relationship managers and corporate finance employees announcing a "yield enhancement opportunity for Clients that may hold Microsoft shares (MSFT US)." The email stated: "Clients who hold Microsoft shares – whether as an free-standing shareholding or as part of a basket – and who will suffer withholding tax on such shareholding (whether at 15 or 30%) may benefit from one of the proposed transactions." The email directed each employee to "[i]dentify Clients that may hold investments in MSFT US and could benefit from the yield enhancement," and to contact the Corporate Equity Derivatives group to discuss the transactions. It also stated: "Our competitors are offering similar products, and time is of the essence."

The attached presentation, whose first page was entitled "Microsft Special Dividend: Yield Enhancement," was explicit in telling Merrill employees that the purpose of the newly-designed transactions was to help non-U.S. clients dodge payment of U.S. dividend taxes:

- "MSFT announced 20 July that it will pay $32 billion of dividend in a $3 per share special dividend, record date 17 November, pay date on 2 December ….

- Dividends paid to non-U.S. holders will be subject to US withholding tax at 30% or a less rate (usually 15%) under a tax treaty. **Depending on the tax status and application [of] the relevant domestic tax law, US withholding tax suffered may represent an absolute cost to the non-US holder.**

- The trade ideas in this presentation may provide a higher synthetic return to such holders than a physical dividend with withholding tax. Merrill Lynch makes money generally through the pricing of the dividend element of the synthetic transaction (and ML's hedge to that transaction).

- The Tax Department has approved these transaction parameters for yield enhancement transactions over MSFT shares. …

---

[236] Email from Andrew Miller of Merrill in London, re Microsoft Trade yesterday (Oct. 7, 2004), Bates No. ML-PSI-00149879-80.

[237] Email from Andrew Miller of Merrill in London, re Microsoft Trade yesterday (Oct. 27, 2004), Bates No. ML-PSI-00149878-79.

- Corporate Equity Derivatives will liaise with US Swaps Desk … to coordinate execution of the transactions."[238]

The presentation then provided charts and an explanation of three possible transactions, the first involving an equity total return swap, the second an exchange traded option called a "flex option," and the third an over-the-counter option. Another Merrill document shows that Merrill actually carried out the Microsoft related swap and option transactions with more than a dozen clients, primarily offshore hedge funds, affecting over 20 million shares of Microsoft stock and resulting in over $18.5 million in dividend taxes not being withheld and turned over the U.S. treasury.[239]

Other documents show that Merrill continued to offer equity swaps to reduce or eliminate clients' dividend taxes. For example, an analysis prepared by Citigroup, in 2007, in connection with a decision to voluntarily pay the IRS $24 million in unpaid dividend taxes associated with certain swap transactions, explained in more detail below, included swaps with Merrill Lynch over a three-year period, from 2003 to 2005, involving nearly $23 million in dividend related payments and $3.4 million in unpaid dividend taxes.[240] In 2006, Merrill's Global Markets & Investment Banking Group prepared a lengthy presentation on its development, marketing, and use of equity swap products.[241] With respect to U.S. stocks that pay dividends, the presentation stated: "ML can pay an amount equal to 100% of the ordinary dividend."[242] When discussing "Key Usage Considerations" for equity swaps, it listed as one key consideration: "Yield Enhancement[:] Dividend enhancement (recapture withheld dividends for foreign investors)".[243] When discussing "Swap Applications and Advantages," it stated: "Dividend Enhancement – As synthetic instruments, swaps are not subject to the withholding taxes that may be incurred by non treaty or offshore investors who own the physical shares of a dividend paying stock," citing the usual dividend withholding tax rates of 30% and 15%.[244] Clearly, helping clients dodge payment of U.S. dividend taxes had become an established part of Merrill's equity swap business.

**Project Gemini Stock Loans.** Merrill Lynch also made use of abusive stock loans to enable its clients to dodge U.S. dividend taxes. In 2005, for example, Merrill launched Project

---

[238] Merrill Lynch presentation entitled, "Yield Enhancement Opportunity[:] Microsoft Special/Cash Dividend (MSFT US)" (Sept. 23, 2004), Bates No. ML-PSI-0289-94 (emphasis in original).

[239] Merrill Lynch document entitled, "Microsoft Counterparties" (undated), Bates No. ML-PSI-0485. One of the clients was a Merrill-related entity called "Merrill Lynch Investment Managers."

[240] Citigroup untitled chart prepared for the IRS listing swap transactions from 2003 to 2005 (undated), Bates No. CITI_PSIWHTAX001460. See also discussion of Citigroup case history.

[241] Merrill Lynch presentation entitled, "Global Financing Products Group" (Spring 2006), Bates No. ML-PSI-0123.

[242] Id. at 141

[243] Id. at 145.

[244] Id. at 147.

Gemini, which it described as "a program intended to provide selected international investment funds holding US equities with an enhanced after tax return."[245] It was planned to be "broadly market[ed]" to "foreign pension funds and investment funds with US equities."[246]

Project Gemini initially provided "dividend enhancements" to a Luxembourg mutual fund controlled by Merrill called Merrill Lynch International Investment Fund (MLIIF), which was already executing the proposed stock loan transaction "with several of Merrill Lynch's competitors."[247] The Project then expanded to service other funds and institutions. The Project utilized an offshore corporation in the Isle of Jersey called Merrill Lynch Equity Solutions Jersey Ltd. (MLESJ). An initial presentation on the Project explained that the proposed transaction involved: "[a] stock loan from MLIIF to a newly formed Jersey Island entity, a subsidiary of ML Group, Inc." and "[a] series of derivative transactions executed with the market by the Jersey entity and MLI to hedge ML market risk."[248] It then provided a series of charts explaining the transaction.

The presentation stated: "Summary of US Tax Analysis[:] No payments into or between Merrill Lynch affiliates (MLI and [MLESJ]) will be subject to withholding tax. Payments to MLIFF under the stock loan will not be subject to withholding tax."[249] A subsequent page in the presentation estimated that the Gemini Project would protect about $72 million in annual U.S. dividends sent to Merrill clients from $21.6 million in U.S. dividend taxes, while bringing in a net economic benefit to Merrill Lynch of about $9.6 million.[250]

Project Gemini was approved by Merrill's product review committees in August 2005, and stock loan transactions began taking place in November that year. A month beforehand, in October 2005, an "Operating Plan" was drawn up.[251] The Plan began by observing: "Project Gemini is a structured transaction designed to provide yield enhancement to non-US clients of Merrill Lynch that own US dividend-paying equities. From the client's perspective, the transaction involves a market standard stock loan to a subsidiary of Merrill Lynch [MLESJ]." The Operating Plan also stated:

---

[245] Merrill Lynch presentation by its Global Markets & Investment Banking Group, "SSPC Discussion Materials: Project Gemini" (Aug. 4, 2005), Bates No. ML-PSI-0300-18.

[246] Id. at 302.

[247] Id. In its presentation, Merrill described MLIIF as a SICAV fund incorporated in Luxembourg, having only non-U.S. investors, and whose investments were managed by Merrill Lynch. SICAV stands for Societe d'Investissement à Capital Variable, "a Luxembourg based public limited liability company whose capital is at any time equal to the net value of its assets." Merrill wrote that, in 2005, MLIIF had "approximately $28 billion of assets, with roughly 25% invested in US equities." It indicated that these U.S. securities were subject to a 30% dividend tax. Id. at 305.

[248] Id. at 302.

[249] Id. at 313.

[250] Id. at 317.

[251] Merrill Lynch document entitled, "Project Gemini Operating Plan as of October 11, 2005" (Oct. 11, 2005), Bates No. ML-PSI-00049447-53.

"The structure may impose some US tax risk on ML. To manage any potential risk, ML has established a cap on the transaction which focuses on our economic return relative to potential tax risk. … Clients may not be offered enhancement of greater than 50% of potential US withholding taxes without approval …. Several of our competitors offer similar products (most notably Morgan Stanley, Lehman Brothers, and many non-US banks) so many natural candidates for the transaction are already being serviced and may command pricing concessions (State Street, BGI). … The success of Project Gemini and our ability to achieve target economics relies on ML's superior reach and breadth of relationships relative to our competitors. Ideal candidates are likely to include SICAVs and Irish mutual fund companies."

Following up on the Operating Plan's tax risk analysis, a Gemini Project review one month later disclosed that Merrill had, in fact, established a tax risk limit for the program: "Annual trading limit initially established at first to be reached of (a) $50 million annual gross withholding tax elimination, and (b) $25 million net withholding tax (=gross withholding tax less MLESJ fees). Limits will be reviewed after one year."[252]

In mid-November 2005, Merrill's Americas Equity Derivatives Sales & Structured Marketing Group conducted a review of its new product and trade development and prepared a presentation. The presentation noted that the Gemini Project had begun executing its "yield enhancement program" on November 15, and projected that it would obtain 2006 revenues of $10 million and 2007 revenues of up to $20 million.[253] In the meantime, the group noted that, even without the Gemini Project, during 2005, it had executed 18 transactions, of which 15 were "dividend yield enhancement."[254] It noted that these transactions involved "9 hedge funds, 1 bank, 1 mutual fund, 1 personal holding company."[255] It also observed that "[m]aturation of on-shore and off-shore hedge fund space creates large pool of high-volume clients focused on sophisticated tax and other structured products as a new asset class."[256]

For about two years, from late 2005 until late 2007, Project Gemini conducted stock loan transactions for non-U.S. clients to reduce their U.S. dividend taxes. In early 2008, after the Subcommittee had began this investigation and contacted several financial institutions and hedge funds, Merrill Lynch decided to suspend the Project and its transactions, as explained in this email sent by a Merrill employee to a client informing the client of the decision:

---

[252] Merrill Lynch document entitled, "GMI New Product Review" (Oct. 25, 2005), Bates No. ML-PSI-0319-56, at 337.

[253] Merrill Lynch document entitled, "New Product & Trade Development," prepared by the Americas Equity Derivatives Sales & Structured Marketing Group (Nov. 17, 2005), Bates No. ML-PSI-00047439-43, at 40.

[254] Id.

[255] Id.

[256] Id.

"Many thanks for meeting with us early on today on short notice.  As explained verbally, as a result of the actions by the US Senate's Permanent Subcommittee on Investigations our Jersey entity (Merrill Lynch Equity Solutions Jersey or MLESJ) has had to cease trading in regards its stock lending activities for US stocks.  As a result of this we are seeking to have the Lender recall the securities in line with the wording as set forth below. …  Our opinion is that as the securities lending business of MLESJ undertaken in these Agreements has been materially restricted … the clause therefore requires the Lender to recall all outstanding loans, for the borrower to return all loaned securities and for the Agreement to terminate."[257]

Merrill Lynch informed the Subcommittee that Project Gemini remains on suspension, although a decision could be made at some future time to renew its operation.

**Tax Indemnity.**  While Merrill Lynch was providing stock loan transactions under Project Gemini, several of its clients, apparently worried about the tax risk, asked the firm to indemnify them against U.S. tax liability associated with the transaction.

For example, in 2007, Olayan Group, an investment firm based in Saudia Arabia, but with a New York office, expressed concerns about the potential tax risks posed by Gemini and asked Merrill Lynch to provide it with a tax indemnification agreement.  On March 29, 2007, a Merrill marketing executive sent the requested language:

"[S]orry this has taken so long to get to you – as a follow up to our meeting and our 'gemini' product that can enhance the effective dividend you get on physically held US stocks (like OXY), here is our standard 'indemnity' language that you were looking for – please review it and let me know your thoughts.  if i'm doing my math right, i think this can save you around $7 million per year on OXY."[258]

The language provided:

"[A]ll payments under this Agreement shall be made on the due date without any withholding or deduction whatsoever unless required by law on account of tax.  If any deduction or withholding on account of tax is required by law to be made from any payment … then the payor shall pay in the same manner and at the same time such additional amounts as would result in the receipt by the payee, free from any such withholding or deduction, such amounts as would have been received by the payee had no such deduction or withholding been required to be made and shall at the same time supply tax vouchers in respect of the same if requested."[259]

---

[257] Email from Hamish Pritchard of Merrill Lynch in London to Chris Poikonen and Mark Wilson of eSec, an apparent client, with copies to two Merrill colleagues, re Exclusive Lending Agreements – Janus Capital and Foreign & Colonial (Jan. 17, 2008), Bates No. ML-PSI-00001261-62.

[258] Email from Brian Abdoo of Merrill Lynch's Multi-Product Marketing group to John O. Wolcott of Olayan's New York office, re crescent/olayan follow up (Mar. 29, 2007), Bates No. ML-PSI-00127175.

[259] Id.

The potential client responded that its contact at a prominent U.S. law firm, Shearman & Sterling, "report that they are apparently satisfied that the transaction works. Once. Or maybe twice, but not necessarily in succession, the reason being that repeated 'abuse' (my hyperbolic word, not theirs) without a non-tax related business purpose would quickly lead the IRS to such conclusion."[260]  The Merrill employee responded:  "who did you talk to at sherman?  i'm pretty sure that we can get them comfortable, perhaps with a few modifications.  They've represented some of our other counterparties doing this trade with us."[261]

The client replied that its legal contact "has talked to a number of his partners, all of whom tell him that the transaction works, as I said, once, maybe twice because repeated use, coincidentally around dividend payment time, would provide a strong case for the IRS to assert tax evasion.  So yes, looking at it in a vacuum, it works, it is the repeated 'overuse', e.g. pigs trying to be hogs, that proves problematic."[262]

After Merrill responded that "something is being miscommunicated here somewhere," the client suggested that Merrill have its lawyers talk to his, explaining that his legal contact "has cautioned us that converting the JPM dividend to nontaxable ordinary income lending the shares just long enough to cover the record dates quarter after quarter does not [work].  And perhaps other clients are less concerned about playing the audit lottery than are we."[263]  A stock loan was never undertaken.

During the same time period, Merrill Lynch was also talking to another client, Goldman Sachs Asset Management (GSAM), the offshore hedge fund management arm of Goldman Sachs, that also had requested tax indemnity.  In January 2007, Merrill Lynch had proposed that GSAM enter into a Project Gemini stock loan transaction with its Jersey subsidiary, MLESJ.[264]  Before agreeing to do so, GSAM asked Merrill Lynch provide it with an indemnity agreement to protect it against any U.S. tax liability.[265]  Merrill Lynch and GSAM then negotiated over the wording of the proposed agreement for the next three months. [266]

---

[260] Email from John O. Wolcott of Olayan's New York office to Brian Abdoo of Merrill Lynch's Multi-Product Marketing group, re crescent/olayan follow up (Mar. 29, 2007), Bates No. ML-PSI-00127175.

[261] Email from Brian Abdoo of Merrill Lynch's Multi-Product Marketing group to John O. Wolcott of Olayan's New York office, re crescent/olayan follow up (Apr. 19, 2007), Bates No. ML-PSI-00127175.

[262] Email from John O. Wolcott of Olayan's New York office to Brian Abdoo of Merrill Lynch's Multi-Product Marketing group, re crescent/olayan follow up (Apr. 19, 2007), Bates No. ML-PSI-00127174-75.

[263] Email from John O. Wolcott of Olayan's New York office to Brian Abdoo of Merrill Lynch's Multi-Product Marketing group, re crescent/olayan follow up (Apr. 25, 2007), Bates No. ML-PSI-00127174.

[264] See Merrill Lynch presentation entitled, "Enhanced Stock Lending Over US Equities[:] GSAM" (Jan. 30, 2007), Bates Nos. GS-PSI-002397-2401.

[265] See email from Karl Wianecki of GSAM to several GSAM colleagues, re Basic flows for US (Feb. 15, 2007), Bates No. GS-PSI-002396; Subcommittee interview with GSAM (Aug. 29, 2008).

[266] Emails between Merrill Lynch and GSAM personnel, re US stock lending to MLESJ (from Feb. 16, 2007 to May 15, 2007), Bates Nos. GS-PSI-002513-22 and GS-PSI-05768-79.

The provisions under discussion, which appear to have been written initially by GSAM, would have required Merrill, as borrower of the stock in question, to "fully comply with all applicable United States income tax withholding obligations if any," and state that Merrill will be "liable for and will fully indemnify the Lender for any United States tax liability, including any interest, penalties or additions to tax … with respect to any failure to withhold and timely pay to the U.S. Internal Revenue Service any United States withholding tax imposed on any substitute payments made to the Lender."   Other provisions would have required GSAM, as the lender of the stock, to notify Merrill within 30 days of receiving any claim from the U.S. government for withholding taxes; give Merrill the right to take over the defense against any IRS claim for taxes; and refuse to agree to any tax settlement without Merrill's written consent. Merrill also proposed a clause that would have prohibited GSAM from "consulting with U.S. governmental officials" without Merrill's consent, but GSAM stated that it could not agree to it.[267]

By May 2007, one GSAM employee told another that "it seems ML is re-evaluating the viability of this product. …  I don't think this is going to happen."[268] On May 15, Merrill Lynch announced to GSAM that its tax department and business personnel had completed work on:

> "a standardized indemnity that we can offer in relation to these transactions going forward. Attached is a mark up showing how this changes from what we had been discussing.  Note that we can accept no substantive changes to this.  Apologies for the timing being during our negotiation, however this has been an ongoing project on our side.  We look forward to discussing this with you and hope that it is acceptable."[269]

Apparently, however, the new proposal was not acceptable to GSAM, and for that and other reasons, no stock loan transaction was concluded.[270]

**Lost Tax Revenue.**  The evidence associated with Merrill's dividend tax transactions indicates that these transactions likely produced substantial tax losses for the U.S. treasury.  For example, Merrill's internal presentation on Project Gemini projected that, each year the program was in effect, the stock loans would enable Merrill clients to avoid paying about $21.6 million in taxes on $72 million in U.S. dividends.[271]  Merrill established an even higher dollar-value limit on the annual tax risk that could be incurred by the program, setting it at the first to be reached of:  "$50 million annual gross withholding tax elimination" or "$25 million net withholding tax (+gross withholding tax less [Merrill] fees)."  A member of Merrill's Multi-Product Marketing

---

[267] Id. at GS-PSI-05775.

[268] Email from Karl Wianecki to Cary Chropuvka, both of GSAM, re US stock lending to MLESJ (May 3, 2007), Bates No. GS-PSI-05771.

[269] Email from Graham Seaton of Merrill Lynch to Rachel Birnbaum of GSAM, with copies to other Merrill and GSAM employees, re US stock lending to MLESJ (May 15, 2007), Bates No. GS-PSI-002513.

[270] Subcommittee interviews with Merrill Lynch (Sept. 2, 2008) and GSAM (Aug. 29, 2008).

[271] Merrill Lynch presentation by its Global Markets & Investment Banking Group, "SSPC Discussion Materials: Project Gemini" (Aug. 4, 2005), Bates No. ML-PSI-0300-18.

group told an offshore hedge fund client in 2007, that the Gemini stock loan program could save it about $7 million in dividend taxes per year on a single U.S. security.[272]  These documents show that Merrill expected its stock loan program to result in $20 to $50 million in lost tax revenues for the United States each year.  The program was actually in operation for about two years, before being suspended in January 2008.

Merrill's other dividend enhancement products also caused tax losses.  In 2004, for example, its Microsoft swap and option transactions resulted in over $18.5 million in dividend taxes not being withheld or remitted to the IRS.[273]  As mentioned earlier, from 2003 to 2005, Merrill conducted swap transactions with Citigroup that involved $23 million in dividend equivalent payments and about $3.4 million in unpaid dividend taxes.[274]  Another client, Maverick Capital, calculated that, in just two years, from 2006 to 2007, Merrill had enabled its offshore hedge funds to escape paying dividend taxes totaling nearly $5 million.[275]  Those figures indicate that Merrill's swap transactions were capable of producing millions of dollars in annual tax "savings" for each of its clients and an equivalent annual tax losses for the U.S. government.

These multi-million-dollar totals, $21.6 million, $7 million, $18.5 million, $3.4 million and $5 million, which involve a limited portion of Merrill's dividend enhancement business, show that, in just four years, its transactions caused the U.S. treasury to lose out on tens of millions of dollars in unpaid dividend taxes.

Merrill Lynch has engaged in abusive dividend tax transactions, including stock swaps, loans, and options, for at least four years.  These transactions became an established and profitable part of its business.  The documents show that Merrill Lynch designed, marketed, and implemented these abusive transactions to enable its non-U.S. clients to dodge payment of U.S. dividend taxes, that Merrill Lynch personnel were well aware of the associated tax risk, and that Merrill Lynch took specific steps to limit its tax exposure.  It was apparently only after this investigation launched an inquiry into these matters that Merrill Lynch decided to suspend one type of abusive dividend tax transaction, involving its Project Gemini stock loans.

---

[272] Email from Brian Abdoo of Merrill Lynch's Multi-Product Marketing group to John O. Wolcott of Olayan's New York office, re crescent/olayan follow up (Mar. 29, 2007), Bates No. ML-PSI-00127175.

[273] Merrill Lynch document entitled, "Microsoft Counterparties" (undated), Bates No. ML-PSI-0485.

[274] Citigroup untitled chart prepared for the IRS listing swap transactions from 2003 to 2005 (undated), Bates No. CITI_PSIWHTAX001460.  See also discussion of Citigroup case history.

[275] Maverick Funds charts entitled, "U.S. Dividend Enhancements" and "Summary of Domestic Enhancements (by broker)" (Dec. 31, 2007), Bates No. MAV0000856-57.

### F.    Citigroup Case History

#### 1.    Background

Citigroup Inc. ("Citi") is one of the largest financial institutions formed and headquartered in the United States, with assets that, at the end of 2007, exceeded $2.18 trillion.[276]  Citi currently operates in about 100 countries, employs over 385,000 individuals worldwide, and is organized into four major segments, Global Consumer Group, Citi Markets and Banking, Global Wealth Management, and Citi Alternative Investments.[277]  In Fiscal Year 2007, Citi reported a net income of $3.6 billion.[278]  Citi's current Chief Executive Officer is Vikram Pandit.[279]

#### 2.    Dividend Tax Abusive Transactions

This final case history presents a unique fact pattern in which, in 2007, Citi took the initiative to pay the IRS $24 million in withholding taxes on certain swap transactions that Citi had undertaken from 2003 to 2005, tied to U.S. stocks for which $160 million in dividend equivalents had been paid but no dividend taxes had been originally withheld.

Citi apparently began engaging in what it termed "dividend uplift" transactions in 2002.[280]  In a 2006 letter to the New York Stock Exchange, Citi explained that its Equity Finance Desk in New York, which dealt primarily with broker-dealers and hedge funds, had begun to engage in transactions "dedicated to achieving 'dividend uplift' for foreign customers in respect of U.S. equities … with the most significant activity occurring in 2004 and early 2005."[281]  Citi described these transactions as follows:

> "U.S. tax rules provide that dividend equivalent amounts paid to a foreign investor under a derivative contract are not subject to withholding tax.  By contrast, actual dividends on U.S. equities are subject to U.S. withholding tax.  In the dividend uplift trades, CGML – Citigroup's U.K. broker/dealer – would acquire a U.S. equity security from an offshore fund or dealer (via a transaction between that entity and Citigroup Global Markets, Inc. ('CGMI')) and enter into a total return swap ('TRS') with that entity.  At the termination

---

[276] Citigroup Inc, 2007 Annual Report at 66.

[277] *Id.* at 2. Note: Employment figure includes both full-time and part-time employees.

[278] *See Id.* at 3.

[279] *Id.* at 4.

[280] See Letter from Citigroup to the New York Stock Exchange, (Feb. 1, 2006), and attachments, Bates No. CITI_PSIWHTAX000738-43, at 739.

[281] Id.

of the TRS, the offshore entity would in many instances reacquire the equities.  In exchange for a LIBOR-based return, CGML paid dividend equivalent amounts to the offshore entity under the TRS, and treated those amounts as paid on a bona fide derivative contract, rather than as a pass-through of dividends on stock held in a custodial-type capacity.  This treatment allowed the payments to be made free of the U.S. withholding taxes that would otherwise have been due to be withheld on dividends paid to the offshore entity.  …

"Customers executing TRSs with the Desk frequently sell the underlying securities to the Desk at the beginning of the TRSs and then wish to reacquire the securities at the termination of the TRS, without any execution or other risk.  However, if at the time the TRS was entered into the customer and the Desk had an understanding that at termination of the TRS the securities would be sold (directly or indirectly) back to the customer, the TRS may be recharacterized for tax purposes as a financing transaction, and the customer as the continuing owner of the securities.  In that case, Citigroup … may be obligated to the IRS or another tax authority for payment of tax that should have been withheld on payments of dividends or dividend equivalent amounts ….

"Citigroup's Tax Department promulgated transaction guidelines for TRSs on U.S. equities in order to minimize the risk that such transactions would be recharacterized as financings and subsequently lose their intended tax benefits.  The risk is mitigated principally by minimizing the chances that the underlying equities would be crossed back to customers. …

"[The Citigroup] Desk engaged in transactions in 2004 and 2005 in which it purchased U.S. … equities directly from customers … and then resold the equities back to the customers upon termination of the TRSs, either directly or through interdealer brokers."[282]

This letter shows that Citi knowingly used total return swaps to enable its offshore clients to dodge U.S. taxes on their stock dividends.  The letter also makes it clear that, as part of its dividend uplift transactions, Citi often took physical possession of the shares of stock that were the subject of the swap, and then returned the shares to the client after the swap ended, in violation of its own stated policies.  The letter shows that Citi was aware that this practice could lead to a determination that the client never really gave up ownership of the stock during the swap transaction, that Citi was really engaged in a stock loan, and that the real purpose of the transaction was to enable Citi to pass through stock dividend payments to the client tax free.  The letter explains that, to avoid this outcome, Citi had promulgated transaction guidelines which consisted principally of telling its employees not to return stock to a client after a dividend uplift swap concluded.

Despite these guidelines, Citi employees on the Equity Finance Desk apparently let clients know that Citi would re-deliver stock to them at the end of a dividend uplift swap.  This

---

[282] Id. at 739-740.

practice was apparently uncovered after Citi's Internal Audit Department raised questions about whether certain dividend uplift swaps being conducted by the Equity Finance Desk complied with Citi's tax guidelines.  That audit led to an investigation by outside counsel[283] which led, in turn, to Citi's deciding to disclose certain swap transactions to the IRS and offer to pay withholding tax on the dividend equivalent payments that had been provided to clients.  The IRS, after receiving the disclosure from Citi, required the bank to provide additional information about the identified swaps and analyze other transactions as well.

**Citi Analysis.**  Citi told the IRS that "extensive interviews" conducted in connection with its investigation had led it to conclude that "as to some total return swap transactions, there was an apparent understanding at the inception of the trade that the shares would effectively be delivered back to the counterparty at the termination of the trade through the use of a large volume market-on-close order, a direct cross to the counterparty, or an effective sale to the counterparty by way of an inter-dealer broker."[284]  Citi said that two employees on its Equity Finance business unit were responsible for those "understandings" and had been subjected to "disciplinary action" as a result.[285]

Citi told the IRS that, because of the prior understanding that Citi would re-deliver purchased shares to a client at the close of the swap transaction, Citi had determined that those swaps could be recharacterized as stock repurchase agreements or securities loans,[286] and withholding tax could be assessed with respect to the dividend equivalent amounts that had been paid under the swaps.[287]  Citi also noted that these transactions "were not in full compliance with" its Tax Policy Guidelines, which had been designed to ensure that its equity swaps would not incur these types of taxes.[288]

Citi told the IRS that all of the swaps in question had been executed by its broker-dealers in the United Kingdom, which meant that the applicable dividend withholding tax rate was

---

[283] According to Citigroup representatives, the investigation examined all total return swaps entered into during the 2003-2005 time period and involving U.S. dividend-paying securities and non-U.S. parties.

[284] Citigroup memorandum to the IRS, re "IRS Withholding Tax Examination (2003-2005): Total Return Swaps over US Equities" (June 14, 2007), Bates No. CITI_PSIWHTAX001208-29 (hereinafter "Citi Memorandum to IRS"), at 1209-10.

[285] Id. at 1210.  Another document indicates that the disciplinary action taken with respect to one of the Citi employees was to suspend him from his position for two months.   See Letter from Citigroup to the New York Stock Exchange, (Feb. 1, 2007), and attachments, Bates No. CITI_PSIWHTAX000738-43, at 741.

[286] Citi Memorandum to IRS, at 1210.

[287] Id. at 1208.

[288] Id. at 1209.  Citi's "Tax Policy Guidelines for Total Return Swaps on US Equities" (Dec. 1, 2003) can be found at 1214.

15%.[289]   After applying this 15% rate to the $160 million in dividend payments, Citi paid the IRS withholding taxes totaling $24 million.

While Citi's payment of withholding taxes to the IRS could be viewed as an admission of wrongdoing, Citi states in its memorandum to the IRS that it had "decided to pay US withholding tax on the dividend equivalent amounts that had been paid under the transactions, even though the tax liability was uncertain."[290]

**Excluded Transactions.**   While Citi took the initiative to pay withholding taxes for certain equity swaps, Citi declined to take the same action with respect to other swap transactions identified in its review as exhibiting troubling practices.   The transactions, most of which were transacted with hedge funds, were conducted through Citi's Equity Finance business unit and generated dividends of $239 million.   Citi's rational for not paying withholding on those transactions was that there was no apparent understanding at the inception of the trade that the counterparty would seek return of the shares at the termination of the swap:

> "The Equity Finance transactions for which Citi did not pay withholding taxes included those transactions where it was unclear at the inception of the trade whether the counterparty would seek delivery of the shares back at the termination of the trade and, accordingly, there was generally no apparent understanding at the inception of the trade regarding possible re-delivery of the shares upon termination. These transactions involved approximately $239M of dividends, and were not executed with UK broker-dealers. Interviews indicated that most of these transactions were executed with hedge funds. Typically, the hedge funds were more interested in synthetic exposure, rather than delivery and re-delivery of shares."[291]

However, many of those transactions included activities that raise concerns and are identified as "Red Flags" in this Report:

> "As noted in Citi's letter dated March 2, 2007, however, the transactions on which no withholding taxes were paid did include: (1) transactions where Citi purchased shares from the swap counterparty at inception of the swap and sold shares to the counterparty upon termination of the swap, (2) transactions where Citi purchased shares from and/or sold shares to an IDB, and (3) transactions where Citi purchased shares on an exchange (including shares purchased pursuant to market-on-close orders) at inception of the swap and/or sold shares on an exchange (including shares sold pursuant to market-on-close orders) upon termination of the swap. However, as stated above, there was generally no apparent understanding at

---

[289] Id. at 1210.

[290] Id.

[291] Id. at 1211.

the inception of the swap to deliver shares back to the counterparty at the termination of the trade."[292]

Citi also declined to pay withholding tax on equity swaps which had been conducted by its Equity Derivatives business unit and were tied to U.S. stock that paid another $36 million in dividends. Citi told the IRS that it had decided not to pay withholding taxes for these swaps, because the transactions were "not clustered around dividend record dates" or "generally did not appear to involve an understanding regarding delivery of the shares back to the counterparty at the inception of the trades." [293]

Finally, Citi told the IRS that it was not identifying any transactions involving "security lending transactions, even though Citigroup also engaged in such transactions, because we believe these other transactions are not the focus of your present examination."[294] Evidence uncovered by the Subcommittee indicates, however, that stock loan transactions have been used by U.S. financial institutions on many occasions to enable clients to dodge payment of U.S. dividend taxes.

In August of 2007, Citi reported to the IRS that it had identified additional transactions that had been conducted by its Derivatives Unit in which dividends had been paid but no taxes withheld. They consisted of 15 trades, all involving Microsoft stock, which had generated $5.7 million in dividends.[295]

**Case History Implications.** The Citi case history is significant for at least three reasons. First, it provides additional evidence related to the amount of tax revenues lost due to nonpayment of dividend taxes. For a three-year period, 2003 to 2005, Citi acknowledged entering into equity swaps with non-U.S. clients tied to stock that paid dividends totaling about $440 million.[296] Normally, $440 million in dividends paid to non-U.S. persons would generate $50 million or more in dividend taxes depending upon whether the 15% or 30% dividend rate applied, but in these swap transactions, no dividend taxes were originally withheld on the ground that the taxable dividends had been transformed into tax-free dividend equivalents. Citi's $24 million payment to the IRS reflected its judgment that some of the dividend equivalent payments made to clients should have been treated as taxable dividends. This total would have been higher

---

[292] Id.

[293] Id.

[294] Letter from Citigroup to the IRS (Feb. 20, 2007), Bates No. CITI_PSIWHTAX001336-39, at 1337.

[295] Letter from Citigroup to the IRS (August 24, 2007), Bates No. CITI_PSIWHTAX001455.

[296] This $440 million figure is derived from four figures supplied by Citi to the IRS: $160 million in dividends paid on stocks for which Citi issued equity swaps and decided to pay withholding taxes; $239 million in dividends paid on stocks for which Citi issued equity swaps and bought and returned stock to its clients but declined to pay withholding taxes; $36 million in dividends paid on additional equity swaps conducted by its Equity Derivatives business unit and for which Citi declined to pay withholding taxes; and $5.7 million in dividend-related payments in swap transaction related to the Microsoft special dividend.

if some of the dividend equivalent payments made in connection with some of the other troubling swaps were also subjected to withholding.  The total would also have been higher had the analysis included consideration of Citi's stock loan transactions.

The Citi case history is also significant, because it shows how commonplace dividend enhancement products have become.  In conducting analysis for the IRS, Citi examined over 6,000 total return swap transactions from 2003 to 2005, involving U.S. dividend-paying securities and non-U.S. clients.[297]  Of those 6,000 swaps, Citi subsequently paid withholding taxes on about 1,350.  Citi also admitted participating in stock loan transactions tied to U.S. dividend-paying stock, but did not specify the total number of stock loans or the total amount of dividends or substitute dividend payments involved.[298]  Together, the Citi documents indicate that swaps and stock loan transactions tied to dividend-paying stock are in routine use across Citi business units, are popular with clients, and serve as potential vehicles for dividend tax abuse.

Finally, the Citi case history makes it clear that U.S. financial institutions are aware of the tax risks associated with their participation in transactions tied to dividend-paying stock.  In this instance, Citi developed tax policy guidelines in 2003 for total return swaps tied to U.S. stock, because it wanted "to ensure that Citi's transactions did not come anywhere remotely close" to transactions that could be characterized as stock repurchase agreements or securities loans.[299] Citi's Internal Audit Department chose to conduct a review of the bank's equity swaps and found many that failed to comply with Citi's tax policy.  Citi then performed a detailed analysis of those swaps and determined that the facts were so troubling for certain swaps involving $160 million in dividend payments, that the better course of action was for Citi to pay $24 million in withholding taxes to the IRS.

---

[297] See, e.g., Form 4564 filed by Citigroup with the IRS, (Nov. 19, 2007), Bates No. CITI_PSIWHTAX001625-26 (stating Citi paid withholding tax on 1,352 total return swaps, but not on 4,720 other total return swaps); Memorandum from Citigroup to the IRS (March 21, 2007), Bates No. CITI_PSIWHTAX001340-80; Memorandum from Citigroup to the IRS (August 24, 2007), Bates No. CITI_PSIWHTAX001455-56.

[298] Letter from Citigroup to the IRS (Feb. 20, 2007), Bates No. CITI_PSIWHTAX001336-39,  at 1337.

[299] Citi Memorandum to IRS, at 1212.

IV.    **U.S. GOVERNMENT RESPONSE TO ABUSIVE
       DIVIDEND TAX TRANSACTIONS**

The six case histories examined in this Report show that abusive dividend tax transactions first began to appear in the United States in the 1990s, and gradually expanded over the next ten years to multiple U.S. financial institutions and offshore entities.  Milestones included the 1991 Treasury rule making swap payments to non-U.S. persons tax free; the 1997 IRS Notice which gave rise to new abusive stock loan transactions; the 2003 lowering of the individual U.S. dividend tax rate which encouraged U.S. firms to issue more dividends; the 2004 Microsoft special dividend which led to a burst of abusive transactions; and the development of financial instruments with features designed to disguise their objective of enabling offshore hedge funds and others to dodge U.S. dividend taxes.  Using names like "dividend enhancement," "yield enhancement," and "dividend uplift," abusive dividend tax transactions have become commonplace among U.S. financial institutions and offshore clinets, and continue to this day.

Many of the documents obtained by the Subcommittee show that the participating U.S. financial institutions and offshore hedge funds were well aware of the tax risks associated with their dividend-related transactions and took actions to limit their tax exposure.  Some set annual monetary limits on the amount of unpaid dividends that could be associated with their transactions.  Some clients obtained tax indemnity agreements.  Tax experts wrote articles highlighting the problem of abusive dividend tax transactions.

Despite the pervasiveness of the problem over the last ten years, the U.S. government has done little to stop the use of abusive dividend tax transactions.  In 1997, the IRS promised to issue guidance on "how substitute dividend payments made by one foreign person to another foreign person are to be treated," but never did.

Due to their inaction on the issue of offshore dividend tax abuse, Treasury and the IRS have failed to send the signals needed to curb the development, marketing, and implementation of "dividend enhancement" transactions aimed at enabling clients to avoid payment of U.S. dividend taxes.  Until Treasury and the IRS make their position known, in writing and through enforcement actions, that dividend enhancement transactions are impermissible, U.S. financial institutions will continue to offer these transactions, dividends will continue to be paid offshore under the guise of tax-free swap payments and substitute dividends, and offshore holders of U.S. securities will continue to dodge paying their fair share of taxes, leaving ordinary Americans to shoulder the U.S. tax burden.

Treasury and the IRS can and should do more to enforce current law.  First, the IRS should complete its pending review of dividend-related transactions and take civil enforcement action against delinquent taxpayers and the U.S. financial institutions that have participated in stock swap and loan transactions aimed at dodging U.S. taxes on stock dividends.

Second, to stop misuse of stock loan transactions to dodge U.S. dividend taxes, the IRS should issue a new regulation on the tax treatment of substitute dividend payments between foreign parties to make clear that inserting an offshore entity into a stock loan transaction does not eliminate U.S. tax withholding obligations.

Third, to stop misuse of equity swap transactions to dodge U.S. dividend taxes, the IRS should issue a new regulation to make dividend equivalent payments under equity swap transactions taxable to the same extent as U.S. stock dividends.

Fourth, Congress should do its part by enacting legislation making it clear that non-U.S. persons cannot avoid U.S. dividend taxes by using a swap or stock loan to disguise dividend payments.  This legislation should end the abuse by eliminating the different tax rules for U.S. stock dividends, dividend equivalents, and substitute dividend payments, and making them all equally taxable in the same way as dividends.  Like Treasury and the IRS, Congress has not sent a clear signal that these abusive transactions distort the law, were never intended by the tax code, and have robbed the U.S. Treasury of tax revenues totaling billions of dollars.  Enactment of clarifying legislation would send a clear signal that abusive dividend tax transactions are unacceptable, strengthen the enforcement authority of the IRS, and help put an end to this particular offshore tax abuse.

## V.      ADDITIONAL MINORITY STAFF VIEWS ON THE REPORT

The factual findings presented in this bipartisan report are compelling and raise valid concerns that demonstrate the need to reevaluate the wisdom and effectiveness of certain tax laws and policies respecting the treatment of specific equity swap and loan transactions.  The Subcommittee's investigation has revealed that, under specific facts and circumstances, a subset of such transactions may result in inappropriate non-payment of U.S. dividend taxes.  We recognize that, for a foreign investor, there is a significant difference in the U.S. withholding tax consequences between investing synthetically through an equity swap versus investing directly in physical, U.S. equities and that this difference in treatment has led to certain abuses.  There is no doubt that some institutions, in certain transactions, have pushed the tax-avoidance envelope too aggressively.

We believe, however, that articulating specific legislative or regulatory responses to these abuses requires a more comprehensive and in-depth analysis than this Report provides.  Experts on tax law and policy are better equipped than we to arrive at an appropriate response.  In light of the Subcommittee's findings, those experts, the relevant executive branch agencies, and the Congressional committees of jurisdiction should engage in a deliberative process to evaluate the various possible responses and determine the most appropriate path.

Therefore, we join with the Majority in this analysis insofar as it identifies and diagnoses the problem.  We strongly urge, however, that any response to these abuses be clearly defined and carefully targeted to preserve the integrity and efficiency of our capital markets, prevent negative impact on foreign investment in the United States, and avoid unintended consequences.